**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

DEMOCRATIC NATIONAL COMMITTEE,
430 South Capitol Street SE
Washington, DC 20003;

Plaintiff,

v.

DONALD J. TRUMP, in his official capacity as President of the United States
1600 Pennsylvania Avenue NW
Washington, DC 20500;

THE WHITE HOUSE OFFICE
1600 Pennsylvania Avenue NW
Washington, DC 20500;

OFFICE OF MANAGEMENT AND BUDGET
725 17th Street NW
Washington, DC 20502;

and

U.S. DEPARTMENT OF HOMELAND SECURITY
2707 Martin Luther King Jr. Ave SE
Washington, DC 20528

Defendants.

Civil Action No. 1:26-cv-3506

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

The Democratic National Committee, plaintiff herein, alleges:

1. The Trump Administration is using taxpayer dollars to air political advertisements, a blatant violation of the statutory ban on the use of appropriations for "publicity or propaganda purposes." President Trump personally directed this illegal activity. The White House Office crafted the partisan campaign. The Office of Management and Budget shifted $20 million to pay

for it. And U.S. Customs and Border Protection (CBP) has carried it out. These unlawful actions are *ultra vires* and violate the Administrative Procedure Act (APA).

2. President Trump's political propaganda ads are an attempt to resuscitate his historically low approval ratings and avoid widespread Republican defeats in the 2026 midterm election. The President has nationalized the midterm election, made himself the center of a two-day "midterm convention," and repeatedly directed voters to "pretend that I am on the ballot." As the 2026 midterm election has approached, Republican poll numbers have plummeted in both traditional battlegrounds and typically favorable states, and Democrats are poised to take control of Congress, governor's mansions, and state legislatures around the country.

3. In late September 2026, advertisements began to appear on broadcast television, touting President Trump and his midterm messaging, including one that is virtually identical to a 2024 campaign ad. Each ends with the statement, "Paid for by the U.S. Government." These ads are a clear violation of the Congressional ban on the use of appropriated funds for "publicity or propaganda purposes."

4. The Democratic National Committee (DNC) is working to defeat President Trump's allies at the polls in all fifty states, up and down the ballot, and shares a unity of interests with Democratic candidates. The Trump Administration's illegal use of taxpayer dollars for campaign-style advertisements deprives the DNC of a fair electoral process by adding public funds to the resources available to support Republican candidates. The use of public funds also places the DNC and Democratic candidates at an electoral disadvantage, even though the publicly funded propaganda advertisements are deeply unpopular with American voters, by preserving funds held by campaign committees and PACs—including MAGA Inc.—for other political expenditures.

5. Facing intense bipartisan backlash, President Trump announced on October 5, 2026 that he was planning to have MAGA Inc., a super PAC the President effectively controls, pay for these propaganda ads "moving forward." And yet for the next two days, the ads have continued to air, still labeled "Paid for by the U.S. Government." With less than 30 days remaining before the midterm election and millions of public dollars apportioned to pay for propaganda ads still unspent, the DNC has no choice but to take action in defense of free and fair elections.

## JURISDICTION AND VENUE

6. This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331.

7. Venue is proper under 28 U.S.C. §§ 88 and 1391(e), as Defendants are located in Washington, DC, within this District, and a substantial part of the events or omissions giving rise to the DNC's claim occurred here.

## PARTIES

8. The Democratic National Committee (DNC) is the oldest continuing party committee in the United States and is the Democratic Party's national committee, as defined by 52 U.S.C. § 30101(14). The DNC is dedicated to electing Democratic candidates in federal, state, and local elections across the country. In support of its mission, the DNC solicits contributions and makes expenditures—both independently of and in coordination with individual candidates—to support Democratic campaigns and committees. In the 2024 election cycle, the DNC raised and spent over $650 million.

9. Donald J. Trump is the President of the United States and is sued in his official capacity. President Trump personally directed the partisan propaganda campaign at issue in this litigation.

10. The White House Office is an office within the Executive Office of the President of the United States. The White House Office is headquartered in Washington, D.C. Departments within the White House Office include the Office of Digital Strategy and the Office of Communications.

11. The Office of Management and Budget (OMB) is an office within the Executive Office of the President of the United States. OMB is headquartered in Washington, D.C. OMB is an agency within the meaning of the APA, 5 U.S.C. § 551(1).

12. The U.S. Department of Homeland Security (DHS) is a federal agency headquartered in Washington, D.C. DHS is an agency within the meaning of the APA, 5 U.S.C. § 551(1). U.S. Customs and Border Protection (CBP) is a component agency within DHS.

## LEGAL FRAMEWORK

### I. The "Publicity or Propaganda" Prohibition

13. The Consolidated Appropriations Act for FY2026 mandates, "No part of any appropriation contained in this or any other Act shall be used directly or indirectly, including by private contractor, for publicity or propaganda purposes within the United States not heretofore authorized by Congress." Pub. L. No. 119-75, § 718, 140 Stat. 173, 495 (2026).

14. Most appropriations statutes since 1951 have contained similar "publicity or propaganda" riders, which apply to all governmental entities receiving appropriated funds. *See, e.g.*, An Act Making Appropriations for the Department of Labor, the Federal Security Agency, and Related Independent Agencies, for the Fiscal Year Ending June 30, 1952, Pub. L. No. 82-134, ch. 373, § 702, 65 Stat. 209, 223 (1951).

