**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

DEMOCRATIC NATIONAL COMMITTEE,

Plaintiff,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, THE WHITE HOUSE OFFICE, OFFICE OF MANAGEMENT AND BUDGET, and U.S. DEPARTMENT OF HOMELAND SECURITY,

Defendants.

Civil Action No. 1:26-cv-3506 (LLA)

# MEMORANDUM IN SUPPORT OF THE DNC'S MOTION FOR A TEMPORARY RESTRAINING ORDER (OR PRELIMINARY INJUNCTION) AND § 705 STAY

# TABLE OF CONTENTS

INTRODUCTION ........ 1

BACKGROUND ........ 2

I. President Trump's Attempt to Influence the November 2026 Elections. ........ 2

II. OMB and CBP Diverted Federal Funds to Broadcast the Propaganda Ads. ........ 3

III. The Trump Administration Begins Airing the Propaganda Ads Using Federal Funds. ........ 4

A. The Propaganda Ads ........ 4

B. President Trump Breaks His Commitment to Use MAGA Inc. to Fund the Propaganda Ads. ........ 7

LEGAL STANDARD ........ 7

ARGUMENT ........ 8

I. The Democratic National Committee Is Likely to Succeed on the Merits. ........ 8

A. The Challenged Ads Are Prohibited "Publicity and Propaganda." ........ 9

B. Spending on the Propaganda Ads Violates the Antideficiency Act and the Purpose Act. ........ 12

C. Spending to Air the Propaganda Ads Violates the APA ........ 14

D. Spending to Develop and Air the Propaganda Ads Is *Ultra Vires*. ........ 16

E. The DNC Has Standing to Challenge the Propaganda Ads ........ 18

II. The Democratic National Committee Faces Irreparable Harm. ........ 21

III. The Balance of Equities and Public Interest Favor Temporary Relief. ........ 23

CONCLUSION ........ 25

## INTRODUCTION

The Trump Administration is using taxpayer dollars to air political advertisements, a blatant violation of the statutory ban on the use of appropriations for "publicity or propaganda purposes." President Trump personally directed this illegal activity. The White House Office crafted the campaign. The Office of Management and Budget shifted $20 million to pay for it. And U.S. Customs and Border Protection (CBP), a component of the U.S. Department of Homeland Security (DHS), has carried it out. These unlawful actions are *ultra vires* and violate the Administrative Procedure Act (APA). This Court can and should enter injunctive relief and a § 705 stay without delay.

The Democratic National Committee (DNC) is working to defeat President Trump's allies at the polls in all fifty states, up and down the ballot, and shares a unity of interests with Democratic candidates. The Trump Administration's illegal use of taxpayer dollars for campaign-style advertisements deprives the DNC of a fair electoral process and places the DNC and Democratic candidates at an electoral disadvantage, even though the publicly funded propaganda advertisements are deeply unpopular with American voters, by preserving funds held by campaign committees and PACs—including MAGA Inc.—for other political expenditures.

Facing intense bipartisan backlash, President Trump announced on October 5 that he planned to have MAGA Inc., a super PAC the President effectively controls, pay for these propaganda ads moving forward. And yet the ads have continued to air, still labeled "Paid for by the U.S. Government." With less than 30 days remaining before the midterm election and millions of public dollars apportioned to pay for the propaganda ads still unspent, the DNC faces immediate and irreparable injury, and the balance of equites and public interest demand an injunction.

Given the threat that Defendants will imminently spend down the remaining funds on additional unlawful ads, the DNC respectfully requests that this Court hold a hearing on this motion as early as possible and issue a temporary restraining order or preliminary injunction prohibiting the White House Office, OMB, and DHS from further use of appropriated funds for "publicity and propaganda" purposes, including the airing of the propaganda ads at issue, future use of propaganda ads developed at public expense, allocating funds to air such ads, and creating similar ads for future use, as well as stay related OMB and DHS action.

## BACKGROUND

President Trump directed illegal use of government funds to develop and air political propaganda, in an attempt to resuscitate his historically low approval ratings and influence the November 2026 elections. The White House Office, OMB, and CBP have carried that directive developing ads, shifting funds appropriated for other purposes to finance them, and purchasing airtime on which to broadcast them. The campaign is unprecedented in modern American history precisely because it is a clear violation of federal law.

### I. President Trump's Attempt to Influence the November 2026 Elections.

As President Trump faced historically low approval ratings in the months before the November 2026 midterm election, he has nonetheless aspired to become the centerpiece of Republican messaging. Weineshet M. Lindholm Declaration ("Lindholm Decl.") Ex. 21. President Trump has repeatedly called on his supporters to "pretend that I'm on the ballot" and warned that Democratic control of Congress would result in his impeachment. *Id.* Even though President Trump's name will not appear on the ballot, President Trump and Republican leaders know that his performance is. *Id.*

In an attempt to rescue Republican control of Congress and avoid oversight, President Trump began strategizing in early August on how to leverage the resources of MAGA Inc., a super

PAC he effectively controls. Lindholm Decl. Ex. 23. MAGA Inc. is already spending millions of dollars to support Republican candidates and oppose Democrats in the November 2026 election. Lindholm Decl. Ex. 14.

During an August 2026 meeting at the White House, President Trump showed advisors videos that showered him with praise, which had been made by the White House Office. . *See, e.g.*, Lindholm Decl. Exs. 3, 4, 6, 9, 11, 23. These campaign-style videos have appeared on official White House social media feeds since early August, as well as President Trump's personal social media accounts. *Id.* President Trump decided to use similar campaign-style videos (the Propaganda Ads), air them on television, and expend federal taxpayer dollars to pay for his propaganda. Lindholm Decl. Ex. 23.

