**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

DEMOCRATIC NATIONAL COMMITTEE,

*Plaintiff*,

*v*.

DONALD TRUMP *et al.*,

*Defendants*.

Civil Action No. 1:26-cv-3506-LLA

**MEMORANDUM OF LAW IN OPPOSITION TO**
**PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER**

## TABLE OF CONTENTS


INTRODUCTION ........ 1

BACKGROUND ........ 2

I. Factual Background ........ 2

II. Relevant Statutory Background ........ 4

III. This Litigation ........ 4

LEGAL STANDARD ........ 5

ARGUMENT ........ 5

I. Plaintiff Will Not Suffer Irreparable Harm—or Indeed, Future Harm—Absent a TRO ........ 6

II. Plaintiffs Are Unlikely to Succeed on the Merits ........ 8

A. Plaintiff is Unlikely to Succeed on the Merits of the APA Claim ........ 8

1. As to OMB, Plaintiff Has Not Challenged Final Agency Action ........ 8

2. Plaintiff's APA Claim Against DHS Is Also Unlikely to Succeed ........ 10

B. Plaintiff's *Ultra Vires* Claim Is Unlikely to Succeed ........ 12

III. The Remaining Preliminary Injunction Factors Favor the Government ........ 15

CONCLUSION ........ 16

# TABLE OF AUTHORITIES

## CASES

*Abbott Lab'ys v. Gardner*,
387 U.S. 136 (1967) .......... 8

*Advocs. for Hum. Rts. v. Blanche*,
838 F. Supp. 3d 1 (D.D.C. 2026) .......... 5, 7

*Am. Foreign Serv. Ass'n v. Trump*,
No. 25-5184, 2025 WL 1742853 (D.C. Cir. June 20, 2025) .......... 12, 13

*Ashland Oil, Inc. v. Fed. Trade Comm'n*,
409 F. Supp. 297 (D.D.C. 1976) .......... 6

*Bennett v. Spear*,
520 U.S. 154 (1997) .......... 8

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983) .......... 7

*City of Phila. v. Sec'y U.S. Dep't of Interior*,
179 F.4th 169 (3d Cir. 2026) .......... 11

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) .......... 7

*Dalton v. Specter*,
511 U.S. 462 (1994) .......... 13

*Darby v. Cisneros*,
509 U.S. 137 (1993) .......... 8

*Davis v. Pension Benefit Guar. Corp.*,
571 F.3d 1288 (D.C. Cir. 2009) .......... 5

*DRG Funding Corp. v. Sec'y of Hous. & Urb. Dev.*,
76 F.3d 1212 (D.C. Cir. 1996) .......... 8, 9

*Elec. Priv. Info. Ctr. v. FTC*,
844 F. Supp. 2d 98 (D.D.C.), *aff'd*, 2012 WL 1155661 (D.C. Cir. Mar. 5, 2012) .......... 5

*Fed. Express Corp. v. U.S. Dep't of Com.*,
39 F.4th 756 (D.C. Cir. 2022) .......... 13, 14, 15

*Feldman v. Bowser*,
315 F. Supp. 3d 299 (D.D.C. 2018) .......... 12, 15

*Franklin v. Massachusetts*,
505 U.S. 788 (1992) ... 5, 8, 13

*Glob. Health Council v. Trump*,
153 F.4th 1 (D.C. Cir. 2025), *denying reh'g en banc*,
2025 WL 2709437 (D.C. Cir. Aug. 28, 2025) ... 13

*Halkin v. Helms*,
690 F.2d 977 (D.C. Cir. 1982) ... 6

*Hilton v. Braunskill*,
481 U.S. 770 (1987) ... 16

*Indep. Equip. Dealers Ass'n v. EPA*,
372 F.3d 420 (D.C. Cir. 2004) ... 11

*Kescoli v. Babbitt,*
101 F.3d 1304 (9th Cir.1996) ... 11

*Lincoln v. Vigil*,
508 U.S. 182 (1993) ... 12

*Lujan v. Nat'l Wildlife Fed'n*,
497 U.S. 871 (1990) ... 10

*Mazurek v. Armstrong*,
520 U.S. 968 (1997) ... 5

*Mississippi v. Johnson*,
71 U.S. (4 Wall.) 475 (1867) ... 13

*Morgan Stanley DW Inc. v. Rothe*,
150 F. Supp. 2d 67 (D.D.C. 2001) ... 5

*Munaf v. Geren*,
553 U.S. 674 (2008) ... 5

*Murthy v. Missouri*,
603 U.S. 43 (2024) ... 7

*Nat. Res. Def. Council v. Kempthorne*,
539 F. Supp. 2d 1155 (E.D. Cal. 2008) ... 11

*Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*,
26 F.4th 960 (D.C. Cir. 2022) ... 14

*Nat'l Treasury Emps. Union v. Trump*,
No. 25-5157, 2025 WL 1441563 (D.C. Cir. May 16, 2025) ... 16

