**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DEMOCRATIC NATIONAL COMMITTEE,<br><br>Plaintiff,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, THE WHITE HOUSE OFFICE, OFFICE OF MANAGEMENT AND BUDGET, and U.S. DEPARTMENT OF HOMELAND SECURITY,<br><br>Defendants. | Civil Action No. 1:26-cv-3506 (LLA) |

# **REPLY MEMORANDUM IN SUPPORT OF THE DNC'S MOTION FOR A TEMPORARY RESTRAINING ORDER (OR PRELIMINARY INJUNCTION) AND § 705 STAY**

# TABLE OF CONTENTS

INTRODUCTION ..... 1

ARGUMENT ..... 2

I. The Propaganda Ads Violate the Prohibition on Use of Taxpayer Funds for Publicity or Propaganda, the Purpose Statute, and the Antideficiency Act. ..... 2

II. The DNC Continues to Face Irreparable Harm from the Propaganda Ads. ..... 3

A. The White House Office Has Not Ceased Its Unlawful Conduct. ..... 4

B. The White House, OMB, and CBP Cannot Avoid an Injunction Through an Uncertain Voluntary Cessation Claim. ..... 4

C. If Voluntary Cessation Does Not Apply, This Matter Would Be Capable of Repetition Yet Evading Review. ..... 9

III. The DNC Is Likely to Succeed on the Merits of Its APA Claim and Ultra Vires Claims ..... 10

A. OMB's Deliberate Use of Allocation to Facilitate the Propaganda Ads Is Final Agency Action. ..... 11

B. DHS Is Engaging in Agency Action to Air the Propaganda Ads. ..... 12

C. The DNC Is Likely to Succeed on the Merits of Its *Ultra Vires* Claim ..... 14

IV. The Remaining Factors Demand Relief. ..... 17

CONCLUSION ..... 18

## INTRODUCTION

The Trump Administration has now spent at least $19 million in taxpayer funds on advertisements extolling the virtues of President Trump, including an advertisement nearly identical to a 2024 campaign ad (the Propaganda Ads). This flies in the face of Congress's prohibition on use of appropriations for "publicity or propaganda," a bar long understood to cover self-aggrandizement and purely partisan materials. Despite President Trump's earlier promise that the ads would no longer air using federal funds, the Propaganda Ads were still on the air when the Democratic National Committee (DNC) brought suit, when the DNC filed the instant motion, and even when Defendants submitted their opposition brief. Defendants deny none of this. Rather, they claim that a promise to cease airing the Propaganda Ads at public expense in the future deprives this Court of jurisdiction, so long as their chosen declarant is unaware of future plans to spend Department of Homeland Security (DHS) funds on publicity or propaganda. Such insubstantial evidence of voluntary cessation cannot defeat the DNC's claim. Nor does it address the DNC's challenge to the use of White House Office staff to develop the Propaganda Ads, which President Trump has promised to continue airing in ad slots purchased by MAGA Inc.

Defendants' remaining arguments require this Court to substitute a mundane story of allocation and obligation for the complete evidence presented in the DNC's motion. Even Defendants confirm that the Propaganda Ads did not originate within DHS, so these technical processes do not fully explain the unlawful agency action. Further, defenses that Office of Management and Budget (OMB) and DHS actions are not "final agency action" or "action" contradict plain logic and the decisions of this Court. And the assertion that the publicity or propaganda ban is not a clear prohibition enforceable through *ultra vires* review asks this Court to ignore the plain meaning and decades of GAO opinions successfully applying the ban.

The U.S. District Court for the Southern District of New York has already enjoined and stayed use of DHS funds to air the Propaganda Ads, including staying the OMB apportionment and DHS vendor payments. *See* Order, *Common Cause v. Dep't of Homeland Security*, No. 1:26-cv-8882 (S.D.N.Y. Oct. 11, 2026) (Doc. 41); *see also Common Cause v. Dep't of Homeland Security*, No. 1:26-cv-8882, 2026 WL 3043900 (S.D.N.Y. Oct. 12, 2026). Even so, the Propaganda Ads continued to air the following day. Lindholm Supp Decl. Ex. 3; *see also* Compliance Rep., *Common Cause v. Dep't of Homeland Security*, No. 1:26-cv-8882 (S.D.N.Y. Oct. 12, 2026) (Doc. 44). Moreover, the *Common Cause* Order expires on October 25 and does not address the *ultra vires* activities of the White House Office. *See Common Cause* Order at 2–3; *see also* Defs.' Mem. 14, *Common Cause v. Dep't of Homeland Security*, No. 1:26-cv-8882 (S.D.N.Y. Oct. 11, 2026) (Doc. 37) (requesting Rule 65(c) bond in apparent anticipation of appeal). This Court can and should order the emergency relief requested.

