**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DEMOCRATIC NATIONAL COMMITTEE,<br><br>*Plaintiff*,<br><br>v.<br><br>DONALD J. TRUMP, *et al.*,<br><br>*Defendants*. | Civil Action No. 26 - 3506 (LLA) |

# MEMORANDUM OPINION AND ORDER

Plaintiff Democratic National Committee (the "DNC") brings this action against President Donald J. Trump, the White House Office, the Office of Management and Budget ("OMB"), and the U.S. Department of Homeland Security ("DHS") (collectively, "Defendants"). ECF No. 1. The DNC alleges that OMB and DHS acted contrary to law and in excess of statutory authority, in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 500 *et seq.*, and that President Trump and the White House Office acted *ultra vires*, by using public funds to finance a national propaganda campaign in contravention of the Consolidated Appropriations Act, 2026, Pub. L. No. 119-75, § 718, 140 Stat. 173 (2026); the Purpose Statute, 31 U.S.C. § 1301(a); and the Anti-Deficiency Act, 31 U.S.C. §§ 1341(a), 1517. ECF No. 1 ¶¶ 184-200. Pending before the court is the DNC's motion for a temporary restraining order ("TRO") (or, in the alternative, a preliminary injunction) and a stay pursuant to Section 705 of the APA, 5 U.S.C. § 705. ECF No. 3. For the reasons explained below, the court grants the DNC's motion and enters a TRO against Defendants pursuant to the terms outlined at the end of this opinion and order.

## I. LEGAL BACKGROUND

The Appropriations Clause of the U.S. Constitution provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. "Textually, the command is unmistakable—'no money can be paid out of the Treasury unless it has been appropriated by an act of Congress.'" *Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 425 (2024) (quoting *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937)). "Decisions of the Supreme Court and [the D.C. Circuit] have strictly enforced the constitutional requirement, implemented by federal statutes, that uses of appropriated funds be authorized by Congress." *U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1342 (D.C. Cir. 2012) (Kavanaugh, J.).

Three such federal statutes are at issue here. First, "[a] core tenet of appropriations law is enshrined" in the Purpose Statute, *id.* at 1348, which provides that "[a]ppropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law," 31 U.S.C. § 1301(a). Next, the Anti-Deficiency Act prohibits any "officer or employee of the United States Government" from "mak[ing] or authoriz[ing] an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation." 31 U.S.C. § 1341(a)(1)(A). The Anti-Deficiency Act further prohibits any "officer or employee of the United States Government" from "involv[ing] [the] government in a contract or obligation for the payment of money before an appropriation is made unless authorized by law." *Id.* § 1341(a)(1)(B). Finally, the Consolidated Appropriations Act specifies that "[n]o part of any appropriation . . . shall be used directly or indirectly, including by private contractor, for publicity

or propaganda purposes within the United States not heretofore authorized by Congress." § 718, 140 Stat. at 495.[1]

Once Congress appropriates funding, the Anti-Deficiency Act requires the President to apportion that funding. *See* 31 U.S.C. § 1513(b)(1). The President has delegated that authority to OMB. *See* Exec. Order No. 6,166 (June 10, 1933), as amended by Exec. Order No. 12,608, 52 Fed. Reg. 34617 (Sep. 9, 1987) ("The functions of making, waiving, and modifying apportionments of appropriations are transferred to [OMB]."). OMB, in turn, must apportion funds in accordance with Congress's instructions. *See Nat'l Endowment for Democracy v. United States*, 795 F. Supp. 3d 63, 66 (D.D.C. 2025) ("After Congress appropriates funding, [OMB] 'apportions' those funds by setting a schedule to determine when they will become available to the relevant executive agency[.]"); *Citizens for Resp. & Ethics in Wash. v. Off. of Mgmt. & Budget* ("*CREW*"), 791 F. Supp. 3d 29, 37 (D.D.C. 2025) ("The decisions about how to allocate funds are called 'apportionments,' and they are used to ensure that the Executive Branch does not spend more or less than Congress appropriated."), appeal docketed, No. 25-5267 (D.C. Cir. argued Oct. 13, 2026).

"An apportionment is legally binding." Off. of Mgmt. & Budget, Exec. Off. of the President, OMB Circular No. A-11, Preparation, Submission, and Execution of the Budget § 120.1 (2025). "[O]bligations and expenditures (disbursements) that exceed an apportionment are a violation of, and are subject to reporting under, the Antideficiency Act," *id.*, which prohibits any "officer or employee of the United States Government" from "mak[ing] or authoriz[ing] an

[1] Congress has prohibited the use of federal funds for "publicity or propaganda purposes" in annual appropriations bills since 1951. *See* Labor-Federal Security Appropriation Act, Pub. L. No. 82-134, § 702, 65 Stat. 209, 223 (1951) ("No part of any appropriation contained in this Act shall be used for publicity or propaganda purposes not heretofore authorized by the Congress.").

expenditure or obligation exceeding an apportionment," 31 U.S.C. § 1517(a)(1). Violations of that prohibition can result in administrative discipline, including removal from office, 31 U.S.C. § 1518, as well as criminal penalties of up to two years of imprisonment and a $5,000 fine, *id.* § 1519.[2]

## II. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A. Appropriation and Apportionment of DHS Funds

In July 2025, Congress enacted a budget reconciliation package known as the "One Big Beautiful Bill Act" ("OBBBA"). *See* Reconciliation Act, Pub. L. No. 119-21, 139 Stat. 72 (2025). As relevant here, Section 90004 of the OBBBA, titled "Border Security, Technology, and Screening," § 90004, 139 Stat. 359 (capitalization altered), appropriated $6,168,000,000 to Customs and Border Protection ("CBP"), an agency within DHS, for the following expenditures:

> (1) Procurement and integration of new nonintrusive inspection equipment and associated civil works, including artificial intelligence, machine learning, and other innovative technologies, as well as other mission support, to combat the entry or exit of illicit narcotics at ports of entry and along the southwest, northern, and maritime borders.
>
> (2) Air and Marine operations' upgrading and procurement of new platforms for rapid air and marine response capabilities.
>
> (3) Upgrades and procurement of border surveillance technologies along the southwest, northern, and maritime borders.

---

[2] Congress has enacted other statutes, which are not at issue here, that mandate the public reporting and disclosure of OMB's apportionment decisions. *See* Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, div. E, tit. II, § 204, 136 Stat. 4459, 4667 (2023); *see also CREW*, 791 F. Supp. 3d at 37, 53 (explaining that the laws require "final apportionment decisions be made publicly available to provide transparency to Congress and the public"). The DNC cites to some of those OMB public disclosures in its briefing. *See* ECF No. 3-4, at 55-60. Citations to ECF Nos. 3-4 and 10-1 refer to the CM/ECF-generated page numbers at the top of each page rather than any internal pagination.

> (4) Necessary expenses, including the deployment of technology, relating to the biometric entry and exit system under section 7208 of the Intelligence Reform and Terrorism Prevention Act of 2004 (8 U.S.C. 1365b).
>
> (5) Screening persons entering or exiting the United States.
>
> (6) Initial screenings of unaccompanied alien children (as defined in section 462(g) of the Homeland Security Act of 2002 (6 U.S.C. 279(g))), consistent with the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (Public Law 110-457; 122 Stat. 5044).
>
> (7) Enhancing border security by combating drug trafficking, including fentanyl and its precursor chemicals, at the southwest, northern, and maritime borders.
>
> (8) Commemorating efforts and events related to border security.

