**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DEMOCRATIC NATIONAL COMMITTEE,<br><br>Plaintiff,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, THE WHITE HOUSE OFFICE, OFFICE OF MANAGEMENT AND BUDGET, and U.S. DEPARTMENT OF HOMELAND SECURITY,<br><br>Defendants. | Civil Action No. 1:26-cv-3506 (LLA) |

# MEMORANDUM IN SUPPORT OF THE DNC'S MOTION FOR PRELIMINARY INJUNCTION AND § 705 STAY

# TABLE OF CONTENTS


INTRODUCTION ..... 1

BACKGROUND ..... 2

I. President Trump's Attempt to Influence the November 2026 Elections ..... 2

II. OMB and CBP Divert Federal Funds to Broadcast the Propaganda Ads ..... 3

III. The Trump Administration Begins Airing Propaganda Ads with Federal Funds ..... 4

A. The First Wave of Propaganda Ads ..... 5

B. President Trump Breaks His Commitment to Use MAGA Inc. to Air the Propaganda Ads ..... 7

IV. Litigation Limits but Does Not End Taxpayer-Funded Partisan Propaganda ..... 8

A. Litigation Removes the First Wave Ads from the Air ..... 8

B. The White House Office Begins Releasing the Second Wave Ads and MAGA Inc. Airs Them ..... 10

C. Litigation Removes Three of the Second Wave Ads from Official Social Media Channels ..... 13

LEGAL STANDARD ..... 13

ARGUMENT ..... 14

I. The Democratic National Committee Is Likely to Succeed on the Merits. ..... 14

A. The Propaganda Ads Violate the Prohibition on Use of Taxpayer Funds for Publicity or Propaganda, the Purpose Statute, and the Antideficiency Act. ..... 14

B. The DNC Has Standing to Challenge the Propaganda Ads. ..... 29

II. The Democratic National Committee Faces Irreparable Harm. ..... 37

III. The Balance of Equities and Public Interest Favor Temporary Relief. ..... 38

CONCLUSION ..... 41

## TABLE OF AUTHORITIES

**Cases**

*AFGE v. O'Connor*, 747 F.2d 748 (D.C. Cir. 1984)........ 21

*Am. Oversight v. Biden*, No. 1:20-cv-716, 2021 WL 4355576 (D.D.C. Sept. 24, 2021) ........ 27

*Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94 (1902). ........ 25

*Bennett v. Spear*, 520 U.S. 154 (1997) ........ 23, 24

*Bost v. Ill. State Bd. of Elections*, 607 U.S. 71 (2026)........ 30, 31

*Cable News Network, Inc. v. Trump*,
No. 1:26-cv-3287, 2026 WL 3063460 (D.D.C. Oct. 13, 2026)........ 41

*Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996)........ 26

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290 (D.C. Cir. 2006)........ 37

*Ciba-Geigy Corp. v. U.S. EPA*, 801 F.2d 430 (D.C. Cir. 1986) ........ 23

*Citizens for Resp. & Ethics in Washington v. OMB*, 791 F. Supp. 3d 29 (D.D.C. 2025)........ 23

*Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971) ........ 25

*Clarke v. United States*, 915 F.2d 699 (D.C. Cir. 1990)........ 34

*Clinton v. New York,* 524 U.S. 417 (1998) ........ 26, 39

*Common Cause v. Dep't of Homeland Security*,
No. 1:26-cv-8882, 2026 WL 3043900 (S.D.N.Y. Oct. 12, 2026)........ passim

*Common Cause v. Dep't of Homeland Security*,
No. 1:26-cv-8882 (S.D.N.Y. Oct. 30, 2026)........ passim

*Crawford v. Marion Cnty. Election Bd.*, 472 F.3d 949 (7th Cir. 2007)........ 30

*Cuomo v. U.S. Nuclear Regul. Comm'n*, 772 F.2d 972 (D.C. Cir. 1985)........ 13

*D.C. Common Cause v. Dist. of Columbia*, 858 F.2d 1 (D.C. Cir. 1988)........ 15, 28

*Dart v. United States*, 848 F.2d 217 (D.C. Cir. 1988) ........ 26

*Del Monte Fresh Produce Co. v. United States*, 570 F.3d 316 (D.C. Cir. 2009) ........ 32, 35, 36

*Dist. of Columbia v. USDA*, 444 F. Supp. 3d 1 (D.D.C. 2020) ........ 13

*DNC v. Trump*, No. 1:26-cv-3506, 2026 WL 3228366 (D.D.C. Oct. 28, 2026) .................. passim

*DSCC v. Trump*, No. 1:26-cv-1114, 2026 WL 2681471 (D.D.C. Sept. 13, 2026) ...................... 30

*DSCC v. Trump*, No. 1:26-cv-3674, 2026 WL 3306993 (D.D.C. Nov. 2, 2026) ......................... 30

*Envtl. Def. Ctr. v. Babbitt*, 73 F.3d 867 (9th Cir. 1995) ............................................................ 21

*FBI v. Fikre*, 601 U.S. 234 (2024) ........................................................................................ 33, 34

*FEC v. Cruz*, 596 U.S. 289 (2022)............................................................................................ 25

*Fed. Express Corp. v. U.S. Dep't of Commerce*, 39 F.4th 756 (D.C. Cir. 2022)......................... 26

*Fla. Audubon Society v. Bentsen*, 94 F.3d 658 (D.C. Cir. 1996) (en banc)................................. 31

*Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905 (D.C. Cir. 2015)........................................ 29

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167 (2000)............ 9, 33

*Gordon v. Holder*, 721 F.3d 638 (D.C. Cir. 2013) ..................................................................... 40

*League of United Latin Am. Citizens v. Exec. Off. of the President*,
780 F. Supp. 3d 135 (D.D.C. 2025) ...................................................................................... 9, 38

*League of United Latin Am. Citizens v. Exec. Off. of the President*,
808 F. Supp. 3d 29 (D.D.C. 2025) ...................................................................................... 30, 39

*League of Women Voters of U.S. v. Newby*, 838 F.3d 1 (D.C. Cir. 2016)................. 37, 38, 39, 40

*Lujan v. Defs. Of Wildlife*, 504 U.S. 555 (1992)......................................................................... 29

*Marbury v. Madison,* 5 U.S. (1 Cranch) 137 (1803).................................................................... 25

*Mehneh v. Rubio*, 164 F.4th 928 (D.C. Cir. 2026)............................................................... 32, 33

*Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172 (1999) ................................ 26

*Mountain States Legal Found. v. Denver Sch. Dist. No. 1*,
459 F. Supp. 357 (D. Colo. 1978).............................................................................................. 39

*Nat'l Ass'n of Post. Supers. v. U.S. Postal Serv.*, 26 F.4th 960 (D.C. Cir. 2022)........................ 27

*Nat'l Council of Nonprofits v. OMB*, 188 F.4th 400 (D.C. Cir. 2026) ........................................ 34

*Nat'l Ctr. for Learning Disabilities v. OMB*,
No. 1:26-cv-13019, 2026 WL 2754447 (D. Mass. Sept. 17, 2026)........................................... 23

*Nat'l Republican Senatorial Comm. v. FEC*, 609 U.S. 908 (2026)............................................. 31

*Nat'l Tr. for Historic Pres. v. Nat'l Park Serv.*, 827 F. Supp. 3d 93 (D.D.C. 2026) .................... 19

*Nat'l Trust for Historic Preservation v. Nat'l Park Serv.*,
185 F.4th 1185 (D.C. Cir. 2026) .................... 13, 27

*Neguse v. U.S. Immigr. & Customs Enf't*, 822 F. Supp. 3d 86 (D.D.C. 2026) .................... 19, 20

*Nken v. Holder*, 556 U.S. 418 (2009) .................... 38

*Novartis Pharm. Corp. v. Kennedy*, 182 F.4th 1027 (D.C. Cir. 2026) .................... 28

*Open Cmtys. All. v. Carson*, 286 F. Supp. 3d 148 (D.D.C. 2017) .................... 9

*Perrin v. United States*, 444 U.S. 37 (1979) .................... 28

*PETA v. Tabak*, 662 F. Supp. 3d 581 (D. Md. 2023) .................... 24

*Phang v. Blanche*, 836 F. Supp. 3d 90 (D.D.C. 2026) .................... 41

*Pride Indus., Inc. v. Comm. for Purchase from People Who Are Blind or Severely Disabled*, 420 F. Supp. 3d 1035 (E.D. Cal. 2019) .................... 24

*Pub. Citizen, Inc. v. FERC*, 92 F.4th 1124 (D.C. Cir. 2024) .................... 32, 33, 35

*Pub. Utils. Comm'n v. FERC*, 236 F.3d 708 (D.C. Cir. 2001) .................... 35

*Purcell v. Gonzalez*, 549 U.S. 1 (2006) .................... 39

*R.I.L.-R v. Johnson*, 80 F. Supp. 3d 164 (D.D.C. 2015) .................... 40

*Reynolds v. Sims*, 377 U.S. 533 (1964) .................... 39

*Sandifer v. U.S. Steel Corp.*, 571 U.S. 220 (2014) .................... 28

*Sebelius v. Cloer*, 569 U.S. 369 (2013) .................... 28

*Shays v. FEC*, 414 F.3d 76 (D.C. Cir. 2005) .................... 9, 30

*Stanson v. Mott*, 551 P.2d 1 (Cal. 1976) .................... 39

*Tandon v. Newsom*, 593 U.S. 61 (2021) .................... 33

*U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590 (2016) .................... 23

*U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339 (D.C. Cir. 2012) .................... 19, 39

*United States v. Espy*, 145 F.3d 1369 (D.C. Cir. 1998) .................... 27

*United States v. Jackson*, 388 F. Supp. 3d 505 (E.D. Pa. 2019) .................... 21

*United States v. W. T. Grant Co.*, 345 U.S. 629 (1953) .... 32

*Uzuegbunam v. Preczewski*, 592 U.S. 279 (2021) .... 32

*Washington v. Reno*, 35 F.3d 1093 (6th Cir. 1994) .... 40

*West v. Lynch*, 845 F.3d 1228 (D.C. Cir. 2017) .... 31

*Widakuswara v. Lake*, 779 F. Supp. 3d 10 (D.D.C. 2025) .... 25

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) .... 13

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) .... 26

**Constitutional Provisions**

U.S. Const. art. I, § 9, cl.7 .... 19

**Statutes**

31 U.S.C. § 1301 .... 14, 28

31 U.S.C. § 1341 .... 14, 20, 29

31 U.S.C. § 1513 .... 23

31 U.S.C. § 1517 .... 23

31 U.S.C. § 1518 .... 23

31 U.S.C. § 1519 .... 23

5 U.S.C. § 706 .... 25

5 U.S.C. § 7234 .... 21

52 U.S.C. § 30101 .... 19

An Act Making Appropriations for the Department of Labor, the Federal Security Agency, and Related Independent Agencies, for the Fiscal Year Ending June 30, 1952, Pub. L. No. 82-134, 65 Stat. 209 (1951) .... 15

Consolidated Appropriations Act for FY2026, Pub. L. No. 119-75, 140 Stat. 173 (2026) .... passim

Continuing Appropriations and Extensions Act for FY2027, Pub. L. No. 119-103, 140 Stat. 987 (2026) .... 3, 15