15. The Government Accountability Office (GAO) has issued extensive guidance concerning the "publicity or propaganda prohibition" in its multivolume treatise, *Principles of*

*Federal Appropriations Law*, also known as the Red Book. *See* GAO, *Principles of Federal Appropriations Law* 3-278 to 3-305 (4th ed. 2017).

16. GAO has identified three activities that are prohibited by the publicity or propaganda prohibition—self-aggrandizement, covert propaganda, and purely partisan materials. *Id.* at 3-282.

17. GAO defines self-aggrandizement as "publicity of a nature tending to emphasize the importance of the agency or activity in question." *Id.* at 3-284.

18. GAO defines "purely partisan materials" as those "designed to aid a political party or candidate," which are typically "completely devoid of any connection with official functions." *Id.* at 3-293 to 3-294.

**II. The Antideficiency Act and the Purpose Act**

19. "Our Constitution gives Congress control over the public fisc." *CFPB v. Cmty. Fin. Servs. Ass'n of Am.*, 601 U.S. 416, 420 (2024).

20. Article I both empowers Congress "to pay the Debts and provide for the common Defence and general Welfare of the United States," and commands that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations Made by Law." U.S. Const. art. I, § 8, cl. 1; *id.* § 9, cl.7; *see also* GAO, *Principles of Federal Appropriations Law* 6-34 (3d ed. 2006).

21. To protect this constitutional authority, the Antideficiency Act and related funding statutes "[restrict] in every possible way the expenditures and expenses and liabilities of the government, so far as executive offices are concerned, to the specific appropriations for each fiscal year." *Wilder's Case*, 16 Ct. Cl. 528, 543 (1880).

22. The Antideficiency Act, 31 U.S.C. §§ 1341–42, 1517, is "the cornerstone of Congressional efforts to bind the Executive branch of government to the limits on expenditure of appropriated funds." *Principles of Federal Appropriations Law*, at 6-34 (internal citation and quotation marks omitted).

23. Relevant here, the Antideficiency Act directs that no "officer or employee of the United States Government" may "make or authorize an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation." 31 U.S.C. § 1341(a)(1)(A).

24. The Antideficiency Act further directs that no "officer or employee of the United States Government" may "involve either government in a contract or obligation for the payment of money before an appropriation is made unless authorized by law." 31 U.S.C. § 1341(a)(1)(B).

25. Finally, the Antideficiency Act directs that an "officer or employee of the United States Government or of the District of Columbia government may not make or authorize an expenditure or obligation exceeding an apportionment." 31 U.S.C. § 1517.

26. The Purpose Statute, 31 U.S.C. § 1301(a), dictates that "Appropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law."

27. Effectively, the Purpose Statute "prohibits charging authorized items to the wrong appropriation, and unauthorized items to any appropriation." GAO, *Principles of Federal Appropriations Law* 4-6 (3d ed. 2006).

28. "Although every violation of [The Purpose Statute] is not automatically a violation of the Antideficiency Act, and every violation of the Antideficiency Act is not automatically a violation of [The Purpose Statute], cases frequently involve elements of both. *Id.* at 4-9.

## III. The Administrative Procedure Act

29. The Administrative Procedure Act establishes a fair and uniform framework for federal agency rulemaking and adjudication, ensures public participation, and guarantees broad judicial review of final agency action. *See* 5 U.S.C. §§ 551–59, 701–06.

30. The APA permits judicial review of any final agency action for which there is no other adequate remedy in a court. 5 U.S.C. § 704.

31. The APA then authorizes courts to hold unlawful and set aside agency action, findings, or conclusions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

32. The APA further authorizes courts to hold unlawful and set aside agency action, findings, or conclusions found to be "in excess of statutory jurisdiction, authority, or limitations or short of statutory right." 5 U.S.C. § 706(2)(C).

## IV. *Ultra Vires* Review

33. "The acts of all [executive] officers must be justified by some law, and in case an official violates the law to the injury of an individual the courts generally have jurisdiction to grant relief. . . . Otherwise the individual is left to the absolutely uncontrolled and arbitrary action of a public and administrative officer, whose action is unauthorized by any law, and is in violation of the rights of the individual." *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 108, 110 (1902).

34. Thus, "[w]hen an executive acts *ultra vires*, courts are normally available to reestablish the limits on his authority." *Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988). "Nothing in the subsequent enactment of the APA altered the *McAnnulty* doctrine of review." *Id.*

35. "That the 'executive's' action . . . is essentially that of the President does not insulate the entire executive branch from judicial review." *Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996).

36. "Such review, commonly known as an *ultra vires* claim, is available where (i) there is no express statutory preclusion of all judicial review; (ii) there is no alternative procedure for review of the statutory claim; and (iii) the agency plainly acts in excess of its delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory." *Fed. Express Corp. v. U.S. Dep't of Commerce*, 39 F.4th 756, 763 (D.C. Cir. 2022) (internal citation and quotation marks omitted).

## <u>ALLEGATIONS</u>

### I. President Trump Nationalizes the 2026 Midterm Election.

37. At the start of 2025, Republicans held narrow majorities in both the House and Senate. Typically, the party controlling the White House loses Congressional seats during midterm elections. This endangered Republican control and President Trump's ability to avoid oversight.