## II. OMB and CBP Diverted Federal Funds to Broadcast the Propaganda Ads.

In the modern era, Congress has expressly prohibited any president or administration from using federal funds for campaign-style advertisements or political propaganda. To fund the ads, OMB allocated $20 million in CBP funds authorized by the One Big Beautiful Bill Act (OBBBA) to be apportioned for "Commemorative Events." Lindholm Decl. Ex. 15. This line item is intended to be used for "Line-of duty death memorial, Department or agency anniversaries, and commendation ceremonies." *See* OBBBA, Pub. L. No. 119-21 §§ 90001-04, 139 Stat. 73, 357-59 (2025).

The next day CBP entered into a $20 million contract with LMD Agency, Inc. to carry out a "National Media Campaign." Lindholm Decl. Ex. 15. The funds were awarded by CBP's Office of Public Affairs. *Id.* A second firm, LMO Advertising, made the purchases to air the ads on television. Lindholm Decl. Ex. 23. The ads began airing shortly thereafter and continue unabated. Lindholm Decl. ¶ 5 & Ex. 20.

## III. The Trump Administration Begins Airing the Propaganda Ads Using Federal Funds.

Over the past two weeks, the Trump Administration has organized a national political propaganda campaign funded by federal taxpayer dollars. To date, the Administration has launched five campaign-style political ads and has attempted to pass them off as "public service announcements." Lindholm Decl. Exs. 2, 5, 7, 8, 10. The Trump Administration's propaganda ad blitz has stretched across the country in an attempt to influence the November 2026 elections.

### A. The Propaganda Ads

President Trump aired the first Propaganda Ad (the Love Me Ad) on September 23, 2026. Lindholm Decl. ¶ 5, Ex. 2. The ad features photos of President Trump, while the introduction of the song "Love Me" by JMSN plays. *Id.* President Trump's voiceover during the ad states "Together we will defeat communism, socialism, and Marxism in America. America will never be a communist country." *Id.* As pictures of President Trump are rapidly shown, the ad flashes through a series of purported accomplishments, such as the "largest tax cuts in history," "reigniting American manufacturing," and "defend law and order and police." *Id.* The Love Me Ad ends with closing remarks by Ultimate Fighting Championship (UFC) CEO Dana White calling President Trump "the toughest, most resilient person that I've ever met, and nothing was going to stop him from fighting so hard for the country he loves." *Id.* As it ends, a disclosure appears stating "Paid for by the U.S. Government." *Id.* The same ad—without the disclosure—is also on President Trump and the White House's social media accounts. Lindholm Decl. ¶¶ 6-7.

President Trump's second ad began broadcastings as soon as the next day. The second ad (the Maduro Ad) highlight the capture of Venezuelan President Nicolás Maduro. Lindholm Decl. ¶ 8, Ex. 5; *see also* Lindholm Decl. Ex. 28. The ad shows President Maduro giving a speech that he is waiting for President Trump to get him; it is then interrupted by remarks from Chairman of

the Joint Chiefs of Staff General Dan Caine about the military raid against President Maduro. Lindholm Decl. ¶ 8, Ex. 5. President Trump's voice is heard—over images of President Maduro blindfolded and handcuffed—proclaiming the military action "one of the most stunning and effective" in American history. *Id.* It ends with Secretary of State Marco Rubio flattering President Trump by saying, in part, "I think people need to understand that this is not a President that just talks and does letters and press conferences . . . . [D]on't play games while this President is in office." *Id.* Once again, as the ad ends, the disclosure "Paid for by the U.S. Government" appears. *Id.* The same ad—again without the disclosure—is on President Trump and the White House's social media accounts. *See, e.g.*, Lindholm Decl. ¶ 6.

The propaganda campaign continued over the weekend of September 26 and 27, 2026. The third ad (the Final Battle Ad) began airing, a nearly identical ad to one of President Trump's 2024 presidential campaign ads. Lindholm Decl. ¶ 10, Ex. 7. The black-and-white ad displays President Trump walking down a hallway to the sound of the President's own voice: "This is the final battle. With you at my side, we will demolish the Deep State." *Id.* Instead of showing President Trump's 2024 campaign logo (as the campaign ad does), the Final Battle Ad ends with the "Paid for by the U.S. Government" disclosure. *Id.*

That same weekend President Trump aired the fourth ad (the Mount Rushmore Ad). Lindholm Decl. ¶ 11, Ex. 8. As the ad begins, President Trump's political campaign flag is displayed in a crowd of supporters gathered to watch President Trump give remarks at Mount Rushmore on July 3, 2026. *Id.* As President Trump speaks, numerous aerial shots and angles of Mount Rushmore and President Trump are shown. *Id.* The Mount Rushmore Ad ends with "Paid for by the U.S. Government." *Id.* The same ad—without the disclosure—is on the White House's social media feeds. Lindholm Decl. Ex. 9.

The final Propaganda Ad to have aired to date (American Military Power Ad) began appearing on television on September 30, 2026. Lindholm Decl. ¶ 13, Ex. 10. The American Military Power Ad resembles an action movie trailer for the Iran War. *Id.* As it begins, lyrics to the song "Boom Boom" by John Lee Hooker are shown over clips of President Trump wearing his presidential campaign "Make America Great Again" baseball cap and aircraft and watercraft engaged in military action. *Id.* Above the footage of military action, President Trump's voiceover is heard: "This regime will soon learn that no one should challenge the strength and might of the United States armed forces." *Id.* The ad continues with Secretary of Defense Pete Hegseth praising President Trump by stating "He reminded the world, as he has time and time again, being an American means something unbreakable." *Id.* As with the other Propaganda Ads, it ends with a disclosure stating "Paid for by the U.S. Government." *Id.* The same ad—without the disclosure—is again on President Trump's and the White House's social media feeds. *Id.*

The White House Office has created several more Propaganda Ads, which have yet to air, and provided them to LMD Agency. Lindholm Decl. Ex. 22. The unaired ads include the "Paid for by the U.S. Government" disclosure as well. *Id.* The unaired ads include "God Made Trump," an ad made by President Trump's 2024 presidential campaign supporters and aired during the Republican Midterm Convention, a partisan political event. *Id.*

During the first week that the Propaganda Ads aired, the Trump Administration spent at least $2.5 million of the $20 million. Lindholm Decl. Ex. 20. The ads were broadcast across the country and primarily shown during football games and primetime or late-night entertainment. Lindholm Decl. Ex. 23. The Trump Administration ramped up the frequency of the Propaganda Ads, and as of October 5, 2026 an estimated $11 million had been spent to air them. Lindholm Ex. 25.