*Newdow v. Roberts*,
603 F.3d 1002 (D.C. Cir. 2010) .......... 13

*Nixon v. Fitzgerald*,
457 U.S. 731 (1982) .......... 13

*Nken v. Holder*,
556 U.S. 418 (2009) .......... 15

*Norton v. S. Utah Wilderness All.*,
542 U.S. 55 (2004) .......... 10, 11

*Nuclear Regul. Comm'n v. Texas*,
605 U.S. 665 (2025) .......... 1, 2, 13, 14

*Nyant v. Chairman, Broad. Bd. of Governors*,
589 F.3d 445 (D.C. Cir. 2009) .......... 14

*O'Shea v. Littleton*,
414 U.S. 488 (1974) .......... 7

*Rochester Tel. Corp. v. United States*,
307 U.S. 125 (1939) .......... 8

*Sherley v. Sebelius*,
644 F.3d 388 (D.C. Cir. 2011) .......... 5

*Soucie v. David*,
448 F.2d 1067 (D.C. Cir. 1971) .......... 5

*Thurston v. United States*,
696 F. Supp. 680 (D.D.C. 1988) .......... 12, 15

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .......... 7

*United States v. Bolton*,
468 F. Supp. 3d 1 (D.D.C. 2020) .......... 7

*United States v. Or. State Med. Soc'y*,
343 U.S. 326 (1952) .......... 7

*Vill. of Bald Head Island v. U.S. Army Corps of Eng'rs*,
714 F.3d 186 (4th Cir. 2013) .......... 11

*Whitmore v. Arkansas*,
495 U.S. 149 (1990) .......... 7

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ........ 5, 6, 15

*Wis. Gas Co. v. Fed. Energy Regul. Comm'n*,
758 F.2d 669 (D.C. Cir. 1985) ........ 6

**STATUTES**

5 U.S.C. § 551 ........ 8, 10, 11

5 U.S.C. § 702 ........ 10

5 U.S.C. § 704 ........ 8, 10

5 U.S.C. § 705 ........ 5

5 U.S.C. § 706 ........ 4, 8

31 U.S.C. § 1301 ........ 4, 15

31 U.S.C. § 1341 ........ 4, 15

31 U.S.C. § 1351 ........ 12

31 U.S.C. § 1512 ........ 2

31 U.S.C. § 1513 ........ 2

Working Families Tax Cut Act,
Pub. L. No. 119-21, 139 Stat. 72 (2025) ........ 2

Consolidated Appropriations Act, 2026,
Pub. L. No. 119-75, 140 Stat. 173 ........ 1, 4, 12, 14

**RULES**

Fed. R. Civ. P. 19 ........ 1, 11, 12

Fed. R. Civ. P. 65 ........ 16

**OTHER AUTHORITIES**

Executive Order (E.O.) 6166, as amended by E.O. 12608 ........ 2

GAO, A Glossary of Terms Used in the Federal Budget Process, *Deobligation*,
https://www.gao.gov/assets/gao-05-734sp.pdf ........ 3

Government Accountability Office ("GAO"), Principles of Federal Appropriations Law (4th ed. 2017), https://www.gao.gov/assets/2019-11/687162.pdf........................................................ 2, 7, 14, 15

OMB Circular No. A-11 ...................................................................................................... 2

## INTRODUCTION

Plaintiff, the Democratic National Committee ("DNC"), challenges the Administration's use of federal funds to air certain advertisements (the "ads") featuring President Trump. The essence of Plaintiff's claims is that the Executive Branch used Congressionally appropriated funds for an unauthorized purpose—"publicity or propaganda." Consolidated Appropriations Act, 2026, Pub. L. No. 119-75, § 718, 140 Stat. 173, 495. Plaintiff seeks emergency relief to stop the Administration from continuing to use federal funds to air the ads. But the President has already said that he will not use additional federal funds to air these ads moving forward. And the agency involved in procuring the media services—the Department of Homeland Security ("DHS")—has instructed its vendor not to purchase additional airtime for these ads past today, October 11, 2026. Any residual funds left over after the vendor is paid for services rendered through today will be deobligated. In other words, after today—and before Plaintiff's reply brief is even due—none of the challenged ads will air using federal funds. Plaintiff therefore does not need prospective emergency relief to stop the airing of the ads with federal funds or to avert any harm therefrom.

That resolves the pending motion. But in any event, Plaintiff's claims are unlikely to succeed on the merits. Plaintiff brings two claims: one claim under the Administrative Procedure Act ("APA") against DHS and the Office of Management and Budget ("OMB"), and an *ultra vires* claim against the President and White House Office. There are several problems with Plaintiff's APA claim, including that Plaintiff has not challenged final agency action with respect to OMB, and this Court cannot enjoin DHS's contract, particularly given that the vendor is not a party to this litigation, *see* Fed. R. Civ. P. 19. In any event, the ad buys end today, and then the task order will be withdrawn and closed.