## ARGUMENT

### I. The Propaganda Ads Violate the Prohibition on Use of Taxpayer Funds for Publicity or Propaganda, the Purpose Statute, and the Antideficiency Act.

The DNC's opening brief lays out a damning indictment of the Trump Administration's misuse of taxpayer funds. *See* DNC Mem. 2–14. (Doc. 3-1). Yet on the fundamental issues before this Court, the White House Office, OMB, and CBP offer no defense. They acknowledge that Congress has prohibited use of appropriated funds for "publicity or propaganda." Defs.' Mem. 3–4 (Doc. 9) (quoting Consolidated Appropriations Act, Pub. L. No. 119-75, § 718, 140 Stat. 173, 495 (2026)). They do not address, and thus concede, that the Love Me Ad, the Maduro Ad, the Final Battle Ad, the Mount Rushmore Ad, and the American Military Power Ad are each publicity, propaganda, or both and that developing and airing them at public expense violated the Antideficiency Act, 31 U.S.C. § 1341(a)(1)(A). *See* DNC Mem. 4–6, 9–10, 12–13; *see also, e.g.*,

fig.1, *infra*. They also do not address, and again concede, that buying airtime for the Propaganda Ads is not spending on "commemorating efforts and events related to border security," the budget line used, in violation of the Purpose Statute, 31 U.S.C. § 1301. *See* DNC Mem. 4–6, 12–14. In this Court, Defendants do not repeat the White House's public defense of the Propaganda Ads as "public service announcements." DNC Mem. 11–12. Finally, the White House Office, OMB, and CBP do not contest, and thus concede, that the DNC has suffered an injury in fact—under both *Bost v. Illinois State Board of Elections*, 607 U.S. 71 (2026) and competitive injury theories—that is fairly traceable to their conduct. Use of federal funds to develop and air the Propaganda Ads violates fundamental separation-of-powers principles and is the essential context of all that follows. *See Common Cause*, 2026 WL 3043900, *2–6, *14–16.

**Figure 1: The Final Battle Ad**




**II. The DNC Continues to Face Irreparable Harm from the Propaganda Ads.**

The White House Office, OMB, and CBP center their defense on the questionable claim that they have ceased their unlawful conduct and the erroneous notion that voluntary cessation of illegal activity after litigation has commenced precludes injunctive relief and deprives this Court of Article III jurisdiction. Defs.' Mem. 6–8. The White House Office's unlawful conduct continues, and the White House, OMB, and CBP's arguments rest on unmet promises to federal

courts and the American people. Even if Defendants could prove that they have stopped paying to air the Propaganda Ads, voluntary cessation of unlawful conduct does not deprive this Court of jurisdiction where—as here—Defendants have failed to "show that the practice cannot 'reasonably be expected to recur.'" *FBI v. Fikre*, 601 U.S. 234, 241 (2024) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000)).

### A. The White House Office Has Not Ceased Its Unlawful Conduct.

Defendants do not address, and thus concede, that the White House Office created the Propaganda Ads and is continuing to facilitate their use. *See* DNC Mem. 1–3, 6, 8, 13, 16–23. President Trump has committed that the Propaganda Ads will continue to air. *See* Lindholm Decl. Ex. 13. (Doc. 3-4). Even if payment for airtime transitions entirely from taxpayer dollars to political committees or Super PACs—which is far from certain, *see* Section II.B, *infra*—the DNC will continue to be harmed, and this harm will still be attributable to the White House Office's unlawful conduct. *See* DNC Br. 22. The White House Office has used public employees as a political advertising firm, creating propaganda ads devoid of informational value and posting them on official social media feeds. *See, e.g.*, Lindholm Decl. Ex. 22; *see also* Mehringer Decl. ¶ 6 (Doc. 9-2) ("None of [DHS's] appropriated funds were used to create or produce any of the media that aired under the terms of the Order."). Indeed, new propaganda ads have appeared on official social media feeds during briefing. *E.g.*, Lindholm Supp. Decl. Ex. 7. Any use of salary appropriations to develop ready-to-air video files containing publicity or propaganda or to provide such files to a media buyer or political committee irreparably harms the DNC. *See* DNC Br. 20.