§ 90004(a), 139 Stat. 359.[3]

The report of the House Budget Committee accompanying the OBBBA described the "commemorative events" category as "honoring meritorious contributions and achievements related to border security, including events recognizing victims of crimes." H.R. Rep. No. 119-106, at 792 (2025). The report specified that "[e]xamples of such events include Line-of-Duty death memorials, Department or agency anniversaries, and commendation ceremonies." *Id.* The report further explained that appropriated funding for that category "can be used for venue and setup, program materials, commemoratives (e.g., plaques, flags, awards); and personnel and services (e.g., honor guard, officiants, security)." *Id.*

In November 2025, OMB apportioned $500,000 to CBP for commemorative events pursuant to Section 90004 of the OBBBA. *See* ECF No. 3-4, at 58. Almost a year later, on September 19, 2026 at 6:15 p.m., CBP submitted a request to OMB to "make an additional

[3] The $6,168,000,000 appropriation was designated "for fiscal year 2025" but "to remain available until September 30, 2029." § 90004(a), 139 Stat. 359.

$20 million available for obligation" for the commemorative-events category. ECF No. 9-1 ¶¶ 3-4. The additional funding would come from funds obligated on a different line item for fiscal year 2027. *Id.*; *see* ECF No. 3-4, at 58. OMB approved the request less than two hours later, at 7:50 p.m., ECF No. 9-1 ¶ 5, and increased the CBP line item for commemorative events by $20 million, *see* ECF No. 3-4, at 60 (designating $20,500,000 for "OBBBA – Commerative [sic] Events").

The following day, on September 20, DHS issued a $20 million purchase order to Lepugh, Inc. (doing business as "LMD Agency, Inc." or "LMD"), an advertising agency, for a "national media campaign." ECF No. 3-4, at 72-73 (capitalization omitted); *see* ECF No. 9-2 ¶ 3. DHS acknowledged that funding for that purchase order came from appropriations pursuant to Section 90004 of the OBBBA, designated for "[c]ommemorating efforts and events related to border security." ECF No. 9-2 ¶ 4 (alteration in original). The campaign entailed "placing national media buys"—that is, purchasing airtime to display advertisements—"with media outlets and programs on a national level using a combination of morning and evening cable news, 6-10am dayparts, 4-11pm dayparts, media programing through FOX, CNN, MSNOW, and NEWSMAX, Sunday shows including broadcasts with CBS, ABC, and NBC, and football commercial buys with CBS, ABC, ESPN, and other channels." *Id.* ¶ 5. The purchase order's "period of performance is September 20, 2026, through September 19, 2027, or until all deliverables and media placements have occurred." *Id.* ¶ 7; *see* ECF No. 3-4, at 71 (denoting the contract end date as "Sep 19, 2027"). The challenged advertisements began to air on television on September 23, 2026. ECF No. 1 ¶ 54; ECF No. 3-5 ¶ 9.

### B. The Challenged Advertisements

The DNC challenges "at least 13 campaign-style ads" that were purportedly developed by the White House Office using appropriated funds and shared with LMD for eventual national distribution. ECF No. 1 ¶ 125. These ads fall into two groups. The first group consists of five ads that aired on television using appropriated funds: (1) "The Country He Loves" or "Love Me" ad, (2) the "Maduro" ad, (3) the "Final Battle" ad, (4) the "Mount Rushmore" ad, and (5) the "American Military Power" ad. *Id.* ¶¶ 59-123.

***"The Country He Loves" or "Love Me" Ad.*** This ad began airing on television on September 23, 2026. *Id.* ¶ 59. The video features a montage of footage and photos of President Trump, accompanied by the song "Love Me" by JSMN, which repeats the lyrics "Love me, love me, love me, love me." *Id.* ¶¶ 60-64. The montage is overlaid with text stating that "America will never be a communist country" and includes a voiceover from President Trump declaring that "together we will defeat communism, socialism, and Marxism in America." *Id.* ¶ 61. The ad concludes with Dana White, president of the Ultimate Fighting Championship ("UFC"), describing President Trump as "the toughest, most resilient person [he has] ever met," followed by a disclosure stating that the ad was "Paid for by the U.S. Government." *Id.* ¶¶ 65, 67. According to the DNC, a copy of the video without that disclosure was posted on the official White House YouTube channel on September 11. *Id.* ¶ 69.

***"Maduro" Ad.*** This ad began airing on television on September 24 in multiple versions ranging between thirty and sixty seconds long. *Id.* ¶¶ 74-75. The ad focuses on the United States' military operation to capture Venezuelan President Nicolás Maduro. *Id.* ¶ 74. The ad cuts between footage of President Maduro giving a speech to "come get him" with footage of Administration officials announcing the operation's success, including President Trump describing the military

action as "one of the most stunning and effective" in American history. *Id.* ¶¶ 76-78. The end of the ad features Secretary of State Marco Rubio stating that "people need to understand that this is not a President that just talks and does letters and press conferences," and warning against "play[ing] games while this President is in office." *Id.* ¶ 79. The ad concludes with a "Paid for by the U.S. Government" disclosure. *Id.* ¶ 80. According to the DNC, a copy of the video without that disclosure was posted on the President Trump's Truth Social account on September 25. *Id.* ¶ 81.

***"Final Battle" Ad.*** This ad began airing on television over the weekend of September 26 and 27. *Id.* ¶ 86. The ad features black-and-white footage of President Trump walking down a hallway as his voiceover promises to "demolish the Deep State," "cast out the communists, Marxists, and fascists," "rout[] the fake news media," and "liberate America from these villains once and for all." *Id.* ¶¶ 88-89. The DNC alleges that the ad "is nearly identical to a political ad that President Trump used during his 2024 presidential election campaign," except for the ad's ending. *Id.* ¶ 92. Whereas the 2024 campaign ad concluded with graphics saying "Join President Trump's Fight for America" and displaying President Trump's 2024 campaign logo, the "Final Battle" ad ends with a "Paid for by the U.S. Government" disclosure. *Id.* ¶¶ 93-94.

***"Mount Rushmore" Ad.*** This ad began airing on television on September 27. *Id.* ¶ 100. The ad features remarks that President Trump delivered on July 3, 2026 at Mount Rushmore alongside footage of the event. *Id.* ¶¶ 102-104. In his remarks, President Trump describes the United States as "the most successful, most accomplished, most exceptional nation ever to exist in human history" and proclaims that "[t]his is only the beginning of the golden age of America." *Id.* ¶ 104. The ad concludes with a "Paid for by the U.S. Government" disclosure. *Id.* ¶ 105.

According to the DNC, a copy of the video without that disclosure was posted on the official White House YouTube channel on September 9. *Id.* ¶ 106.

***"American Military Power" Ad.*** This ad began airing on television on September 30. *Id.* ¶ 111. The ad focuses on the United States' military operation in Iran. *Id.* ¶¶ 112-113. The ad includes footage of military action interspersed with clips of President Trump, along with a voiceover from Secretary of Defense Pete Hegseth declaring that President Trump has "reminded the world, as he has time and time again, being an American means something unbreakable." *Id.* ¶¶ 114, 116. According to the DNC, a copy of the video without that disclosure was posted on the official White House YouTube channel on September 11. *Id.*[4]

The second group of challenged ads consists of ads shared with LMD that have not yet aired on television, but "may be aired as the November 2026 elections approach." *Id.* ¶ 124. These unaired ads include (1) a "UFC 250" ad featuring a UFC fight held at the White House; (2) a "King of the Jungle" ad showing a lion hunting in the wild and disparaging President Trump's "perceived political enemies"; and (3) a "Resilience" ad highlighting various events in President Trump's life, including the announcement of his presidential candidacy in 2015 and the assassination attempt during the 2024 election campaign. *Id.* ¶¶ 124-135. The unaired ads also include a "God Made Trump" ad, which was originally "made by President Trump's supporters during the 2024 Presidential election" and "previously shown during the Republican Midterm Convention." *Id.* ¶ 129. Like the aired ads, each unaired ad concludes with a disclosure stating that it was "Paid for by the U.S. Government." *Id.* ¶ 130.

---

[4] The DNC does not specify in the complaint whether the "American Military Power" ad contained the "Paid for by the U.S. Government" disclosure. *See* ECF No. 1 ¶¶ 111-123.