La. Rev. Stat § 18:402 .... 38

La. Rev. Stat. § 18:402 .... 38

La. Rev. Stat. § 18:511 .... 38

Miss. Code § 23-15-193 .... 38

N.J. Stat. § 19:2-3 .... 38

One Big Beautiful Bill Act, Pub. L. No. 119-21, 139 Stat. 72 .... 3, 4, 21, 22

Va. Code § 24.2-215 .... 38

**Legislative History**

H.R. Rep. No. 119-06 (2025) .... 22

**Administrative Materials**

11 C.F.R. § 100.22 .... 19

52 U.S.C. §§ 30101–46 .... 19

*Acting Comptroller General Fisher to the Chairman, NLRB*, 31 Comp. Gen. 311 (1952) .... 15

Federal Commc'ns Comm'n, *Standardized and Enhanced Disclosure Requirements for Television Broadcast Licensee Public Interest Obligations,* FCC 07-205 (Nov. 27, 2007) .... 18

Gov't Accountability Off., B-337581 (Comp. Gen), 2025 WL 1714236 (June 17, 2025) .... 24

Gov't Accountability Off., *Principles of Federal Appropriations Law* (4th ed. 2017) .... 16, 18, 28

Off. of Mgmt. & Budget, Circular No. A-11 (2025) .... 24

**Secondary Sources**

Frederick Schauer, *A Critical Guide to Vehicles in the Park* 83 N.Y.U. L. Rev. 1109 (2008) .... 27

*Propaganda*, Black's Law Dictionary (12th ed. 2024) .... 28

*Publicity*, Black's Law Dictionary (12th ed. 2024) .... 28

The Debates in the Several State Conventions on the Adoption of the Federal Constitution (Jonathan Elliot ed., 2d ed. 1836) .... 39

The Federalist No. 58 (James Madison) (Clinton Rossiter ed., 1961) .... 39

*Use*, Black's Law Dictionary (12th ed. 2024) .... 20

## INTRODUCTION

The Trump Administration is using taxpayer dollars to develop, distribute, air, stream, and promote political advertisements and purely partisan videos, a blatant violation of the statutory ban on the use of appropriations for "publicity or propaganda purposes." President Trump personally directed this illegal activity. The White House Office crafted the content. The Office of Management and Budget (OMB) shifted $20 million to pay for airtime. And U.S. Customs and Border Protection (CBP), a component of the U.S. Department of Homeland Security (DHS), contracted to put the ads on television. These unlawful actions are *ultra vires* and violate the Administrative Procedure Act (APA). This Court has already issued a temporary restraining order and § 705 stay against unlawful OMB and DHS actions. *See DNC v. Trump*, No. 1:26-cv-3506, 2026 WL 3228366, at *6–7, 9, 12 (D.D.C. Oct. 28, 2026) (Doc. 26). This Court should now enter a preliminary injunction against the full scope of Defendants' illegal activity.

The Democratic National Committee (DNC) works to defeat President Trump's allies at the polls in all fifty states, up and down the ballot, and shares a unity of interests with Democratic candidates in federal, state, and local elections. The Trump Administration's illegal use of taxpayer dollars to develop, distribute, air, stream, and promote campaign-style advertisements and videos deprives the DNC of a fair electoral process and places the DNC and Democratic candidates at an electoral disadvantage, even though the publicly funded propaganda advertisements and videos are deeply unpopular with American voters, by preserving funds held by campaign committees and aligned PACs for other political expenditures.

Facing intense bipartisan backlash, President Trump announced on October 5 that he planned to have MAGA Inc., a super PAC the President effectively controls, pay to air these propaganda ads moving forward. And yet the ads continued to air, still labeled "Paid for by the

U.S. Government." Even after a federal court ordered that the ads could no longer air at taxpayer expense, they continued to air with the same label. *See* Oct. 12 Let., *Common Cause v. DHS*, No. 1:26-cv-8882 (S.D.N.Y. Oct. 12, 2026) (Doc. 43). And even once the ads ceased to run at taxpayer expense, White House staff continued to develop new partisan videos, for which MAGA Inc. purchased airtime, and White House and DHS officials continued to claim that the ads are public service announcements and expressions of patriotism. Absent relief, the DNC faces immediate and irreparable injury, and the balance of equities and public interest demand an injunction.

## BACKGROUND

President Trump directed illegal use of government funds to develop and air political propaganda, in an attempt to resuscitate his historically low approval ratings and influence elections. The White House Office, OMB, and CBP have carried that directive by developing ads, shifting funds appropriated for other purposes to finance them, and purchasing airtime on which to broadcast them. The campaign is unprecedented in modern American history precisely because it is a clear violation of federal law.

### I. President Trump's Attempt to Influence the November 2026 Elections

As President Trump faced historically low approval ratings in the months before the November 2026 midterm election, he nonetheless aspired to become the centerpiece of Republican messaging. Weineshet M. Lindholm Declaration ¶ 24 (Doc. 3-4); Lindholm Decl. Ex. 21 (Doc. 3-4, at 112). President Trump repeatedly called on his supporters to "pretend that I'm on the ballot" and warned that Democratic control of Congress would result in his impeachment. *Id.* Even though President Trump's name did not appear on the ballot, President Trump and Republican leaders knew that his performance was. *Id.*

In an attempt to save Republican control of Congress and avoid oversight, President Trump began strategizing in early August on how to leverage the resources of MAGA Inc., a super PAC

he effectively controls. Lindholm Decl. Ex. 23 (Doc. 3-4, at 129). As of August, MAGA Inc. had already spent or transferred millions of dollars to support Republican candidates and oppose Democrats in the November 2026 election. Lindholm Decl. Ex. 14 (Doc. 3-4, at 49).

During an August 2026 meeting at the White House, President Trump showed advisors videos that showered him with praise, which had been made by White House Office staff. Lindholm Decl. Exs. 3, 4, 6, 9, 11, 23 (Doc. 3-4, at 10, 13, 21, 31, 37, 129); *see also Common Cause* RFA Resps. 3–6 (admitting "EOP staff compiled certain of the Challenged Advertisements") (Doc. 24-1, at 27–29). These campaign-style videos have appeared on official White House social media feeds since early August, as well as President Trump's personal social media accounts. *Id.* White House Office staff are public employees, whose salaries are funded by annual appropriations. *See* Consolidated Appropriations Act for FY2026, Pub. L. No. 119-75, div. E, tit. II, 140 Stat. 173, 450 (2026); Continuing Appropriations and Extensions Act for FY2027, Pub. L. No. 119-103, § 101(5), 140 Stat. 987, 987–88 (2026). President Trump decided to have the White House Office produce similar campaign-style videos, air them on television, and expend federal taxpayer dollars to pay for his propaganda. *See* Lindholm Decl. Ex. 23 (Doc. 3-4, at 129); *see also Common Cause* RFA Resps. 3–6 (admitting "EOP staff compiled certain of the Challenged Advertisements") (Doc. 24-1, at 27–29); Weineshet M. Lindholm Second Supplemental Declaration Ex. 14 (*Common Cause* Supp. Interrog. Resps. 10 & 11 (responding that "EOP staff generated and posted" challenged ads)).

## II. OMB and CBP Divert Federal Funds to Broadcast the Propaganda Ads

In the modern era, Congress has expressly prohibited any president or administration from using federal funds for campaign-style advertisements or political propaganda. To fund broadcasting the ads on television, OMB allocated $20 million in CBP funds authorized by the One Big Beautiful Bill Act (OBBBA), Pub. L. No. 119-21, 139 Stat. 72 (2025) to be apportioned

for "Commemorative Events" during FY2026. Lindholm Decl. Ex. 15 (Doc. 3-4, at 55); Woolf Decl. ¶¶ 3–9 (Doc. 9-1); Mehringer Decl. ¶ 4. This line item is intended for "Line-of duty death memorial, Department or agency anniversaries, and commendation ceremonies." *See* OBBBA, Pub. L. No. 119-21 §§ 90001–04, 139 Stat. 73, 357–59 (2025). This $20 million allocation was forty times larger than the $500,000 OMB had previously allocated to this line item. Lindholm Decl. Ex. 15 (Doc. 3-4, at 55).

The next day CBP entered into a $20 million contract with LMD Agency, Inc. to carry out a "National Media Campaign." Lindholm Decl. Ex. 15 (Doc. 3-4, at 55); Mehringer Decl. ¶¶ 3, 5. The funds were awarded by CBP's Office of Public Affairs. Lindholm Decl. ¶ 20; Lindholm Decl. Ex. 17 (Doc. 3-4, at 71). A second firm, LMO Advertising, purchased advertising slots. Lindholm Decl. Ex. 23 (Doc. 3-4, at 129). The ads soon began airing on all major broadcast and cable news networks, as well as during televised football games. Lindholm Decl. ¶¶ 5, 23; Lindholm Decl. Ex. 20 (Doc. 3-4, at 106); Mehringer Decl. ¶¶ 3, 5, 7; *see also Common Cause* RFA Resp. 2 (admitting DHS funds "were used to disseminate certain of the Challenged Advertisements") (Doc. 24-1, at 26).

### III. The Trump Administration Begins Airing Propaganda Ads with Federal Funds

For roughly three weeks beginning in late September, the Trump Administration carried out a political propaganda campaign on broadcast and cable television, funded with taxpayer dollars. *See* Mehringer Decl. ¶ 5. The Administration launched five campaign-style political ads (the First Wave Ads) and attempted to pass them off as "public service announcements." Lindholm Decl. Exs. 2, 5, 7, 8, 10, 12 (Doc. 3-4, at 7, 18, 25, 28, 34, 40). The propaganda blitz stretched across the country in an attempt to influence the November 2026 elections.

### A. The First Wave of Propaganda Ads

The Trump Administration began airing the first propaganda ad, the Love Me Ad, on September 23, 2026. Lindholm Decl. Ex. 2 (Doc. 3-4, at 7). The ad features photos of President Trump, while the introduction of the song "Love Me" by JMSN plays. *Id.* President Trump's voiceover states "Together we will defeat communism, socialism, and Marxism in America. America will never be a communist country." *Id.* Across a series of images of President Trump, the ad names the President's purported accomplishments, such as the "largest tax cuts in history," "reigniting American manufacturing," and "defend law and order and police." *Id.* The Love Me Ad ends with closing remarks by Ultimate Fighting Championship (UFC) CEO Dana White calling President Trump "the toughest, most resilient person that I've ever met, and nothing was going to stop him from fighting so hard for the country he loves." *Id.* As it ends, a disclosure appears stating "Paid for by the U.S. Government." *Id.* The same ad—without the disclosure—is also on President Trump and the White House's social media accounts. Lindholm Decl. Exs. 3, 4 (Doc. 3-4, at 10, 13).

The second propaganda ad, the Maduro Ad, began broadcastings as soon as the next day. The Maduro Ad highlights the capture of Venezuelan President Nicolás Maduro. Lindholm Decl. Exs. 5, 28 (Doc. 3-4, at 18, 162). The ad shows President Maduro at a rally, saying that he is waiting for President Trump to get him; it is then interrupted by remarks from the Chairman of the Joint Chiefs of Staff about the military raid against President Maduro. Lindholm Decl. Ex. 5 (Doc. 3-4, at 18). President Trump's voice is heard—over images of President Maduro blindfolded and handcuffed—proclaiming the military action "one of the most stunning and effective" in American history. *Id.* It ends with Secretary of State Marco Rubio flattering President Trump by saying, "I think people need to understand that this is not a President that just talks and does letters and press conferences . . . . [D]on't play games while this President is in office." *Id.* Once again, as the ad

ends, the disclosure "Paid for by the U.S. Government" appears. *Id.* The same ad—again without the disclosure—is on President Trump and the White House's social media accounts. *See, e.g.*, Lindholm Decl. ¶ 6.