38. In response, President Trump chose to place himself at the center of the Republican Party's 2026 midterm strategy, to the chagrin of many Republican candidates.

39. President Trump has repeatedly urged his supporters to "pretend that I'm on the ballot." Speaking of himself in the third person, President Trump made this specific plea on Fox News: "When he's out of the ballot, the people don't go to vote, and I'm asking the people . . . to get out and vote. Pretend I'm on the ballot."

40. President Trump has also warned that Democratic control of Congress would result in his impeachment.

41. The 2026 Republican Midterm Convention embodied this campaign strategy. President Trump spoke on both nights of the Convention, with each speech lasting over an hour and a half.

42. In his speech on the first night of the Convention, President Trump claimed that Democratic Party had nominated “radical left communists” and that the United States would become “a communist country if they win.”

43. President Trump’s speech on the second night of the Convention culminated in a demand that his supporters commit to vote on November 3 and repeat the following pledge: “I pledge to the greatest president in the history of the United States, that loves us so much we can’t even breathe, that I will go out with my family, my friends. I’ll do it any way, I don't care if I’m registered or not, I’m going to try and cheat like hell like they do.”

44. During the Convention, President Trump also pleaded with attendees and viewers to “pretend that I’m on the ballot. I’m on the ballot. I’m on. Just one more time.”

45. This political strategy holds serious political risks, particularly in light of the President’s historically low approval ratings.

46. At the time of the Midterm Convention, President Trump’s approval ratings averaged approximately 38% percent among reliable polls. They have only fallen since. A Reuters/Ipsos poll released on October 5, 2026 found that President Trump had a record low approval rating of 32%.

47. President Trump has frequently expressed frustration that the public does not fully understand or appreciate his success. He has attributed public disapproval to media bias and ingratitude among Americans.

48. In response, President Trump and his allies have searched for ways to promote his perceived achievements, restore some measure of popular approval for his Administration, and save Republicans from overwhelming defeat in the midterm election.

**II. The White House and DHS Release Propaganda Ads.**

49. Since early August, President Trump and his advisers have been considering spending money from MAGA Inc., a super PAC he effectively controls, to support Republican candidates during the November 2026 elections.

50. During an August 2026 meeting, President Trump showed his advisers videos made by the White House Office, indicating that he favored the imagery in those videos. The White House Office videos focused on President Trump in front of crowds and alongside military hardware. The voiceovers showered President Trump with praise.

51. The White House Office has created these campaign-style videos since at least August 2026. They have then appeared on both President Trump's personal social media accounts and official White House accounts.

52. President Trump subsequently decided to air the ads on television, paid for with public funds, and selected which propaganda ads to air.

53. President Trump personally instructed the Director of the Office of Management and Budget (OMB), Russ Vought, to find a way to fund the propaganda ads on television. OMB subsequently apportioned $20 million of Customs and Border Protection (CBP) funds to be spent on President Trump's propaganda campaign.

54. The decision to air the propaganda ads was made in early September, and the propaganda ads began rolling out on television on September 23, 2026.

55. President Trump's propaganda ads have aired across the country, including in Albany, Chicago, Los Angeles, Miami, New York City, Philadelphia, and Washington, D.C. and across a range of television networks, including ABC, NBC, MS Now, CBS, CNN, Fox News, and Newsmax.

56. The propaganda ads have targeted various television programming, including NFL and college football, news programs including "Meet the Press" and "Good Morning America," and entertainment shows including "Jimmy Kimmel Live!," Saturday Night Live, and Dancing with the Stars.

57. The propaganda ads have aired in media markets where competitive congressional elections are being held.

58. The propaganda ads are an attempt to aggrandize the President and to portray the President and the Republican Party in a beneficial light. They also echo campaign themes presented by the Republican Party at the Midterm Convention and in other contexts. The partisan aim of the propaganda ads is beyond question.

**A. The Love Me Ad**

59. On September 23, 2026, the first propaganda ad aired. The Trump Administration titled the ad "The Country He Loves." Public reporting has referred to the advertisement as the Love Me Ad because it features an unauthorized use of the song "Love Me" by JMSN (Christian Berishaj).

60. The Love Me Ad flips rapidly through pictures and videos of President Trump over audio of him denouncing communism and socialism.

61. President Trump's narration is captioned throughout the Love Me Ad, including the following statement: "Together we will defeat communism, socialism, and Marxism in America. America will never be a communist country."

62. The Love Me Ad displays purely partisan statements to advance President Trump and Republicans' electoral strategy for the November 2026 elections. These statements include "Largest tax cuts in history," "Reigniting American manufacturing," "Defend law and order and police."

63. Images displayed in the Love Me Ad include stills of FIFA President Gianni Infantino awarding President Trump the so-called "FIFA Peace Prize," President Trump in a hat that says "Gulf of America," and President Trump delivering speeches to crowds.

64. Throughout the Love Me Ad, the introduction of the song "Love Me" by JMSN plays. The Ad uses the following lyrics: "Love me, love me, love me, love me | Oh, baby | Love me (love me), love me (love me) | Love me (yeah, yeah, yeah), love me (yeah, yeah) | Oh baby (love me), oh, love me (love me), love me (love me) | Yeah, yeah, yeah, yeah, yeah, yeah."