### B. President Trump Breaks His Commitment to Use MAGA Inc. to Fund the Propaganda Ads.

Condemnation for President Trump's illegal use of federal funds to develop and air the Propaganda Ads arrived quickly. Congressional Democrats spoke out against the use of federal funding. Lindholm Decel. Exs. 21, 23. Many congressional Republicans also expressed public concern or disapproval over the use of federal government money for political ads. *Id.* In a failed attempt to quell the upheaval, the White House issued a press release on September 25, 2026 that stated "President Trump is not on the ballot and there is no call to action." Lindholm Decl. Ex. 12. The press release ends by claiming that the propaganda ads are "aimed at the country—not a line on the ballot." *Id.* Nonetheless, discontent with the President's actions continued. Following the weeks of bipartisan backlash, including from the Republican Senate President John Thune, President Trump announced on social media on October 5, 2026 that the federal government would no longer pay for his political ads. Lindholm Decl. Ex. 13.

President Trump's pledge did not last long. Hours after the social media post, the Propaganda Ads continued to run in the early morning hours of October 6, 2026 with the "Paid for by the U.S. Government" disclosure. Lindholm Decl. Ex. 29. Later that day, the Final Battle Ad aired on a national broadcast of "Dancing with the Stars" and again the next morning on "Fox & Friends," again with a "Paid for by the U.S. Government" disclosure. Lindholm Decl. Exs. 26, 27.

## LEGAL STANDARD

As with a preliminary injunction, a party seeking a TRO must establish "(1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest." *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) (quoting *Sherley v. Sebelius*,

644 F.3d 388, 392 (D.C. Cir. 2011)). "The factors governing issuance of a preliminary injunction also govern issuance of a § 705 stay." *Dist. of Columbia v. USDA*, 444 F. Supp. 3d 1, 15 (D.D.C. 2020) (citing *Cuomo v. U.S. Nuclear Regul. Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985)).

## ARGUMENT

This is a remarkable case where the need for immediate relief is clear. The White House Office, OMB, and CBP continue to air the Propaganda Ads, in an apparent attempt to spend down the remainder of the $20 million contract before their unlawful actions can be stopped. Developing and airing the Propaganda Ads violates Congress's mandate that appropriated funds not be used for "publicity or propaganda," Consolidated Appropriations Act for FY2026, Pub. L. No. 119-75, § 718, 140 Stat. 173, 495 (2026), and further use—in violation of the Antideficiency Act, 31 U.S.C. § 1341, and the Purpose Statute, 31 U.S.C. § 1301—may be halted as both a violation of the APA and *ultra vires*. Because the DNC is likely to succeed on the merits, the threat of irreparable harm is beyond question, and the balance of equities and public interest tilt only in favor of a TRO and § 705 stay, this Court should grant relief forthwith.

### I. The Democratic National Committee Is Likely to Succeed on the Merits.

The DNC advances a simple legal proposition: it is illegal for the White House Office, OMB, and CBP to use taxpayer funds to develop and air publicity or propaganda in express contravention of federal law. The APA and *ultra vires* review provide appropriate vehicles to enjoin and stay the offensive conduct. And the DNC is harmed by this ongoing unlawful action. *See, e.g.*, *Bost v. Ill. State Bd. of Elections*, 607 U.S. 71, 77 (2026); *see also Nat'l Republican Senatorial Comm. v. FEC*, 146 S. Ct. 2404, 2425 (2026) (recognizing "unity of interest" between candidates and a national party committee).

### A. The Challenged Ads Are Prohibited "Publicity and Propaganda."

The DNC is likely to show that the Propaganda Ads violate a core principle of modern appropriations law: federal funds may not be used for "publicity or propaganda." *See, e.g.*, *D.C. Common Cause v. Dist. of Columbia*, 858 F.2d 1, 11 (D.C. Cir. 1988). The Consolidated Appropriations Act for FY2026 mandates, "No part of any appropriation contained in this or any other Act shall be used directly or indirectly, including by private contractor, for publicity or propaganda purposes within the United States not heretofore authorized by Congress." Pub. L. No. 119-75, § 718, 140 Stat. at 495. Most appropriations statutes since 1951 have contained similar "publicity or propaganda" riders, which apply to all governmental entities receiving appropriated funds. *See, e.g.*, An Act Making Appropriations for the Department of Labor, the Federal Security Agency, and Related Independent Agencies, for the Fiscal Year Ending June 30, 1952, Pub. L. No. 82-134, ch. 373, § 702, 65 Stat. 209, 223 (1951).

The D.C. Circuit has had no trouble holding that the use of public funds to distribute pamphlets, flyers, and posters urging a particular vote on a ballot initiative violated the ban on use of appropriations for "publicity or propaganda purposes." *D.C. Common Cause*, 858 F.2d at 11. In turn, appropriators have long understood the publicity or propaganda prohibition to bar use of taxpayer dollars for "self-aggrandizement, covert propaganda, and purely partisan materials." Government Accountability Office (GAO), *Principles of Federal Appropriations Law* 3-282 (4th ed. 2017). Self-aggrandizement is "publicity of a nature tending to emphasize the importance of the agency or activity in question." *Id.* at 3-284. Purely partisan materials as those "designed to aid a political party or candidate," which are typically "completely devoid of any connection with official functions." *Id.* at 3-293 to 3-294. The Propaganda Ads each fit one or both definitions.