Finally, Plaintiff is not likely to show that the actions challenged here are so clearly "contrary to a *specific prohibition* in a statute" to justify *ultra vires* review. *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025) (citation omitted). Such review is not available in

"typical statutory authority cases," rather, *ultra vires* review is available only to correct extreme error. *See id.* It is akin to a "Hail Mary" pass in football. *Id.* Here, as in football, it is unlikely to succeed. *See id.* In particular, while appropriated funds should not be used for "publicity or propaganda," those terms are undefined, and it is a "recognized and legitimate exercise of the Administration's authority to inform the public of its policies, to justify its policies and to rebut attacks on its policies," *see* Government Accountability Office ("GAO"), Principles of Federal Appropriations Law 3-282, 3-296 (4th ed. 2017), https://www.gao.gov/assets/2019-11/687162.pdf (citation omitted). In light of those competing considerations, Plaintiff is unlikely to show it is entitled to the "Hail Mary" remedy of *ultra vires* review.

For the foregoing reasons, this Court should deny Plaintiff's motion for emergency relief.

## BACKGROUND

### I. Factual Background

On September 19, 2026, U.S. Customs and Border Protection ("CBP"), a component of DHS, submitted a request to OMB to reapportion funds appropriated by the Working Families Tax Cut Act. *See* Working Families Tax Cut Act, Pub. L. 119-21, § 90004, 139 Stat. 72, 359 (2025); *see also* Decl. of William C. Woolf, dated Oct. 10, 2026 ("Woolf Decl."), ¶ 3, attached as Ex. A.[1] Through the reapportionment request, CBP sought to make an additional $20 million of the funds appropriated under the Working Families Tax Cut Act available for "[c]ommemorating efforts and

[1] Congress established the apportionment process in the Antideficiency Act, which gives the President the authority to make appropriated amounts available for obligation at such rates as to achieve the most effective and economical use thereof and to avoid deficiency and the need for supplemental appropriations, *see* 31 U.S.C. §§ 1512, 1513(b). The President has delegated that authority to OMB. *See* Executive Order (E.O.) 6166, as amended by E.O. 12608. An apportionment is thus an OMB-approved plan to use budgetary resources. *See* OMB Circular No. A-11 § 120.1. Notably, an apportionment "is not a means for resolving any question dealing with . . . the legality of using funds for the purpose for which they are apportioned." *Id.* at § 120.9. A reapportionment is a revision of a previous apportionment of budgetary resources for an appropriation or fund account. *See id.* Thus, once Congress appropriates funds, OMB apportions the appropriation, and then agencies allot those funds for obligations including by purchasing a service, entering into a contract, awarding a grant, or otherwise taking an action that requires the government to make a payment. *See* OMB Circular No. A-11, §§ 120.45–120.47.

events related to border security" in Fiscal Year 2026, rather than for other purposes in Fiscal Year 2027. *Id.* ¶ 4; *see also* Decl. of Holly C. Mehringer, dated Oct.10, 2026, ("Mehringer Decl."), ¶ 4, attached as Ex. B. OMB approved CBP's request that same day. Woolf Decl. ¶ 5.

On or about September 20, 2026, CBP used the reapportioned funds to issue a $20 million purchase order for media services to a vendor under a previously awarded blanket purchase agreement. *Id.* ¶ 3. The terms of the Purchase Order required the vendor to provide media buy support with media outlets and programs on a national level. *Id*. The Purchase Order did not fund the creation or production of any videos or media; it only funded the airing of preexisting media. *Id*. ¶ 6.

The Purchase Order's period of performance is September 20, 2026, through September 19, 2027, or until all deliverables and media placements have occurred. *Id*. ¶ 7. The vendor has currently purchased media buys under the terms of the Purchase Order through Sunday, October 11, 2026. *Id*. ¶ 8. DHS has directed the vendor not to make any additional media buys past October 11 and expects that the vendor will submit its final invoice for services performed under the Purchase Order after that date. *Id*. Once that invoice is paid for services rendered through October 11, any residual funding left under the Purchase Order will be deobligated. *Id.* ¶ 9.[2]

DHS has no plans to make any additional media buys under the Purchase Order, or to renew the Purchase Order, or otherwise use appropriated funds on any similar contracts for the creation or distribution of the media that is the subject of this lawsuit. *Id*. ¶ 10.

## II. Relevant Statutory Background

The Purpose Act provides that appropriations should be used for their intended purpose. *See* 31 U.S.C. § 1301(a) ("[A]ppropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law."). The Consolidated

[2] "Deobligation" refers to "[a]n agency's cancellation or downward adjustment of previously incurred obligations." *See* GAO, A Glossary of Terms Used in the Federal Budget Process, *Deobligation*, https://www.gao.gov/assets/gao-05-734sp.pdf (last accessed Oct. 11, 2026).