### B. The White House, OMB, and CBP Cannot Avoid an Injunction Through an Uncertain Voluntary Cessation Claim.

Defendants do not contest, and thus concede, that when the DNC filed suit and filed the instant motion, the DNC faced a "a real and immediate threat" of future, irreparable harm. *Murthy*

*v. Missouri*, 603 U.S. 43, 58 (2024) (internal quotation marks and citation omitted); *see also, e.g.*, *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) (explaining that after election deadlines "there can be no do over and no redress" (internal quotation marks and citation omitted)); *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 486 (2d Cir. 2013) (noting that harm can be "particularly irreparable" in the electoral context because "timing is of the essence in politics and a delay of even a day or two may be intolerable"). Only now do the White House Office, OMB, and CBP claim that the DNC faces no future injury, let alone "irreparable harm," because the Propaganda Ads will have ceased to air before briefing concludes on the instant motion. Defs.' Mem. 6–8. And so the proper framework of analysis is mootness, rather than an initial standing claim. *See, e.g.*, *City of Erie v. Pap's A.m.*, 529 U.S. 277, 287 (2000); *Pub. Citizen, Inc. v. FERC*, 92 F.4th 1124, 1128 (D.C. Cir. 2024) ("A case is moot if a decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future." (internal quotation marks and citation omitted)). "Typically, an end to offending behavior moots a case. But there are exceptions." *PETA v. USDA*, 918 F.3d 151, 157 (D.C. Cir. 2019).[1]

"The party seeking jurisdictional dismissal must establish mootness," a burden the White House Office, OMB, and CBP cannot bear. *Mehneh v. Rubio*, 164 F.4th 928, 931 (D.C. Cir. 2026)

[1] Most of the cases on which Defendants rely are inapposite, as they address matters in which there was no ongoing harm at the time the matter or request for injunctive relief was filed, rather than assertions of mootness. *See* Defs.' Mem. 6–8; *see also, e.g.*, *Wis. Gas. Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (rejecting "unsubstantiated and speculative allegations" of economic injury); *Halkin v. Helms*, 690 F.2d 977, 1005 (D.C. Cir. 1982) (rejecting claim based on "past injury"). The only case with a passing resemblance to this one is *United States v. Bolton*, in which the United States sought a TRO against publication of a book allegedly containing classified material. 468 F. Supp. 3d 1 (D.D.C. 2020). Yet even in *Bolton*, the defendant had "delivered a final manuscript to his publisher" before the case was filed, defeating redressability. *Id.* at 3. Here, a redressable and irreparable harm was ongoing at filing, which makes all the difference.

(internal quotation marks and citation omitted). To be sure, the President committed on October 5 "to not using additional public funds to air these ads moving forward." Defs.' Mem 6. Yet the Propaganda Ads continued to air. *See* Mehringer Decl. ¶ 8. Defendants then represented to this Court that "the ads are only airing . . . through . . . Sunday, October 11, 2026." Defs. Mem. 6. Yet the Propaganda Ads continued to air on October 12. *See* Lindholm Supp. Decl. Ex. 3. Thus, all evidence before this Court as to the date the Propaganda Ads would cease to air absent the *Common Cause* Order has been discredited. Moreover, LMD Agency (the ad-buy vendor) has yet to be paid, Mehringer Decl. ¶ 9, and so unlawful obligations may yet be enjoined. *See also Common Cause*, 2026 WL 3043900, at *8-10.[2]

Even if the White House Office, OMB, and CBP could credibly represent that the ad campaign is over and all bills have been paid, "voluntary cessation of allegedly illegal conduct does not . . . make the case moot," let alone undermine the prerequisites to injunctive relief. *United States v. W. T. Grant Co.*, 345 U.S. 629, 632 (1953). A defendant cannot "automatically moot a case by the simple expedient of suspending its challenge conduct after it is sued." *Fikre*, 601 U.S. at 241 (internal quotation marks and citation omitted). Rather, the case remains live unless it is "*absolutely clear* that the allegedly wrongful behavior could not reasonably be expected to recur." *Pub. Citizen*, 92 F.4th at 1128 (quoting *Friends of the Earth*, 528 U.S. at 190) (emphasis added). "[S]o long as a case is not moot, litigants otherwise entitled to emergency injunctive relief remain entitled to such relief where the[y] remain under a constant threat that government officials will

[2] The *Common Cause* Order also does not moot this case. "A case is moot if (1) there is no reasonable expectation that the conduct will recur and (2) interim relief or events have completely and irrevocable eradicated the effects of the alleged violation." *Moharam v. TSA*, 134 F.4th 598, 607–08 (D.C. Cir. 2025) (internal citation and quotation marks omitted). The *Common Cause* Order neither governs the White House Office nor lasts beyond October 25. *See Common Cause* Order at 2–3. It is neither complete nor irrevocable.

use their power to reinstate the challenged [action]." *Tandon v. Newsom*, 593 U.S. 61, 63 (2021) (internal quotation marks and citation omitted).