### C. Continued Funding of the Challenged Advertisements

On October 5, 2026, President Trump announced on Truth Social that he would pay for the ads himself and "with the money [he] raised for MAGA[] Inc." because the "Radical Left [was] upset" that he was "paying for [the ads] with U.S.A. money." ECF No. 3-4, at 45; *see* ECF No. 1 ¶ 157. The DNC identifies MAGA Inc. as a super PAC closely affiliated with President Trump, that has spent millions of dollars to support Republican candidates and oppose Democratic candidates in the November 2026 elections. ECF No. 1 ¶¶ 5, 49, 172, 182.

Despite President Trump's commitment, the challenged ads continued to air with the "Paid for by the U.S. Government" disclosure. *Id.* ¶¶ 159-161. For example, on October 6, the "Final Battle" ad aired on a national broadcast of *Dancing with the Stars*. *Id.* ¶ 160. Then, on October 7, the "Final Battle" ad aired again during a broadcast of *Fox & Friends*. *Id.* ¶ 161. Additionally, on October 6, OMB apportioned $1 million to the CBP line item for commemorative events for fiscal year 2027. ECF No. 9-1 ¶ 9. The DNC alleges that after President Trump's Truth Social announcement, at least $100,000 of appropriated funds were spent on the challenged ads. ECF No. 1 ¶ 162.

### D. This Litigation

The DNC is the national committee responsible for the day-to-day operations of the Democratic Party. ECF No. 1 ¶ 8; *see* 52 U.S.C. § 30101(14). The DNC's membership includes Democratic candidates running for office, as well as voters and volunteers for Democratic campaigns. *See* ECF No. 1 ¶ 4; ECF No. 3-5 ¶¶ 4-7, 13, 15, 18. In support of its mission "to elect[] Democratic candidates in federal, state, and local elections across the country," the DNC "solicits contributions and makes expenditures—both independently of and in coordination with individual candidates—to support Democratic campaigns and committees." ECF No. 1 ¶ 8.

The DNC filed suit against Defendants on October 7, 2026. ECF No. 1. Two days later, on October 9, the DNC sought a TRO (1) prohibiting Defendants from spending appropriated funds to develop and air the challenged ads and (2) prohibiting any further use of ads developed using public dollars. *See* ECF No. 3-1, at 2, 25; ECF No. 3-2, at 1-2. The court ordered expedited briefing on the TRO motion. Oct. 9, 2026 Minute Order. In its opposition brief filed on October 11, Defendants represented that the Administration would no longer use federal funds to air the challenged ads moving forward. ECF No. 9, at 1. Defendants included an October 10 declaration from Holly Mehringer, DHS's "Senior Official Performing the Duties of the Chief Financial Officer," ECF No. 9-2 ¶ 1, attesting that LMD had executed media buys under the purchase order "through Sunday, October 11, 2026, at an approximate cost of $19,000,000," *id.* ¶ 8. Ms. Mehringer represented that DHS had "directed [LMD] not to make any additional media buys past October 11 and expects that [LMD] will submit its final invoice for services performed under the Order after that date." *Id.* Once the final invoice is received, "that invoice will be paid for services already performed under the Order." *Id.* Ms. Mehringer further represented that "[a]ny residual funding left under the Order after October 11, 2026, after all invoices have been paid, will be de-obligated." *Id.* ¶ 9. Finally, Ms. Mehringer attested that "to the best of [her] knowledge and belief, [DHS] has no plans to make any additional media buys under the Order or to renew the Order or otherwise use DHS appropriated funds on any similar contracts for the creation or distribution of the media that is the subject of this lawsuit." *Id.* ¶ 10.

The TRO motion has been fully briefed, ECF Nos. 3-1, 9, 10, and the court heard oral argument on the motion on October 15. Oct. 15, 2026 Minute Entry.[5] The DNC subsequently filed three status reports regarding additional ads available on the White House's YouTube page, at least some of which the DNC had not previously identified to the court. *See* ECF Nos. 14, 21, 25. The DNC alleges that these additional ads were unlawfully developed by "White House Office personnel," ECF No. 14, at 1; ECF No. 21, at 2, or with unspecified "staff time," ECF No. 25, at 2. According to the DNC, MAGA Inc. has paid for at least some of these ads to air on television. *See* ECF No. 14, at 1; ECF No. 21, at 1. The DNC also submitted a fourth status report regarding discovery updates from parallel proceedings in the U.S. District Court for the Southern District of New York indicating that "[White House Executive Office of the President ("EOP")] staff compiled" some of the challenged ads. ECF No. 24, at 2.[6]

### E. Parallel Litigation in the Southern District of New York

On the same day that the DNC filed this suit, Common Cause and other plaintiffs (collectively, the "Common Cause plaintiffs") filed suit in the Southern District of New York against DHS, DHS Secretary Markwayne Mullin, OMB, OMB Director Russell Vought, the EOP, and White House Chief of Staff Susie Wiles. *See* Compl., *Common Cause v. Dep't of Homeland*

---

[5] Pending before the court is a substantially similar action filed by the Democratic Party of Wisconsin and Yee Leng Xiong against President Trump, DHS, DHS Secretary Markwayne Mullin, CBP, CBP Commissioner Rodney S. Scott, OMB, and OMB Director Russell Vought. *See* Compl., *Democratic Party of Wis. v. Trump*, No. 26-CV-3547 (D.D.C. Oct. 9, 2026), ECF No. 1. Plaintiffs in that case filed a notice of support of the DNC's motion for a TRO. Notice, *Democratic Party of Wis.*, No. 26-CV-3547 (D.D.C. Oct. 14, 2026), ECF No. 7. The court has directed the parties to address whether consolidation of these two matters would be appropriate. *See* Oct. 14, 2026 Minute Order.

[6] The White House Office and OMB are both components within the EOP. ECF No. 1 ¶¶ 10-11; *see Sculimbrene v. Reno*, 158 F. Supp. 2d 26, 29 (D.D.C. 2001).

*Sec.*, No. 26-CV-8882 (S.D.N.Y. Oct. 7, 2026), ECF No. 1. Like the DNC, the Common Cause plaintiffs challenge the use of federal funds appropriated to DHS to pay for the ads, which they claim are propaganda. *See id.*

The next day, on the evening of October 8, the Common Cause plaintiffs filed a motion for a TRO and a stay under Section 705 of the APA. Mot., *Common Cause*, No. 26-CV-8882 (S.D.N.Y. Oct. 8, 2026), ECF No. 25. The next morning, on October 9, the district court held an initial conference on the motion and ordered expedited briefing. *See* Order, *Common Cause*, No. 26-CV-8882 (S.D.N.Y. Oct. 9, 2026), ECF No. 33. In support of their opposition to the TRO, the defendants included the same declaration from Ms. Mehringer attesting that DHS would not purchase any additional airtime beyond October 11. *See* Decl., *Common Cause*, No. 26-CV-8882 (S.D.N.Y. Oct. 10, 2026), ECF No. 38. On October 11, upon the conclusion of briefing, the district court entered a TRO effective as of 6:45 p.m. that day. Order, *Common Cause*, No. 26-CV-8882 (S.D.N.Y. Oct. 9, 2026), ECF No. 41.

After the TRO went into effect, the Common Cause plaintiffs notified the district court that some of the challenged ads had continued to air on national television on October 12. Notice, *Common Cause*, No. 26-CV-8882 (S.D.N.Y. Oct. 12, 2026), ECF No. 43. The district court thereafter permitted the Common Cause plaintiffs to proceed with limited discovery in connection with their preliminary injunction ("PI") motion, scheduled a hearing on the PI motion for November 4, 2026, and extended the TRO through November 8, 2026. Order, *Common Cause*, No. 26-CV-8882 (S.D.N.Y. Oct. 14, 2026), ECF No. 53. Upon consent motions from the parties, the district court has rescheduled the PI motion hearing to November 13, 2026, and extended the TRO through November 20, 2026. Order, *Common Cause*, No. 26-CV-8882 (S.D.N.Y. Oct. 22, 2026), ECF No. 80. That litigation remains ongoing.