The propaganda campaign continued over the weekend of September 26 and 27, 2026. The third propaganda ad, the Final Battle Ad, is nearly identical to one of President Trump's 2024 presidential campaign ads. Lindholm Decl. Exs. 1, 7 (Doc. 3-4, at 1, 25). The black-and-white ad displays President Trump walking down a hallway to the sound of the President's own voice: "This is the final battle. With you at my side, we will demolish the Deep State." *Id.* It continues through a litany of President Trump's accusations against his perceived enemies. *See id.* Instead of showing President Trump's 2024 campaign logo (as the campaign ad does), the Final Battle Ad ends with the "Paid for by the U.S. Government" disclosure. *Id.*

That same weekend President Trump aired the fourth ad, the Mount Rushmore Ad. Lindholm Decl. Ex. 8 (Doc. 3-4, at 28). As the ad begins, President Trump's political campaign flag is displayed in a crowd of supporters gathered to watch the President give remarks at Mount Rushmore on July 3, 2026. *Id.* As President Trump speaks, the ad shows numerous aerial shots and angles of Mount Rushmore and President Trump. *Id.* The Mount Rushmore Ad ends with "Paid for by the U.S. Government." *Id.* The same ad—without the disclosure—is on the White House's social media feeds. Lindholm Decl. Ex. 9 (Doc. 3-4, at 31).

The final propaganda ad to have aired in this first wave, the American Military Power Ad, began appearing on TV on September 30, 2026. Lindholm Decl. Ex. 10 (Doc. 3-4, at 34). The American Military Power Ad resembles an action movie trailer for the Iran War. *Id.* As it begins, lyrics to the song "Boom Boom" by John Lee Hooker are shown over clips of President Trump wearing his presidential campaign "Make America Great Again" baseball cap, as well as aircraft

and watercraft engaged in military action. *Id.* Over the footage of military action, President Trump's voiceover is heard: "This regime will soon learn that no one should challenge the strength and might of the United States armed forces." *Id.* The ad continues with Secretary of Defense Pete Hegseth praising President Trump by stating, "He reminded the world, as he has time and time again, being an American means something unbreakable." *Id.* As with the other propaganda ads, it ends with a disclosure stating, "Paid for by the U.S. Government." *Id.* The same ad—without the disclosure—is on President Trump's and the White House's social media feeds. *Id.*[1]

During the first week that the First Wave Ads aired, the Trump Administration spent approximately $2.5 million on advertising slots. Lindholm Decl. Ex. 20 (Doc. 3-4, at 106). The ads were broadcast across the country and primarily shown during football games and primetime or late-night entertainment. Lindholm Decl. Ex. 23 (Doc. 3-4, at 129). The Trump Administration then ramped up the frequency of the propaganda ads and, by October 5, 2026, an estimated $11 million had been spent on advertising slots. Lindholm Ex. 25 (Doc. 3-4, at 142).

### B. President Trump Breaks His Commitment to Use MAGA Inc. to Air the Propaganda Ads

Condemnation of President Trump's illegal use of federal funds to develop and air propaganda ads arrived quickly. Congressional Democrats spoke out against the use of federal funding. Lindholm Decel. Exs. 21, 23 (Doc. 3-4, at 112, 129). Many congressional Republicans also expressed public concern or disapproval over the use of federal government money for political ads. *Id.* In a failed attempt to quell the upheaval, the White House issued a press release

[1] The White House Office provided at least fourteen total propaganda videos to LMD Agency. Lindholm Decl. Ex. 22 (Doc. 3-4, at 120). The unaired videos include "God Made Trump," a video that aired during the Republican Midterm Convention, a partisan political event. *Id.* Another, entitled "King of the Jungle," features images of President Trump and his campaign rallies, video of lions hunting, and images of Democratic leaders past and present. *Id.* Each of the unaired ads included a "Paid for by the U.S. Government" disclosure affixed by White House Office staff. *Id.* The DNC does not seek preliminary relief with respect to the unaired ads.

on September 25, 2026 that stated, "President Trump is not on the ballot and there is no call to action." Lindholm Decl. Ex. 12 (Doc. 3-4, at 40). The press release ends by claiming that these propaganda ads are "aimed at the country—not a line on the ballot." *Id.* Nonetheless, discontent continued. Following the weeks of bipartisan backlash, including from the Republican Senate Majority Leader John Thune, President Trump announced on October 5, 2026 that the federal government would no longer pay for his political ads. Lindholm Decl. Ex. 13 (Doc. 3-4, at 44).

President Trump's pledge did not last long. The propaganda ads continued to run early on October 6, 2026, each with a "Paid for by the U.S. Government" disclosure. Lindholm Decl. Ex. 29 (Doc. 3-4, at 166). The Final Battle Ad aired later that day on a national broadcast of "Dancing with the Stars" and the next morning on "Fox & Friends," again with a "Paid for by the U.S. Government" disclosure. Lindholm Decl. Exs. 26, 27 (Doc. 3-4, at 145, 158).

## IV. Litigation Limits but Does Not End Taxpayer-Funded Partisan Propaganda

### A. Litigation Removes the First Wave Ads from the Air

The DNC filed suit on October 7, Compl. (Doc. 1), and moved for a temporary restraining order (TRO) or preliminary injunction and an APA stay soon thereafter, DNC TRO Mot. (Doc. 3). On that date, the Trump Administration directed that the propaganda ads should continue airing only for another four days. *See* Tr. 14:1–3 (Oct. 15, 2026) (Lindholm 2d Supp. Decl. Ex. 13). While briefing in this case was ongoing, the U.S. District Court for the Southern District of New York entered its own TRO on October 11, prohibiting further airing of the First Wave Ads using taxpayer funded advertising slots and staying the OMB apportionment and DHS purchase order and vendor payments. *See* Order, *Common Cause v. DHS*, No. 1:26-cv-8882 (S.D.N.Y. Oct. 11, 2026) (Doc. 41); *see also Common Cause v. DHS*, No. 1:26-cv-8882, 2026 WL 3043900 (S.D.N.Y. Oct. 12, 2026). The First Wave Ads continued briefly before coming off the air. Weineshet M. Lindholm Supplemental Declaration ¶¶ 4–6, 8 (Doc. 10-1); Lindholm Supp. Decl. Ex. 6 (Doc. 10-

1, at 35); *see also* Compliance Rep., *Common Cause v. DHS*, No. 1:26-8882 (S.D.N.Y. Oct. 12, 2026) (Doc. 44). In total, LMD Agency purchased approximately $19 million worth of advertising slots under its $20 million contract with CBP. Mehringer Decl. ¶ 8. Notably, OMB has apportioned another $1 million for CBP "Comme[mo]rative Events" during FY2027. *See* Lindholm 2d Supp. Decl. Ex. 16.

On October 28, this Court entered a TRO staying OMB allocations and DHS obligations related to propaganda ads and enjoining OMB and DHS from developing, airing, or distributing the First Wave Ads. *See DNC v. Trump*, 2026 WL 3228366, at *16. The Court found that the DNC likely had standing to challenge the propaganda ads, based on a competitive injury, *see id.* at *8–9 (citing *Shays v. FEC*, 414 F.3d 76 (D.C. Cir. 2005)), and that any voluntary cessation of the challenged conduct did not moot the case, *see id.* at *13–14 (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000)). In turn, the Court found that the DNC was likely to succeed on the merits of its APA claim against OMB and DHS, as the challenged allocation and obligations constituted final agency action contrary to the Consolidated Appropriations Act, the Purpose Statute, and the Anti-Deficiency Act. *See id.* at *9–12. The Court then found that the use of public dollars to fund a nationwide media campaign irreparably harms the DNC's electoral interests. *See id.* at *12 (quoting *League of United Latin Am. Citizens v. Exec. Off. of the President* (*LULAC*), 780 F. Supp. 3d 135, 201 (D.D.C. 2025)). Finally, the Court found that the balance of equities and the public interest favor "an injunction that merely ends an unlawful practice." *Id.* at *15 (quoting *Open Cmtys. All. v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017)). Two days later, Defendants confirmed compliance. *See* Status Rep. (Doc. 27).

### B. The White House Office Begins Releasing the Second Wave Ads and MAGA Inc. Airs Them

Even as federal courts condemned the use of federal funds for propaganda ads, the White House Office continued to develop and release publicity or propaganda videos (the Second Wave Ads) on official social media and video streaming channels. In several cases, MAGA Inc. then aired the same videos as television advertisements, with a disclosure that MAGA Inc. had paid for the airtime but no indication that crafting the content had been paid for by the U.S. Government.

The White House Office released the next four propaganda videos on October 12, 2026, the day after the *Common Cause* TRO issued. The first, the Every Democrat Voted Against No Tax on Tips Ad (No Tax on Tips), begins with President Trump castigating Democrats for having voted against "no tax on tips," "no tax on overtime," and "no tax on Social Security," while images of Democratic members of Congress—many of whom were running for reelection in 2026—successively fade from color to monochrome, the classic palette of a negative political ad. Lindholm Supp. Decl. Ex. 8 (Doc. 10-1, at 41).[2] The ad then proceeds from a clip of Congressman Jamie Raskin questioning the proposals, to President Trump reiterating his criticism at an August 2026 campaign rally, to House Minority Leader Hakeem Jeffries proclaiming that every Democrat would vote against the proposals, which were part of a larger legislative package. *Id.* On or about October 16, MAGA Inc. began paying to air the video on national TV, with a disclosure that MAGA Inc. had paid for the airtime but no indication that crafting the content had been paid for by the U.S. Government. *See* Lindholm 2d Supp. Decl. Ex. 1.

The second new ad, the $5000 to Americans Ad, begins with President Trump speaking from the Oval Office, where he promises, "I am going to give all adult citizens in the United States

---

[2] This video is no longer on the White House YouTube channel. *See* Background Section IV.C, *infra*. It remains available at https://www.youtube.com/watch?v=tZRfNIrGTJg.

$5000." Lindholm Supp. Decl. Ex. 6 (Doc. 10-1, at 35).[3] The video then flashes between images of hundred-dollar bills, the President's rallies, and other media events, while the President explains that this boon is available only if the Republicans win, whereas electing Democrats will lead to an economic depression. *Id.* President Trump had announced this proposal at the Republican Midterm Convention to persuade voters to vote for Republicans. *See* Lindholm 2d Supp. Decl. Ex. 12. On or about October 29, MAGA Inc. began airing the video on national TV, again with a disclosure that MAGA Inc. had paid for the airtime but no indication that crafting the content had been paid for by the U.S. Government. *See* Lindholm 2d Supp. Decl. Ex. 8.

The third, the Stephen Miller Ad, features the White House Deputy Chief of Staff exalting President Trump in a 90-second monologue for purportedly solving problems "that plagued this nation for decades, generations, or even longer," while pulsing electronica plays underneath. *See* Lindholm 2d Supp. Decl. Ex. 3. The visuals are a montage of President Trump speaking at rallies; the President shaking hands with world leaders; military strikes on Iran, Venezuela, and small, unarmed boats; and migrants at the Southern border. *Id.* On October 20, MAGA Inc. began airing the video on national TV, again with a disclosure that MAGA Inc. had paid for the airtime but no indication that crafting the content had been paid for by the U.S. Government. *See* Lindholm 2d Supp. Decl. Ex. 2.