65. The Love Me Ad then offers a rousing claim from President Trump's political supporter, Ultimate Fighting Championship (UFC) CEO Dana White, that President Trump is "the toughest, most resilient person that I've ever met, and nothing was going to stop him from fighting so hard for the country he loves." As Mr. White's statement plays, clips of Mr. White and President Trump are displayed.

66. Mr. White's statement is cut from remarks he gave at President Trump's victory rally on the night before the 2025 Presidential Inauguration.

67. The Love Me Ad ends with a disclosure that it was "Paid for by the U.S. Government."

68. On September 1, 2026, the White House TikTok account had posted a video that contains the same text of claimed "accomplishments" and a similar fast-paced slideshow, albeit without the statement from Mr. White.

69. On September 11, 2026, the official White House YouTube channel posted the Love Me Ad in full without the "Paid for by the U.S. Government" notice. This occurred weeks before the ad aired on television.

70. The Love Me Ad provides no informational value to the American public. It is a pure tribute to President Trump and an attempt to sway voters in the weeks leading up to the November 2026 elections.

71. The Love Me Ad does not inform the public on the Trump Administration policies, justify Administration policies, or rebut attacks on Administration policies.

72. The Love Me Ad is "purely partisan" and "self-aggrandizement."

73. Use of Congressional appropriations to develop and air the Love Me Ad is a clear violation of federal law.

**B. The Maduro Ad**

74. The second propaganda ad (the Maduro Ad) began airing as early as the following day, on September 24, 2026. This ad focused on the military capture of Venezuelan President Nicolás Maduro.

75. The Maduro Ad has been aired in multiple versions, from 30 seconds to 60 seconds long.

76. The Maduro Ad is another clear instance of self-aggrandizement. It emphasizes unconstitutional and illegal strikes on Venezuela and the relative success of that campaign, as

compared to the ongoing conflict with Iran, which has been a political albatross for the Republican Party during the 2026 midterm election.

77. The Maduro Ad begins with Venezuelan President Nicolás Maduro giving a speech that he is waiting for President Trump to come get him. Maduro's statement is then interrupted by statements from Chairman of the Joint Chiefs of Staff General Dan Caine about the U.S.' military action in Caracas, Venezuela, while apparent clips of the raid to abduct President Maduro are displayed.

78. President Maduro is then shown blindfolded and handcuffed, and President Trump begins to speak calling the military action "one of the most stunning and effective" in American history.

79. The Maduro Ad ends with a clip of Secretary of State Marco Rubio flattering President Trump. Secretary Rubio states, "I don't understand yet how they haven't figured this out, and now if you don't know, now you know, because this is the way it's going to play out. And I think people need to understand that this is not a President that just talks and does letters and press conferences, and you know, if he says he's serious about something he means it, but don't play games, don't play games while this President is in office because it's not going to turn out well."

80. The Maduro Ad ends with a disclosure that it was "Paid for by the U.S. Government."

81. On September 11, 2026, President Trump posted a video nearly identical to the Maduro Ad on his Truth Social media account. The day after the Maduro Ad first aired on television, President Trump again posted the video on his Truth Social media account without the "Paid for by the U.S. Government" disclosure.

82. The Maduro Ad provides no informational value to the American public. It is a tribute to President Trump, a reminder of a relatively successful military campaign, a distraction from the ongoing conflict in Iran, and an attempt to sway voters in the weeks leading up to the November 2026 election.

83. The Maduro Ad does not inform the public on the Trump Administration policies, justify Administration policies, or rebut attacks on Administration policies.

84. The Maduro Ad is "purely partisan" and "self-aggrandizement."

85. Use of Congressional appropriations to develop and air the Maduro Ad is a clear violation of federal law.

**C. The Final Battle Ad**

86. The third propaganda ad (the Final Battle Ad) began airing over the weekend of September 26 and 27, 2026.

87. The Final Battle Ad is the clearest and most brazen example of partisan propaganda among the advertisements at issue.

88. The Final Battle Ad shows a black-and-white video of President Trump walking down a hallway, as a voiceover from President Trump plays.

89. During the Final Battle Ad, President Trump narrates, "This is the final battle. With you at my side, we will demolish the Deep State. We will expel the war mongers from our government. We will drive out the globalists; we will cast out the communists, Marxists, and fascists. We will throw off the sick political class that hates our country. We will route the fake news media, and we will liberate America from these villains once and for all."

90. The Final Battle Ad ends with a disclosure statement that it was "Paid for by the U.S. Government."

91. Upon information and belief, President Trump's voiceover in the Final Battle Ad comes from portions of a speech he gave at the 2023 Conservative Political Action Conference.

92. The Final Battle Ad is nearly identical to a political ad that President Trump used during his 2024 Presidential election campaign.

93. On January 12, 2024, President Trump's campaign committee paid to air an ad (the 2024 Campaign Ad) featuring the same visual and voiceover in support of his presidential election campaign.

94. The sole differences between the Final Battle Ad and the 2024 Campaign Ad are that the Final Battle Ad includes the disclosure that it is "Paid for by the U.S. Government" while the 2024 Campaign Ad ends with a graphic that says "Join President Trump's Fight for America" and then displays a second graphic of President Trump's 2024 campaign logo.