The Final Battle Ad is the most flagrant offender. This is an advertisement about President Trump. The viewer sees only him, walking alone and determined through a portrait-lined hallway,

center-screen and sharply focused. The viewer hears only his voice, urging the viewer to join him in the "final battle" against perceived domestic enemies. The ad plainly emphasizes the President's importance and the importance of the battle he wages, particularly in the weeks before the midterm election. The ad is a partisan creation, having been aired originally during the 2024 presidential campaign to aid President Trump's candidacy. It is identical in every way except for displaying President Trump's campaign logo at the end. It also bears no connection to official functions of the President. It is publicity and propaganda.

The Love Me Ad fares no better. Once again, this is an advertisement about President Trump. The viewer sees a rapid montage of video and still images of the President, interspersed with his campaign messaging and clips of military hardware. The audio is again President Trump deriding "communism" and "Marxism," which he and his Republican allies have equated with the Democratic Party platform, followed by a refrain of "Love Me" and obsequious praise of the President. Once again, the ad plainly emphasizes the President's importance, promotes his partisan framing of partisan differences in the runup to the November 3 election, and bears no connection to official functions. It is publicity and propaganda.

The remaining Propaganda Ads are "self-aggrandizement," "purely partisan materials," or both. The Maduro Ad and the American Military Power Ad pair images of President Trump and military equipment in action with sycophantic tributes from members of his Cabinet. The Mount Rushmore Ad consists entirely of remarks by President Trump, displays his political campaign memorabilia along with images of him speaking before a crowd before the graven images of presidents past, suggesting that President Trump is patriotic. This Court may watch the advertisements itself to confirm that they fall within the publicity and propaganda prohibition. *See* Lindholm Decl. (collecting links).

President Trump's stated intention to use funds from MAGA Inc. to air the ads confirms their partisan and self-aggrandizing nature. By its own account, MAGA Inc. is a "political committee." *Statement of Organization: FEC Form 1*, MAGA Inc. (Mar. 11, 2026), https://perma.cc/55TC-B8ES. Its name derives from "Make America Great Again," President Trump's well-known campaign slogan. And it has expended $30,000,000 on the U.S. Senate race in Texas, as well as $800,000 on the U.S. Senate race in South Carolina. *See* Lindholm Decl. Ex. 14. During this federal election cycle, MAGA Inc. has also spent nearly $600,000 on "strategic political consulting" and tens of thousands of dollars for events at Trump-branded properties. *See* FEC, *Disbursements: MAGA Inc. (C00892471)*, https://perma.cc/HG4F-SLW6. The willingness of MAGA Inc. to pay for the Propaganda in the future reinforces that they are political propaganda for the President.

The White House Office's public defense that the propaganda ads are mere "public service announcements" bears no relation to the content of the advertisements. *See* Press Release, The White House, *Presidential Public Service Announcements Are Nothing New* (Sept. 25, 2026), https://perma.cc/DXT2-YV3X. *But see* FCC, *Standardized and Enhanced Disclosure Requirements for Television Broadcast Licensee Public Interest Obligations* at 1301, FCC 07-205 (Nov. 27, 2007), available at https://docs.fcc.gov/public/attachments/FCC-07-205A3.pdf (public service announcement standards). The Propaganda Ads are not a "reminder for Americans to love their country." *Presidential Public Service Announcements Are Nothing New.* Indeed, the "Love Me" ad is literally an exhortation to love President Trump. The White House offers three examples of public service announces it suggests are analogous, but each promoted clear public policies: Medicare Part D, the Affordable Care Act, the Clean Water Act, and public health messaging during the Covid-19 pandemic. *See id.* On the other hand, President Wilson's use of domestic

propaganda to promote participation in World War I is a relic predating the "publicity and propaganda" ban. No modern example is comparable to the Propaganda Ads, in both their aggrandizement of the President and their nakedly partisan aims.

The White House's remaining contention that the Propaganda Ads are not "campaign ads" is a non sequitur. *See id.* The ads may not explicitly address a candidate "on the ballot" or contain a "call to action," terms borrowed from campaign finance law. *Cf.* 52 U.S.C. § 30101(17), (20)(A)(ii); 11 C.F.R. § 100.22. But there is no basis to limit the publicity or propaganda ban to activity regulated by the Federal Election Campaign Act, 52 U.S.C. §§ 30101–46. Had Congress intended the ban on use of appropriations for "publicity or propaganda" to incorporate those definitions, it could have borrowed language or cross-referenced explicitly. Congress did not.

### B. Spending on the Propaganda Ads Violates the Antideficiency Act and the Purpose Act.

The Executive can spend money only in accordance with statutes enacted by Congress. This limitation arises directly from the Constitution, which provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations Made by Law." U.S. Const. art. I, § 9, cl.7. "Congress's control over federal expenditures is absolute, and one way that Congress exercises that power is through the Purpose Statute, which commands that 'appropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law.'" *Neguse v. U.S. Immigr. & Customs Enf't*, 822 F. Supp. 3d 86, 93 (D.D.C. 2026) (quoting *U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1348 (D.C. Cir. 2012) (Kavanaugh, J.) (quoting 31 U.S.C. § 1301(a)). "[A]n appropriation from Congress is authorization to use funds for a specified purpose." *Nat'l Tr. for Historic Pres. v. Nat'l Park Serv.*, 827 F. Supp. 3d 93, 109 (D.D.C. 2026). The Purpose Statute does not "permit an agency . . . to authorize the expenditure of funds beyond what Congress has approved." *U.S. Dep't of Navy v. FLRA*, 665 F.3d 1339, 1348

(D.C. Cir. 2012).