Appropriations Act provides that: "No part of any appropriation contained in this or any other Act shall be used directly or indirectly . . . for publicity or propaganda purposes within the United States not heretofore authorized by Congress." Pub. L. No. 119-75, § 718, 140 Stat. at 495. And the Antideficiency Act states that an officer or employee of the United States may not "involve [the] government in a contract or obligation for the payment of money before an appropriation is made unless authorized by law," 31 U.S.C. § 1341(a)(1)(B).

**III. This Litigation**

Plaintiff initiated this action on October 7, 2026. *See* Compl. It brought two claims. First, it brought an APA claim against OMB and DHS, challenging OMB's apportionment of appropriated funds, and DHS's contracting and expenditure of appropriated funds, to air the challenged ads. *Id.* ¶ 184–192 (Count I). That Count alleges that the challenged action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" *Id.* ¶ 186 (quoting 5 U.S.C. § 706(2)(A)). And second, it brought an *ultra vires* claim against the President and the White House Office, alleging that using taxpayer funds to develop and air the ads violates the Purpose Act, the Antideficiency Act, and the statutory ban on using appropriated funds for "publicity and propaganda." *Id.* ¶ 195 (Count II). Two days later, Plaintiff moved for a Temporary Restraining Order, "prohibiting the White House Office, OMB, and DHS from further use of appropriated funds for 'publicity and propaganda' purposes, including the airing of the propaganda ads at issue, future use of propaganda ads developed at public expense, allocating funds to air such ads, and creating similar ads for future use, as well as stay related OMB and DHS action." DNC's Mot. for a TRO (or Prelim. Inj.) & § 705 Stay at 2, ECF No. 3 ("Pl.'s Br.").

## LEGAL STANDARD

"The court considers the same factors in ruling on a motion for a temporary restraining order and a motion for a preliminary injunction." *Elec. Priv. Info. Ctr. v. FTC*, 844 F. Supp. 2d 98, 101 (D.D.C.) (quoting *Morgan Stanley DW Inc. v. Rothe*, 150 F. Supp. 2d 67, 72 (D.D.C. 2001)), *aff'd*, 2012 WL 1155661 (D.C. Cir. Mar. 5, 2012). "A preliminary injunction is an extraordinary and drastic remedy." *Munaf v. Geren*, 553 U.S. 674, 689 (2008) (citation omitted). It is "never awarded as of right," *id.* at 690, and "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion," *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted); *accord Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009). The movant must satisfy a four-prong test, establishing "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *accord Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011).

The same factors govern Plaintiff's request for a stay under 5 U.S.C. § 705. *See Advocs. for Hum. Rts. v. Blanche*, 838 F. Supp. 3d 1, 9 (D.D.C. 2026). For the same reasons Plaintiff is not entitled to a TRO, Plaintiff is not entitled to a Section 705 stay (which could only apply to OMB and DHS, since the APA does not apply to the President or the White House Office). *See Franklin v. Massachusetts*, 505 U.S. 788, 800–01 (1992); *Soucie v. David*, 448 F.2d 1067, 1075 (D.C. Cir. 1971).

## ARGUMENT

Plaintiff's motion fails for several reasons. First, Plaintiff cannot show that it is likely to suffer irreparable harm absent preliminary relief, because its purported injury is based on the airing of the challenged ads with federal funds. *See* Pl.'s Br. at 21 ("Each publication of an illegally-funded ad inflicts harm[.]"). But those ads will not air using federal funds after today, Sunday, October 11, 2026. The TRO should be denied on this basis alone. In any event, Plaintiff is also unlikely to succeed on the merits of its APA claim, and it has not shown a "clear and specific"

violation of a statutory prohibition to justify *ultra vires* relief. Nor do the equities support injunctive relief. The motion should be denied.

## I. Plaintiff Will Not Suffer Irreparable Harm—or Indeed, Future Harm—Absent a TRO

To meet its burden on irreparable harm, Plaintiff must show that "[t]he injury complained of [is] of such *imminence* that there is a 'clear and present' need for equitable relief to prevent irreparable harm." *Wis. Gas Co. v. Fed. Energy Regul. Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985) (quoting *Ashland Oil, Inc. v. Fed. Trade Comm'n*, 409 F. Supp. 297, 307 (D.D.C. 1976)). And "the injury must be both certain and great," *id.* Plaintiff claims it needs a temporary restraining order to prevent Defendants from "continu[ing] to publish the illegal ads through Election Day." Pl.'s Br. at 21. But no such relief is needed because, as Plaintiff concedes, the Administration has already committed to not using additional public funds to air these ads moving forward. And the ads are only airing under the terms of the Purchase Order through today, Sunday, October 11, 2026. *See* Mehringer Decl. ¶ 8. DHS directed the vendor not to purchase additional airtime beyond today, so no additional liabilities to be paid out of federal funds will incur starting tomorrow. *Id.* While the vendor will be paid for services already rendered from the apportioned appropriation, any residual funding left over after those services are paid for will be deobligated. *Id.* ¶¶ 8, 9. And DHS has no plans to make additional purchases under the Purchase Order, or to renew the Purchase Order, or to "otherwise use appropriated funds on any similar contracts for the creation or distribution of the media that is the subject of this lawsuit," *id.* ¶ 10. There is therefore nothing for this Court to enjoin, and Plaintiff has not shown that it faces any future harm. The absence of future harm is fatal to Plaintiff's motion for a TRO. *See Winter*, 555 U.S. at 20 (explaining that the movant must show "that he is likely to suffer irreparable harm in the absence of preliminary relief").