The White House Office, OMB, and CBP cannot meet the "formidable burden" to prove that their wrongful behavior cannot reasonably be expected to recur. *Fikre*, 601 U.S. at 241. Defendants' mootness claim turns on a statement in the Mehringer Declaration:

> As of the date of this declaration and to the best of my knowledge and belief, the Department has no plans to make any additional media buys under the Order or to renew the Order or otherwise use DHS appropriated funds on any similar contracts for the creation or distribution of the media that is the subject of this lawsuit and referenced above.

Mehringer Decl. ¶ 10. Mehringer has already been proven wrong regarding when the Propaganda Ads would stop running. *See supra*. The initial qualifier "As of the date of this declaration" renders the declaration inadequate. *See Fikre*, 601 U.S. at 241–42 (concluding that a declaration that the plaintiff "will not be placed on the No Fly List in the future based on the currently available information" did not moot case). Moreover, the mere fact that the "Senior Official Performing the Duties of the Chief Financial Officer for the United States Department of Homeland Security," Mehringer Decl. ¶ 1, is unaware of politically sensitive plans to use government funds to air Propaganda Ads does not establish that no such plans exist. The qualifier "to the best of my knowledge and belief" indicates that Mehringer cannot speak on behalf of DHS. *Cf. In re Vitamins Antitrust Litig.*, 216 F.R.D. 168, 172 (D.D.C. 2003) (requiring corporate deposition witness to "testify as to matters known or reasonably available to the organization" (quoting Fed. R. Civ. P. 30(b)(6)). Nor does the Mehringer Declaration indicate that any inquiry was made within DHS. *Cf. Covad Commc'ns. Co. v. Revonet, Inc.*, 267 F.R.D. 14, 25 (D.D.C. 2010) (requiring corporate entity to "prepare the deponent so that he or she can testify on matters . . . reasonably known by the responding entity."). Defendants do not contest, and thus concede, that President Trump and

OMB Director Vought made the relevant decisions personally. DNC Mem. 1, 3. The Mehringer declaration does not address actual decisionmakers' intentions—it simply demonstrates that Mehringer is not aware of views of the President or his cabinet. This is not enough. *See also Common Cause*, 2026 WL 3043900, at *9.

In fact, President Trump and Secretary Mullin have indicated that they view government funding of the Propaganda Ads as legal, "standard," and commendable public service announcements, which precludes an "absolutely clear" finding that the challenged conduct will not recur. *Pub. Citizen*, 92 F.4th at 1128. President Trump has posted that airing the Propaganda Ads at public expense was "a rather standard thing to do." Lindholm Decl. Ex. 13; *see also* Lindholm Decl. Ex. 12 (White House press release proclaiming that "[t]he attacks on President Donald J. Trump's public service announcements are highly dishonest"). And only days ago, on the purported last day on which the Propaganda Ads were to air, Secretary Mullin said with respect to the Ads, "Any time we can do a public service announcement and brag about America, I'm all for it." Lindholm Supp. Decl. Ex. 4. After refusing to answer questions about whether taxpayers would be reimbursed for the money spent to air the Propaganda Ads, Secretary Mullin continued, "I commend the opportunity of President Trump to give us the opportunity to brag about America." *Id.* These are the words of an official looking for the *next* opportunity to fund similar content.

Finally, President Trump has tied halting efforts to cease airing the Propaganda Ads at public expense to public backlash, even while laying the groundwork for renewed broadcasts. When President Trump first announced a purported end to public funding of the Propaganda Ads on October 5, he observed that "[t]he Radical Left is upset with the fact that I am taking Ads . . . and paying for them with U.S.A. money." Lindholm Decl. Ex. 13. Thus, any end to the illegal ad campaign was likely "in order to avoid litigation." *E.g.*, *Alaska v. U.S. Dep't of Agric.*, 17 F.4th

1224, 1229 (D.C. Cir. 2021) (internal quotation marks and citation omitted). But the next day, OMB apportioned $1,000,000 to the FY27 budget line for "[c]ommemorating efforts and events related to border security," the budget line used in FY27 to finance airing the Propaganda Ads, fully twice the amount of the original FY26 allocation. Woolf Decl. ¶ 9 (Doc. 9-1); *see also* Lindholm Decl. Ex. 15 (indicating original FY26 allocation). And of course, the Propaganda Ads continued to air after President Trump's statement, after the DNC filed suit, after the DNC filed the instant motion, and even after a TRO was entered in *Common Cause*. "[T]he cessation of an ongoing activity pending a lawsuit may well imply an intent to renew the activity once the court has dropped out." *Clarke v. United States*, 915 F.2d 699, 706 (D.C. Cir. 1990); *see also Common Cause*, 2026 WL 3043900, at *9. This Court should reject Defendants' challenges to standing and irreparable harm.