## III. LEGAL STANDARDS

### A. Temporary Restraining Order

A TRO is an extraordinary remedy meant to prevent serious and imminent harm in dire circumstances. To obtain one, "the moving party must show (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction were not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). When a government entity is a party to the case, the third and fourth factors merge. *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

Prior to the Supreme Court's decision in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008), courts in this Circuit tended to employ a "sliding-scale" method in which "a strong showing on one factor could make up for a weaker showing on another." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011). While the D.C. Circuit has considered abandoning the sliding-scale method for one that treats the substantial likelihood prong as "an independent, free-standing requirement," *id.* at 393, it has yet to decide one way or the other, *see Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 726 (D.C. Cir. 2022). At the very least, however, the plaintiff must present a "serious legal question on the merits." *Changji Esquel Textile*, 40 F.4th at 726 (quoting *Sherley*, 644 F.3d at 398). Given the ambiguity with respect to the sliding-scale approach, the court will consider all factors and only delve into their relevant weight if it would affect the outcome. *See Costa v. Bazron*, 456 F. Supp. 3d 126, 133 (D.D.C. 2020).

### B. Stay Under Section 705 of the APA

The APA permits a court reviewing agency action to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings" if it is "necessary to prevent irreparable injury." 5 U.S.C. § 705. The standard for an administrative stay is substantially the same as the standard for a TRO. *Nken*, 556 U.S. at 433-34.

## IV. DISCUSSION

The DNC asserts that it has satisfied all the factors for a TRO. *See* ECF No. 3-1, at 8-25; ECF No. 10, at 2-18. Defendants' primary argument in response is that no relief is warranted at this juncture because Defendants have ceased their purportedly unlawful conduct, so the DNC will not suffer any injury moving forward. *See* ECF No. 9, at 5-8. The court addresses each TRO factor in turn.

### A. Likelihood of Success on the Merits

The DNC argues that Defendants developed and aired the challenged ads, which are "publicity or propaganda" in violation of the Consolidated Appropriations Act, Purpose Statute, and Anti-Deficiency Act. ECF No. 3-1, at 8-18. The DNC raises (1) an APA claim against OMB and DHS and (2) an *ultra vires* claim against the White House Office.[7] In response, Defendants argue that (1) the DNC's APA claim fails because neither OMB nor DHS engaged in final agency action subject to APA review, and (2) the DNC's *ultra vires* claim fails because the relevant statutes do not justify *ultra vires* review. ECF No. 9, at 8-15. In doing so, Defendants do not

---

[7] Although the DNC's complaint raises an *ultra vires* claim against President Trump, *see* ECF No. 1 ¶¶ 193-200, the DNC has clarified that it does not seek relief against the President, *see* ECF No. 10, at 14 n.3.

challenge the substantive merits of either claim. The court concludes that the DNC has established a substantial likelihood of success on the merits of its APA claim against OMB and DHS. Because that provides sufficient grounds to grant the TRO, the court declines to reach the DNC's *ultra vires* claim against the White House Office. *See AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, 766 F. Supp. 3d 74, 82 (D.D.C. 2025) ("The Court need only find that [the] [p]laintiffs are likely to succeed on one of these claims for this factor to weigh in favor of a temporary restraining order.").[8]

**1. Standing**

To obtain a TRO, "'[a] plaintiff must show a likelihood of success encompass[ing] not only substantive theories but also establishment of jurisdiction,' including standing to sue." *Cabrera v. U.S. Dep't of Lab.*, 792 F. Supp 3d 91, 99-100 (D.D.C. 2025) (alterations in original) (quoting *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015)). This means that a "plaintiff cannot 'rest on . . . mere allegations, but must set forth by affidavit or other evidence specific facts' that, if 'taken to be true,' demonstrate a substantial likelihood of standing." *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 377 (D.C. Cir. 2017) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). "To establish standing, a plaintiff must show: (1) an 'injury in fact'; (2) a 'causal connection between the injury'

[8] Because any relief granted must be "adequately tailored to the showing made at this stage," *AIDS Vaccine Advoc. Coal.*, 766 F. Supp. 3d at 84, the court's relief will apply to the five ads that the DNC alleges were unlawfully aired using funds appropriated to DHS: (1) "The Country He Loves" or "Love Me" ad, (2) the "Maduro" ad, (3) the "Final Battle" ad, (4) the "Mount Rushmore" ad, and (5) the "American Military Power" ad, *see* ECF No. 1 ¶¶ 59-123. The court's relief, at this juncture, will not apply to the remaining ads that the DNC primarily alleges were unlawfully developed using White House personnel, *see* ECF No. 1 ¶¶ 124-135, some of which appear to be on the White House's YouTube page, *see* ECF No. 14, at 1-2; ECF No. 21, at 1; ECF No. 25, at 1-2. Both parties will, of course, have the opportunity to develop their claims further at the preliminary-injunction phase, where the record and therefore the appropriate relief may well evolve.

and the challenged action; and (3) a likelihood that the 'injury will be redressed by a favorable decision.'" *Cabrera*, 792 F. Supp. 3d at 101 (quoting *Lujan*, 504 U.S. at 560-61). Furthermore, "standing is assessed as of the time a suit commences," meaning that post-complaint events will not deprive a plaintiff of standing. *Del Monte Fresh Produce Co. v. United States*, 570 F.3d 316, 324 (D.C. Cir. 2009). The court easily concludes that the DNC has met its burden.

The DNC asserts that Defendants' unlawful actions impose competitive harm on the DNC and its members, including Democratic candidates running for office. ECF No. 3-1, at 18-21; *see* ECF No. 1 ¶¶ 180-183. The court agrees. In *Shays v. Federal Election Commission*, 414 F.3d 76 (D.C. Cir. 2005), the D.C. Circuit recognized that political candidates have standing to challenge the "illegal structuring of a competitive environment" in which "rival parties defend their concrete interests (e.g., their interest in . . . winning reelection)." *Id.* at 85-86. This type of standing is relevant "when a plaintiff challenges an improper benefit to a competitor" because political-competitor standing "recognizes that certain benefits predictably inflict concrete harms on the head-to-head competitors of their beneficiaries." *League of United Latin Am. Citizens v. Exec. Off. of President* ("*LULAC*"), 808 F. Supp. 3d 29, 56 (D.D.C. 2025) (citing *Shays*, 414 F.3d at 85-87.).

Here, the DNC alleges that by unlawfully using public funds to develop and air political ads advancing Republican electoral interests, Defendants "fundamentally alter the environment," *Shays*, 414 F.3d at 87, and necessarily cause Democratic campaign prospects to suffer, ECF No. 3-1, at 19-20; *see* ECF No. 3-5 ¶¶ 14-18. As the DNC explains, and as common sense dictates, election resources are finite. *See* ECF No. 3-5 ¶ 18. Thus, every public dollar spent on airing the challenged ads allows MAGA Inc.—which has already spent $25,000,000 in the 2025-26 federal election cycle to support Republican candidates and oppose Democratic candidates—to conserve

its resources for other political efforts adverse to the DNC. ECF No. 3-1, at 19-20; *see* ECF No. 3-5 ¶ 15 ("For every taxpayer dollar President Trump spends on his propaganda campaign, it is a dollar that MAGA Inc. can instead invest in paid media, get-out-the vote efforts, and direct voter communications."). These harms are particularly acute in close political races in the final weeks before the November 2026 elections. *See* ECF No. 3-1, at 20; ECF No. 3-5 ¶¶ 11, 15. Defendants do not dispute any of these assertions. *See generally* ECF No. 9. Moreover, Defendants attest that their own conduct caused the federally funded national media campaign disseminating the challenged ads. *See* ECF No. 9-2 ¶¶ 3-6. Accordingly, the court concludes that the DNC has satisfied its burden of establishing a concrete and imminent injury that is traceable to Defendants' conduct. Furthermore, that injury is redressable by this court, which can enjoin Defendants from further disseminating the challenged ads in the national media market.