The fourth new ad, the Man in the Arena Ad, is a highlight reel for President Trump, a work of pure publicity. Lindholm Supp. Decl. Ex. 7 (Doc. 10-1, at 38). Throughout the ad, a voiceover recites a passage from President Theodore Roosevelt's 1910 "Citizenship in a Republic" speech, well known both for its praise of "the strong man" who "strives valiantly," though his

[3] This video is no longer on the White House YouTube channel. *See* Background Section IV.C, *infra*. It remains available at https://video.snapstream.net/Play/3UXHcnSuULUe5XoaW6DaMs?accessToken=78grc0jkuv5g.

"face is marred by dust and sweat and blood," and its dismissal of "the critic." *Id.* The ad then proceeds through a montage of President Trump at his rallies, alongside troops and military hardware, at Freedom250 events, and accompanied by other trappings of his office. *Id.*

On October 25 and 26, the White House Office posted two final Second Wave propaganda ads to the official White House YouTube page. *See* Lindholm 2d Supp. Decl. Ex. 7. The first, the Cost of Socialism, is a classic negative political advertisement. *See* Lindholm 2d Supp. Decl. 7.[4] It presents a series of unsubstantiated harms associated with the Democratic Socialists of America's "proposed agenda" and concludes with a call to action for voters: "The decisions we make today will shape tomorrow, and the cost of getting it wrong could be irreversible." *See id.* Throughout the 2026 election cycle, President Trump and Republicans attempted to tie the Democratic Party to the Democratic Socialists of America, which is an independent political organization. *See* Lindholm 2d Supp. Decl. Ex. 7.

The second, the Retribution Through Success Ad, begins with a 2024 clip of President Trump telling an interviewer "Retribution will be through success," followed by a montage of military activity and President Trump's political events, over the intense chorus of "Somewhere I Belong" by Linkin Park. *See* Lindholm 2d Supp. Decl. Ex. 4. As with the Final Battle Ad, the Retribution Through Success Ad echoes a slogan of President Trump's 2024 campaign, when President Trump and his surrogates frequently quipped that that they would achieve retribution against perceived enemies through their success. *See* Lindholm 2d Supp. Decl. Exs. 5-6.

---

[4] This video is no longer on the White House YouTube channel. *See* Section IV.C, *infra*. It remains available at https://video.snapstream.net/Play/3UXHcnSuULUe5XoaW6DaMs?accessToken=78grc0jkuv5g.

### C. Litigation Removes Three of the Second Wave Ads from Official Social Media Channels

This Court limited its temporary restraining order to final agency action preceding the purchase of television advertising slots for the propaganda ads and did not reach the DNC's *ultra vires* claim against the White House Office. *See DNC v. Trump*, 2026 WL 3228366, at *7. Soon thereafter, the U.S. District Court for the Southern District of New York issued an expanded TRO that enjoined dissemination of the $5,000 to Every American Ad, the No Tax on Tips Ad, and the Cost of Socialism Ad, including removal of the ads from social media sites. Order, *Common Cause v. DHS*, No. 1:26-cv-8882 (S.D.N.Y. Oct. 30, 2026) (Doc. 101); *see also* Let. Mot. to Stay, *Common Cause v. DHS*, No. 1:26-cv-8882 (S.D.N.Y. Oct. 30, 2026) (Doc. 102). Those Ads have since been removed from the White House YouTube page by making the videos "private," although they remain uploaded and ready to be republished. *See* Lindholm 2d Supp. Decl. Ex. 10; *see also* Notice of Compliance, *Common Cause v. DHS*, No. 1:26-cv-8882 (S.D.N.Y. Oct. 31, 2026) (Doc. 104). The expanded TRO also does not address the Stephen Miller Ad, the Man in the Arena Ad, or the Retribution Through Success Ad.

## LEGAL STANDARD

For a preliminary injunction to issue, this Court must find "that (1) the moving party is likely to 'succeed on the merits'; (2) the moving party is likely to 'suffer irreparable harm in the absence of preliminary relief'; (3) the equities favor the issuance of an injunction; and (4) 'an injunction is in the public interest.'" *Nat'l Trust for Historic Preservation v. Nat'l Park Serv.*, 185 F.4th 1185, 1219 (D.C. Cir. 2026) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). "The factors governing issuance of a preliminary injunction also govern issuance of a § 705 stay." *Dist. of Columbia v. USDA*, 444 F. Supp. 3d 1, 15 (D.D.C. 2020) (citing *Cuomo v. U.S. Nuclear Regul. Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985)).

## ARGUMENT

Developing, distributing, airing, streaming, and promoting propaganda ads violates Congress's mandate that appropriated funds not be used for "publicity or propaganda," Consolidated Appropriations Act for FY2026, Pub. L. No. 119-75, § 718, 140 Stat. 173, 495 (2026), and further use—in violation of the Antideficiency Act, 31 U.S.C. § 1341, and the Purpose Statute, 31 U.S.C. § 1301—may be halted as both a violation of the APA and *ultra vires*. This Court has already found that the DNC is likely to prevail on its APA claim, that the threat of irreparable harm is beyond question, and that the balance of equities and public interest tilt only in favor of relief. *See DNC v. Trump*, 2026 WL 3228366, at *7–15. The U.S. District Court for the Southern District of New York has also found that the use of "staff time paid for by taxpayer appropriated fund[s] to compile and create at least three of the challenged advertisements" was *ultra vires*. Tr. 32:20–33:3, 36:11–19, *Common Cause v. Dep't of Homeland Security*, No. 1:26-cv-8882 (S.D.N.Y. Oct. 30, 2026) (*Common Cause II*) (Lindholm 2d Supp. Decl. Ex. 15). Thus, this Court should grant a preliminary injunction barring development, distribution, airing, streaming, and promoting of publicity and propaganda videos, including a specific bar on the propaganda ads named herein.

### I. The Democratic National Committee Is Likely to Succeed on the Merits.

#### A. The Propaganda Ads Violate the Prohibition on Use of Taxpayer Funds for Publicity or Propaganda, the Purpose Statute, and the Antideficiency Act.

The DNC advances a simple legal proposition: it is illegal for the White House Office, OMB, and CBP to use taxpayer funds to develop, distribute, air, stream, and promote publicity or propaganda in express contravention of federal law. The APA and *ultra vires* review provide appropriate vehicles to enjoin and stay the offensive conduct.

#### 1. The Challenged Ads Are Prohibited "Publicity and Propaganda."

The DNC is likely to show that the propaganda ads violate a core principle of modern appropriations law: federal funds may not be used for "publicity or propaganda." *See, e.g.*, *D.C. Common Cause v. Dist. of Columbia*, 858 F.2d 1, 11 (D.C. Cir. 1988); *see also DNC v. Trump*, 2026 WL 3228366, at *1 & n.1; *Common Cause*, 2026 WL 3043900, at *16. The Consolidated Appropriations Act for FY2026 mandates, "No part of any appropriation contained in this or any other Act shall be used directly or indirectly, including by private contractor, for publicity or propaganda purposes within the United States not heretofore authorized by Congress." Pub. L. No. 119-75, § 718, 140 Stat. at 495. In turn, the Continuing Appropriations and Extensions Act for FY2027 dictates that continuing appropriations "shall be available to the extent and in the manner that would be provided by the pertinent appropriations act." Pub. L. No. 119-103, § 103, 140 Stat. at 989. Most appropriations statutes since 1951 have contained similar "publicity or propaganda" riders, which apply to all governmental entities receiving appropriated funds. *See, e.g.*, An Act Making Appropriations for the Department of Labor, the Federal Security Agency, and Related Independent Agencies, for the Fiscal Year Ending June 30, 1952, Pub. L. No. 82-134, ch. 373, § 702, 65 Stat. 209, 223 (1951). For seventy-five years, these provisions have barred the use of taxpayer funds for the "individual glorification" of executive branch officials. *Acting Comptroller General Fisher to the Chairman, NLRB*, 31 Comp. Gen. 311, 313 (1952).

The D.C. Circuit has had no trouble holding that the use of public funds to distribute pamphlets, flyers, and posters urging a particular vote on a ballot initiative violated the ban on use of appropriations for "publicity or propaganda purposes." *D.C. Common Cause*, 858 F.2d at 11. In turn, appropriators have long understood the publicity or propaganda prohibition to bar use of taxpayer dollars for "self-aggrandizement, covert propaganda, and purely partisan materials." Government Accountability Office (GAO), *Principles of Federal Appropriations Law* 3-282 (4th

ed. 2017). Self-aggrandizement is "publicity of a nature tending to emphasize the importance of the agency or activity in question." *Id.* at 3-284. Purely partisan materials as those "designed to aid a political party or candidate," which are typically "completely devoid of any connection with official functions." *Id.* at 3-293 to 3-294. The propaganda ads specifically discussed each fit one or both definitions. *See DNC v. Trump*, 2026 WL 3228366, at *12 ("Tellingly, Defendants raise no arguments on the substantive merits"); *Common Cause*, 2026 WL 3043900, at *16. The DNC respectfully urges the Court to view these videos for a complete understanding of their content.

The Final Battle Ad is the most flagrant offender. This is an advertisement about President Trump. The viewer sees only him, walking alone and determined through a portrait-lined hallway, center-screen and sharply focused. The viewer hears only his voice, urging the viewer to join him in the "final battle" against perceived domestic enemies. The ad plainly emphasizes the President's importance and the importance of the battle he wages, particularly in the weeks before an election. The ad is a partisan creation, having been aired originally during the 2024 presidential campaign to aid President Trump's candidacy. It is identical in every way except for displaying President Trump's campaign logo at the end. It also bears no connection to official functions of the President. It is publicity and propaganda.

The Love Me Ad fares no better. Once again, this is an advertisement about President Trump. The viewer sees a rapid montage of video and still images of the President, interspersed with his campaign messaging and clips of military hardware. The audio is again President Trump deriding "communism" and "Marxism," which he and his Republican allies have equated with the Democratic Party platform, followed by a refrain of "Love Me" and obsequious praise of the President. Once again, the ad plainly emphasizes the President's importance, promotes his partisan

viewpoint in the runup to the November 3 election, and bears no connection to official functions. It is publicity and propaganda.

The remaining First Wave Ads are "self-aggrandizement," "purely partisan materials," or both. The Maduro Ad and the American Military Power Ad pair images of President Trump and military equipment in action with sycophantic tributes from members of his Cabinet. The Mount Rushmore Ad consists entirely of remarks by President Trump and displays his political campaign memorabilia along with images of him speaking to an adoring crowd underneath the graven images of presidents past, strongly inferring that President Trump is both patriotic and among our greatest national leaders. Each ad falls within the heartland of the publicity or propaganda ban.

The Second Wave Ads aired by MAGA Inc. in the days leading up to the 2026 midterm election—the No Tax on Tips Ad, the $5000 to Americans Ad, and the Stephen Miller Ad—are also purely partisan. By its own account, MAGA Inc. is a "political committee." *Statement of Organization: FEC Form 1*, MAGA Inc. (Mar. 11, 2026), https://perma.cc/55TC-B8ES. Its name derives from "Make America Great Again," President Trump's central campaign slogan, and it expended hundreds of millions of dollars in support of Republicans and in opposition to Democrats during the midterm elections. *See* Lindholm 2d Supp. Decl. Ex. 13. MAGA Inc.'s decision to expend resources to air these ads confirms their partisan content. Moreover, the No Tax on Tips and the $5000 to Americans Ad focus on Democrats' partisan identities, and the Stephen Miller Ad consists entirely of plaudits for the President. The ads fall squarely within the publicity or propaganda ban. *See Common Cause II*, at 34:4–35:15 (deeming the No Tax on Tips Ad and the $5000 to Americans Ad "purely partisan").