95. President Trump also used language nearly identical to the Final Battle Ad at a January 29, 2024 presidential campaign event in Las Vegas, Nevada.

96. The Final Battle Ad provides no informational value to the American public. It is a tribute to President Trump, an echo of his campaign theme that electing Democrats will bring "communism" to the United States, a vilifying attack on his perceived enemies, and an attempt to sway voters in the weeks leading up to the November 2026 elections.

97. The Final Battle Ad does not inform the public on the Trump Administration policies, justify Administration policies, or rebut attacks on Administration policies.

98. The Final Battle Ad is "purely partisan" and "self-aggrandizement."

99. Use of Congressional appropriations to develop and air the Final Battle Ad is a clear violation of federal law.

**D. The Mount Rushmore Ad**

100. The fourth propaganda ad began to air September 27, 2026. The White House's YouTube page titled this propaganda piece "Mount Rushmore."

101. The Mount Rushmore Ad is blatant self-aggrandizement of the President.

102. The Mount Rushmore Ad begins with President Trump's voice speaking while a crowd is displayed. President Trump's political campaign flag is also predominantly displayed.

103. The Mount Rushmore Ad continues with numerous angles of Mount Rushmore taken during a speech President Trump gave on July 3, 2026, followed by more video of the crowd.

104. The Mount Rushmore Ad contains the following remarks from President Trump:

> In all the chronicles of the ages, never before has any nation celebrated so magnificent a triumph as this one. We are the freest people on earth. And by the grace of God, the United States of America is the most successful, most accomplished, most exceptional nation ever to exist in human history. Liberty has prevailed here because of the culture and character of the people who declared it, defended it, and preserved it. We reach a milestone like no other and celebrate with joyful hearts and soaring spirits because after two and a half centuries, we know that this is not an ending. This is only the beginning of the golden age of America. God bless you all.

105. The Mount Rushmore Ad ends with a disclosure statement that it was "Paid for by the U.S. Government."

106. The same video was posted on the White House's official YouTube page on September 9, 2026, but without the "Paid for by the U.S. Government" disclosure.

107. The Mount Rushmore Ad provides no informational value to the American public. It is a tribute to President Trump and an attempt to cast President Trump as patriotic. It also displays President Trump's political campaign memorabilia. In sum, the Mount Rushmore Ad is an attempt to sway voters in the weeks leading up to the November 2026 elections.

108. The Mount Rushmore Ad does not inform the public on Trump Administration policies, justify Administration policies, or rebut attacks on Administration policies.

109. The Mount Rushmore Ad is "self-aggrandizement."

110. Use of Congressional appropriations to develop and air the Mount Rushmore Ad is a clear violation of federal law.

**E. The American Military Power Ad**

111. The fifth propaganda ad began to air on September 30, 2026. The White House's YouTube page titled this propaganda piece "American Military Power."

112. The American Military Power Ad resembles a move trailer for the Iran War.

113. The American Military Power Ad begins with an announcement of President Trump's authorization of Operation Epic Fury in Iran. As the ad continues, the lyrics to "Boom Boom" by John Lee Hooker begin. The ad plays the opening line "Boom, boom, boom, boom | I'm gonna shoot you right down | Right off your feet."

114. The American Military Power Ad then shows a clip of President Trump wearing his presidential campaign "Make America Great Again" baseball cap, including the numbers "45-47." The ad then begins rotating through clips of aircraft and watercraft preparing to engage in military action.

115. The American Military Power Ad incorporates President Trump's statement, "This regime will soon learn that no one should challenge the strength and might of the United States armed forces."

116. The American Military Power Ad continues with Secretary of Defense Pete Hegseth praising President Trump: "He reminded the world, as he has time and time again, being an American means something unbreakable."

117. The American Military Power Ad then displays bombs being dropped on Iran, while Secretary Hegseth continues, "If you kill Americans, if you threaten Americans anywhere on Earth, we will hunt you down without apology and without hesitation, and we will kill you."

118. The American Military Power Ad continues to display military action while Secretary Hegseth states, "We didn't start this war, but under President Trump we are finishing it."

119. The same video was posted on the White House's official YouTube page on September 11, 2026, but without the "Paid for by the U.S. Government" disclosure.

120. The American Military Power Ad provides no informational value to the American public. It is a tribute to President Trump and an attempt to counter widespread public disapproval of ongoing military actions in Iran, the Administration's failure to resolve the conflict, and the conflict's impact on prices in the United States. The American Military Power Ad is an attempt to sway voters in the weeks leading up to the November 2026 elections.

121. The American Military Power Ad does not inform the public on Trump Administration policies, justify Administration policies, or rebut attacks on Administration policies.

122. The American Military Power Ad is both "purely partisan" and "self-aggrandizement."

123. Use of Congressional appropriations to develop and air the American Military Power Ad is a clear violation of federal law.

**F. Future Propaganda Ads**

124. President Trump and the White House Office have already prepared additional propaganda ads, which may be aired as the November 2026 elections approach.

125. Including those addressed above, there are at least 13 campaign-style political ads in a Dropbox account controlled by LMD Agency Inc., the government contractor bringing the ads to air.