The Antideficiency Act is another statutory means of effectuating Congress' absolute power of the purse, as set forth in the Constitution. In addition to prohibiting making or authorizing an expenditure or obligation in excess of the Congressional appropriation amount, 31 U.S.C. § 1341(a)(1)(A), the Antideficiency Act directs that no "officer or employee of the United States Government" may "involve either government in a contract or obligation for the payment of money before an appropriation is made unless authorized by law." 31 U.S.C. § 1341(a)(1)(B).

There is no federal statute authorizing the creation or airing of partisan political advertisements or glorified tributes to the sitting president, particularly one who has made himself the centerpiece of highly contested midterm elections around the country. To the contrary, Congress has repeatedly prohibited the use of any appropriated funds "for publicity or propaganda purposes within the United States and not heretofore authorized by Congress." Pub. L. 119-75, § 718, 140 Stat. at 495. Any contrary use of federal funds runs afoul of both the Antideficiency Act and the Purpose Statute.[1]

Nevertheless, President Trump directed the White House Office to engage public employees on taxpayer-funded salaries to create the ads. OMB allocated federal funding to be used to air them. DHS then completed this unlawful action through a contract awarded to LMD Agency, Inc., a marketing agency, to carry out a "National Media Campaign" that included the airing of the Propaganda Ads in the remaining weeks before the November 2026 elections. With no applicable appropriation statute providing legitimate funding for the Propaganda Ads, OMB

---

[1] Most appropriations statutes since 1951 have contained similar "publicity or propaganda" riders, which apply to all governmental entities receiving appropriated funds. *See, e.g.*, An Act Making Appropriations for the Department of Labor, the Federal Security Agency, and Related Independent Agencies, for the Fiscal Year Ending June 30, 1952, Pub. L. No. 82-134, ch. 373, § 702, 65 Stat. 209, 223 (1951); *see also Principles of Federal Appropriations Law* at 3-280.

diverted $20 million out of the funds that had been appropriated by Congress to U.S. Customs and Border Protection for various "border security, technology, and screening" functions in Section 90004 of the One Big Beautiful Bill Act ("OBBBA"). Pub. L. 119-21, July 4, 2025. One of the enumerated functions for which the funds were to be used was "[c]ommemorating efforts and events related to border security." *Id.* § 90004(a)(8). This line item appears to be the source of the funding used for the Propaganda Ads. *See* Lindholm Decl. Ex. 16.

Unsurprisingly, there was no Congressional authorization for any such obligation or contract, as required by the Antideficiency Act. The expenditure also clearly violates the Purpose Statute for the same lack of an authorizing statutory basis. There is no credible argument that the Propaganda Ads glorifying President Trump and urging voters to back his party in the upcoming elections are covered by language authorizing spending on "[c]ommemorating efforts and events related to border security." OBBBA, § 90004(a)(8). Nor is there any other language in that or any other appropriations act that would permit the spending of public money on the Propaganda Ads. Indeed, legislative history reveals that Congress intended the commemorative events spending to be used for "Line-of-Duty death memorials, Department or agency anniversaries, and commendation ceremonies." H.R. Rep. No. 119-06, at 792 (2025).

As described in detail above, the Propaganda Ads are "self-aggrandizement," "purely partisan materials," or both, far removed from the salutary purposes specified in the statute and its legislative history. *See* Argument Section I.A, *supra*. The Propaganda Ads have nothing to do with commemorating border security or other traditional public service messaging, as required for expenditures under this budget line. Thus, using taxpayer money appropriated for those purposes violates both the Antideficiency Act and the Purpose Statute.

### C. Spending to Air the Propaganda Ads Violates the APA.

As demonstrated above, the White House Office, OMB, and CBP's use of public money

to fund the Propaganda Ads violates multiple federal laws: the ban on using federal funds for "publicity or propaganda," the Antideficiency Act, and the Purpose Statute. *See* Argument Sections I.A–B, *supra*. Under the APA, the Court has the power to stay these unlawful actions and enjoin their implementation.

OMB and CBP's activities to fund the Propaganda Ads are "final agency action" under the APA. 5 U.S.C. § 704. To constitute "final agency action," two conditions must be met: (1) "the action must mark the consummation of the agency's decision-making process" (that is, "it must not be of a merely tentative or interlocutory nature"), and (2) the action "must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (internal quotation marks omitted). Courts "are to apply the finality requirement in a 'flexible' and 'pragmatic' way." *Ciba-Geigy Corp. v. U.S. EPA*, 801 F.2d 430, 435 (D.C. Cir. 1986); *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599 (2016) (noting the " 'pragmatic' approach [the Supreme Court] ha[s] long taken to finality").

OMB's allocation of $20 million in federal funds for use by CBP, and CBP's subsequent use of those funds to develop and air the Propaganda Ads, including through its contract with LMD Agency, meets that standard. Defendants' actions were in no way tentative; the final decision has been made because the funds have been committed and are being spent. Further, the commitment and spending of the funds is an action from which legal consequences have flowed because money has changed hands, ads have been developed, and air time has been purchased.