Plaintiff cannot justify its request for prospective injunctive relief by pointing to past injury. *See Halkin v. Helms*, 690 F.2d 977, 1005 (D.C. Cir. 1982) ("[P]ast injury alone is not

sufficient to merit the award of relief against future conduct. A great deal more is required, particularly when the relief sought would broadly enjoin the conduct of vital governmental functions which require the exercise of discretion in a myriad of unpredictable circumstances."); *Advocs. for Hum. Rts.*, 838 F. Supp. 3d at 13 ("Evidence of prior unlawful conduct, however, does not necessarily establish standing for a preliminary injunction, which requires an imminent *future* injury."); *United States v. Bolton*, 468 F. Supp. 3d 1, 6 (D.D.C. 2020) (government was not entitled to injunctive relief given that injunction would no longer prevent irreparable injury); *cf. United States v. Or. State Med. Soc'y*, 343 U.S. 326, 333 (1952) ("The sole function of an action for injunction is to forestall future violations. It is so unrelated to punishment or reparations for those past[.]").

The need to show future injury is also required to establish Article III standing to seek prospective injunctive relief. Because "standing is not dispensed in gross[,] [the] plaintiff[] must demonstrate standing for each claim that [it] press[es] and for each form of relief that [it] seek[s]." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). Here, to obtain the mandatory, forward-looking injunction Plaintiff seeks, it must show "a real and immediate threat of repeated injury[.]" *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974)); *see also City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983) ("[Plaintiff's] standing to seek the injunction requested depended on whether he was likely to suffer future injury from the [challenged practice.]"); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) ("[A]llegations of *possible* future injury are not sufficient." (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990))). Plaintiff cannot make this showing for the reasons explained above—no more federal funds will be used to air these ads. And "[i]f appropriated funds are not involved, there is no violation [of federal appropriations law] no matter how blatant the conduct may be." *See* Principles of Federal Appropriations Law at 3-283.

Thus, whether framed in terms of substantive principles governing the grant of equitable relief or standing, this Court cannot grant the relief Plaintiff requests.

## II. Plaintiffs Are Unlikely to Succeed on the Merits

### A. Plaintiff is Unlikely to Succeed on the Merits of the APA Claim

#### 1. As to OMB, Plaintiff Has Not Challenged Final Agency Action

Plaintiff contends that OMB's apportionment of the appropriated funds that DHS later obligated to a contract for the media buys constitutes a final agency action. Under the APA, aggrieved parties may only challenge "agency action" that is arbitrary, capricious, or otherwise not in accordance with law. *See* 5 U.S.C. § 706(2). The APA defines agency action as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act . . . ." *See id.* § 551(13). Each category is further defined. *See id.* § 551. And any agency action must be "final" to be subject to judicial review. *See id.* § 704. For an agency action to be final, it must be both (a) "the 'consummation' of the agency's decision-making process," and (b) a decision "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citations omitted); *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 148 (1967). In other words, for the challenged action to be final, it must "inflict[] an actual, concrete injury," *Darby v. Cisneros*, 509 U.S. 137, 144 (1993). By contrast, if an action affects the challenger's rights only "on the contingency of future administrative action," it is not final. *DRG Funding Corp. v. Sec'y of Hous. & Urb. Dev.*, 76 F.3d 1212, 1214 (D.C. Cir. 1996) (quoting *Rochester Tel. Corp. v. United States*, 307 U.S. 125, 130 (1939)); *see also Franklin*, 505 U.S. at 797 (to be final, the action must "directly affect the parties.").

Here, OMB's decision to approve the reapportionment of funds at CBP's request made additional funds available to CBP for potential future obligation. *See* Woolf Decl. ¶¶ 4–6. Obligation is the act by which an agency commits to spend apportioned funds for a specified

purpose. OMB's approval of the reapportionment did not itself obligate any portion of the funds or determine how they ultimately would be spent. *Id.* ¶ 6.

Plaintiff's theory of harm is contingent on what came next: DHS's contracting with a vendor to air the ads. *See* Pl.'s Br. at 21 ("Each *publication* of an illegally-funded ad inflicts harm[.]" (emphasis added)). And even after OMB apportioned the funds, DHS had broad discretion to decide how to use the funds apportioned and could have used the funds for something else, consistent with its congressional directives. In other words, while apportionment may be necessary for the funding of the ads, it is not sufficient for them. Because OMB's decision to reapportion the funds therefore affects Plaintiff only "on the contingency of [DHS's] future administrative action," and does not itself inflict any injury on Plaintiff, it is not final agency action. *DRG Funding Corp.*, 76 F.3d at 1214 (citation omitted).