### C. If Voluntary Cessation Does Not Apply, This Matter Would Be Capable of Repetition Yet Evading Review.

Even if this Court were to decline to apply the voluntary cessation doctrine—and it should not—then this action and the instant motion are capable of repetition yet evading review, another exception to mootness. This doctrine applies when "(1) the challenged action is in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party would be subjected to the same action again." *Del Monte Fresh Produce Co. v. United States*, 570 F.3d 316, 322 (D.C. Cir. 2009). "[E]vading review" means review from the U.S. Supreme Court, and so "actions of less than two years' duration cannot be 'fully litigated.'" *Id.* (quoting *Pub. Utils. Comm'n v. FERC*, 236 F.3d 708, 714 (D.C. Cir. 2001)). A reasonable expectation of recurrence requires only that "the legal wrong complained of by the plaintiff is reasonably likely to recur." *Id.* In this action, both prongs are "simultaneously present." *Id.*

Defendants' unlawful allocation and obligation occurred on an expedited basis. OMB received the technical allocation request on September 19 and granted it in under two hours. Woolf Decl. ¶¶ 3–4. CBP has obligated $19 million on airtime in less than three weeks, and the ads ceased airing only after a federal court issued a TRO and § 705 stay. Once again, Defendants re-appropriated the unexpired $1 million for fiscal year 2027 under the same budget line used for the Propaganda Ads. *See id.* ¶ 9. This is significantly less than the two years typically sufficient to meet the "evading review" prong. *See Del Monte*, 570 F.3d at 322.

Unlawful federal spending on the Propaganda Ads is also reasonably likely to recur. President Trump directed OMB and DHS to appropriate funds and use them to air the ads. Lindholm Decl. Ex. 23. Even after suggesting MAGA Inc. would buy airtime in the future, President Trump and others have extolled the ads and framed them as public service announcements. Lindholm Decl. Exs. 12 & 25; Lindholm Supp. Decl. Ex. 10. At any moment, President Trump could once again direct OMB to appropriate funds to unlawfully pay for propaganda ads that the White House Office is continuing to create and post on official social media feeds. Lindholm Supp. Decl. Ex. 5. Further, the unspent $1 million was reallocated to the budget line used to purchase airtime for the Propaganda Ads *after* President Trump claimed MAGA Inc. would henceforth foot the bill. *See* Woolf Decl. ¶ 9. The DNC would also once again be harmed by further ads, for the same reason the DNC has standing here. Thus, the capable of repetition yet evading review doctrine applies.

## III. The DNC Is Likely to Succeed on the Merits of Its APA Claim and *Ultra Vires* Claims.

Aiming to avoid the substance of this dispute, Defendants next argue that neither OMB's apportionment of the appropriated funds nor DHS's obligation of the funds constitute final agency action subject to judicial review and that the "publicity or propaganda" ban is not sufficiently clear

to allow *ultra vires* review. Defs.' Mem. 8-15. They are wrong on each count. Both the OMB apportionment and DHS's obligation of funds via the ad-buy contract are final agency actions. Each "mark[ed] the consummation of the agency's decisionmaking process" and "determined" "rights or obligations" or had "legal consequences." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016). That is enough. *See also Common Cause*, 2026 WL 3043900, at *14 (recognizing Defendants conceded OMB apportionment and DHS contracting were final agency action). And the terms "publicity" and "propaganda" each have an "ordinary, contemporary, common meaning" that this Court can and should apply. *Perrin v. United States*, 444 U.S. 37, 42 (1979). The DNC is likely to succeed on these claims.

### A. OMB's Deliberate Use of Allocation to Facilitate the Propaganda Ads Is Final Agency Action.

The OMB apportionment of $20 million in federal funds for use by CBP constitutes final agency action because it satisfies the well-established *Bennett v. Spear* test. 520 U.S. 154, 177–78 (1997). The question is not whether OMB itself obligated the funds. Defs.' Mem. 9. *Bennett* requires that "the action must mark the consummation of the agency's decision-making process" (*i.e.*, "it must not be of a merely tentative or interlocutory nature") and "must be one by which rights or obligations have been determined, or from which legal consequences will flow." 520 U.S. at 177-78. OMB apportionment meets both prongs.