In response, under an argument heading principally addressing "irreparable harm," *see* ECF No. 9, at 6, Defendants contend that the DNC cannot establish standing because "no more federal funds will be used to air the[] [challenged] ads [after October 11]," *id.* at 7. To begin, the record evidence belies that assertion: at minimum, challenged ads with the "Paid for the U.S. Government" disclosure continued to air the very next day, on October 12. *See, e.g.*, ECF No. 10-1, at 8-13, 58-66. Next, even accepting Defendants' representation as true, the argument still fails, regardless of whether it is construed as one relating to irreparable harm or to standing. *See* ECF No. 9, at 8 (asserting that "whether framed in terms of substantive principles governing the grant of equitable relief or standing, this Court cannot grant the relief Plaintiff requests"). For clarity, the court will address Defendants' irreparable harm argument in the relevant section below. *See infra* Part IV.B. But to offer a preview, the DNC correctly points out that Defendants'

argument is best understood as one of mootness, and Defendants fail to carry their burden of showing that the DNC no longer has a live controversy. *See* ECF No. 10, at 5-6.

In all events, the DNC has met its burden of establishing standing. To be sure, a plaintiff "must establish a substantial risk of future injury" to obtain forward-looking relief. *Murthy v. Missouri*, 603 U.S. 43, 69 (2024). But as courts have often explained, standing is determined "by examining the facts *at the time the suit was filed*." *Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. Dep't of Lab.*, 836 F. Supp. 3d 137, 157 (D.D.C. 2026) (emphasis added) (citing *Davis v. Fed. Election Comm'n*, 554, U.S. 724, 734 (2008)); *see Garcia v. U.S. Citizenship & Immigr. Servs.*, 168 F. Supp. 3d 50, 65 (D.D.C. 2016) ("[W]hereas a standing inquiry is concerned with the presence of injury, causation, and redressability *at the time a complaint is filed*, a mootness inquiry scrutinizes the presence of these elements *after filing*—*i.e.*, at the time of a court's decision."). "[A]t the time [the DNC] sought relief from [this] court," *Advanced Mgmt. Tech., Inc. v. Fed. Aviation Admin.* 211 F.3d 633, 636 (D.C. Cir. 2000), the challenged ads were undisputedly still airing on national television. That suffices for standing purposes. Accordingly, at this juncture, the court finds that the DNC has demonstrated a substantial likelihood of standing.[9]

---

[9] As an alternative ground for standing, the DNC asserts that the organization and its members, including Democratic candidates, are directly harmed by being forced to compete in unlawfully structured elections. ECF No. 3-1, at 18; *see* ECF No. 1 ¶¶ 176-179. To support this argument, the DNC points to an expansive theory of candidate standing recently recognized by the Supreme Court in *Bost v. Illinois Board of Elections*, 607 U.S. 71 (2026). In *Bost*, the Court held that political candidates have standing to challenge "the rules that govern the counting of votes in their elections"—such as a rule extending a ballot-receipt deadline—"regardless [of] whether those rules harm their electoral prospects or increase the cost of their campaigns." 607 U.S. at 82. The Court reasoned that candidates' "interest[s] extend[] to the integrity of the election—and the democratic process by which they earn or lose the support of the people they seek to represent." *Id.*; *see DSCC v. Trump*, 2026 WL 2168617, at *4 n.8 (D.C. Cir. July 28, 2026) (recognizing that "*Bost* held that candidates have a concrete and particularized interest in the 'process' of elections

(*continued on next page*)

**2. The DNC's APA Claim Against OMB and DHS**

Next, Defendants do not challenge the merits of the DNC's APA claim against OMB and DHS, which asserts that the agencies acted contrary to law and in excess of their statutory authority by violating the Consolidated Appropriations Act, Purpose Statute, and Anti-Deficiency Act. Rather, Defendants raise only a threshold argument that neither OMB nor DHS engaged in final agency action subject to APA review. *See* ECF No. 9, at 8-12. The court is unpersuaded.[10]

The APA permits judicial review of "final agency action." 5 U.S.C. § 704. The APA defines "agency action" to "include[] the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." *Id.* § 551(13). The agency action must be "final," meaning that it both (1) "mark[s] the 'consummation' of the agency's decisionmaking process" and (2) determines "'rights or obligations' . . . from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (first quoting *Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 113 (1948); then quoting *Port of Bos. Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)).

First, OMB's apportionment of $20 million in federal funds to CBP is "final" agency action because an apportionment both marks the consummation of OMB's decision-making process and

---

sufficient on its own to challenge an extant election rule" (quoting 607 U.S. at 76)). Because the court finds that the DNC has standing based on competitive harm, the court need not address whether *Bost* extends to a plaintiff who does not challenge a "rule[] that govern[s] the counting of votes in [an] election." 607 U.S. at 83.

[10] The defendants in the parallel litigation in the Southern District of New York did not argue that OMB and DHS failed to take final agency action. *See Common Cause v. Dep't of Homeland Sec.*, No. 26-CV-8882, 2026 WL 3043900, at *14 (S.D.N.Y. Oct. 12, 2026) ("As a threshold matter, [the] [d]efendants do not contest . . . that both OMB's apportionment of funds to DHS for the challenged advertisements and DHS's contract to purchase advertising placements constitute final agency actions subject to judicial review under the APA."). When asked about this difference in position at the TRO hearing, Defendants had no explanation. *See* ECF No. 13, at 31:6-31:15.

determines obligations from which legal consequences flow. *See id.* Far from being tentative, an apportionment is a final decision that is "legally binding and result[s] in the actual spending of public funds." *CREW*, 791 F. Supp. 3d at 37; *see* OMB Circular No. A-11 § 120.1. Indeed, Defendants concede that OMB's decision "*completed* [OMB's] consideration of CBP's particular reapportionment request." ECF No. 9, at 9 (emphasis added). Put differently, there was no additional action for OMB to take to "consummat[e]" its decision-making process. *Bennett*, 520 U.S. at 178. Indeed, in analogous contexts, courts have concluded that OMB apportionment decisions are final rather than "deliberative" or "predecisional." *CREW*, 791 F. Supp. 2d at 54 (quoting OMB Circular No. A-11 § 120.1); *see* Order, at 19, *CREW*, No. 25-5267 (D.C. Cir. Aug. 9, 2025) (Henderson, J.) (respecting denial of a stay pending appeal) (agreeing that OMB apportionment decisions are likely final as opposed to "predecisional" or "deliberative").

Furthermore, an apportionment is a final decision from which legal consequences flow. *See Bennett*, 520 U.S. at 178. The Anti-Deficiency Act prohibits government officers and employees from "mak[ing] or authoriz[ing] an expenditure or obligation exceeding an apportionment." 31 U.S.C. § 1517(a)(1). An apportionment thus establishes "legal limits that restrict how much an agency can obligate, when it can obligate, and what projects, programs, and activities it can obligate for." OMB Circular No. A-11 § 120.10; *see* 31 U.S.C. § 1513(d) (providing that an appropriation "may be divided and subdivided administratively *within the limits of the apportionment*" (emphasis added)). An officer's or employee's failure to abide by an apportionment can lead not only to administrative discipline, such as removal from office, 31 U.S.C. § 1518, but also to criminal penalties of up a two-year term of imprisonment and a $5,000

fine, *id.* § 1519. At bottom, Defendants have not—and indeed, could not—dispute that an OMB apportionment "has direct and appreciable legal consequences." *Bennett*, 520 U.S. at 178.[11]