The three remaining Second Wave Ads—the Man in the Arena Ad, the Retribution through Success Ad, and the Cost of Socialism Ad—are once again "self-aggrandizement," "purely

partisan," or both. The Man in the Arena Ad converts a tribute to political action into a paean to President Trump. It is "completely devoid of any connection with official functions." *Principles of Federal Appropriations Law* at 3-294. The Retribution Through Success Ad begins with a 2024 campaign slogan and flashes between political rallies and images of military equipment, evoking First Wave Ads already deemed unlawful by this Court. *See DNC v. Trump*, 2026 WL 3228366, at *16. The Cost of Socialism Ad condemns the purported impact of "socialist" policies, incorporates the visual tropes of a negative ad, and ends with a warning tied to the 2026 midterm election: "The decisions we make today will shape tomorrow, and the cost of getting it wrong could be irreversible." That small measure of subtlety does not mask pure partisan intent. *See Common Cause II*, at 33:4–34:3 (deeming the Cost of Socialism Ad "purely partisan").

The White House Office's public defense that the propaganda ads are mere "public service announcements" bears no relation to the content of the advertisements. *See* Lindholm Decl. Ex. 12 (Doc. 3-4, at 40). *But see* FCC, *Standardized and Enhanced Disclosure Requirements for Television Broadcast Licensee Public Interest Obligations* at 1301, FCC 07-205 (Nov. 27, 2007), available at https://docs.fcc.gov/public/attachments/FCC-07-205A3.pdf (public service announcement standards). The propaganda ads are not a "reminder for Americans to love their country." Lindholm Decl. Ex. 12 (Doc. 3-4, at 40). Indeed, the "Love Me" ad is literally an exhortation to love President Trump. The White House offers three examples of public service announces it suggests are analogous, but each promoted clear public policies: Medicare Part D, the Affordable Care Act, the Clean Water Act, and public health measures during the Covid-19 pandemic. *See id.* The White House also compares the ads to President Wilson's use of domestic propaganda to promote participation in World War I, which predated the "publicity and propaganda" ban. No modern example is comparable to President Trump's propaganda ads, in

both their aggrandizement of the President and their nakedly partisan aims. The White House has suggested more recently that the ads are "patriotic videos," Lindholm 2d Supp. Decl. Ex. 11, but patriots do not confuse love of country for love of one man.

The White House's remaining contention that the propaganda ads are not "campaign ads" is a non sequitur. *See id.* The ads may not explicitly address a candidate "on the ballot" or contain a "call to action," terms borrowed from campaign finance law. *Cf.* 52 U.S.C. § 30101(17), (20)(A)(ii); 11 C.F.R. § 100.22. But there is no basis to limit the publicity or propaganda ban to activity regulated by the Federal Election Campaign Act, 52 U.S.C. §§ 30101–46. Had Congress intended the ban on use of appropriations for "publicity or propaganda" to incorporate those definitions, it could have borrowed language or cross-referenced explicitly. Congress did not.

**2. Spending on the Propaganda Ads Violates the Antideficiency Act and the Purpose Act.**

The Executive can spend money only in accordance with statutes enacted by Congress. This limitation arises directly from the Constitution, which provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations Made by Law." U.S. Const. art. I, § 9, cl.7. "Congress's control over federal expenditures is absolute, and one way that Congress exercises that power is through the Purpose Statute, which commands that 'appropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law.'" *Neguse v. U.S. Immigr. & Customs Enf't*, 822 F. Supp. 3d 86, 93 (D.D.C. 2026) (quoting *U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1348 (D.C. Cir. 2012) (Kavanaugh, J.)), *appeal docketed*, No. 26-5072 (D.C. Cir.). "[A]n appropriation from Congress is authorization to use funds for a specified purpose." *Nat'l Tr. for Historic Pres. v. Nat'l Park Serv.*, 827 F. Supp. 3d 93, 109 (D.D.C. 2026). The Purpose Statute does not "permit an agency . . . to authorize the expenditure of funds beyond what Congress has approved." *U.S. Dep't of Navy*, 665 F.3d at 1348.

The Antideficiency Act is another statutory means of effectuating Congress' absolute power of the purse, as set forth in the Constitution. In addition to prohibiting making or authorizing an expenditure or obligation in excess of the Congressional appropriation amount, 31 U.S.C. § 1341(a)(1)(A), the Antideficiency Act directs that no "officer or employee of the United States Government" may "involve either government in a contract or obligation for the payment of money before an appropriation is made unless authorized by law." 31 U.S.C. § 1341(a)(1)(B).

There is no federal statute authorizing the creation or airing of partisan political advertisements or glorified tributes to the sitting president, particularly one who has made himself the centerpiece of elections around the country. To the contrary, Congress has repeatedly prohibited the use of appropriated funds "for publicity or propaganda purposes within the United States and not heretofore authorized by Congress." Pub. L. 119-75, § 718, 140 Stat. at 495. Any contrary use of federal funds runs afoul of both the Antideficiency Act and the Purpose Statute.

Nevertheless, President Trump directed the White House Office to engage public employees on taxpayer-funded salaries to create the ads. Payment of White House Office staff with appropriated funds to spend time developing, distributing, streaming, or promoting the propaganda ads—including facilitating a transfer of materials to MAGA Inc.—constituted illegal use of taxpayer funds. *See Neguse*, 822 F. Supp. 3d at 106; *see also Common Cause II*, at 30:19–22 ("As a threshold matter, plaintiffs are likely to succeed in showing that expending staff time constitutes a use of appropriated funds."). In this context, "use" means "'[t]o employ for the accomplishment of a purpose; to avail oneself of.'" *Id.* at 105 (quoting *Use*, Black's Law Dictionary (12th ed. 2024)). There is no "de minimis" exception: "When [an appropriations rider] says that '[n]one' of [an agency's] annually appropriated funds may be used for a prohibited purpose, it means none." *Neguse*, 822 F. Supp. 3d at 115. The fact that White House Office staff

are "paid a fixed salary is immaterial; the fact that these employees would be devoting time . . . is sufficient to constitute use of funds." *United States v. Jackson*, 388 F. Supp. 3d 505, 514 (E.D. Pa. 2019); *see also Envtl. Def. Ctr. v. Babbitt*, 73 F.3d 867, 871–72 (9th Cir. 1995) ("The use of any government resources—whether salaries, employees, paper, or buildings—to accomplish [an agency action] would entail government expenditure."). This use of staff time violated the Antideficiency Act.[5]

With respect to the First Wave Ads, OMB allocated federal funding to be used for air time, and DHS completed this unlawful action through a contract awarded to LMD Agency, Inc., a marketing agency, to carry out a "National Media Campaign" that included the airing of the propaganda ads in the remaining weeks before the November 2026 elections. With no applicable appropriation statute providing legitimate funding for propaganda ads, OMB diverted $20 million out of the funds that had been appropriated by Congress to U.S. Customs and Border Protection for various "border security, technology, and screening" functions in Section 90004 of the OBBBA. *See* Pub. L. No. 119-21, § 90004, 139 Stat. at 359. One of the enumerated functions for which the funds were to be used was "[c]ommemorating efforts and events related to border security." *Id.* § 90004(a)(8), 139 Stat. at 359. This line item appears to be the source of the funding used for the propaganda ads. *See* Lindholm Decl. Ex. 16 (Doc. 3-4, at 61).

Unsurprisingly, there was no Congressional authorization for any such obligation or

[5] Congress has tied other restrictions on the political activity of government employees to the payment of salaries out of Congressional appropriations. Thus, under the Hatch Act, any employee whose "duties and responsibilities. . . continue outside normal duty hours and while away from the normal duty post; and . . . *who is an employee paid from an appropriation for the Executive Office of the President*" may not "engage in political activity. . . while the employee is on duty [or] in any room or building occupied in the discharge of official duties by an individual employed . . . in the Government of the United States." 5 U.S.C. § 7234 (emphasis added); *see also AFGE v. O'Connor*, 747 F.2d 748, 752–55 (D.C. Cir. 1984) (addressing adjudicatory structure).

contract, as required by the Antideficiency Act. The expenditure also clearly violates the Purpose Statute for the same lack of an authorizing statutory basis. There is no credible argument that propaganda ads glorifying President Trump and urging voters to back his party in the November 2026 elections are covered by language authorizing spending on "[c]ommemorating efforts and events related to border security." OBBBA, Pub. L. No. 119-21, § 90004(a)(8), 139 Stat. at 359. Nor is there any other language in that or any other appropriations act that would permit the spending of public money on the propaganda ads. Indeed, legislative history reveals that Congress intended the commemorative events spending to be used for "Line-of-Duty death memorials, Department or agency anniversaries, and commendation ceremonies." H.R. Rep. No. 119-06, at 792 (2025).

As described in detail above, the propaganda ads are "self-aggrandizement," "purely partisan materials," or both, far removed from the salutary purposes specified in the statute and its legislative history. *See* Argument Section I.A.1, *supra*. The propaganda ads have nothing to do with commemorating border security or other traditional public service messaging, as required for expenditures under this budget line. Thus, using taxpayer money appropriated for those purposes violates both the Antideficiency Act and the Purpose Statute.

**3. Spending to Air the Propaganda Ads Violates the APA.**

As demonstrated above, the White House Office, OMB, and CBP's use of public money to fund the propaganda ads violates multiple federal laws: the ban on using federal funds for "publicity or propaganda," the Antideficiency Act, and the Purpose Statute. *See* Argument Sections I.A.1–2, *supra*. Under the APA, the Court has the power to stay these unlawful actions and enjoin their implementation. *See DNC v. Trump*, 2026 WL 3228366, at *7.

OMB and CBP's activities to fund the First Wave Ads are "final agency action" under the APA. 5 U.S.C. § 704. To constitute "final agency action," two conditions must be met: (1) "the

action must mark the consummation of the agency's decision-making process" (that is, "it must not be of a merely tentative or interlocutory nature"), and (2) the action "must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (internal quotation marks omitted). Courts "are to apply the finality requirement in a 'flexible' and 'pragmatic' way." *Ciba-Geigy Corp. v. U.S. EPA*, 801 F.2d 430, 435 (D.C. Cir. 1986); *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599 (2016) (noting the "'pragmatic' approach [the Supreme Court] ha[s] long taken to finality"). OMB allocation and CBP obligations through contracting and procurement meet both prongs of this test. *See DNC v. Trump*, 2026 WL 3228366, at *9–11.

OMB's allocation of $20 million in federal funds for use by CBP is final agency action. Apportionment is the final step in OMB's process, constituting the completed, approved plan for the use of budgetary resources, not a tentative recommendation or intermediate step. *See Citizens for Resp. & Ethics in Washington v. OMB*, 791 F. Supp. 3d 29, 55 (D.D.C. 2025) (concluding that apportionments are final and not mere "interim decisions"); *Nat'l Ctr. for Learning Disabilities v. OMB*, No. 1:26-cv-13019, 2026 WL 2754447, at *12 (D. Mass. Sept. 17, 2026) (finding "no reason to conclude" that apportionments were "not final agency actions"). In turn, apportionment is an action "from which legal consequences will flow." *Bennett*, 520 U.S. at 177-78. Government officers and employees "may not make or authorize an expenditure or obligation exceeding an apportionment," 31 U.S.C. § 1517(a)(1); *see also id.* § 1513(d) (providing that an appropriation "may be divided and subdivided administratively within the limits of the apportionment"), and criminal consequences may flow from willful failure to abide by an apportionment, *id.* § 1519; *see also id.* § 1518 (imposing administrative discipline for failure to abide by apportionment). OMB itself has issued guidance that apportionments are "legally binding" because they "limit[] the

obligations [the agency] may incur." OMB, Circular A-11 § 120.1 (2025), *available at* https://perma.cc/AGL4-VWSH; *see also* GAO, B-337581 (Comp. Gen), 2025 WL 1714236, at *16 (June 17, 2025) (recognizing apportionments are legally binding and cannot be predecisional or deliberative). An apportionment does not merely guide or advise agency conduct—it establishes the outer legal boundary of permissible agency action with respect to the obligation of appropriated funds. It is final agency action.