126. One additional ad is "UFC 250," which features the UFC fight held at the White House.

127. A second additional ad is "King of the Jungle," which shows a lion hunting in the wild and disparages President Trump's perceived political enemies, including President Barack Obama and other Democrats.

128. A third additional ad is "Resilience," which displays different points of President Trump's life, including announcing his candidacy for President in 2015; his 2023 mugshot from Fulton County, Georgia for election interference; and video of an assassination attempt during the 2024 election campaign.

129. A fourth additional ad is "God Made Trump," a three-minute propaganda piece previously shown during the Republican Midterm Convention. (Unlike the other ads, which the White House Office created, "God Made Trump" was made by President Trump's supporters during the 2024 Presidential election.)

130. Each ad in the Drobox account ends with "Paid for by the U.S. Government."

131. None of the additional ads provide informational value to the American public. Each is an attempt to sway voters in the weeks leading up to the November 2026 elections.

132. None of the additional ads inform the public on the Trump Administration policies, justify Administration policies, or rebut attacks on Administration policies.

133. The additional ads are both "purely partisan" and "self-aggrandizement."

134. Use of Congressional appropriations to develop the additional ads is a clear violation of federal law.

135. Any future use of Congressional appropriations to air the additional ads would be a clear violation of federal law.

**III. OMB and DHS Facilitate the Use of Apportioned Funds to Support Propaganda.**

136. There is no federal budget line item to create advertisements for partisan propaganda. As described above, the Consolidated Appropriations Act specifically bans use of appropriations for "publicity or propaganda purposes."

137. On September 19, 2026, Office of Management and Budget (OMB) approved $20 million in funds authorized by the One Big Beautiful Bill Act (OBBBA) funds for CBP to be apportioned to line item 6043, for "Comme[mo]rative Events." According to OMB, funds approved for line item 6043 are apportioned with the understanding that DHS will work with OMB to finalize a spend plan for the amounts appropriated in sections 90001, 90002 and 90004 of the OBBBA. Section 90001 apportions funds for border infrastructure, section 90002 apportions funds for CBP personnel, fleet vehicles and facilities, and section 90004 apportions funds for CBP border security technology, surveillance upgrades and "commemorating efforts and events related to border security." *See* OBBBA, Pub. L. No. 119-21, §§ 90001–04, 139 Stat. 73, 357-59 (2025).

138. Congress intended the commemorative events spending to be used for "Line-of-Duty death memorials, Department or agency anniversaries, and commendation ceremonies." *See* H.R. Rep. No. 119-06, at 792 (2025).

139. OMB officials, including OMB Director Russ Vought, approved the $20 apportionment for the purpose of paying to air the propaganda ads.

140. DHS officials, including Secretary of Homeland Security Markwayne Mullin, approved the use of DHS funds to air the propaganda ads.

141. On or about September 20, 2026, the Trump Administration contracted with LMD Agency, Inc., a marketing agency, to carry out a "National Media Campaign" during the subsequent year.

142. The Trump Administration awarded LMD Agency, Inc. a $20 million contract to air the propaganda ads in the remaining weeks before the November 2026 elections.

143. A second firm, LMO Advertising, purchased the airtime for the propaganda ads.

144. The funds were awarded by CBP's "mission support contracting division" and passed through the CBP Office of Public Affairs.

145. Between September 23 and September 27, 2026, the ads aired nearly 90 times across national television networks, including Fox, Newsmax, MS Now, and CBS. Ad-tracking firm iSpot.TV estimated that the Trump Administration spent $337,000 on these national placements.

146. During that same time, the ads aired on local television stations at least 2,311 times. Ad-tracking firm AdImpact estimated that the local television airings cost $1.4 million.

147. AdImpact has estimated that more than $2.5 million was spent on the propaganda ads during the first week of airing.

148. The Trump Administration has indicated that the propaganda ads will continue and intensify as Election Day approaches.

## IV. Broken Commitments to Shift Funding from Taxpayer Dollars to MAGA Inc.

149. Public reaction to the propaganda ads has been intensely negative.

150. According to a Reuters/Ipsos poll, roughly 86% of Americans—including 80% of Republicans—disapprove of using taxpayer dollars to fund campaign-style TV advertisements featuring President Trump ahead of the 2026 midterm election.

151. Congressional Democrats have resounding condemned the use of appropriations to support the propaganda ads.

152. Some Congressional Republicans—including Senate Majority Leader John Thune, Senator John Kennedy, and Representative Thomas Massie—have also voiced disapproval of the use of appropriations to support the propaganda ads.

153. In response to this bipartisan condemnation, the White House issued a press release on September 25, 2026 suggesting that the propaganda ads are "public service announcements." This is false under any plausible definition of "public service announcement."

154. The September 25 press release also stated that "President Trump is not on the ballot and there is not call to action." However, as noted above, President Trump has urged his voters to act as though he is on the ballot. Moreover, the timing of the ads in the lead-up to the 2026 midterm election establishes an implicit call to action.

155. The press release ends by claiming that "patriotism isn't partisan" and that the propaganda ads are "aimed at the country—not a line on the ballot." But patriots do not confuse love of country for love of one man.

156. The September 25 press release failed to quell backlash to the propaganda ads.

157. On October 5, 2026, President Trump posted on social media that he would no longer use federal funding to pay for the propaganda ads and instead would pay for them with MAGA Inc. funding. A White House official similarly said, "MAGA Inc. will pay for the . . . ads moving forward."