In turn, the DNC is likely to show that OMB and CBP have acted within one of the grounds for invalidation set forth in 5 U.S.C. § 706(2), which provides that the court "shall . . . hold unlawful and set aside agency action" that is "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C). This

is because an agency "literally has no power to act . . . unless and until Congress authorizes it to do so by statute." *FEC v. Cruz*, 596 U.S. 289, 301 (2022). "This rule applies to actions that 'fail[] to meet statutory, procedural, or constitutional requirements.'" *Widakuswara v. Lake*, 779 F. Supp. 3d 10, 35 (D.D.C. 2025) (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 414 (1971)). Because the DNC is likely to establish that OMB and CBP have violated the ban on using federal funds for "publicity or propaganda," the Antideficiency Act, and the Purpose Statute, *see* Argument Sections I.A–B, *supra*, the DNC is in turn likely to that OMB and CBP have engaged in final agency action that is contrary to law and must be set aside in accordance with the APA.

**D. Spending to Develop and Air the Propaganda Ads Is *Ultra Vires*.**

"The government of the United States has been emphatically termed a government of laws, and not of men." *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 163 (1803). Therefore, "[t]he acts of all [executive] officers must be justified by some law. . . . Otherwise the individual is left to the absolutely uncontrolled and arbitrary action of a public and administrative officer, whose action is unauthorized by any law." *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 108, 110 (1902). Americans are witnessing such lawless action on television screens when government-funded propaganda ads appear. The White House Office developed and aired the ads at taxpayer expense. Such activities are *ultra vires*—without any legal basis—to the political benefit of the President and his political party.

The President's power to issue an edict to executive branch subordinates directing action "must stem either from an act of Congress or from the Constitution itself." *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 188–89 (1999) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952)). The same is true of his immediate subordinates in the White House Office. Because "[t]here is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes," *Clinton v. City of New York,* 524 I.S. 417, 438

(1998), the President and his subordinates lack the authority to develop propaganda ads at public expense and order the expenditure of $20 million to air them because Congress provided no appropriations for that purpose. To the contrary, Congress prohibited such use of taxpayer dollars.

Courts have long been the check on unconstrained presidential action: "[w]hen an executive acts *ultra vires*, courts are normally available to reestablish the limits on his authority." *Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988); *Chamber of Com.*, 74 F.3d at 1328. ("Review of the legality of [such] Presidential action" is available "in a suit seeking to enjoin the officers who attempt to enforce the President's directive (citation omitted)"). The standard for court review is well established:

> Such review, commonly known as an *ultra vires* claim, is available where (i) there is no express statutory preclusion of all judicial review; (ii) there is no alternative procedure for review of the statutory claim; and (iii) the agency plainly acts in excess of its delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory.

*Fed. Express Corp. v. U.S. Dep't of Commerce*, 39 F.4th 756, 763 (D.C. Cir. 2022) (internal citation and quotation marks omitted). The DNC is likely to succeed on the merits of its claim that the use of federal monies to develop and air blatantly political ads is an *ultra vires* exercise of executive power. The first two elements of the *ultra vires* test are satisfied because there is no statutory preclusion of judicial review; nor is there any alternative procedure to review the actions of the White House Office. *See, e.g.*, *Am. Oversight v. Biden*, No. 1:20-cv-716, 2021 WL 4355576, at *6 (D.D.C. Sept. 24, 2021) (citing *United States v. Espy*, 145 F.3d 1369, 1373 (D.C. Cir. 1998)).

As laid out above, development of the Propaganda Ads is contrary to the specific statutory prohibition: "No part of any appropriation contained in this or any other Act shall be used directly or indirectly, including by private contractor, for publicity or propaganda purposes within the United States not heretofore authorized by Congress." Pub. L. No. 119-75, § 718, 140 Stat. at 495.

Once again, the "publicity or propaganda prohibition" prohibits self-aggrandizement and purely partisan materials, including "publicity of a nature tending to emphasize the importance of the agency or activity in question" and those "designed to aid a political party or candidate," which are typically "completely devoid of any connection with official functions. *Principles of Federal Appropriations Law* at 3-282, -284, -293 to -294. Those descriptions aptly describe the Propaganda Ads. *See* Argument Section I.A, *supra*.

The final prong of the *ultra* vires standard is also satisfied by the White House Office's violation of the Antideficiency Act and Purpose Statute's clear and mandatory prohibitions on the use of Congressionally appropriated funds for purposes other than for which they were appropriated. *See* Argument Section I.B, *supra.* President Trump's oral directive to develop the Propaganda Ads—implemented by the White House Office and ultimately funded by OMB and DHS—is the definition of an *ultra vires* act. The DNC is thus likely to succeed on the merits of its *ultra vires* claim against the White House Office.

### E. The DNC Has Standing to Challenge the Propaganda Ads

Finally, the DNC is likely to show that it has standing to challenge the Propaganda Ads. To establish standing, a plaintiff must have suffered an "injury in fact" that is "concrete and particularized," "actual or imminent," and "fairly . . . trace[able] to the challenged action of the defendant," which "likely" will be "redressed by a favorable decision." *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 560 (1992) (alteration in original) (internal citations omitted). At the preliminary-injunction stage, the movant has the burden of showing a "substantial likelihood" of standing. *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015).

The Trump Administration's illegal propaganda campaign harms the DNC by forcing the DNC and its members (including Democratic candidates) to compete in unlawfully structured elections. "[C]andidates . . . have an interest in a fair process" and "suffer [a cognizable harm]

when the process departs from the law." *Bost*, 607 U.S. at 77; *see also DSCC v. Trump*, No. 1:26-cv-1114, 2026 WL 2681471, at *5 (D.D.C. Sept. 13, 2026) (recognizing that *Bost* extends "to aspects of the electoral process beyond just vote counting). Even candidates who ultimately prevail suffer a concrete injury when laws "erode[] public confidence that the election results reflect the people's will." *Id.* at 78; *see also id.* at 77 ("Win or lose, candidates suffer when the process departs from the law.").