Accordingly, while OMB's approval completed its consideration of CBP's particular reapportionment request, it did not determine whether, when, or how the additional funds would be obligated or expended. Those decisions required separate action by CBP. The fact that OMB completed one stage of the budgetary process does not mean that it consummated the distinct decision-making process concerning the advertising activity Plaintiff seeks to challenge. The relevant distinction is between OMB's authorization of budgetary resources and CBP's subsequent exercise of its procurement authority. The former established the availability of funds, and the latter determined whether and how those funds would be committed to particular services.

Subsequent developments in the lifecycle of appropriated funds further illustrate this distinction. Apportionments are effective only for the fiscal year to which they apply, and unobligated balances from multiyear appropriations must be apportioned again in subsequent fiscal years. Woolf Decl. ¶¶ 7–8. Thus, any particular apportionment or reapportionment does not irrevocably determine the ultimate disposition of the appropriated funds. Rather, the continued availability and use of those resources remains subject to applicable fiscal year limitations,

subsequent apportionments, and independent agency decisions concerning obligation and expenditure.

Plaintiff therefore cannot establish final agency action with respect to OMB because any alleged injury resulting from the placement of the ads arises, if at all, from subsequent decisions of other agencies. Plaintiff is thus not likely to succeed on the merits of its APA claim as against OMB.

**2. Plaintiff's APA Claim Against DHS Is Also Unlikely to Succeed**

At the outset, the airing of the ads is not itself an agency action. The APA allows only for review of "agency action." 5 U.S.C. §§ 702, 704. The statute carefully defines "agency action" to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." *Id.* § 551(13). Each category is further defined.[3] *See also Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004) (*SUWA*) (explaining that "[a]ll of those categories involve circumscribed, discrete agency actions"). Crucially, the APA does not authorize "general judicial review of the [agency's] day-to-day operations," *Lujan v. Nat'l Wildlife Fed'n*,

[3] "[R]ule" "means the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency." 5 U.S.C. § 551(4).

"[O]rder" "means the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing." *Id.* § 551(6).

"[L]icense" "includes the whole or a part of an agency permit, certificate, approval, registration, charter, membership, statutory exemption or other form of permission." *Id.* § 551(8).

"[S]anction" "includes the whole or a part of an agency—(A) prohibition, requirement, limitation, or other condition affecting the freedom of a person; (B) withholding of relief; (C) imposition of penalty or fine; (D) destruction, taking, seizure, or withholding of property; (E) assessment of damages . . . ; (F) requirement, revocation, or suspension of a license; or (G) taking other compulsory or restrictive action." *Id.* § 551(10).

"[R]elief" "includes the whole or a part of an agency—(A) grant of money, assistance, license, authority, exemption, exception, privilege, or remedy; (B) recognition of a claim, right, immunity, privilege, exemption, or exception; or (C) taking of other action on the application or petition of, and beneficial to, a person." *Id.* § 551(11).

497 U.S. 871, 899 (1990), or cover "all conduct such as, for example, constructing a building, operating a program, or performing a contract," *Vill. of Bald Head Island v. U.S. Army Corps of Eng'rs*, 714 F.3d 186, 193 (4th Cir. 2013). The term "agency action" is "not so all-encompassing as to authorize us to exercise judicial review over everything done by an administrative agency." *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004) (Roberts, J.).

"Airing" the ads fits into none of these categories, and therefore does not constitute an agency action that is reviewable under the APA. *See City of Phila. v. Sec'y U.S. Dep't of Interior*, 179 F.4th 169, 183 (3d Cir. 2026) (holding that an agency's decision to remove exhibits from a National Park site was not an "agency action" because it did not satisfy any of the definitions for "rule, order, license, sanction, [or] relief" (quoting 5 U.S.C. § 551(13))).

To the extent Plaintiff seeks to enjoin the contract that DHS entered into with the vendor, that effort fails as well. *See* Proposed Order at 2, ECF No. 3-2 (proposing that the Court enjoin the vendor from continuing to run the ads).

*First*, no injunction is necessary because, as explained above, media buys are purchased under the contract only through today, October 11, 2026. DHS has no plans to make additional media buys under the order, reopen the order, or enter into new contracts for the creation or distribution of the media challenged in this litigation. Mehringer Decl. ¶ 10. The Purchase Order will be withdrawn and closed after today, so there is nothing for the Court to enjoin.