Apportionment is the final step in OMB's process, constituting the completed, approved plan for the use of budgetary resources, not a tentative recommendation or intermediate step. *See Citizens for Resp. & Ethics in Washington v. Off. of Mgmt. & Budget* (*CREW*), 791 F. Supp. 3d 29, 55 (D.D.C. 2025) (concluding that apportionments are final and not mere "interim decisions"). Indeed, Defendants concede that "OMB's approval completed its consideration of CBP's particular reapportionment request." Defs.' Mem. 9. Defendants suggest that apportionment is

not final because it "does not irrevocably determine the ultimate distribution of appropriated funds," but *Bennett* requires only "consummation," not irrevocability. 520 U.S. at 178.

In turn, apportionment is an action "from which legal consequences will flow." *Bennett*, 520 U.S. at 177-78. Government officers and employees "may not make or authorize an expenditure or obligation exceeding an apportionment," 31 U.S.C. § 1517(a)(1), and criminal consequences may flow from willful failure to abide by an apportionment, *id.* § 1519. OMB itself has issued guidance that apportionments are "legally binding" because they "limit[] the obligations [the agency] may incur." OMB, Circular A-11 § 120.1; *see also CREW*, 791 F. Supp. 3d at 54 (rejecting OMB's claim that apportionments are predecisional based, in part, on guidance). The GAO has also confirmed this understanding. For example, in an April 2025 letter to Congressional leaders, the GAO's General Counsel included correspondence to OMB indicating that apportionments are legally binding and cannot be predecisional or deliberative. B-337581 (Comp. Gen), 2025 WL 1714236, at *16 (June 17, 2025). An apportionment does not merely guide or advise agency conduct—it establishes the outer legal boundary of permissible agency action with respect to the obligation of appropriated funds. It is final agency action.

### B. DHS Is Engaging in Agency Action to Air the Propaganda Ads.

DHS's obligation of funds to air the Propaganda Ads also constitutes a final agency action under *Bennett v. Spear*. Once again, the obligation of funds "mark[s] the consummation of the agency's decisionmaking process" and is not "of a merely tentative or interlocutory nature." *Bennett*, 520 U.S. at 177–78. The award of a contract, the moment at which an agency obligates funds through a legally binding agreement, has been consistently recognized as the consummation of the agency's procurement decisionmaking process. *See, e.g., PETA v. Tabak*, 662 F. Supp. 3d 581, 591 (D. Md. 2023) (holding that NIH's decision to approve and award a grant was the consummation of the agency's decisionmaking process that was of sufficient legal consequence to

make the action final under the APA). Here, not only has DHS entered into a binding contract with LMD Agency, it has incurred obligations of up to $20 million. Defs.' Mem. 3. This marks the culmination of DHS decisionmaking.

Second, DHS's obligation of funds is an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett*, 520 U.S. at 177–78. The issuance of the Purchase Order itself is of sufficient legal consequence to make DHS's action "final" under the APA. *See Tabak*, 662 F. Supp. 3d at 591; *cf. Pride Indus., Inc. v. Comm. for Purchase from People Who Are Blind or Severely Disabled*, 420 F. Supp. 3d 1035, 1045 (E.D. Cal. 2019) ("Without a final decision awarding the contract, the defendants' actions to date are not actions from 'legal consequences will flow.'"). A contract award, such as the Purchase Order, plainly satisfies this requirement. Upon award, the awardee acquires the right to perform the contract and receive payment, the government incurs a binding legal obligation to pay for performance, and unsuccessful bidders lose their opportunity to compete for that procurement. Indeed, the government has admitted that DHS's issuance of the Purchase Order gives rise to at least some legal consequences—namely, that the government must pay invoices for services rendered pursuant to that Purchase Order. Defs.' Mem. 3. The government here recognizes that the Purchase Agreement created enforceable legal rights in the contractor and corresponding duties in the agency. That satisfies *Bennett*.

Defendants seize upon shorthand to imply that the DNC challenges only "airing" of the ads, rather than obligation of allocated funds. Defs.' Mem. 10. Not so. "Airing" denotes the entirety of the procurement process resulting in the reservation of ad slots and the broadcast of the Propaganda Ads. *See, e.g.*, DNC Mem. 13 ("DHS then completed this unlawful action through a contract awarded to LMD Agency Inc."); DNC Mem. 15 (addressing "CBP's subsequent use of

[allocated] funds"). For purposes of the APA, this is an "order." 5 U.S.C. § 551(6). Defendants also suggest that that the DNC seeks to set aside the contract, Defs.' Mem. 11, but once again this is not the case. The Propaganda Ads must no longer be broadcast pursuant to the contract, but Defendants may nonetheless seek a deficiency appropriation to pay for services rendered. *See* Government Accountability Office (GAO), *Principles of Federal Appropriations Law* 2-4 (4th ed. 2016). Even if this Court were to deem LMD Agency a necessary party, it may exercise its discretion to allow provisional relief in this expedited proceeding as an exercise of "equity and good conscience." Fed. R. Civ. P. 19(b); *see also, e.g.*, *Gen. Elec. Co. v. Seamans*, 340 F. Supp. 636, 641 (D.D.C. 1972) (recognizing "overriding public interest" . . . in having the governmental agencies follow their own regulations" including those governing "procurement activity"). Finally and fundamentally, the DNC does not seek to "enforce specific appropriations laws." Defs.' Mem. 12. The DNC advances a valid APA claim.