Defendants, citing *DRG Funding Corp. v. Secretary of Housing & Urban Development*, 76 F.3d 1212 (D.C. Cir. 1996), nevertheless contend that OMB did not engage in "final" agency action because any use of funds was "contingent" on CBP decisions to spend the apportioned funds, ECF No. 9, at 9. At the outset, Defendants' assertion appears to be an undeveloped causation argument rather than an argument about the finality of OMB agency action. *See Bennett*, 520 U.S. at 177 ("This confuses the question whether the Secretary's action is final with the separate question whether [the] petitioners' harm is 'fairly traceable' to the Secretary's action[.]"). To be sure, an agency like CBP need not ultimately exhaust all funding apportioned by OMB. But that alone does not defeat the finality of *OMB*'s agency action and Defendants do not point to any case to suggest otherwise. *Cf. Domestic Sec., Inc. v. Sec. & Exch. Comm'n*, 333 F.3d 239, 246 (D.C. Cir. 2003) (holding that the existence of a "condition" to implementing an order "does not affect" the order's finality when that condition is "unrelated" to the order's "substance"). And, as explained, an OMB apportionment creates a "legally binding" ceiling that any subsequent obligation cannot breach. OMB, Circular A-11 § 120.10; *see* 31 U.S.C. § 1513(d). Therefore, CBP did not have the kind of "absolute discretion to accept or reject" the constraints imposed by

[11] In the background section of their opposition brief, Defendants quote OMB guidance providing that "an apportionment 'is not a means for resolving any question dealing with . . . the legality of using funds for the purpose for which they are apportioned.'" ECF No. 9, at 2 n.1 (alteration in original) (quoting OMB Circular No. A-11 § 120.9). Defendants offer no arguments about the relevance of this provision. *See generally* ECF No. 9. In any event, the notion that OMB's apportionment authority does not "alter the *substantive* obligations imposed by *other* statutes on the expenditure of funds," *Nat'l Endowment for Democracy*, 795 F. Supp. 3d at 70 (second emphasis added), does not nullify the fact that an OMB appropriation *itself* enacts a "legally binding" ceiling on how apportionments may be expended, OMB Circular No. A-11 § 120.1.

OMB's apportionment, which would otherwise indicate nonfinal agency action. *Bennett*, 520 U.S. at 178.[12]

In any event, *DRG Funding* is inapposite. In that case, the D.C. Circuit held that a "provisional" ruling in the context of an administrative adjudication that "does not end the controversy" was not a final agency action subject to APA review. 76 F.3d at 1215. No such "intermediate decision" is being challenged here. *Id.* This is not a case where "completion of [OMB's] processes may [later] obviate the need for judicial review," *id.*, because there was no further action for OMB to take. Moreover, even if OMB were to subsequently reapportion the funds allocated to CBP, other courts in this district have recognized that "[n]o matter how many times an [OMB] apportionment changes, each generated apportionment is 'legally binding,' creating administrative and criminal consequences under the Anti-Deficiency Act." *CREW*, 791 F. Supp. 3d at 55; *cf. U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 598 (2016) (noting that the possibility of later revision "is a common characteristic of agency action, and does not make an otherwise definitive decision nonfinal"). Thus, the court concludes that OMB likely engaged in final agency action subject to APA review. *Accord Nat'l Ctr. for Learning Disabilities v. Off. of Mgmt. & Budget*, No. 26-CV-13019, 2026 WL 2754447, at *12 (D. Mass. Sep. 17, 2026) (finding "no reason to conclude" that "certain completed actions, including OMB['s] apportioning and the Department [of Education's] obligating funds in conflict with congressional explanatory statements" did not constitute final agency subject to APA review).

[12] What is more, as Defendants' own briefing and declaration indicate, CBP could not have obligated an additional $20 million without first receiving authorization from an OMB reapportionment decision. *See* ECF No. 9, at 1-3; ECF No. 9-1 ¶¶ 3-5.

Second, DHS engaged in final agency action when it obligated funds to air the challenged ads. To begin, Defendants' primary argument that "*the airing* of the ads is not itself an agency action," ECF No. 9, at 10 (emphasis added), mischaracterizes the DNC's claim again DHS. The DNC's APA challenge takes aim at DHS's *obligation of federal funds* to develop and air the challenged ads, "including through [DHS's] contract with LMD." ECF No. 3-1, at 15; *see* ECF No. 1 ¶ 188 (alleging that "DHS's contracting and expenditure of appropriated funds to air the propaganda ads is 'final agency action' . . . within the meaning of the APA"). On that point, Defendants do not seriously dispute that DHS's conduct constitutes final agency action, and only contest whether the court has the authority to enjoin or set aside a contract for which a vendor is not a party to the litigation. *See* ECF No. 9, at 11. True, LMD is not a party to this action. And Federal Rule of Civil Procedure 19(a) requires joinder when feasible of a party that "claims an interest relating to the subject of the action." Fed. R. Civ. P. 19(a)(1)(B). At this early juncture, however, the court need not void the purchase order in its entirety, which would undoubtedly affect LMD's interest. Instead, the court can enjoin Defendants from using funds appropriated by Congress for "commemorative events" related to border security to pay any invoices for airing the challenged ads.[13] *Cf. U.S. Dep't of Navy*, 665 F.3d at 1347 (reiterating that "an agency cannot use the device of a contract, grant, or agreement to accomplish a purpose it could not do by direct expenditure" (quoting U.S. Gov't Accountability Off., Principles of Federal Appropriations Law 4-9 (3d ed. 2004))).

[13] In the interim, DHS remains free to seek a deficiency appropriation from Congress to cover any amounts owed under the purchase order. *See* U.S. Gov't Accountability Off., Principles of Federal Appropriations Law 2-4 (4th ed. 2016) ("A 'deficiency appropriation' provides authority to satisfy obligations that exceeded an agency's available budget authority.").

Next, Defendants make the cursory assertion that the DNC's challenge must fail because no "private right of action" exists under the Anti-Deficiency Act. ECF No. 9, at 12 (quoting *Thurston v. United States*, 696 F. Supp. 680, 683 (D.D.C. 1988)). That misses the point. The DNC brings its claim under the APA, not the Anti-Deficiency Act. *See Nat'l Ctr. for Learning Disabilities*, 2026 WL 2754447, at *10 ("Defendants argue that the [Anti-Deficiency Act] 'has no rights creating language' and therefore does not create a private right of action. This argument is inapposite because Plaintiffs bring their claims under the APA, and not directly under the [Anti-Deficiency Act]." (citation omitted)); *see also Japan Whaling Assoc. v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 n.4 (1986) ("We [] reject the Secretary's suggestion that no private cause of action is available to respondents. . . . The 'right of action' in such cases is expressly created by the [APA].").

Finally, Defendants raise a single-sentence argument that "disputes" involving "the allocation of federal funds . . . are better left to the political process than the courts." ECF No. 9, at 12. Once again, Defendants misapprehend the nature of the relevant issue. Here, Congress has *already* made political judgments by allocating appropriations and specifying the purposes for which they may be used. The question now is whether Defendants have complied with the parameters enacted by Congress. Once Congress has spoken, courts "strictly enforce[]" Congress's mandate. *U.S. Dep't of Navy*, 665 F.3d at 1342. And, in construing the boundaries of permissible uses of appropriations, "it is the court that has the last word." *Id.* at 1349 (quoting *Delta Data Sys. Corp. v. Webster*, 744 F.2d 197, 202 (D.C. Cir. 1984)).

Tellingly, Defendants raise no arguments on the substantive merits of Plaintiffs' APA claim against OMB and DHS. That is, Defendants do not even attempt to defend the challenged ads as being permissible uses of appropriations under the Consolidated Appropriations Act,

Purpose Statute, or Anti-Deficiency Act. *See generally* ECF No. 9. Indeed, when given an opportunity at the motion hearing to address why using federal funds to rebroadcast a partisan campaign ad—as in the case of the "Final Battle" ad—would not constitute "publicity or propaganda" in violation of the Consolidated Appropriations Act, Defendants reiterated that they "don't have a position on that question at this time." ECF No. 13, at 32:22-32:23. Because Defendants have conceded the merits of the DNC's APA claim, the court concludes at this early stage that the DNC has shown a substantial likelihood that OMB and DHS engaged in final agency action and is likely to succeed on its APA claim.