DHS's obligation of funds to air the First Wave Ads also constitutes a final agency action. Once again, the obligation of funds "mark[s] the consummation of the agency's decisionmaking process" and is not "of a merely tentative or interlocutory nature." *Bennett*, 520 U.S. at 177–78. The award of a contract, the moment at which an agency obligates funds through a legally binding agreement, has been consistently recognized as the consummation of the agency's procurement decisionmaking process. *See, e.g.*, *PETA v. Tabak*, 662 F. Supp. 3d 581, 592 (D. Md. 2023) (holding that NIH's decision to approve and award a grant was the consummation of the agency's decisionmaking process that was of sufficient legal consequence to make the action final under the APA). DHS's obligation of funds is then an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett*, 520 U.S. at 177–78. The issuance of the Purchase Order itself is of sufficient legal consequence to make DHS's action "final" under the APA. *See PETA*, 662 F. Supp. 3d at 591.; *cf. Pride Indus., Inc. v. Comm. for Purchase from People Who Are Blind or Severely Disabled*, 420 F. Supp. 3d 1035, 1045 (E.D. Cal. 2019) ("Without a final decision awarding the contract, the defendants' actions to date are not actions from 'legal consequences will flow.'"). Upon award, the awardee acquires the right to perform the contract and receive payment, the government incurs a binding legal obligation to pay

for performance, and unsuccessful bidders lose their opportunity to compete for that procurement. That satisfies *Bennett*.

In turn, the DNC is likely to show that OMB and CBP have acted within one of the grounds for invalidation set forth in 5 U.S.C. § 706(2), which provides that the court "shall . . . hold unlawful and set aside agency action" that is "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C). This is because an agency "literally has no power to act . . . unless and until Congress authorizes it to do so by statute." *FEC v. Cruz*, 596 U.S. 289, 301 (2022). "This rule applies to actions that 'fail[] to meet statutory, procedural, or constitutional requirements.'" *Widakuswara v. Lake*, 779 F. Supp. 3d 10, 35 (D.D.C. 2025) (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 414 (1971)). Because the DNC is likely to establish that OMB and CBP have violated the ban on using federal funds for "publicity or propaganda," the Antideficiency Act, and the Purpose Statute, *see* Argument Sections I.A.1–2, *supra*, the DNC is in turn likely to establish that OMB and CBP have engaged in final agency action contrary to law that must be set aside in accordance with the APA.

#### 4. Spending to Develop and Distribute the Propaganda Ads Is *Ultra Vires*.

"The government of the United States has been emphatically termed a government of laws, and not of men." *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 163 (1803). Therefore, "[t]he acts of all [executive] officers must be justified by some law. . . . Otherwise the individual is left to the absolutely uncontrolled and arbitrary action of a public and administrative officer, whose action is unauthorized by any law." *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 108, 110 (1902). Americans are witnessing such lawless action on television and computer screens when government-funded propaganda appears. The White House Office developed, distributed, steamed, and promoted the ads at taxpayer expense. Such activities are *ultra vires*—without any legal basis—to the political benefit of the President and his political party.

The President's power to issue an edict to executive branch subordinates directing action "must stem either from an act of Congress or from the Constitution itself." *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 188–89 (1999) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952)). The same is true of his immediate subordinates in the White House Office. Because "[t]here is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes," *Clinton v. New York,* 524 U.S. 417, 438 (1998), the President and his subordinates lack the authority to develop propaganda ads at public expense and order the expenditure of $20 million to air them because Congress provided no appropriations for that purpose. To the contrary, Congress prohibited such use of taxpayer dollars.

Courts have long been the check on unconstrained presidential action: "[w]hen an executive acts *ultra vires*, courts are normally available to reestablish the limits on his authority." *Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988); *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) ("Review of the legality of [such] Presidential action" is available "in a suit seeking to enjoin the officers who attempt to enforce the President's directive" (internal quotation marks and citation omitted)). The standard for court review is well established:

> Such review, commonly known as an *ultra vires* claim, is available where (i) there is no express statutory preclusion of all judicial review; (ii) there is no alternative procedure for review of the statutory claim; and (iii) the agency plainly acts in excess of its delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory.

*Fed. Express Corp. v. U.S. Dep't of Commerce*, 39 F.4th 756, 763 (D.C. Cir. 2022) (internal citation and quotation marks omitted). The DNC is likely to succeed on the merits of its claim that the use of federal monies to develop and distribute blatantly political ads is an *ultra vires* exercise of executive power. The first two elements of the *ultra vires* test are satisfied because there is no statutory preclusion of judicial review; nor is there any alternative procedure to review the actions

of the White House Office. *See, e.g.*, *Am. Oversight v. Biden*, No. 1:20-cv-716, 2021 WL 4355576, at *6 (D.D.C. Sept. 24, 2021) (citing *United States v. Espy*, 145 F.3d 1369, 1373 (D.C. Cir. 1998)); *see also Common Cause II*, at 26:17–18 ("Defendants do not take issue with the first two requirements.").

As laid out above, development, distribution, streaming, and promotion of the propaganda ads is contrary to a clear and mandatory statutory prohibition. The prohibition directs that "[n]o part of any appropriation . . . shall be used." Consolidated Appropriations Act 2026, Pub. L. No. 119-75, § 718, 140 Stat. at 495. "That language is undoubtedly mandatory." *Nat'l Ass'n of Post. Supers. v. U.S. Postal Serv.*, 26 F.4th 960, 971 (D.C. Cir. 2022) (applying "shall"). It also "plainly delineates the outer limits of agency authority" without "ambiguous provisions." *Id.* at 971–72 (contrasting clear rule with a command to use "appropriate data"). *Id.* The mere existence of borderline cases does not preclude *ultra vires* review. *See, e.g.*, *Nat'l Trust for Historic Preservation in the U.S. v. Nat'l Park Serv.*, 185 F.4th 1185, 1224 (D.C. Cir. 2026) (deeming prohibition on unauthorized erection of any "building or structure . . . on any reservation, park, or public grounds of the Federal Government in the District of Columbia" sufficiently clear). *See generally* Frederick Schauer, *A Critical Guide to Vehicles in the Park* 83 N.Y.U. L. Rev. 1109, 1110 (2008) (recognizing even rules with "straightforward application" have a "penumbra" of hard cases). Once again, the publicity or propaganda ban prohibits self-aggrandizement and purely partisan materials, including "publicity of a nature tending to emphasize the importance of the agency or activity in question" and those "designed to aid a political party or candidate," which are typically "completely devoid of any connection with official functions. *Principles of Federal*

*Appropriations Law* at 3-282, -284, -293 to -294.[6] Those descriptions aptly describe the propaganda ads. *See* Argument Section I.A.1, *supra*. Thus, the DNC is likely to succeed in showing that White House Office "staff time paid for by taxpayer appropriated fund[s] to compile and create . . . challenged advertisements violates a specific statutory prohibition that is clear and mandatory—namely [the] prohibition on using appropriated funds for publicity or propaganda." *Common Cause II*, at 32:22–33:3.

The final prong of the *ultra* vires standard is also satisfied by the White House Office's violation of the Antideficiency Act and the Purpose Statute's clear and mandatory prohibitions on the use of appropriated funds for purposes other than for which they were appropriated. *See* Argument Section I.B, *supra.* The Purpose Statute dictates that "Appropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law." 31 U.S.C. § 1301(a). The Antideficiency Act directs that "an officer or employee of the United States Government . . . may not make or authorize an expenditure or obligation exceeding an

[6] No statutorily-specific definition is necessary when a court can apply the "ordinary, contemporary, common meaning" of "publicity or propaganda." *Perrin v. United States*, 444 U.S. 37, 42 (1979); *see also, e.g.*, *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227 (2014); *Sebelius v. Cloer*, 569 U.S. 369, 376 (2013); *Novartis Pharm. Corp. v. Kennedy*, 182 F.4th 1027, 1033 (D.C. Cir. 2026). "Publicity" and "propaganda" both have "ordinary, contemporary, common" meanings, *Perrin*, 444 U.S. at 42, and authoritative guidance confirms that "publicity or propaganda" is sufficiently clear to allow review. "Publicity" denotes "efforts to get public attention" or "public promotion." *Publicity*, Black's Law Dictionary (12th ed. 2024). "Propaganda" is "systematic dissemination of doctrine, rumor, or selected information as part of a campaign to promote or hinder a particular view or cause." *Propaganda*, Black's Law Dictionary (12th ed. 2024). Thus, the D.C. Circuit needed no interpretive aids to deem "pamphlets, flyers, and posters in connection with an initiative campaign [to be] publicity or propaganda." *D.C. Common Cause*, 858 F.2d at 11. And the GAO has long applied the ban to "self-aggrandizement, covert propaganda, and purely partisan materials." *Principles of Federal Appropriations Law* at 3-282; *see also id.* at 3-284 (defining "self-aggrandizement" as "publicity of a nature tending the emphasize the importance of the agency or activity in question"); *id.* at 3-294 (defining "purely partisan materials" as those "designed to aid a political party or candidate," which are typically "devoid of any connection with official functions").

amount available in an appropriation or fund for the expenditure or obligation" or "involve [the U.S.] government in a contract or obligation for the payment of money before an appropriation is made." 31 U.S.C. § 1341(a)(1)(A)–(B). No ambiguity exists in these clear, mandatory terms.

President Trump's directive to develop propaganda is the definition of an *ultra vires* act. The DNC is likely to succeed on the merits of its *ultra vires* claim against the White House Office.

**B. The DNC Has Standing to Challenge the Propaganda Ads.**

The DNC is also likely to show that it has standing to challenge the propaganda ads. To establish standing, a plaintiff must have suffered an "injury in fact" that is "concrete and particularized," "actual or imminent," and "fairly . . . trace[able] to the challenged action of the defendant," which "likely" will be "redressed by a favorable decision." *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 560 (1992) (alteration in original) (internal citations omitted). At the preliminary-injunction stage, the movant has the burden of showing a "substantial likelihood" of standing. *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015). The DNC "easily" meets that burden. *DNC v. Trump*, 2026 W 3228366, at *8–9.

The White House Office, OMB, and DHS's illegal propaganda campaign impose a competitive harm on the DNC and its members (including candidates). "[T]here is little doubt that Defendants' unlawful use of public funds makes it more difficult for the DNC to achieve its mission of electing Democratic candidates in federal, state, and local elections across the country." *DNC v. Trump*, 2026 WL 32287366, at *12 (internal citation and quotation marks omitted). By using public funds to develop, distribute, air, stream, or promote propaganda ads, the White House Office, OMB, and DHS are subsidizing MAGA Inc., which can then preserve funds for other partisan activities. During the 2025-2026 federal election cycle, MAGA Inc. has expended hundreds of millions of dollars in support of Republican candidates and in opposition to Democratic candidates. Lindholm 2d Supp. Decl. Ex. 13. MAGA Inc. has invested in paid media,

get-out-the-vote efforts, and direct voter communication. Lindholm Decl. Ex. 14 (Doc. 3-4, at 49). Every taxpayer dollar spent in support of the propaganda ads preserves a dollar to be spent in tight political races. *See* Liberty Schneider Declaration ¶¶ 14–15 (Doc. 3-5). As a result, the electoral prospects of Democratic campaigns necessarily suffer. *See Crawford v. Marion Cnty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007), *aff'd*, 553 U.S. 181 (2008). This injury to the electoral prospects of Democratic candidates and campaigns is cognizable under Article III. *See, e.g.*, *Shays*, 414 F.3d at 85–86 (holding that candidates may challenge regulation that would "alter the environment in which rival parties defend their concrete interests . . . in winning reelection") (cleaned up); *League of United Latin Am. Citizens v. Exec. Off. of the President* (*LULAC II*), 808 F. Supp. 3d 29, 61 (D.D.C. 2025) (concluding that party affiliates had shown political competitor standing), *appeal pending*, No. 25-5476 (D.C. Cir.); *DSCC v. Trump*, No. 1:26-cv-1114, 2026 WL 2681471, at *5 (D.D.C. Sept. 13, 2026).