158. President Trump also explained that he would not reimburse the federal government for any federal funding already spent on the propaganda ads.

159. Nonetheless, the Maduro Ad continued to air on the morning of October 6. The ad continued to carry the disclosure, "Paid for by the U.S. Government."

160. Then in the evening of October 6, the Final Battle Ad aired during a national broadcast of "Dancing with the Stars" on ABC and Disney+. Once again, the ad carried the disclosure, "Paid for by the U.S. Government."

161. In the morning of October 7, the Final Battle Ad aired once more, during a broadcast of Fox & Friends. Again, the ad carried the disclosure, "Paid for by the U.S. Government."

162. In total, at least $100,000 in public funds has been spent on the propaganda ads since President Trump announced that MAGA Inc. would fund the ads going forward.

163. By continuing to use government funds, President Trump, the White House Office, OMB, and DHS are preserving MAGA Inc. funds for other uses in support of Republican candidates.

164. Several millions of dollars from the $20 million of apportioned funds being used by DHS to support propaganda ads have not yet been spent.

165. DHS continues to spend down the $20 million in apportioned funds, under its contract with LMD Agency.

## V. The Propaganda Ads Aims to Influence the 2026 Midterm Election.

166. The propaganda ads have been placed both nationwide and in specific media markets. Specifically, the propaganda ads have aired in markets where there are competitive contests in the November 2026 midterm election.

167. Even though President Trump is not a candidate in the November 2026 midterm election, his call on Americans to "pretend" that he is on the ballot is an attempt to bolster turnout among Republicans and Republican-leaning voters. Indeed, even after the September 25 press release noted that "President Trump is not on the ballot," President Trump said at a September 30 White House event, "If we are successful in winning the House and the Senate, which is very important. I hope you can believe that I'm running."

168. Vice President Vance, who is also not on the November 2026 ballot, has copied President Trump's theme. During an interview, Vice President Vance stated, "Give us another chance—or, give us another couple of years."

169. Other Republican leaders, including House Speaker Mike Johnson, and conservative commentators, including Sean Hannity, have reiterated the talking point that even if President Trump's name is not on the ballot, his performance over the last two years is.

170. RNC Chairman Joe Gruters has also followed this talking point. When asked if voters can pretend President Trump is on the ballot, he responded, "that's exactly what we need. We need the president to be on the ballot."

171. Thus, when challenged about the ads, a White House official stated that the ads are "reminding viewers that there has been a lot done during the first year and a half." The official also stated, "It runs the gamut of a lot of different messaging points. And it's messaging points that are our strongest points."

172. At the same time, MAGA Inc. is spending millions of dollars to support Republican candidates and oppose Democrats in the November 2026 election. Specifically, MAGA Inc. has already reported spending $30 million on the U.S. Senate race in Texas and more than $800,000 on the U.S. Senate race in South Carolina. MAGA Inc. has also announced investments in U.S.

Senate races in Alaska, Georgia, Michigan, New Hampshire, North Carolina, and Ohio and U.S. House races congressional races in Florida, New York, and Pennsylvania.

173. Every ad that is funded by Congressional appropriations rather than MAGA Inc. reserves resources for MAGA Inc. to use for partisan purposes, in support of Republican candidates and in opposition to Democrats in the 2026 midterm election and beyond.

## VI. The Propaganda Ads Undermine Free and Fair Elections.

174. The propaganda ads marshal government resources in support of the President's party in advance of the 2026 midterm election. This use of Congressional appropriations for partisan purposes violates the clear command of federal law. Fundamentally, the ads undermine free and fair elections.

175. The DNC has an interest in a fair elector process that is harmed by the propaganda ads and the illegal use of Congressional appropriations to develop and air them. The DNC is not a "common competitor[] in the economic marketplace. [Democratic] candidates seek to represent the people. And their interest in that prize cannot be severed from their interest in the electoral process—a process 'of the most fundamental significance under our constitutional structure.'" *Bost v. Ill. State Bd. of Elections*, 607 U.S. 71, 77 (2026) (quoting *Ill. Bd. of Elections v. Socialist Workers Pty.*, 440 U.S. 173, 184 (1979)).

### A. Direct Harm to the DNC

176. The Trump Administration's illegal propaganda campaign harms the DNC by forcing the DNC and Democratic candidates to compete in unlawfully structured elections.

177. "[C]andidates . . . have an interest in a fair process" and "suffer [a cognizable harm] when the process departs from the law." *Bost v. Ill. State Bd. of Elections*, 607 U.S. at 77. Even candidates who ultimately prevail suffer a concrete injury when laws "erode[] public confidence

that the election results reflect the people's will." *Id.* at 78; *see also id.* at 77 ("Win or lose, candidates suffer when the process departs from the law.").

178. In turn, "[p]olitical parties . . . occupy a unique position with a special relationship and unity of interest with candidates." *Nat'l Republican Senatorial Comm. v. FEC*, 146 S. Ct. 2404, 2425 (2026) (internal citation and quotation marks omitted); *see also id.* at 2418 (describing "the thoroughly intertwined relationship of parties and their candidates").