In turn, "[p]olitical parties . . . occupy a unique position with a special relationship and unity of interest with candidates." *Nat'l Republican Senatorial Comm.*, 146 S. Ct. at 2425 (internal citation and quotation marks omitted); *see also id.* at 2418 (describing "the thoroughly intertwined relationship of parties and their candidates"). The White House Office, OMB, and DHS have used appropriated funds and diverted CBP funding for a partisan propaganda campaign. Following a promise to cease using public funds and continue the ad campaign using a partisan super PAC, the Trump Administration has continued to air the ads at public expense and preserved MAGA Inc.'s funds for other political efforts adverse to Democratic candidates and the DNC. This alters campaign spending rules in ways that deprive "candidate[s] of a fair process." *Bost*, 607 U.S. at 77. That concrete injury is compounded by damage to the DNC's reputational interests, which depend on public confidence in free and fair elections. *See* Schneider Decl. ¶¶ 11–13.

The White House Office, OMB, and DHS's illegal propaganda campaign also impose a competitive harm on the DNC and its members (including candidates). By using public funds to develop and air the propaganda ads after committing to continue to air the ads using funds from MAGA Inc., a super PAC controlled by the President, President Trump, the White House Office, OMB, and DHS are allowing MAGA Inc. to preserve funds for other partisan activities. During the 2025-2026 federal election cycle, MAGA Inc. has expended more than $25,000,000 in support

of Republican candidates and in opposition to Democratic candidates. Lindholm Decl. Ex. 14. MAGA Inc. has invested in paid media, get-out-the-vote efforts, and direct voter communication. *Id.* Every taxpayer dollar spent in support of the Propaganda Ads preserves a dollar to be spent in tight political races. *See* Schneider Decl. ¶¶ 14–15. As a result, the electoral prospects of Democratic campaigns necessarily suffer. *See Crawford v. Marion Cnty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007), *aff'd*, 553 U.S. 181 (2008). This injury to the electoral prospects of Democratic candidates and campaigns is cognizable under Article III. *See, e.g.*, *Shays v. FEC*, 414 F.3d 76, 85–86 (D.C. Cir. 2005) (holding that candidates may challenge regulation that would "alter the environment in which rival parties defend their concrete interests . . . in winning reelection") (cleaned up); *League of United Latin Am. Citizens v. Exec. Office of the President* (*LULAC II*), 808 F. Supp. 3d 29, 61 (D.D.C. 2025) (concluding that party affiliates had shown political competitor standing); *DSCC*, 2026 WL 2681471, at *5.

These harms are also fairly traceable to the challenged actions of the White House Office, OMB, and DHS and will likely be redressed by a favorable decision enjoining or staying their illegal actions. *See, e.g.*, *Fla. Audubon Society v. Bentsen*, 94 F.3d 658 (D.C. Cir. 1996) (en banc) (establishing that redressability examines whether "the relief sought, assuming that the court chooses to grant it, will *likely* alleviate the particularized injury alleged by plaintiffs" (emphasis added)); *see also West v. Lynch*, 845 F.3d 1228, 1235 (D.C. Cir. 2017) (recognizing that causation and redressability are closely related like two sides of a coin" (internal citation, quotation marks and ellipsis omitted)). Once again, the White House Office crafted the partisan campaign, using personnel whose salaries are supported by federal appropriations. An injunction against further use of the illegally crafted ads and further development of publicity or propaganda will redress ongoing harms and prevent future harms. In turn, OMB shifted $20 million to pay for the

Propaganda Ads. The availability of these funds for the understood purpose of airing the Propaganda Ads was a but-for cause of both *Bost* injury and competitive injury to the DNC. An injunction and § 705 stay of the apportionment and future apportionments intended to fund propaganda ads would zero out the funds available to continue to air the Propaganda Ads, which would redress ongoing harms and prevent future harms. Finally, and most simply, DHS has entered into a contract to air the Propaganda Ads and has funded them with its appropriations. An injunction and § 705 stay of the ad-buy contract and funding of the Propaganda Ads would redress ongoing harms and prevent future harms. Redressability does not require "full redress"; the Court need only be able to "effectuate a partial remedy." *Uzuegbunam v. Preczewski*, 592 U.S. 279, 291 (2021). That standard is easily met in this case.

## II. The Democratic National Committee Faces Irreparable Harm.

The DNC has already detailed the harm it has suffered and continues to suffer due to the airing of the Propaganda Ads. *See* Argument Section I.E, *supra*. That harm is irreparable.

A party seeking an injunction must make two showings to demonstrate irreparable harm. "First, the harm must be 'certain and great,' 'actual and not theoretical,' and so 'imminent that there is a clear and present need for equitable relief to prevent irreparable harm.'" *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 7–8 (D.C. Cir. 2016) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (alteration marks omitted)). "Second, the harm must be beyond remediation." *Id.* at 8 (quoting *Chaplaincy*, 454 F.3d at 297). Both elements are present here.

As established above, the White House Office, OMB, and DHS continue to expend public money to air the propaganda ads. *See* Background Section III.B, *supra.* Absent a temporary restraining order and § 705 stay, Defendants will be free to continue to publish the illegal ads through Election Day. Each publication of an illegally-funded ad inflicts harm anew: further

damage is done to the legality and fairness of the electoral system and further resources are contributed to Republican election efforts. Thus, the harm the DNC faces is certain, great, actual and not theoretical, and imminent. Further, no subsequent order of the Court, whether before or after Election Day, could remedy those injuries.[2]