*Second*, even if the contract were to continue, this Court could not enjoin or set aside the contract, particularly given that the vendor is not a party to this litigation. *See, e.g.*, *Nat. Res. Def. Council v. Kempthorne*, 539 F. Supp. 2d 1155, 1185 (E.D. Cal. 2008) ("It is well-settled that in an action to set aside a contract, all parties to the contract must be present."); *Kescoli v. Babbitt,* 101 F.3d 1304, 1310 (9th Cir. 1996) (where the plaintiff's action would affect agreements to which tribes were parties, tribes were necessary pursuant to Rule 19); *see also* Fed. R. Civ. P. 19 (providing that necessary parties claim an interest in the subject of the action such that disposing

of the action in their absence may impair their ability to protect their interests). Here, the vendor "claims an interest relat[ed] to subject of the action"—the Purchase Order for the media buys—such that "disposing of the action in [its] absence may" "impair or impede [its] ability to protect [its] interest." Fed. R. Civ. P. 19(a)(1)(B). The vendor's interests would be affected, for example, if the government were precluded from paying its debts to the vendor pursuant to any court order. Therefore, if the Court were to contemplate the relief Plaintiff requests, the vendor would be a necessary party.

Even if there were final agency action that Plaintiff could properly challenge in this litigation, Plaintiff's challenge seeks to enforce specific appropriations laws. But Congress has provided for other mechanisms to enforce appropriations laws, *see, e.g.*, 31 U.S.C. § 1351 (Reports on violations of the Antideficiency Act), so Plaintiff has not clearly shown that it, as a private party, can vindicate the interests it asserts in this litigation through the APA. *See Thurston v. United States*, 696 F. Supp. 680, 683 (D.D.C. 1988) (holding that "[n]o private right of action for declaratory, mandatory or injunctive relief exists under [the Antideficiency Act]" because the Act "explicitly sets forth procedures for reporting violations . . . and enforcing its provisions"); *Feldman v. Bowser*, 315 F. Supp. 3d 299, 305 (D.D.C. 2018) (Jackson, K.B., J.) (same). Moreover, given the historic centrality of the political branches in decisions concerning the allocation of federal funds, *cf. Lincoln v. Vigil*, 508 U.S. 182, 192 (1993), and Congress's authority to oversee federal agencies, disputes in this area are better left to the political process than the courts.

### B. Plaintiff's *Ultra Vires* Claim Is Unlikely to Succeed

Plaintiff's *ultra vires* claim alleges that the President and the White House Office improperly used taxpayer dollars to air the challenged ads in violation of the Antideficiency Act, the Purpose Act, and the ban on using appropriated funds for "publicity or propaganda," Pub. L. 119-75, § 718, 140 Stat. at 495. At the outset, "the President is not an agency. So it is unclear whether *ultra vires* review is available at all." *Am. Foreign Serv. Ass'n v. Trump*, No. 25-5184,

2025 WL 1742853, at *2 (D.C. Cir. June 20, 2025); *see also id.* ("[A]n *ultra vires* action is a suit in equity, . . . and courts generally lack authority to enjoin the President." (citations omitted)); *Franklin v. Massachusetts*, 505 U.S. 788, 802–03 (1992) (plurality op.) (federal courts have "no jurisdiction of a bill to enjoin the President in the performance of his official duties"); *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) ("With regard to the President, courts do not have jurisdiction to enjoin him." (citation omitted)); *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1867).[4]

Even assuming *ultra vires* review is available, as the Court did in *Dalton v. Specter*, 511 U.S. 462, 474 (1994), to prevail on an *ultra vires* claim, the plaintiff must establish that: 1) "review is not expressly precluded by statute;" 2) "there is no alternative procedure for review of the statutory claim;" and 3) "the challenged action is plainly in excess of [the executive's] delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory." *Glob. Health Council v. Trump*, 153 F.4th 1, 20 (D.C. Cir. 2025) (citation omitted), *denying reh'g en banc*, 2025 WL 2709437 (D.C. Cir. Aug. 28, 2025); *see also Nuclear Regul. Comm'n*, 605 U.S. at 681 (explaining that *ultra vires* review applies only when an executive "has taken action entirely 'in excess of its delegated powers and contrary to a *specific prohibition*' in a statute" (citation omitted)).

A defendant "violates a clear and mandatory statutory command only when the error is so extreme that one may view it as jurisdictional or nearly so." *Glob. Health Council*, 153 F.4th at 20; *Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 764 (D.C. Cir. 2022) ("[*U*]*ltra vires* claims are confined to extreme error where the executive has stepped so plainly beyond the bounds

[4] The same principles that foreclose injunctive relief also foreclose declaratory relief. *See Franklin*, 505 U.S. at 827 (Scalia, J., concurring in part and concurring in the judgment). And the Supreme Court has twice held that causes of action that are available against other government officials should not be extended to the President absent a clear statement by Congress. *See Nixon v. Fitzgerald*, 457 U.S. 731, 748 n.27 (1982); *Franklin*, 505 U.S. at 801.

of [its statutory authority], or acted so clearly in defiance of it, as to warrant the immediate intervention of an equity court[.]" (citation omitted)).