### C. The DNC Is Likely to Succeed on the Merits of Its *Ultra Vires* Claim

The DNC is also likely to establish that the White House Office acted *ultra vires*: in excess of its delegated authorities and contrary to "specific prohibition" on expending government funds on "publicity or propaganda." Defendants' only rejoinder is that the publicity or propaganda ban, the Antideficiency Act, and the Purpose Statute are insufficiently clear to allow *ultra vires* review. Defs.' Mem. 1, 12-15. Defendants do not contest, and thus concede, all other requirements of an *ultra vires* claim. *See, e.g.*, *Fed. Express Corp. v. U.S. Dep't of Comm.*, 39 F.4th 756, 763 (D.C. Cir. 2022). Moreover, the plain language of each of the statutes, as well as the relevant interpretative guidance, necessitates that Defendants' argument fails.[3]

[3] Defendants' initial argument that the Court has no authority to declare the President has acted *ultra* vires is misplaced. Defs.' Mem. 12–13. The DNC does not seek a preliminary relief against the President, only the White House Office, OMB, and DHS. *See* DNC Mot. (Doc. 9).

Defendants argue that no *ultra vires* claim is available under the publicity or propaganda prohibition because "publicity or propaganda" is insufficiently "clear and mandatory" without a statutory definition. Defs.' Mem. 14. (quoting Consolidated Appropriations Act 2026, Pub. L. No. 119-75, § 718, 140 Stat. at 495). The prohibition directs that "[n]o part of any appropriation . . . shall be used." Consolidated Appropriations Act 2026, Pub. L. No. 119-75, § 718, 140 Stat. at 495. "That language is undoubtedly mandatory." *Nat'l Ass'n of Post. Supers. v. U.S. Postal Serv.*, 26 F.4th 960, 971 (D.C. Cir. 2022) (applying "shall"). It also "plainly delineates the outer limits of agency authority" without "ambiguous provisions." *Id.* at 971–972 (contrasting clear rule with a command to use "appropriate data"). *Id.* No statutorily-specific definition is necessary when this Court can apply the "ordinary, contemporary, common meaning" of "publicity or propaganda." *Perrin*, 444 U.S. at 42; *see also, e.g.*, *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227 (2014); *Sebelius v. Cloer*, 569 U.S. 369, 376 (2013); *Novartis Pharm. Corp. v. Kennedy*, 182 F.4th 1027, 1033 (D.C. Cir. 2026); *cf.* Defs.' Mem. 14. The mere existence of borderline cases does not preclude *ultra vires* review. *See, e.g.*, *Nat'l Trust for Historic Preservation in the U.S. v. Nat'l Park Serv.*, 185 F.4th 1185, 1224 (D.C. Cir. 2026) (deeming prohibition on unauthorized erection of any "building or structure . . . on any reservation, park, or public grounds of the Federal Government in the District of Columbia" sufficiently clear). *See generally* Frederick Schauer, *A Critical Guide to Vehicles in the Park* 83 N.Y.U. L. Rev. 1109, 1110 (2008) (recognizing even rules with "straightforward application" have a "penumbra" of hard cases).

"Publicity" and "propaganda" both have "ordinary, contemporary, common" meanings, *Perrin*, 444 U.S. at 42, and authoritative guidance confirms that "publicity or propaganda" is sufficiently clear to allow review. "Publicity" denotes "efforts to get public attention" or "public promotion." *Publicity*, Black's Law Dictionary (12th ed. 2024). "Propaganda" is "systematic