### B. Irreparable Injury

Irreparable injury is "a high standard." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297. First, the injury "must be both certain and great," "actual and not theoretical," and "of such *imminence* that there is a 'clear and present' need for equitable relief." *Id.* (quoting *Wis. Gas Co. v. Fed. Energy Regul. Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam)). Second, the injury "must be beyond remediation," meaning that "[t]he possibility [of] adequate compensatory or other corrective relief . . . at a later date . . . weighs heavily against a claim of irreparable harm." *Id.* at 297-98 (quoting *Wis. Gas Co.*, 758 F.2d at 674). The DNC has shown a likelihood of irreparable injury.

"[O]bstacles [that] unquestionably make it more difficult for the [plaintiff] to accomplish [its] primary mission . . . provide injury for purposes . . . [of] irreparable harm." *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016). Here, there is little doubt that Defendants' unlawful use of public funds makes it more difficult for the DNC to achieve its mission of "electing Democratic candidates in federal, state, and local elections across the country." ECF No. 1 ¶ 8; *see* ECF No. 3-1, at 20. As explained, *see supra* IV.A.1, Defendants'

use of public dollars to finance the challenged ads imposes competitive harm on the DNC, causing Democratic campaign prospects to suffer. The DNC attests that it "is actively budgeting, strategizing, and executing its plans for the 2026 midterm election cycle, which is already underway, in all 50 States, Washington[,] D.C., and the five U.S. territories." ECF No. 3-5 ¶ 8. "And because each day presents an opportunity to . . . persuade voters[] and galvanize supporters that cannot be restored once lost," the use of public dollars to fund a nationwide media campaign "irreparably harm[s] the [DNC]'s interests." *League of United Latin Am. Citizens v. Exec. Off. of President*, 780 F. Supp. 3d 135, 201 (D.D.C. 2025). "Because this Court can neither postpone an election nor turn back the clock to give [the DNC's candidates] additional time to pursue their campaigns, this is not a case in which 'adequate compensatory or other corrective relief will be available at a later date.'" *Id.* at 201-02 (quoting *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297). Once "the November election pass[es], 'there can be no do over and no redress.'" *Newby*, 838 F.3d at 9 (quoting *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014)).

Defendants do not dispute that such harm is beyond remediation. Instead, their principal argument is that they have changed their conduct, so no injury will continue to occur. *See* ECF No. 9, at 6-7. In their opposition brief, which was filed on October 11, Defendants represented that "the Administration has already committed to not using additional public funds to air these ads moving forward." *Id.* at 6. According to Defendants, "DHS has no plans to make additional [airtime] purchases under the Purchase Order" or "'otherwise use appropriated funds on any similar contracts for the creation or distribution of the media that is the subject of this lawsuit.'" *Id.* (quoting ECF No. 9-2 ¶ 10). The court is unpersuaded.

As the DNC correctly points out, Defendants' argument sounds in mootness, which Defendants bear the burden of establishing. *See* ECF No. 10, at 5-10; *cf. Mehneh v. Rubio*, 164 F.4th 928, 931 (2016) ("The party seeking jurisdictional dismissal must establish mootness, while the opposing party has the burden to prove that a mootness exception applies." (quoting *Reid v. Hurwitz*, 920 F.3d 828, 832 (D.C. Cir. 2019))). Mootness "scrutinizes the presence of [an injury] *after filing—i.e.*, at the time of a court's decision." *Garcia*, 168 F. Supp. 3d at 65. Furthermore, it is blackletter law that a defendant's "voluntary cessation of a challenged practice does not deprive a federal court of its power to determine [the practice's] legality." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (quoting *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982)). If voluntary cessation automatically mooted every case, a defendant would be "free to return to [its] old ways" as soon as the case was dismissed. *Id.* (quoting *City of Mesquite*, 455 U.S. at 289). Therefore, voluntary cessation can only deprive the court of jurisdiction if it is "*absolutely clear* [that] the allegedly wrongful behavior could not reasonably be expected to recur." *Pub. Citizen, Inc. v. Fed. Energy Regul. Comm'n*, 92 F.4th 1124, 1128 (D.C. Cir. 2024) (emphasis added) (quoting *Friends of the Earth, Inc.*, 528 U.S. at 189). This is a "heavy burden" for the party asserting mootness. *Friends of the Earth, Inc.*, 528 U.S. at 189 (quoting *United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203 (1968)).

In support of their argument, Defendants first point to President Trump's October 5 Truth Social announcement that MAGA Inc. would pay for the ads in lieu of "U.S.A. money." ECF No. 3-4, at 45. But that promise went unfulfilled—the ads continued to air with the "Paid for by the U.S. Government" disclosure for at least another week. ECF No. 1 ¶¶ 159-161. Specifically, the ads continued to air on October 6, when OMB apportioned $1 million to the CBP line item for commemorative events. *Id.* ¶ 160; ECF No. 9-1 ¶ 9. The ads continued to air on

October 7, when the Common Clause plaintiffs filed suit in the Southern District of New York and the DNC filed suit here. ECF No. 1 ¶ 161; ECF No. 3-4, at 146-148. The ads continued to air on October 11, after the Common Cause plaintiffs sought a TRO in the Southern District of New York and the DNC sought a TRO in this court. *See* ECF No. 10-1, at 7, 10. And the ads continued to air on October 12, even after the Southern District of New York's TRO went into effect. *See id.* at 13. This sequence of events gives the court reason to doubt Defendants' assurances that the same injury will not recur.

Second, Defendants cite to Ms. Mehringer's declaration, *see* ECF No. 9, at 6 (citing ECF No. 9-2), but that declaration is insufficient to moot this case. Ms. Mehringer attests that the $20 million purchase order with LMD for a national media campaign is effective "through September 19, 2027, or until all deliverables and media placements have occurred," and at least $1 million remains to be spent under the terms of the order. ECF No. 9-2 ¶¶ 7-8. Moreover, DHS will not de-obligate the appropriated funds until "all invoices" to LMD have been paid, whenever that might be. *Id.* ¶ 9. While Ms. Mehringer asserts that, "to the best of [her] knowledge and belief" in her capacity as the DHS "Senior Official Performing the Duties of the Chief Financial Officer," that DHS "has no plans" as of October 10 to make additional media buys under the purchase order or "otherwise use DHS appropriated funds on any similar contracts," *id.* ¶¶ 1, 10, that statement does not make clear that DHS *will not* make such plans in the future. Ms. Mehringer's statement does not bind DHS. Nor does it extend to agencies beyond DHS, such as OMB. "Put simply, the government's sparse declaration falls short of demonstrating that it cannot reasonably be expected to do again in the future what it is alleged to have done in the past." *Fed. Bureau of Investigation v. Fikre*, 601 U.S. 234, 242 (2024) (concluding that a declaration that

the plaintiff "will not be placed on the No Fly List in the future based on the currently available information" was insufficient to moot the case).

Furthermore, the timing of Ms. Mehringer's declaration announcing DHS's purported commitment to ceasing unlawful conduct underscores the DNC's voluntary-cessation argument. Ms. Mehringer's declaration—which is identical to her declaration in the parallel litigation in the Southern District of New York—was executed the day the defendants' opposition to the TRO was due in that case. *Compare* ECF No. 9-2, *with* Decl., *Common Cause*, No. 26-CV-8882 (S.D.N.Y. Oct. 10, 2026), ECF No. 38. The voluntary-cessation doctrine is especially important in cases where, as here, the plaintiff suspects the defendant of "manipulating the judicial process through the false pretense of singlehandedly ending a dispute." *Pub. Citizen, Inc.*, 92 F.4th at 1128 (internal quotation marks omitted) (quoting *Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1, 15 (D.C. Cir. 2019)); *see* ECF No. 10, at 8-9. Ms. Mehringer's representations about DHS's change in conduct, taken at face value, indicate that the government's present restraint responds to ongoing litigation rather than any independently implemented change in policy. Simply put, Defendants cannot be said to have changed their conduct "before [they] knew about any lawsuit in the first place," *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, 188 F.4th 400, 408 (D.C. Cir. 2026), and their actions therefore run the risk that, after "dismissal," they would "later pick up where [they] left off," *Fikre*, 601 U.S. at 241.