The Trump Administration's illegal propaganda campaign also harms the DNC by forcing the DNC and its members (including Democratic candidates) to compete in unlawfully structured elections. "[C]andidates . . . have an interest in a fair process" and "suffer [a cognizable harm] when the process departs from the law." *Bost v. Ill. State Bd. of Elections*, 607 U.S. 71, 77 (2026); *see also DSCC v. Trump*, 2026 WL 2681471, at *5 (recognizing that *Bost* extends "to aspects of the electoral process beyond just vote counting"); *cf. DSCC v. Trump*, No. 1:26-cv-3674, 2026 WL 3306993, at *6 (D.D.C. Nov. 2, 2026) (recognizing *Bost* addresses a "rule or process governing" elections). Even candidates who ultimately prevail suffer a concrete injury when laws "erode[] public confidence that the election results reflect the people's will." *Bost*, 607 U.S. at 78; *see also id.* at 77 ("Win or lose, candidates suffer when the process departs from the law.").

In turn, "[p]olitical parties . . . occupy a unique position with a special relationship and unity of interest with candidates." *Nat'l Republican Senatorial Comm. v. FEC*, 609 U.S. 908, 934 (2026) (internal citation and quotation marks omitted); *see also id.* at 922(describing "the thoroughly intertwined relationship of parties and their candidates"). The White House Office, OMB, and DHS have used appropriated funds for a partisan propaganda campaign. Following a promise to cease using public funds and continue the ad campaign using a partisan super PAC, the Trump Administration continued to develop, distribute, and air ads at public expense and preserved MAGA Inc.'s funds for other political efforts adverse to Democratic candidates and the DNC. Even after federal courts entered TROs, the White House Office continued to craft and release new propaganda ads. This alters campaign spending rules in ways that deprive "candidate[s] of a fair process." *Bost*, 607 U.S. at 77. That injury is compounded by damage to the DNC's reputational interests, which depend on confidence in free and fair elections. *See* Schneider Decl. ¶¶ 11–13.

These harms are also fairly traceable to the challenged actions of the White House Office, OMB, and DHS and will likely be redressed by a favorable decision enjoining and staying their illegal actions. *See, e.g.*, *Fla. Audubon Society v. Bentsen*, 94 F.3d 658, 664–65 (D.C. Cir. 1996) (en banc) (establishing that redressability examines whether "the relief sought, assuming that the court chooses to grant it, will *likely* alleviate the particularized injury alleged by plaintiffs" (emphasis added)); *see also West v. Lynch*, 845 F.3d 1228, 1235 (D.C. Cir. 2017) (recognizing that causation and redressability are closely related like two sides of a coin" (internal citation, quotation marks and ellipsis omitted)). Once again, the White House Office crafted the partisan campaign, using personnel whose salaries are supported by federal appropriations. An injunction against further use of the illegally crafted ads and further development of publicity or propaganda will redress ongoing harms and prevent future injuries. In turn, OMB shifted $20 million to pay for

airtime for propaganda ads. The availability of these funds for the understood purpose of airing propaganda ads was a but-for cause of both the competitive injury and *Bost* injury to the DNC. An injunction and § 705 stay of the apportionment and future apportionments intended to fund propaganda ads would zero out the funds available to air propaganda ads, which would redress ongoing harms and prevent future harms. Finally, and most simply, DHS entered into a contract to air propaganda ads and funded them with its appropriations. An injunction and § 705 stay of the ad-buy contract and funding of the propaganda ads would redress ongoing harms and prevent future injury. Redressability does not require "full redress"; the Court need only be able to "effectuate a partial remedy." *Uzuegbunam v. Preczewski*, 592 U.S. 279, 291 (2021). That standard is easily met in this case.

**1. The White House, OMB, and CBP Cannot Avoid an Injunction Through an Uncertain Voluntary Cessation Claim.**

"[S]tanding is assessed at the time a suit commences," and so post-complaint events cannot deprive the DNC of standing. *Del Monte Fresh Produce Co. v. United States*, 570 F.3d 316, 324 (D.C. Cir. 2009); *see also DNC v. Trump*, 2026 WL 3228366, at *8. To be sure, a case may become moot "if a decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future." *Pub. Citizen, Inc. v. FERC*, 92 F.4th 1124, 1128 (D.C. Cir. 2024). However, Defendants are not likely to establish that "by virtue of an intervening event, [this Court] cannot grant any effectual relief whatever" in the DNC's favor. *Mehneh v. Rubio*, 164 F.4th 928, 931 (D.C. Cir. 2026) (internal citation and quotation marks omitted); *see also DNC v. Trump*, 2026 WL 3228366, at *13; *Common Cause*, 2026 WL 3043900, at *8–10. Notwithstanding the rapidly shifting facts, the DNC may still obtain effective relief.

"Voluntary cessation of allegedly illegal conduct does not . . . make the case moot." *United States v. W. T. Grant Co.*, 345 U.S. 629, 632 (1953). A defendant cannot "automatically moot a

case by the simple expedient of suspending its challenge conduct after it is sued." *FBI v. Fikre*, 601 U.S. 234, 241 (2024) (internal quotation marks and citation omitted). Rather, the case remains live unless it is "*absolutely clear* that the allegedly wrongful behavior could not reasonably be expected to recur." *Pub. Citizen*, 92 F.4th at 1128 (quoting *Friends of the Earth*, 528 U.S. at 190) (emphasis added). "The heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to recur lies with the party asserting mootness." *Friends of the Earth*, 528 U.S. at 170. "[S]o long as a case is not moot, litigants otherwise entitled to emergency injunctive relief remain entitled to such relief where the[y] remain under a constant threat that government officials will use their power to reinstate the challenged [action]." *Tandon v. Newsom*, 593 U.S. 61, 63 (2021) (internal quotation marks and citation omitted). "The voluntary-cessation doctrine is especially important in cases where, as here, the plaintiff suspects the defendant of 'manipulating the judicial process through the false pretense of singlehandedly ending a dispute.'" *DNC v. Trump*, 2026 WL 3228366, at *14 (quoting *Pub. Citizen*, 92 F.4th at 1128).

This Court has already reviewed evidence relevant to the APA claims against OMB and DHS and found that Defendants had not met their "formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur," *id.* (quoting *Mehneh*, 164 F.4th at 931 n*), and with good reason. On October 5, the President announced that henceforth MAGA Inc. would pay to air the ads, but no effort was made to cease airing the ads at taxpayer expense until the day the DNC filed this lawsuit, and the ads continued to air using appropriated funds for at least another week. Subsequent assurances rest on the following statement from the "Senior Official Performing the Duties" of CFO for DHS:

> As of the date of this declaration and to the best of my knowledge and belief, the Department has no plans to make any additional media buys under the Order or to renew the Order or otherwise use DHS appropriated funds on any similar contracts

> for the creation or distribution of the media that is the subject of this lawsuit and referenced above.

Mehringer Decl. ¶ 10. This declaration is riddled with qualifiers and reflects restraint only in the face of litigation, not an independent change in policy. Further, Homeland Security Secretary Markwayne Mullin has publicly welcomed another opportunity to air more "public service announcements" if President Trump asks. Thus, the risk persists that after any jurisdictional dismissal, OMB and DHS would "later pick up where [they] left off." *Fikre*, 601 U.S. at 241; *see also Clarke v. United States*, 915 F.2d 699, 706 (D.C. Cir. 1990) ("[T]he cessation of an ongoing activity pending a lawsuit may well imply an intent to renew the activity once the court has dropped out."); *Common Cause*, 2026 WL 3043900, at *9.

This matter is readily distinguishable from *National Council of Nonprofits v. OMB*, where the D.C. Circuit recently declined to apply the voluntary cessation doctrine. 188 F.4th 400, 408-09 (D.C. Cir. 2026). Plaintiffs in *National Conference of Nonprofits* had challenged a global funding freeze tied to the start of President Trump's second term in office. *See id.* at 404. Not only had the memorandum triggering the freeze been rescinded, but the Trump Administration had clarified that it had never intended to establish a blanket freeze and did not defend its legality. *See id.* at 402–09. Thus, in *National Council of Nonprofits*, there was "no indication of any manipulation of the court's jurisdiction," let alone a "reasonable expectation" that Defendants would return to the challenged acts upon dismissal. *Id.* at 408–09. Here, this Court has already recognized that "Defendants cannot be said to have changed their conduct 'before they knew about any lawsuit in the first place,'" *DNC v. Trump*, 2026 WL 3228366, at *14 (quoting *Nat'l Council of Nonprofits*, 188 F.4th at 408), and acknowledged the risk that Defendants would respond to a dismissal by relaunching the offending conduct, *see id.* (quoting *Fikre*, 601 U.S. at 241). Administration officials maintain that the propaganda ads are legal, "standard," and commendable

public service announcements, and Secretary Mullin has indicated that he would seize the opportunity for DHS to air similar "public service announcements" in the future, Lindholm Supp. Decl. Ex. 4 (Doc. 10-1, at 14), which precludes an "absolutely clear" finding that the challenged conduct will not recur. *Pub. Citizen*, 92 F.4th at 1128.

There is also no suggestion of mootness with respect to the White House Office. Not only has the White House Office continued developing propaganda ads throughout this litigation, *see* Background Section IV.B, *supra*, but even after the U.S. District Court for the Southern District of New York entered a TRO against the distribution of three purely partisan ads, the White House Office released a bombastic video labeling President Trump "THE HARDEST WORKING PRESIDENT IN HISTORY" based on his recent flurry of partisan rallies prior to the 2026 midterm election. *See* Lindholm 2d Supp. Decl. ¶ 22; Lindholm 2d Supp. Decl. Exs. 15, 19. Thus, the *ultra vires* claim against the White House Office is not moot.

**2. If Voluntary Cessation Does Not Apply, This Matter Would Be Capable of Repetition Yet Evading Review.**

Even if this Court were to decline to apply the voluntary cessation doctrine to OMB and DHS—and it should not—then this action is capable of repetition yet evading review, another exception to mootness. This doctrine applies when "(1) the challenged action is in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party would be subjected to the same action again." *Del Monte*, 570 F.3d at 322. "[E]vading review" means review from the U.S. Supreme Court, and so "actions of less than two years' duration cannot be 'fully litigated.'" *Id.* (quoting *Pub. Utils. Comm'n v. FERC*, 236 F.3d 708, 714 (D.C. Cir. 2001)). A reasonable expectation of recurrence requires only that "the legal wrong complained of by the plaintiff is reasonably likely to recur." *Id.* In this action, both prongs are "simultaneously present." *Id.*

Defendants' unlawful allocation and obligation occurred on an expedited basis. OMB received the technical allocation request on September 19 and granted it in under two hours. Woolf Decl. ¶¶ 3–4. CBP obligated $19 million on airtime in less than three weeks, and the ads ceased airing only after a federal court issued a TRO and § 705 stay. Once again, Defendants re-appropriated the unexpired $1 million for fiscal year 2027 under the same budget line used for the propaganda ads. *See id.* ¶ 9. This is significantly less than the two years typically sufficient to meet the "evading review" prong. *See Del Monte*, 570 F.3d at 322.