179. President Trump, the White House Office, OMB, and DHS have used appropriated funds and diverted CBP funding for a partisan propaganda campaign. Following a promise to cease using public funds and continue the ad campaign using a partisan super PAC, the Trump Administration has continued to air the ads at public expense and preserved MAGA Inc.'s funds for other political efforts adverse to Democratic candidates and the DNC. This alters campaign spending rules in ways that deprive "candidate[s] of a fair process." *Bost*, 146 S. Ct. at 520. That concrete injury is compounded by damage to the DNC's reputational interests, which depend on public confidence in free and fair elections.

**B. Competitive Harm**

180. The Trump Administration's illegal propaganda campaign also imposes a competitive harm on the DNC.

181. By using public funds to develop and air the propaganda ads after committing to continue to air the ads using funds from MAGA Inc., a super PAC controlled by the President, President Trump, the White House Office, OMB, and DHS are allowing MAGA Inc. to preserve funds for other partisan activities.

182. During the 2025-2026 federal election cycle, MAGA Inc. has expended more than $25,000,000 in support of Republican candidates and in opposition to Democratic candidates.

MAGA Inc. has invested in paid media, get-out-the-vote efforts, and direct voter communication. Every taxpayer dollar spent in support of the propaganda ads preserves a dollar to be spent in tight political races. As a result, the electoral prospects of Democratic campaigns necessarily suffer. *See Crawford v. Marion Cnty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007), *aff'd*, 553 U.S. 181 (2008).

183. This injury to the electoral prospects of Democratic candidates and campaigns is cognizable under Article III. *See, e.g.*, *Shays v. FEC*, 414 F.3d 76, 85–86 (D.C. Cir. 2005) (holding that candidates may challenge regulation that would "alter the environment in which rival parties defend their concrete interests . . . in winning reelection") (cleaned up); *LULAC v. Exec. Office of the President*, 808 F. Supp. 3d 29, 61 (D.D.C. 2025) (concluding that party affiliates had shown political competitor standing).

## CAUSES OF ACTION

### Count I: Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C)
### (OMB and DHS)

184. The DNC realleges and incorporates by reference the allegations set forth above.

185. The APA entitles "a person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action . . . to judicial review." 5 U.S.C. § 702.

186. The APA directs courts to hold unlawful and set aside agency actions that are found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations or short of statutory right. 5 U.S.C. § 706(2)(A), (C).

187. OMB's allocation of appropriated funds for the purpose of airing the propaganda ads is a "final agency action for which there is no other adequate remedy in a court," within the meaning of the APA. 5 U.S.C. § 704.

188. DHS's contracting and expenditure of appropriated funds to air the propaganda ads is "final agency action for which there is no other adequate remedy in a court," within the meaning of the APA. 5 U.S.C. § 704.

189. OMB's allocation and DHS's contracting and expenditure violate the statutory ban on use of appropriations for "publicity or propaganda purposes."

190. OMB's allocation and DHS's contracting and expenditure violate the Antideficiency Act and the Purpose Act.

191. OMB and DHS's actions, as alleged herein, are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law in violation of the APA.

192. OMB and DHS's actions, as alleged herein, are in excess of statutory jurisdiction, authority, or limitations or short of statutory right.

**Count II: *Ultra Vires***
**(President Trump and the White House Office)**

193. The DNC realleges and incorporates by reference the allegations set forth above.

194. *Ultra vires* review is available where (i) there is no express statutory preclusion of all judicial review; (ii) there is no alternative procedure for review of the statutory claim; and (iii) the agency plainly acts in excess of its delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory.

195. President Trump and the White House Office's use of taxpayer dollars to develop and air the propaganda ads violates the statutory ban on use of appropriations for "publicity or propaganda purposes."

196. Thus, President Trump and the White House Office's use of taxpayer dollars to develop and air the propaganda ads violates the Antideficiency Act and the Purpose Act.

197. These actions are plainly in excess of delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory.

198. Although the President and the White House Office are not agencies for purposes of the APA, there is no express statutory preclusion of all judicial review of their actions.

199. There is no alternative procedure for review of the statutory claim.

200. Accordingly, this Court may act in equity to "reestablish the limits on [the President's] authority." *Reich*, 74 F.3d at 1328 (quoting *Dart*, 828 F.2d at 224).

## **PRAYER FOR RELIEF**

WHEREFORE, the Democratic National Committee requests that this Court:

A. Declare that President Trump, the White House Office, OMB, and DHS acted unlawfully by developing and airing the propaganda ads using Congressionally appropriated funds;

B. Declaring that President Trump and the White House Office's actions were *ultra vires*;

C. Declaring that OMB and DHS's actions were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

D. Declaring that OMB and DHS's actions were in excess of statutory jurisdiction, authority, or limitations or short of statutory right;

E. Enjoin President Trump, the White House Office, OMB, and DHS from continuing to use appropriated funds to develop and air propaganda ads;

F. Award the DNC its costs, attorneys' fees, and other disbursements for this action; and

G. Grant any other relief this Court deems appropriate.

Dated: October 7, 2026

Respectfully submitted,

*/s/ Daniel J. Freeman*__________
Daniel J. Freeman
(Bar No. 90038422)
Democratic National Committee
430 South Capitol Street SE
Washington, DC 20003
(202) 863-8000
freemand@dnc.org