In a similar case last year, this Court found that the DNC and related entities had met the irreparable harm requirement when President Trump issued an executive order purporting to change federal voter registration rules. Judge Kollar-Kotelly explained that "[b]ecause this Court can neither postpone an election nor turn back the clock to give Plaintiffs additional time to pursue their campaigns, [a dispute about election rules] is not a case in which adequate compensatory or other corrective relief will be available at a later date. The only way to provide complete relief to the Plaintiff is to award a preliminary injunction." *League of United Latin Am. Citizens v. Exec. Off. of the President* (*LULAC I*), 780 F. Supp. 3d 135, 201–02 (D.D.C. 2025) (internal citation and quotation marks omitted). Similarly, when the government sought to change voter registration requirements shortly before the registration deadline for an upcoming election, the D.C. Circuit found that the "harm is irreparable because after the registration deadlines for the November election pass, there can be no do over and no redress." *Newby*, 838 F.3d at 9. This case is no different. The White House Office, OMB, and DHS's illegal conduct are actively inflicting great

[2] President Trump's October 5, 2026 announcement that MAGA Inc., a super PAC the President effectively controls, is not relevant to the irreparable harm analysis. Ads have continued to air with the disclosure, "Paid For By U.S. Government." *See* Background Section III.B, *supra*. The White House Office, OMB, and DHS are not bound by President Trump's social media feed; only a valid court order with the force of law can restrain and stay the illegal conduct at issue. Indeed, even if MAGA Inc. were to fund airing propaganda ads developed by the White House Office, this would continue to harm the DNC. The President may not use public employees receiving government salaries—even those in the White House Office—as an in-house advertising firm to develop "publicity or propaganda."

harm on the DNC, will continue to do so every day until restrained, and that harm cannot be remedied after the fact.

### III. The Balance of Equities and Public Interest Favor Temporary Relief.

The balance of equities and the public interest—which merge when the government opposes injunctive relief, *Nken v. Holder*, 556 U.S. 418, 435 (2009)—decisively support issuance of a TRO (or preliminary injunction) and § 705 stay. There is a fundamental public interest in free and fair elections in which all candidates abide by the election laws. *See, e.g., Newby*, 838 F.3d at 13 (citing *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006)); *see also Reynolds v. Sims*, 377 U.S. 533, 561–62 (1964) (recognizing paramount importance of lawful elections). Moreover, the White House Office, OMB, and CBP's blatant usurpation of Congress's power of the purse to develop and air the Propaganda Ads is adverse to the public interest. Congress's exclusive power over federal spending in the Constitution and through the Antideficiency Act is "a bulwark of the Constitution's separation of powers among the three branches of the National Government." *Dep't of Navy v. FLRA*, 665 F.3d 1339, 1346–47 (D.C. Cir. 2012) (quoting The Federalist No. 58, at 359 (James Madison) (Clinton Rossiter ed., 1961)). The Spending and Appropriations Clauses protect liberty by ensuring that "the purse is lodged in one branch, and the sword in another." 2 The Debates in the Several State Conventions on the Adoption of the Federal Constitution 349 (A. Hamilton) (Jonathan Elliot ed., 2d ed. 1836). When "the decision to spend [is] determined by the Executive alone, without adequate control by the citizen's Representatives in Congress, liberty is threatened." *Clinton v. City of New York*, 524 U.S. 417, 451 (1998). In this case, that liberty is the freedom of citizens to select their representatives in free and fair elections governed by laws prohibiting the use of appropriated funds for "publicity or propaganda," which in turn limit expenditures in the political arena to those raised and spent by political committees and PACs. Under this system, the federal government may not develop propaganda ads.

On the other side of the equation, there is also no equitable or legitimate public interest in the government unlawfully spending public monies on propaganda ads to advance the core election themes of one political party and rehabilitate the President's historically low approval ratings. The White House Office, OMB, and DHS "cannot suffer harm from an injunction that merely ends an unlawful practice." *R.I.L.-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015) (citation omitted). Nor is there any "public interest in the perpetuation of unlawful agency action." *Newby*, 838 F.3d at 12; *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) ("[E]nforcement of an unconstitutional law is always contrary to the public interest."); *see also Washington v. Reno*, 35 F.3d 1093 (6th Cir. 1994) (holding an injunction against spending public funds in violation of statutory restraints does not harm government defendants).

Indeed, President Trump and the White House Office's October 5 assertion that MAGA Inc. will pay for the Propaganda Ads going forward is an implicit acknowledgment that the diversion of funds to air the ads was unlawful. President Trump's October 5 assertion that MAGA Inc. would air the Propaganda Ads is also implicit acknowledgment that OMB and DHS will not be harmed by entry of a temporary restraining order and § 705 stay. Even if it were in these agencies' interest for the Propaganda Ads to air—and it is not—President Trump and his political allies intend to continue to air them. OMB and DHS certainly have no interest in MAGA Inc. preserving its funds for other political purposes.

On the other side of the ledger, the DNC faces of substantial, demonstrable, and irreparable harm from the White House Office, OMB, and CBP undermining free and fair elections. The DNC also faces clear harm based on OMB and CBP displacing MAGA Inc. spending on propaganda ads and contributing to the overall pool of resources available to support Republican

candidates and oppose Democrats. The merged balance of equities and public interest test conclusively favors entering the requested temporary restraining order.

## CONCLUSION

For the foregoing reasons, the Court should grant the DNC's motion for a temporary restraining order (or preliminary injunction) and § 705 stay, order Defendants to cease spending public funds to develop and air the propaganda ads, and prohibit further use of propaganda ads developed at public expense.

Dated: October 8, 2026

Respectfully submitted,

*/s/ Benjamin B. Klubes*
Benjamin B. Klubes
(Bar No. 428852)
Adam Miller
(Bar No. 496339)
Klubes Law Group
1717 K Street NW, Suite 900
Washington, DC 20006
(202) 753-5054
blkubes@klubeslaw.com
amiller@klubeslaw.com

*/s/ Daniel J. Freeman*
Daniel J. Freeman
(Bar No. 90038422)
Democratic National Committee
430 South Capitol Street SE
Washington, DC 20003
(202) 863-8000
freemand@dnc.org

*Counsel for Democratic National Committee*