By contrast, "vague statutory provisions, such as one that requires an agency to use 'appropriate data' to calculate a payment amount, are not sufficiently clear and mandatory to warrant non-APA review." *Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*, 26 F.4th 960, 971 (D.C. Cir. 2022); *see also Fed. Express Corp.*, 39 F.4th at 764 ("Only error that is 'patently a misconstruction of the Act,' that 'disregard[s] a specific and unambiguous statutory directive,' or that 'violate[s] some specific command of a statute' will support relief." (citation omitted)). The "claim is essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds." *Nuclear Regul. Comm'n*, 605 U.S. at 681-82 (quoting *Nyant v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009)).

Here, Plaintiff contends that the ads are contrary to the prohibition on using federal funds "for publicity or propaganda purposes," Pl.'s Br. at 17 (citing Pub. L. No. 119-75, § 718, 140 Stat. at 495). But the Act does not define "publicity" or "propaganda." *See* Principles of Federal Appropriations Law at 3-281 ("[T]here is no definition of either term."); *see also id.* at 3-282 ("[T]he prohibitions themselves provide little definitional guidance as to what specific activities are publicity or propaganda").

And "[i]n construing and applying a publicity or propaganda provision," *id.* at 3-281, it is necessary to "achieve a delicate balance between competing interests." *Id.* On the one hand, the Executive "has a legitimate right to explain and defend its policies and respond to attacks on th[ose] polic[ies]." *Id.* at 3-294. So "[t]o restrict all materials that have some political content or express support of an Administration's policies would significantly curtail th[at] recognized and legitimate exercise of the Administration's authority to inform the public of its policies, to justify its policies and to rebut attacks on its policies." *Id.* at 3-296 (citation omitted). It is also "important for the public to understand the philosophical underpinnings of the policies advanced by elected officials

and their staff in order for the public to evaluate and form opinions on those policies." *Id.* (citation omitted). On the other hand, the statute must mean something, so if the activity in question is "completely devoid of any connection with official functions," then the use of appropriated funds will be improper. *Id.* at 3-294 (citation omitted).

In light of the foregoing considerations, Plaintiff is unlikely to show that the statute provides a "clear and specific statutory mandate," *Fed. Express Corp.*, 39 F.4th at 766, that would justify *ultra vires* review.

Plaintiff also claims that the alleged violations of the Purpose Act and the Antideficiency Act are sufficient to support *ultra vires* review. The Purpose Act provides that appropriations should be used for their intended purpose. *See* 31 U.S.C. § 1301(a) ("[A]ppropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law."). For reasons similar to those set forth above in connection with the prohibition on using funds for "publicity or propaganda," the Purpose Act's directive to use funds for which they are intended is likewise not sufficiently clear or specific to support *ultra vires* review. For its part, the Antideficiency Act directs that an officer or employee of the United States may not "involve [the] government in a contract or obligation for the payment of money before an appropriation is made unless authorized by law," *id.* § 1341. But not every violation of the Purpose Act automatically violates the Antideficiency Act. *See* Principles of Federal Appropriations Law at 3-12. The lack of clarity underscores the unavailability of *ultra vires* review. In all events, the Antideficiency Act is not privately enforceable. *See Thurston*, 696 F. Supp. 680 at 683; *Feldman*, 315 F. Supp. 3d at 305.

## III. The Remaining Preliminary Injunction Factors Favor the Government

Plaintiff has not shown that "the balance of equities and consideration of the public interest" favor a preliminary injunction. *Winter*, 555 U.S. at 32. Where, as here, the Government is the defendant, these factors "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009). The

Government will imminently cease the conduct of which Plaintiff complains—the airing of the challenged ads with public funds—so Plaintiff will suffer no harm moving forward, and no prospective relief could remedy any claimed past harms. Therefore, any prospective relief would burden the Government to no benefit for the Plaintiff. Nor is it appropriate to issue injunctive relief that would preclude vendors from settling their debts with the government or constrain unknown and hypothetical government action. These factors thus weigh against granting the requested relief.

Finally, if the Court were to grant Plaintiff's motion, the Government respectfully requests that any injunctive relief be accompanied by a bond under Fed. R. Civ. P. 65(c). *See also Nat'l Treasury Emps. Union v. Trump*, No. 25-5157, 2025 WL 1441563, at *3 n.4 (D.C. Cir. May 16, 2025) (per curiam) ("[I]njunction bonds are generally required."). The Government also respectfully requests that such relief be stayed pending the disposition of any appeal that is authorized. *See Hilton v. Braunskill*, 481 U.S. 770, 776 (1987) (setting forth the factors "regulating the issuance of a stay").

**CONCLUSION**

For the reasons above, the Court should deny Plaintiff's Motion for a Temporary Restraining Order.

Dated: October 11, 2026

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*
*Civil Division*

JOSEPH E. BORSON
NOAH T. KATZEN
*Assistant Branch Directors*

*/s/ Elisabeth J. Neylan*
Elisabeth J. Neylan (N.Y. Bar Reg. Number 6125736)

William I. Friedman (N.Y. Bar Reg.
Number 4039509)
*Trial Attorneys*
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20530
Telephone: (202) 616-3519
Email: elisabeth.j.neylan@usdoj.gov

*Attorneys for the United States*