dissemination of doctrine, rumor, or selected information as part of a campaign to promote or hinder a particular view or cause." *Propaganda*, Black's Law Dictionary (12th ed. 2024). Thus, the D.C. Circuit needed no interpretive aids to deem "pamphlets, flyers, and posters in connection with an initiative campaign [to be] publicity or propaganda." *D.C. Common Cause v. Dist. of Columbia*, 858 F.2d 1, 11 (D.C. Cir. 1988). And the GAO, rather than abandoning the field to ambiguity, *cf.* Defs.' Mem. 14–15, has long applied the ban to "self-aggrandizement, covert propaganda, and purely partisan materials." *Principles of Federal Appropriations Law* at 3-282; *see also id.* at 3-284 (defining "self-aggrandizement" as "publicity of a nature tending the emphasize the importance of the agency or activity in question"); *id.* at 3-284 (defining "purely partisan materials" as those "designed to aid a political party or candidate," which are typically devoid of any connection with official functions"). Ultimately, Congressional leaders, the U.S. District Court for the Southern District of New York, and the American public have had no difficulty criticizing the Propaganda Ads as "publicity or propaganda." *See, e.g.*, *Common Cause*, 2026 WL 3043900, at *16.

The Purpose Statute and Antideficiency Act are similarly clear and mandatory. The Purpose Statute dictates that "Appropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law." 31 U.S.C. § 1301(a). The Antideficiency Act directs that "an officer or employee of the United States Government . . . may not make or authorize an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation" or "involve [the U.S.] government in a

contract or obligation for the payment of money before an appropriation is made." 31 U.S.C. § 1341(a)(1)(A)–(B). Defendants cannot identify ambiguity in these clear, mandatory terms.[4]

## IV. The Remaining Factors Demand Relief.

The balance of equities and the public interest continue to favor immediate injunctive relief. The mere plea that the Propaganda Ads will not cause "harm moving forward," Defs.' Mem. 16, goes to the likelihood of irreparable harm and does not shift the equities. Defendants have no response to the principles advanced in the DNC's opening brief. There is no "public interest in the perpetuation of unlawful agency action." *Newby*, 838 F.3d at 12 (quoted in DNC Br. 24). There is "a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *Id.* at 13 (cited in DNC Br. 23). And "there is undoubtedly a public interest in 'preserving the integrity of [the] election process.'" *League of United Latin Am. Citizens v. Exec. Off. of President*, 808 F. Supp. 3d 29, 84 (D.D.C. 2025) (quoting *Newby*, 838 F.3d at 13) (alteration in original); *see also Common Cause*, 2026 WL 3043900, at *17–18.

Although a bond is generally required under Rule 65(c), *see* Defs.' Mem. 16, any bond should be nominal. *See, e.g.*, *Wuxi v. Apptec Co., Ltd v. U.S. Dep't of Defense*, 2026 WL 2279624, at *16 (D.D.C. Aug. 7, 2026) (requiring $1 bond where defendants had "identified no material monetary injury or quantifiable cost likely to result from the injunction"); *Phang v. Blanche*, 836 F. Supp. 3d 90, 114-15 (D.D.C. 2026), appeal docketed, No. 26-5299 (D.C. Cir.) (imposing $1 bond because "anything more . . . would . . . potentially create a chilling effect on . . . public-law

[4] The fact that some violations of the Purpose Statute violate the Antideficiency Act and some do not, Defs.' Mem. 15, is unrelated to the "clear and mandatory" requirement. And the fact that the Antideficiency Act does not contain a private right of action, Defs.' Mem. 15 (citing *Thurston v. United States*, 696 F. Supp. 680, 683 (D.D.C. 1988)), does not defeat an *ultra vires* claim. To the contrary, it is a prerequisite to *ultra vires* review. *See Fed. Express Corp.*, 39 F.4th at 763.

plaintiffs"). This Court should also deny any request for a stay pending disposition of an authorized appeal. Defs.' Mem. 16. Although preliminary injunctions are appealable, TROs generally are not. *See Dellinger v. Bessent*, 2025 WL 559669, at *4 (D.C. Cir. Feb. 15, 2025). Should this Court afford relief, Defendants offer no further grounds for a "sharp departure from established procedures that balance and protect the interests of litigants. *Id.* at *1.

## CONCLUSION

For the foregoing reasons, the Court should grant the DNC's motion for a temporary restraining order (or preliminary injunction) and § 705 stay.

Dated: October 13, 2026

Respectfully submitted,

*/s/ Benjamin B. Klubes*
Benjamin B. Klubes
(Bar No. 428852)
Adam Miller
(Bar No. 496339)
Klubes Law Group
1717 K Street NW, Suite 900
Washington, DC 20006
(202) 753-5054
blkubes@klubeslaw.com
amiller@klubeslaw.com

*/s/ Daniel J. Freeman*
Daniel J. Freeman
(Bar No. 90038422)
Democratic National Committee
430 South Capitol Street SE
Washington, DC 20003
(202) 863-8000
freemand@dnc.org

*Counsel for Democratic National Committee*