Finally, although it appears that Defendants are now complying with the Southern District of New York's TRO, the court expects that, if that TRO were lifted, harms to the DNC would

immediately resume.[14] The November 2026 elections are less than one week away, with early voting already underway, and Defendants have not convincingly shown that they will refrain from "resum[ing] the challenged activity" in the future. *Pub. Citizen, Inc.*, 92 F.4th at 1128.

In sum, Defendants cannot meet their "formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur.'" *Mehneh*, 164 F.4th at 931 n.* (quoting *Friends of the Earth, Inc.*, 528 U.S. at 190). Notably, Defendants have abandoned any pretense of a mootness or another jurisdictional argument. Although Defendants proffered at the motion hearing that "there are issues concerning standing and mootness in this case," they conceded that "[t]he government has not fully developed its response to those issues at this time." ECF No. 13, at 18:6-18:9. When given an opportunity by the court to clarify its stance, Defendants reiterated that "[they] don't have a position on standing and mootness beyond what [counsel] just stated." *Id.* at 18:19-18:21. Defendants then doubled down and asked the court to address only "irreparable harm without wading into those other issues." *Id.* at 18:21-18:23. But Defendants' sole irreparable harm argument relies on the lack of any live or ongoing controversy—mootness by another name. Defendants cannot cloak their argument under a different heading to change their burden. *See Nat'l Endowment for Democracy*, 795 F. Supp. 3d at 70 ("[Courts] are not required to exhibit a naiveté from which ordinary citizens are free." (alteration in original)

---

[14] Defendants have not asserted that the TRO issued by the Southern District of New York undermines the DNC's claim of irreparable harm here. Even assuming that the Southern District of New York's TRO applies to the DNC, that would not block this court from entering a TRO of its own. *See Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F. Supp. 3d 1, 60 (D.D.C. 2020) ("[C]ourts routinely grant follow-on injunctions against the Government, even in instances when an earlier nationwide injunction has already provided plaintiffs in the later action with their desired relief." (collecting cases)). This court has no control over the duration or scope of the Southern District of New York's TRO. Declining to grant a TRO here when the DNC has met the requirements for one would leave the DNC unprotected and vulnerable to further harm.

(quoting *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019))). At bottom, Defendants ask the court to find a lack of irreparable harm when the condition precedent to that assertion relies on a mootness argument that Defendants have failed to develop. Accordingly, the court gives little weight to Defendants' argument. To hold otherwise would create an end-run around the voluntary-cessation doctrine. The court therefore concludes that the DNC has established a likelihood of irreparable harm absent relief.

### C. Balance of Equities and the Public Interest

Finally, the balance of equities and the public interest favor granting a TRO. *See Chaplaincy of Full Gospel Churches*, 454 F.3d at 297. Defendants offer no explanation as to why granting relief to the DNC would "burden the Government." ECF No. 9, at 16.[15] Indeed, Defendants "cannot suffer harm from an injunction that merely ends an unlawful practice." *Open Cmtys. All. v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017) (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)); *see Newby*, 838 F.3d at 12 ("There is generally no public interest in the perpetuation of unlawful agency action."). By contrast, there is "a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *Newby*, 838 F.3d at 12 (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)). And "there is undoubtedly a public interest in 'preserving the integrity of [the] election process.'" *LULAC*, 808 F. Supp. 3d at 84 (alteration in original) (quoting *id.* at 13).

---

[15] The court notes that the defendants in the *Common Cause* case consented to extend the Southern District of New York's TRO through November 20, 2026. *See* Order, *Common Cause*, No. 26-CV-8882 (S.D.N.Y. Oct. 22, 2026), ECF No. 80. While not dispositive, the court finds that the defendants' consent in that case provides further indication that a TRO here would not unduly burden the government.

**D. Bond and Stay Pending Appeal**

Federal Rule of Civil Procedure 65(c) provides that the court may issue a TRO "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The D.C. Circuit has recognized that Rule 65 "vest[s] broad discretion in the district court to determine the appropriate amount of [a bond]." *DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999). "This includes 'the discretion to require no bond at all.'" *Climate United Fund v. Citibank, N.A.*, 778 F. Supp. 3d 90, 121 (D.D.C. 2025) (quoting *P.J.E.S. ex rel. Escobar Francisco v. Wolf*, 502 F. Supp. 3d 492, 520 (D.D.C. 2020)).

Defendants request that "any injunctive relief be accompanied by a bond," ECF No. 9, at 16, whereas the DNC asks that any bond imposed be "nominal," ECF No. 10, at 17. The court will exercise its "broad discretion" under Rule 65(c), *DSE, Inc.*, 169 F.3d at 33, and order the DNC to post a nominal bond of $1. Defendants likely used public dollars to unlawfully finance a national media campaign in the final weeks before the November 2026 elections. In cases such as this one, where Congress has appropriated funds for designated purposes while prohibiting other uses of those funds, "public policy mandate[s] that parties . . . adversely affected by improper administration of programs . . . be strongly encouraged to correct such errors." *Widakurswara v. Lake*, 779 F. Supp. 3d 10, 39 (D.D.C. 2025) (alterations in original) (quoting 11A Charles Alan Wright et al., *Federal Practice and Procedure* § 2954 (3d ed. 2024)); *cf. Nat'l Endowment for Democracy*, 795 F. Supp. 3d at 73 (concluding that when the federal government has impermissibly withheld federal funding, "[i]t makes little sense to exacerbate the [plaintiff's] financial strain by requiring the [plaintiff] to post bond"). To that end, the court will not impose a more burdensome bond.

Finally, the court will not stay this order pending appeal, as Defendants request in their opposition. ECF No. 9, at 16. A stay would be premature when Defendants have not decided to pursue an appeal and would otherwise defeat the purpose of the court's relief. *See Am. Gateways v. U.S. Dep't of Just.*, No. 25-CV-1370, 2025 WL 2029764, at *11 n.5 (D.D.C. July 21, 2025).

## V. CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that Plaintiff's Motion for a Temporary Restraining Order, ECF No. 3, is **GRANTED**. It is further

**ORDERED** that OMB's apportionment of $20 million to fund the development and airing of ads covered by the September 20, 2026 purchase order for a national media campaign, including "The Country He Loves" or "Love Me" ad, the "Maduro" ad, the "Final Battle" ad, the "Mount Rushmore" ad, and the "American Military Power" ad (collectively, the "challenged ads"), is hereby **STAYED**; and it is further

**ORDERED** that OMB and DHS are **ENJOINED** from developing and airing the challenged ads; and it is further

**ORDERED** that OMB and DHS shall take all necessary actions to cease distribution of the challenged ads, including through authorized third parties; and it is further

**ORDERED** that this Order shall apply to the maximum extent provided for by Federal Rule of Civil Procedure 65(d)(2); and it is further

**ORDERED** that Defendants shall immediately provide a copy of this Order to Lepugh, Inc., doing business as LMD Agency, Inc., constituting actual notice under Federal Rule of Civil Procedure 65(d)(2)(C); and it is further

**ORDERED** that Defendants shall file a status report with the court by October 30, 2026, confirming and describing their compliance with the court's Order; and it is further

**ORDERED** that this Order shall remain in effect until fourteen days from today, subject to an extension by this court; and it is further

**ORDERED** that the parties shall meet and confer and file a joint status report proposing a preliminary injunction briefing schedule on or before November 2, 2026.

**SO ORDERED.**

LOREN L. ALIKHAN
United States District Judge

Date: October 28, 2026