Unlawful federal spending on the propaganda ads is also reasonably likely to recur. President Trump directed OMB and DHS to appropriate funds and use them to air the ads. Lindholm Decl. Ex. 23 (Doc. 3-4, at 129). Even after suggesting MAGA Inc. would buy airtime in the future, President Trump and others have extolled the ads and framed them as public service announcements. Lindholm Decl. Exs. 12 & 25 (Doc. 3-4, at 40, 142); Lindholm Supp. Decl. Ex. 10 (Doc. 10-1, at 50). At any moment, President Trump could once again direct the expenditure of taxpayer funds to unlawfully pay for propaganda ads that the White House Office is continuing to create and post on official social media feeds. Lindholm Supp. Decl. Ex. 5 (Doc. 10-1, at 32). Administration officials maintain that the propaganda ads are legal, "standard," and commendable public service announcements, with Secretary Mullin indicating that he would seize the opportunity for DHS to air similar "public service announcements" in the future, Lindholm Supp. Decl. Ex. 4, which further suggests that unlawful federal spending on videos and ads is reasonably likely to recur absent an injunction. Finally, the unspent $1 million was reallocated to the budget line used to purchase airtime for the propaganda ads *after* President Trump claimed MAGA Inc. would henceforth foot the bill. *See* Woolf Decl. ¶ 9. The DNC would also once again be harmed

by further ads, for the same reason the DNC has standing here. Thus, the capable of repetition yet evading review doctrine applies.

**II. The Democratic National Committee Faces Irreparable Harm.**

The DNC has already detailed the harm it has suffered and continues to suffer due to the airing of the propaganda ads. *See* Argument Section I.B, *supra*. That harm is irreparable.

A party seeking an injunction must make two showings to demonstrate irreparable harm. "First, the harm must be 'certain and great,' 'actual and not theoretical,' and so 'imminent that there is a clear and present need for equitable relief to prevent irreparable harm.'" *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 7–8 (D.C. Cir. 2016) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (alteration marks omitted)). "Second, the harm must be beyond remediation." *Id.* at 8 (quoting *Chaplaincy*, 454 F.3d at 297). Both elements are present here. *See DNC v. Trump*, 2026 WL 3228366, at *12–14.

As established above, Defendants continue to expend public money to develop, distribute, air, stream, or promote propaganda ads. *See* Background Section IV.B, *supra.* Although TROs entered by this Court and the Southern District of New York limited that harm in the weeks leading up to Election Day, a preliminary injunction is needed to prevent the resumption of unlawful activity. Each publication of an illegally-funded ad inflicts harm anew: further resources are contributed to Republican election efforts and further damage is done to the legality and fairness of the electoral system. Thus, the harm the DNC faces is certain, great, actual and not theoretical, and imminent. No subsequent order of the Court could remedy those injuries.

In a similar case more than a year before the general election, this Court found that the DNC and related entities had met the irreparable harm requirement when President Trump issued an executive order purporting to change federal voter registration rules. Judge Kollar-Kotelly explained,

> Because this Court can neither postpone an election nor turn back the clock to give Plaintiffs additional time to pursue their campaigns, [a dispute about election rules] is not a case in which adequate compensatory or other corrective relief will be available at a later date. The only way to provide complete relief to the Plaintiff is to award a preliminary injunction.

*LULAC*, 780 F. Supp. 3d at 201–02 (internal citation and quotation marks omitted), *appeal pending*, No. 25-5476 (D.C. Cir.). Similarly, when the government sought to change voter registration requirements, the D.C. Circuit found that the "harm is irreparable because after the registration deadlines for the November election pass, there can be no do over and no redress." *Newby*, 838 F.3d at 9.

This case is no different. The White House Office's illegal conduct is actively inflicting great harm on the DNC, OMB and CBP's conduct inflicted substantial harm until stayed and enjoined, and those harms cannot be remedied after the fact. Even after 2026 General Election on November 3, two close Congressional contests have triggered December runoff elections. Lindholm 2d Supp. Decl. Ex. 18; *see also* La. Rev. Stat. §§ 18:402, 18:511. Special elections may be called at any time to fill the seats of officials elected or appointed to new offices or whose offices otherwise become vacant. Louisiana, Mississippi, New Jersey and Virginia will hold partisan elections in 2027. *See* La. Rev. Stat § 18:402(B); Miss. Code § 23-15-193(1); N.J. Stat. § 19:2-3; Va. Code § 24.2-215. And fundamentally, the 2028 presidential election cycle has begun. No order of this Court can repair damage to the relative financial standing of the political parties and their allies or reputational harm on the President's opponents caused by public-funded propaganda ads. These harms are "certain," "actual," and ongoing, such that there is a "clear and present need" for relief. *Newby*, 838 F.3d at 8 (internal citation and quotation marks omitted).

**III. The Balance of Equities and Public Interest Favor Temporary Relief.**

The balance of equities and the public interest—which merge when the government opposes injunctive relief, *Nken v. Holder*, 556 U.S. 418, 435 (2009)—decisively support issuance

of a preliminary injunction and § 705 stay. "A fundamental precept of this nation's democratic electoral process is that the government may not 'take sides' in election contests or bestow an unfair advantage on one of several competing factions." *Mountain States Legal Found. v. Denver Sch. Dist. No. 1*, 459 F. Supp. 357, 360 (D. Colo. 1978) (quoting *Stanson v. Mott*, 551 P.2d 1, 9 (Cal. 1976)). There is also a foundational public interest in free and fair elections in which all participants abide by the election laws. *See, e.g., Newby*, 838 F.3d at 13 (citing *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006)); *see also Reynolds v. Sims*, 377 U.S. 533, 561–62 (1964) (recognizing paramount importance of lawful elections); *LULAC II*, 808 F. Supp. 3d at 84 (recognized "public interest in 'preserving the integrity of [the] election process'" (quoting *Newby*, 838 F.3d at 13) (alteration in original)); *DNC v. Trump*, 2026 WL 3228366, at *15; *Common Cause*, 2026 WL 3043900, at *17–18.

The White House Office, OMB, and CBP's blatant usurpation of Congress's power of the purse to develop and air the propaganda ads is also against the public interest. Congress's exclusive power over federal spending in the Constitution and through the Antideficiency Act is "a bulwark of the Constitution's separation of powers among the three branches of the National Government." *U.S. Dep't of Navy v. FLRA*, 665 F.3d at 1346–47 (quoting The Federalist No. 58, at 359 (James Madison) (Clinton Rossiter ed., 1961)). The Spending and Appropriations Clauses protect liberty by ensuring that "the purse is lodged in one branch, and the sword in another." 2 The Debates in the Several State Conventions on the Adoption of the Federal Constitution 349 (A. Hamilton) (Jonathan Elliot ed., 2d ed. 1836). When "the decision to spend [is] determined by the Executive alone, without adequate control by the citizen's Representatives in Congress, liberty is threatened." *Clinton v. New York*, 524 U.S. at 451. In this case, that liberty is the freedom of citizens to select their representatives in free and fair elections governed by laws prohibiting the

use of appropriated funds for "publicity or propaganda," which in turn limit expenditures in the political arena to those raised and spent by political committees and PACs. Under this system, the federal government may not develop propaganda ads.

There is also no equitable or legitimate public interest in the government unlawfully spending public monies on propaganda ads to advance the core election themes of one political party and rehabilitate the President's historically low approval ratings. The White House Office, OMB, and DHS "cannot suffer harm from an injunction that merely ends an unlawful practice." *R.I.L.-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015) (citation omitted); *see also DNC v. Trump*, 2026 WL 3228366, at *15. Nor is there any "public interest in the perpetuation of unlawful agency action." *Newby*, 838 F.3d at 12; *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) ("[E]nforcement of an unconstitutional law is always contrary to the public interest."); *see also Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994) (holding that an injunction against spending public funds in violation of statutory restraints does not harm government defendants).

Indeed, President Trump and the White House Office's October 5 assertion that MAGA Inc. will pay for the propaganda ads going forward is an implicit acknowledgment that the diversion of public funds to air the ads was unlawful. President Trump's October 5 assertion that MAGA Inc. would air the propaganda ads is also implicit acknowledgment that OMB and DHS will not be harmed by entry of a preliminary injunction and § 705 stay. Even if it were in these agencies' interest for Republican political ads to air—and it is not—President Trump and his political allies may continue to air ads created with funds raised by PACs or candidate committees. OMB and DHS certainly have no interest in MAGA Inc. preserving its funds for other political purposes.

On the other side of the ledger, the DNC faces substantial, demonstrable, and irreparable harm from the White House Office, OMB, and CBP undermining free and fair elections. The DNC also faces clear harm based on OMB and CBP displacing MAGA Inc. spending on propaganda ads and contributing to the overall pool of resources available to support Republican candidates and oppose Democrats. The merged balance of equities and public interest test conclusively favors entering the requested preliminary injunction and § 705 stay.[7]

## CONCLUSION

For the foregoing reasons, the Court should grant the DNC's motion for a preliminary injunction and § 705 stay, order Defendants to cease spending public funds to develop and air the propaganda ads, and prohibit further use of propaganda ads developed at public expense.

[7] This Court previously ordered the DNC to post a nominal bond of $1. *See DNC v. Trump*, 2026 WL 3228366, at *15; *see also* Deposit of Bond, *DNC v. Trump*, No. 1:26-cv-3506 (D.D.C. Oct. 29, 2026). This Court need not require an additional bond, as courts may carry a TRO bond forward as security for a preliminary injunction. *See, e.g.*, *Cable News Network, Inc. v. Trump*, No. 1:26-cv-3287, 2026 WL 3063460, at *32 (D.D.C. Oct. 13, 2026). Defendants have not shown an economic injury in prior briefing, at the TRO hearing, or in the parallel New York proceeding. Requiring any more than a nominal bond—particularly without evidence of economic injury—could create a chilling effect on public law plaintiffs. *See Phang v. Blanche*, 836 F. Supp. 3d 90, 114-15 (D.D.C. 2026), *appeal docketed*, No. 26-5299 (D.C. Cir.).

Dated: November 5, 2026

Respectfully submitted,

*<u>/s/ Benjamin B. Klubes</u>*
Benjamin B. Klubes
(Bar No. 428852)
Adam Miller
(Bar No. 496339)
Klubes Law Group
1717 K Street NW, Suite 900
Washington, DC 20006
(202) 753-5054
blkubes@klubeslaw.com
amiller@klubeslaw.com

*<u>/s/ Daniel J. Freeman</u>*
Daniel J. Freeman
(Bar No. 90038422)
Nicolas F. Garcia*†
Democratic National Committee
430 South Capitol Street SE
Washington, DC 20003
(202) 863-8000
freemand@dnc.org
garcian@dnc.org
* Admitted *pro hac vice*.
†*Not admitted to the D.C. Bar. Admitted to the bars of New York and Florida only. Practice in the District of Columbia is strictly limited to in-house counsel services for the Democratic National Committee pursuant to D.C. App. R. 49(c)(6) and matters before U.S. courts pursuant to D.C. App. R. 49(c)(3).*