**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

DEMOCRATIC NATIONAL COMMITTEE,

*Plaintiff*,

*v.*

DONALD TRUMP *et al.*,

*Defendants*.

Civil Action No. 1:26-cv-3506-LLA

**MEMORANDUM OF LAW IN OPPOSITION TO**
**PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS


INTRODUCTION ..... 1

BACKGROUND ..... 2

I. Factual Background ..... 2

A. Five Challenged Ads Aired with Funds Appropriated to DHS ..... 2

B. Six New Ads Did Not Air Using Appropriated Funds ..... 4

II. Relevant Statutory Background ..... 4

III. This Litigation ..... 5

LEGAL STANDARDS ..... 6

ARGUMENT ..... 7

I. Plaintiff Will Not Suffer Irreparable Harm Absent a PI ..... 8

II. Plaintiff Lacks Standing to Seek Prospective Relief ..... 11

III. Plaintiffs Are Unlikely to Succeed on the Merits ..... 14

A. Plaintiff's Ultra Vires Claim Is Unlikely to Succeed ..... 14

B. Plaintiff is Unlikely to Succeed on the Merits of the APA Claim ..... 19

1. As to OMB, Plaintiff Has Not Challenged Final Agency Action ..... 19

2. Plaintiff's APA Claim Against DHS Is Also Unlikely to Succeed ..... 22

IV. The Remaining Preliminary Injunction Factors Favor the Government ..... 24

CONCLUSION ..... 25

## TABLE OF AUTHORITIES

### CASES

*Abbott Lab'ys v. Gardner*,
387 U.S. 136 (1967) .......... 20

*Advocs. for Hum. Rts. v. Blanche*,
838 F. Supp. 3d 1 (D.D.C. 2026) .......... 6, 13

*Am. Foreign Serv. Ass'n v. Trump*,
No. 25-5184, 2025 WL 1742853 (D.C. Cir. June 20, 2025) .......... 14

*Am. Legion v. Am. Humanist Ass'n*,
588 U.S. 29 (2019) .......... 17

*Ashland Oil, Inc. v. Fed. Trade Comm'n*,
409 F. Supp. 297 (D.D.C. 1976) .......... 8

*Bennett v. Spear*,
520 U.S. 154 (1997) .......... 19, 21

*Bost v. Ill. Bd. of Elections*,
607 U.S. 71 (2026) .......... 11, 12

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983) .......... 11, 13

*City of Phila. v. Sec'y U.S. Dep't of Interior*,
179 F.4th 169 (3d Cir. 2026) .......... 23

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) .......... 11

*Corewell Health William Beaumont Univ. Hosp. v. Kennedy*,
Civ. A. No. 1:26-cv-03111, 2026 WL 3257581 (D.D.C. Oct. 29, 2026) .......... 9, 10

*Dalton v. Specter*,
511 U.S. 462 (1994) .......... 14

*Darby v. Cisneros*,
509 U.S. 137 (1993) .......... 20

*Davis v. Pension Benefit Guar. Corp.*,
571 F.3d 1288 (D.C. Cir. 2009) .......... 6

*DRG Funding Corp. v. Sec'y of Hous. & Urb. Dev.*,
76 F.3d 1212 (D.C. Cir. 1996) .......... 20

*Fed. Express Corp. v. U.S. Dep't of Com.*,
39 F.4th 756 (D.C. Cir. 2022) .......... 14, 15, 18

*Feldman v. Bowser*,
315 F. Supp. 3d 299 (D.D.C. 2018) .......... 19, 25

*Franklin v. Massachusetts*,
505 U.S. 788 (1992) .......... 6, 7, 14, 20, 21

*G&E Real Est., Inc. v. Avison Young-Washington, D.C.*,
168 F. Supp. 3d 147 (D.D.C. 2016) .......... 12

*Gill v. Whitford*,
585 U.S. 48 (2018) .......... 9

*Glob. Health Council v. Trump*,
153 F.4th 1 (D.C. Cir. 2025), *denying reh'g en banc*,
2025 WL 2709437 (D.C. Cir. Aug. 28, 2025) .......... 14

*Halkin v. Helms*,
690 F.2d 977 (D.C. Cir. 1982) .......... 13

*Indep. Equip. Dealers Ass'n v. EPA*,
372 F.3d 420 (D.C. Cir. 2004) .......... 23

*Kescoli v. Babbitt,*
101 F.3d 1304 (9th Cir. 1996) .......... 23

*Lincoln v. Vigil*,
508 U.S. 182 (1993) .......... 25

*Lujan v. Nat'l Wildlife Fed'n*,
497 U.S. 871 (1990) .......... 22

*Mazurek v. Armstrong*,
520 U.S. 968 (1997) .......... 6

*Mississippi v. Johnson*,
71 U.S. (4 Wall.) 475 (1867) .......... 14

*Mohammadi v. Islamic Republic of Iran*,
782 F.3d 9 (D.C. Cir. 2015) .......... 12

*Munaf v. Geren*,
553 U.S. 674 (2008) .......... 6

*Murthy v. Missouri*,
603 U.S. 43 (2024) .......... 9, 10, 11, 13

*Nat. Res. Def. Council v. Kempthorne*,
539 F. Supp. 2d 1155 (E.D. Cal. 2008)........................................................................ 23

*Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*,
26 F.4th 960 (D.C. Cir. 2022)........................................................................ 15

*Neguse v. U.S. Immigr. & Customs Enf't*,
822 F. Supp. 3d 86 (D.D.C. 2026), *appeal filed*, No. 26-5072 (D.C. Cir. Mar. 3, 2026)......... 15

*Newdow v. Roberts*,
603 F.3d 1002 (D.C. Cir. 2010)........................................................................ 14

*Nixon v. Fitzgerald*,
457 U.S. 731 (1982)........................................................................ 14

*Nken v. Holder*,
556 U.S. 418 (2009)........................................................................ 24

*Norton v. S. Utah Wilderness All.*,
542 U.S. 55 (2004)........................................................................ 22

*Nuclear Regul. Comm'n v. Texas*,
605 U.S. 665 (2025)........................................................................ 2, 14, 15

*Nyant v. Chairman, Broad. Bd. of Governors*,
589 F.3d 445 (D.C. Cir. 2009)........................................................................ 15

*O'Shea v. Littleton*,
414 U.S. 488 (1974)........................................................................ 11

*Rochester Tel. Corp. v. United States*,
307 U.S. 125 (1939)........................................................................ 20

*Rockwell Int'l Corp. v. United States*,
549 U.S. 457 (2007)........................................................................ 2, 12

*Royal Canin v. Wullschleger*,
604 U.S. 22 (2025)........................................................................ 12, 13

*Shays v. Fed. Election Comm'n*,
414 F.3d 76 (D.C. Cir. 2005)........................................................................ 8, 12

*Sherley v. Sebelius*,
644 F.3d 388 (D.C. Cir. 2011)........................................................................ 6

*Soucie v. David*,
448 F.2d 1067 (D.C. Cir. 1971)........................................................................ 7

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) ........ 11

*Thurston v. United States*,
696 F. Supp. 680 (D.D.C. 1988) ........ 19, 24

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) ........ 11

*United States v. Bolton*,
468 F. Supp. 3d 1 (D.D.C. 2020) ........ 13

*United States v. Or. State Med. Soc'y*,
343 U.S. 326 (1952) ........ 13

*Vill. of Bald Head Island v. U.S. Army Corps of Eng'rs*,
714 F.3d 186 (4th Cir. 2013) ........ 22

*Whitmore v. Arkansas*,
495 U.S. 149 (1990) ........ 11

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ........ 6, 9, 11, 24

*Wis. Gas Co. v. Fed. Energy Regul. Comm'n*,
758 F.2d 669 (D.C. Cir. 1985) ........ 8, 9

**STATUTES**

5 U.S.C. § 551 ........ 19, 22, 23

5 U.S.C. § 702 ........ 22

5 U.S.C. § 704 ........ 19, 22

5 U.S.C. § 705 ........ 6

5 U.S.C. § 706 ........ 5, 19

5 U.S.C. § 7324 ........ 16

31 U.S.C. § 1301 ........ 4, 19

31 U.S.C. § 1341 ........ 5, 16, 19

31 U.S.C. § 1342 ........ 16

31 U.S.C. § 1351 ........ 24

31 U.S.C. § 1512 .......... 2

31 U.S.C. § 1513 .......... 2

Pub. L. No. 105-61, 111 Stat. 1272 (Oct. 10, 1997) .......... 16

Consolidated Appropriations Act, 2026,
Pub. L. No. 119-75, 140 Stat. 173 .......... 1, 4, 14

Working Families Tax Cut Act,
Pub. L. No. 119-21, 139 Stat. 72 (2025) .......... 2

**RULES**

Fed. R. Civ. P. 19 .......... 23, 24

**OTHER AUTHORITIES**

B-178528 (July 27, 1973) .......... 18

B-194776 (June 4, 1979) .......... 18

Executive Order (E.O.) 6166, as amended by E.O. 12608 .......... 3

GAO, A Glossary of Terms Used in the Federal Budget Process, *Deobligation*,
https://www.gao.gov/assets/gao-05-734sp.pdf .......... 4

Government Accountability Office (GAO), Principles of Federal Appropriations Law
(4th ed. 2017),
https://www.gao.gov/assets/2019-11/687162.pdf .......... *passim*

Letter for Joseph S. Clark, United States Senate, B-144323 (Comp. Gen. Nov. 4, 1960),
https://www.gao.gov/products/b-144323 .......... 17

OMB Circular No. A-11 .......... 3

## INTRODUCTION

Three weeks before the midterm elections, Plaintiff, the Democratic National Committee (DNC), sought a temporary restraining order to stop the Administration from airing certain advertisements with federal funds on the theory that the ads harmed Democratic prospects in the final weeks before Election Day. The gravamen of Plaintiff's challenge was that the Department of Homeland Security (DHS) had entered into a contract, using appropriated funds, to air ads the DNC considers "publicity or propaganda," despite the statutory ban on using appropriated funds for that purpose. Consolidated Appropriations Act, 2026, Pub. L. No. 119-75, § 718, 140 Stat. 173, 495. But even before the DNC filed suit, the President decided that no more federal funds would be spent to air these ads moving forward. Consistent with that promise, DHS instructed its vendor not to air any ads under the contract past October 11, 2026. After that, new ads either aired using private funds or were posted to official social media pages. And the midterm elections took place on November 3, 2026.

Two days after Election Day—and *two years* before the 2028 presidential election—the DNC sought the extraordinary remedy of a preliminary injunction. This time it was to challenge the airing of ads using private funds, and the creation and posting of ads by federal employees to the White House YouTube page. This Court should deny that request.

*First*, the DNC has not met its burden to show imminent irreparable harm. The Government is no longer using appropriated funds to air the challenged ads. It has not been for over a month now. The use of private funds to air the challenged ads is not unlawful, and no injunction could properly encompass third parties not before the Court. And the relevant election is now two years away, obviating any need for interim relief while the DNC's claims are litigated.

*Second*, the DNC is unlikely to succeed on the merits of either of its two claims: 1) an Administrative Procedure Act (APA) claim against DHS and the Office of Management and Budget (OMB) and 2) an *ultra vires* claim against the President and White House Office. As

Defendants previously explained, Plaintiff has not challenged final agency action with respect to OMB. As to DHS, Plaintiff lacks standing to seek prospective relief against the contract between DHS and its vendor because Plaintiff cannot show future injury stemming from that contract as of November 2, 2026—the date Plaintiff amended its Complaint, which is the relevant date for standing purposes. *See Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 473–74 (2007).

On the *ultra vires* claim, Plaintiff now contends that the use of White House staff time to develop, post, and transfer the challenged ads to private parties constitutes a use of appropriated funds for "publicity or propaganda," even though employees are paid fixed salaries, because those salaries are paid from appropriations. The novelty of Plaintiff's application of the "publicity or propaganda" ban to mere staff time alone should defeat its *ultra vires* claim. More fundamentally, "publicity" and "propaganda" are not the kind of clear, specific statutory terms that justify *ultra vires* review, *see Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025), especially in light of legitimate uses of appropriated funds to justify and defend Administration policies. Plaintiff's theory also raises serious separation of powers concerns, and its requested relief would work a significant intrusion into the affairs of a coordinate branch of Government.

This Court should deny Plaintiff's motion for emergency relief.

## BACKGROUND

### I. Factual Background

#### A. Five Challenged Ads Aired with Funds Appropriated to DHS

On September 19, 2026, U.S. Customs and Border Protection (CBP), a component of DHS, submitted a request to OMB to reapportion funds appropriated by the Working Families Tax Cut Act. *See* Working Families Tax Cut Act, Pub. L. No. 119-21, § 90004, 139 Stat. 72, 359 (2025); *see also* Decl. of William C. Woolf, dated Oct. 10, 2026 ("Woolf Decl."), ¶ 3, ECF No. 9-1.[1]

[1] Congress established the apportionment process in the Antideficiency Act, which gives the President the authority to make appropriated amounts available for obligation at such rates as to achieve the most effective and economical use thereof and to avoid deficiency and the need for supplemental appropriations, *see* 31 U.S.C. §§ 1512, 1513(b). The President has delegated that

Through the reapportionment request, CBP sought to make an additional $20 million of the funds appropriated under the Working Families Tax Cut Act available for "[c]ommemorating efforts and events related to border security" in Fiscal Year 2026, rather than for other purposes in Fiscal Year 2027. *See* Decl. of Holly C. Mehringer, dated Oct. 10, 2026, ("Mehringer Decl."), ¶ 4, ECF No. 9-2. OMB approved CBP's request that same day. Woolf Decl. ¶ 5.

On or about September 20, 2026, CBP used the reapportioned funds to issue a $20 million purchase order for media services to a vendor under a previously awarded blanket purchase agreement. *Id.* ¶ 3. The Purchase Order required the vendor to provide media buy support with media outlets and programs on a national level. *Id*. The vendor purchased media buys under the terms of the Purchase Order through October 11, 2026. The Purchase Order did not fund the creation or production of any videos or media; it only funded the airing of preexisting media. *Id*. ¶ 6. These ads were also posted to the White House's official social media pages. *See, e.g.*, Decl. of Weineshet M. Lindholm ¶¶ 6, 9, 12, 14, ECF No. 3-3.

On October 5, 2026, the President announced that no additional federal funds would be used to air the challenged ads. In response to that announcement, DHS directed the vendor not to make any additional media buys past October 11, 2026. *See* Ex. A to Status Report Regarding Compliance, Suppl. Decl. of Holly C. Mehringer, dated Oct. 15, 2026, ("Suppl. Mehringer Decl."), ¶ 4, *Common Cause II*, ECF No. 27-1. At the direction of DHS, the vendor instructed all media outlets not to run any ads past October 11. *Id.* ¶ 4. The last of the challenged ads to air under

---

authority to OMB. *See* Executive Order (E.O.) 6166, as amended by E.O. 12608. An apportionment is thus an OMB-approved plan to use budgetary resources. *See* OMB Circular No. A-11 § 120.1. Notably, an apportionment "is not a means for resolving any question dealing with . . . the legality of using funds for the purpose for which they are apportioned." *Id.* at § 120.9. A reapportionment is a revision of a previous apportionment of budgetary resources for an appropriation or fund account. *See id.* Thus, once Congress appropriates funds, OMB apportions the appropriation, and then agencies allot those funds for obligations including by purchasing a service, entering into a contract, awarding a grant, or otherwise taking an action that requires the government to make a payment. *See* OMB Circular No. A-11, §§ 120.45–120.47. It is only at the obligation stage that the government enters into a legally binding financial arrangement with a third party.

the Purchase Order aired at 7:36 p.m. on that date. *Id.* ¶ 5–7. In total, five challenged ads aired under the terms of the Purchase Order. Once the vendor is paid for services rendered, any residual funding left under the Purchase Order will be de-obligated. Mehringer Decl. ¶ 9.[2] DHS has no plans to make any additional media buys under the Purchase Order, or to renew the Purchase Order, or otherwise use appropriated funds on any similar contracts for the creation or distribution of the media that is the subject of this lawsuit. *Id.* ¶ 10.

### B. Six New Ads Did Not Air Using Appropriated Funds

In the latter half of October 2026, six additional ads were posted to the White House's YouTube page. *See* Am. Compl. ¶¶ 174–79, ECF No. 29. Three of those ads also aired on television using the private funds of MAGA Inc., an independent Super PAC. *Id.* ¶ 178. On October 30, 2026, the District Court for the Southern District of New York expanded its previously issued Temporary Restraining Order to encompass the following three ads: the "No Tax on Tips" Ad, the "$5000 to Americans" Ad and the "Cost of Socialism" Ad. *See* Order at 2, *Common Cause v. DHS*, 1:26-cv-8882 (S.D.N.Y. Oct. 30, 2026) (*Common Cause II*), ECF No. 101. That Order required those ads to be removed from official government social media pages, and purported to require MAGA Inc., which was not a party to that litigation, to cease airing the ads on television. The Government complied with the Court's order by removing the three ads from social media, and MAGA Inc. voluntarily instructed its media buyer to cancel any placements of the specified advertisements.

## II. Relevant Statutory Background

The Consolidated Appropriations Act provides that: "No part of any appropriation contained in this or any other Act shall be used directly or indirectly . . . for publicity or propaganda purposes within the United States not heretofore authorized by Congress." Pub. L. No.

[2] "Deobligation" refers to "[a]n agency's cancellation or downward adjustment of previously incurred obligations." *See* GAO, A Glossary of Terms Used in the Federal Budget Process, *Deobligation*, https://www.gao.gov/assets/gao-05-734sp.pdf (last accessed Nov. 11, 2026).

119-75, § 718, 140 Stat. at 495. The Purpose Act provides that appropriations should be used for their intended purpose. *See* 31 U.S.C. § 1301(a) ("[A]ppropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law."). And the Antideficiency Act states that an officer or employee of the United States may not "involve [the] government in a contract or obligation for the payment of money before an appropriation is made unless authorized by law," 31 U.S.C. § 1341(a)(1)(B).

## III. This Litigation

Plaintiff initiated this action on October 7, 2026. *See* Compl., ECF No. 1. It brought two claims. First, it brought an APA claim against OMB and DHS, challenging OMB's apportionment of appropriated funds, and DHS's contracting and expenditure of appropriated funds, to air the challenged ads. *Id.* ¶¶ 184–92 (Count I). That Count alleged that the challenged action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" *Id.* ¶ 186 (quoting 5 U.S.C. § 706(2)(A)). And second, it brought an *ultra vires* claim against the President and the White House Office, alleging that using taxpayer funds to develop and air the ads violates the Purpose Act, the Antideficiency Act, and the statutory ban on using appropriated funds for "publicity or propaganda." *Id.* ¶ 195 (Count II). Two days later, Plaintiff moved for a Temporary Restraining Order, "prohibiting the White House Office, OMB, and DHS from further use of appropriated funds for 'publicity and propaganda' purposes, including the airing of the propaganda ads at issue, future use of propaganda ads developed at public expense, allocating funds to air such ads, and creating similar ads for future use, as well as stay related OMB and DHS action." DNC's Mot. for a TRO (or Prelim. Inj.) & § 705 Stay at 2, ECF No. 3.

After a hearing, this Court found that the DNC was likely to succeed on the merits of its APA claim against OMB and DHS, so it granted Plaintiff's motion for a Temporary Restraining Order. *See* Mem. Op. & Order at 16, ECF No. 26. The Order stayed OMB's apportionment of $20 million to air the five challenged ads and enjoined OMB and DHS from airing those five ads. *See id.* at 34–35. The Court declined to reach the *ultra vires* claim against the White House Office. *See*

*id.* at 16. And its relief did not apply to ads that the DNC alleged were unlawfully developed using White House personnel, *see id.* at 16 n.8 (citing Compl. ¶¶ 124–35), some of which appeared on the White House's YouTube page, *see id.* (citing Status Report at 1–2, ECF No. 14; Second Status Report at 1, ECF No. 21; Fourth Status Report at 1–2, ECF No. 25).

On November 2, Plaintiff amended its Complaint, largely to add factual allegations regarding what happened after the five challenged ads stopped airing on television with DHS-appropriated funds. *See, e.g.*, Am. Compl. ¶¶ 174–81. Its Amended Complaint focused on ads that aired using MAGA Inc. funds and/or were posted to the White House YouTube page in the latter half of October. Three days later, on November 5, 2026, Plaintiff moved for a preliminary injunction. *See* ECF No. 31 ("Pl.'s Br."). It seeks to enjoin the White House Office, DHS, and OMB from using public funds, including staff time, to create and air the challenged ads and any "substantially similar" ads, and to enjoin the White House Office from distributing the same through television advertising, social media, and any other video distribution platform, including by providing the ads to any third party. *See* [Proposed] Order Granting Prelim. Inj. & § 705 Stay, ECF No. 31-3 ("Proposed Order").

## LEGAL STANDARDS

"A preliminary injunction is an extraordinary and drastic remedy." *Munaf v. Geren*, 553 U.S. 674, 689 (2008) (citation omitted). It is "never awarded as of right," *id.* at 690, and "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion," *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted); *accord Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009). The movant must satisfy a four-prong test, establishing "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *accord Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011).

The same factors govern Plaintiff's request for a stay under 5 U.S.C. § 705. *See Advocs. for Hum. Rts. v. Blanche*, 838 F. Supp. 3d 1, 9 (D.D.C. 2026). For the same reasons Plaintiff is not

entitled to a preliminary injunction, Plaintiff is not entitled to a Section 705 stay (which could only apply to OMB and DHS, since the APA does not apply to the President or the White House Office). *See Franklin v. Massachusetts*, 505 U.S. 788, 800–01 (1992); *Soucie v. David*, 448 F.2d 1067, 1075 (D.C. Cir. 1971).

**ARGUMENT**

Plaintiff's motion fails for several reasons. At the outset, Plaintiff's purported injury stems from the airing of the challenged ads with federal funds. *See* Pl.'s Br. at 37 ("The DNC has already detailed the harm it has suffered and continues to suffer due to the airing of the propaganda ads."). That alleged harm was "particularly acute in close political races in the final weeks before the November 2026 elections." ECF No. 26 at 18. But the last ads to air using federal funds aired more than a month ago, on October 11, 2026. And the next relevant election is now two years away.[3] Plaintiff therefore cannot show that a preliminary injunction is needed to avert imminent irreparable harm to its prospects in that election. Moreover, even if staff time spent on the challenged ads works competitive harm on the DNC by allowing MAGA Inc. to conserve resources to use against it, any amount would be de minimis. Accordingly, the resulting competitive harm would fail to qualify as the significant irreparable harm that Plaintiff must show to justify a preliminary injunction.

On the merits, Plaintiff's claims fare no better. Its *ultra vires* claim is unlikely to succeed, given the lack of clarity regarding whether the "publicity or propaganda" ban even extends to the use of staff time, the ambiguity in the statutory language, and the legitimate use of appropriated funds to inform the public of Administration policies and rebut attacks on those policies. As for the APA claim, Plaintiff has not challenged final agency action with respect to OMB,[4] and Plaintiff lacks standing to seek prospective relief against DHS because it cannot show likely future injury

---

[3] As explained below, *see* infra pp. 10–11, neither the possibility of special elections nor the runoff elections in Louisiana justify Plaintiff's requested relief.

[4] Defendants respectfully disagree with the Court's conclusion that OMB's apportionment is a final agency action, *see* ECF No. 26 at 20, for the reasons explained in their opposition to Plaintiff's motion for a TRO and resubmitted below, *see infra* pp. 19–22.

traceable to DHS. The balance of equities and public interest also favor the Government. Plaintiff's motion should be denied.

## I. Plaintiff Will Not Suffer Irreparable Harm Absent a PI

To meet its burden on irreparable harm, Plaintiff must show that "[t]he injury complained of [is] of such *imminence* that there is a 'clear and present' need for equitable relief to prevent irreparable harm." *Wis. Gas Co. v. Fed. Energy Regul. Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985) (quoting *Ashland Oil, Inc. v. Fed. Trade Comm'n*, 409 F. Supp. 297, 307 (D.D.C. 1976)). And "the injury must be both certain and great," *id.*

Plaintiff initially claimed that it needed a TRO to avert competitive harm leading up to the November 3, 2026 midterm elections. *See* ECF No. 3-1 at 19; *see also* ECF No. 26 at 17 (citing *Shays v. Fed. Election Comm'n*, 414 F.3d 76 (D.C. Cir. 2005)). Because "election resources are finite," "every public dollar spent on airing the challenged ads allows MAGA Inc. . . . to conserve its resources for other political efforts adverse to the DNC." *Id.* at 17–18. That alleged harm was "particularly acute in close political races in the final weeks before the November 2026 elections." *Id.* at 18. On that theory, Plaintiff obtained a TRO to prevent the Government from continuing to spend down its $20 million Purchase Order to air ads on national television in the lead-up to the midterm elections.

But now, the midterms elections have passed. And the Federal Government is no longer using appropriated funds to air the challenged ads. The last of the challenged ads to air under the Purchase Order aired on October 11, 2026. In a sworn declaration, DHS averred that once the vendor is paid for services rendered through that date, any residual funding left under the Purchase Order will be de-obligated. Mehringer Decl. ¶ 9. And the agency has no plans to use any additional appropriated funds to air the challenged ads. *Id.* ¶ 10. Plaintiff has therefore failed to show irreparable future harm traceable to DHS. *See Murthy v. Missouri*, 603 U.S. 43, 70 (2024) (concluding that an injunction could not stand where the plaintiff had failed to demonstrate likely

future injury traceable to the defendant, even though the challenged conduct was ongoing at the time of the complaint).

After October 11, a private party not before the Court used its own funds to air some of the challenged ads, which is not unlawful. *See* Government Accountability Office (GAO), Principles of Federal Appropriations Law 3-282, 3-283 (4th ed. 2017), https://www.gao.gov/assets/2019-11/687162.pdf ("If appropriated funds are not involved, there is no violation [of federal appropriations law] no matter how blatant the conduct may be."). Even if it were, MAGA Inc. would not properly be subject to any injunction issued by this Court, so Plaintiff cannot show that the requested injunction would avert any alleged harm stemming from the actions of MAGA Inc. *See Winter*, 555 U.S. at 20 (Plaintiff must show that it "is likely to suffer irreparable harm in the absence of preliminary relief"); *Murthy*, 603 U.S. at 57 ("[I]t is a bedrock principle that a federal court cannot redress 'injury that results from the independent action of some third party not before the court.'" (citation omitted)); *cf. Gill v. Whitford*, 585 U.S. 48, 73 (2018) ("A plaintiff's remedy must be tailored to redress the plaintiff's particular injury.").

To the extent Plaintiff claims that the use of staff time to create, transfer, and post the challenged ads to social media pages constitutes a use of appropriated funds for "publicity or propaganda," Plaintiff has failed to sustain its burden on irreparable harm on this basis as well. At the outset, the mere creation of the challenged ads causes Plaintiff no harm, which Plaintiff tacitly concedes by not seeking relief with respect to ads it alleges were created by White House staff and provided to the vendor, but not aired. *See* Pl.'s Br. at 7 n.1.[5]

Putting that aside, Plaintiff's theory of competitive harm is that "every public dollar spent on airing the challenged ads allows MAGA Inc. . . . to conserve its resources for other political efforts adverse to the DNC." ECF No. 26 at 17–18. Even if Plaintiff were correct that the use of staff time constitutes a use of appropriated funds, such that staff time spent on these ads

[5] Plaintiff alleges that all but one of the ads provided to the vendor were created using White House staff. *See* Am. Compl. ¶ 132.

competitively harms the DNC, Plaintiff would still have to show harm that is "both certain and great." *Wis. Gas Co.*, 758 F.2d at 674. In other words, a preliminary injunction cannot issue on the basis of some irreparable harm; the claimed harm must be "significant." *See Corewell Health William Beaumont Univ. Hosp. v. Kennedy*, 2026 WL 3257581, at *6 (D.D.C. Oct. 29, 2026) ("Unlike for Article III standing, under which [the Plaintiff] need only show, say, $1 of harm, [he] must show that its economic harm absent an injunction, even if unrecoverable, will be 'significant.'" (citation omitted)). And to make this showing, the Plaintiff "must 'adequately describe and quantify the level of harm' that it faces." *Id.* (citation omitted).

Here, Plaintiff has not even attempted to quantify the amount of appropriated funds it alleges were involved in the use of staff time to develop, transfer, or post the ads, but appears to acknowledge that whatever the amount is, it is de minimis. *See* Pl.'s Br. at 20 (arguing that, on the merits, the fact that staff are paid fixed salaries is immaterial because there is no "de minimis" exception to the ban on the use of appropriated funds for publicity or propaganda). On Plaintiff's theory, then, it has failed to show the requisite significant irreparable harm, because any amount of "resources" MAGA Inc. may have conserved due to staff time spent on the challenged ads is de minimis.

Even if Plaintiff could show irreparable harm, it could not show that any such harm is *imminent*, given that the next relevant election is two years away. *See id.* at 38 ("[F]undamentally, the 2028 presidential election cycle has begun."). Nor does Plaintiff's passing reference to special elections or runoff elections warrant a different result. Plaintiff asserts that "[s]pecial elections may be called at any time to fill the seats of officials elected or appointed to new offices or whose offices otherwise become vacant." *Id.* Such bald speculation cannot satisfy Plaintiff's burden to show imminent irreparable harm. *See Murthy*, 603 U.S. at 70 ("[Plaintiff] cannot satisfy his burden with such conjecture."). And while Plaintiff also states that "two close Congressional contests have triggered December runoff elections," in Louisiana, Pl.'s Br. at 38, Plaintiff has not even attempted

to show how the existence of the challenged ads on the White House YouTube page causes it irreparable harm in those elections.

Finally, Defendants respectfully disagree with the Court's conclusion that these arguments "sound[] in mootness." ECF No. 26 at 28. Defendants are not seeking dismissal at this time. Instead, Plaintiff is seeking a preliminary injunction, and to obtain its requested relief, Plaintiff bears the burden to show it will suffer imminent irreparable harm absent a preliminary injunction. *Winter*, 555 U.S. at 20; *see also Murthy*, 603 U.S. at 70. Because Plaintiff cannot show imminent future injury, its motion should be denied.

## II. Plaintiff Lacks Standing to Seek Prospective Relief

Relatedly, Plaintiff lacks standing to seek prospective relief. The doctrine of Article III standing, which stems from the Constitution's case-or-controversy limitation on judicial power, requires the party invoking federal jurisdiction to plausibly allege i) an injury-in-fact ii) that is fairly traceable to the conduct of the party sued and iii) judicially redressable. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Because "standing is not dispensed in gross," the plaintiff "must demonstrate standing for each claim that [it] press[es] and for each form of relief that [it] seek[s]." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). Here, to obtain the mandatory, forward-looking injunction Plaintiff seeks, it must show "a real and immediate threat of repeated injury[.]" *Murthy*, 603 U.S. at 58 (quoting *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974)); *see also City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983) ("[Plaintiff's] standing to seek the injunction requested depended on whether he was likely to suffer future injury from the [challenged practice.]"); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) ("[A]llegations of *possible* future injury are not sufficient." (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990))).

Plaintiff initially advanced two theories of standing. First, it claimed that the airing of the ads with federal funds "force[d]" it "to compete in unlawfully structured elections" devoid of a "fair process." *See* ECF No. 3-1 at 18–19 (citing *Bost v. Ill. Bd. of Elections*, 607 U.S. 71, 77

(2026)). This Court correctly declined to endorse that theory of standing, which rested on "an expansive theory of candidate standing recently recognized by the Supreme Court in *Bost*." ECF No. 26 at 19 n.9. In *Bost*, the Supreme Court held that "[c]andidates have a concrete and particularized interest in *the rules that govern* the counting of votes in their elections." *Bost*, 607 U.S. at 82 (emphasis added). Because no such rule is at issue here, Plaintiff's reliance on *Bost* is misplaced. *See* Pl.'s Br. at 30. As Chief Judge Boasberg recently explained, "*Bost* did not hold that every governmental action alleged to undermine electoral fairness inflicts a concrete injury on a plaintiff." Mem. Op. at 13, *DSCC v. Trump*, 1:26-cv-3674-JEB (D.D.C. Nov. 2, 2026), ECF No. 34. The *Bost* Court "concluded only that candidates experience a concrete and particularized harm when the 'preordained rules' governing a candidate's election actually depart from law." *Id.* Under Plaintiff's expansive reading of *Bost*, "candidates would have standing to challenge every Tweet, Truth Social post, or campaign speech that deploys rhetoric that undermines confidence in the election[.]" *Id.* at 14. "*Bost* does not support the notion that Plaintiffs have standing to challenge [such rhetoric]." *Id.*

Instead, this Court accepted Plaintiff's alternative theory, which was that "at the time the suit was filed," Plaintiff was facing competitive harm in the final weeks leading up to the November 3, 2026 midterm elections. *See* ECF No. 3-1 at 19; *see also* ECF No. 26 at 17 (citing *Shays v. Fed. Election Comm'n*, 414 F.3d 76 (D.C. Cir. 2005)).

But on November 2, 2026, Plaintiff amended and supplemented its Complaint. *See* ECF No. 29. While standing is generally determined when a suit is filed, "when a plaintiff files a complaint in federal court and then voluntarily amends the complaint, courts look to the amended complaint to determine jurisdiction." *Rockwell Int'l Corp.*, 549 U.S. at 473–74; *see also Royal Canin v. Wullschleger*, 604 U.S. 22, 35–36 (2025) ("The reconfiguration accomplished by an amendment may bring the suit either newly within or newly outside a federal court's jurisdiction."); *Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, 18 (D.C. Cir. 2015) ("The

district court thus had no obligation to consider jurisdictional bases set forth in prior iterations of the complaint."); *G&E Real Est., Inc. v. Avison Young-Washington, D.C.*, 168 F. Supp. 3d 147, 159 (D.D.C. 2016) ("[T]he Court must measure standing by the state of the world as of the date of the Amended Complaint."). This is so because "the new pleading 'supersedes' the old one: The 'original pleading no longer performs any function in the case.'" *Royal Canin*, 604 U.S. at 35 (citation omitted).

On November 2—weeks after the challenged ads ceased airing with federal funds—Plaintiff had no standing to seek prospective relief. *See, e.g.*, *Murthy*, 603 U.S. at 70; *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983). As of that date, all of the harms Plaintiff alleged, to the extent they were even cognizable, were at most past harms related to the creation, transfer, and posting of the challenged ads. *See generally* ECF No. 29. Plaintiff cannot justify its request for prospective injunctive relief by pointing to past injury. *See Halkin v. Helms*, 690 F.2d 977, 1005 (D.C. Cir. 1982) ("[P]ast injury alone is not sufficient to merit the award of relief against future conduct. A great deal more is required, particularly when the relief sought would broadly enjoin the conduct of vital governmental functions which require the exercise of discretion in a myriad of unpredictable circumstances."); *Advocs. for Hum. Rts.*, 838 F. Supp. 3d at 13 ("Evidence of prior unlawful conduct, however, does not necessarily establish standing for a preliminary injunction, which requires an imminent *future* injury."); *United States v. Bolton*, 468 F. Supp. 3d 1, 6 (D.D.C. 2020) (government was not entitled to injunctive relief given that injunction would no longer prevent irreparable injury); *cf. United States v. Or. State Med. Soc'y*, 343 U.S. 326, 333 (1952) ("The sole function of an action for injunction is to forestall future violations. It is so unrelated to punishment or reparations for those past[.]").

For the foregoing reasons, even applying this Court's previous standing analysis, Plaintiff does not have standing to seek prospective relief.

## III. Plaintiffs Are Unlikely to Succeed on the Merits

### A. Plaintiff's *Ultra Vires* Claim Is Unlikely to Succeed

Plaintiff's *ultra vires* claim alleges that the President and the White House Office improperly used taxpayer dollars to air the challenged ads in violation of the Antideficiency Act, the Purpose Act, and the ban on using appropriated funds for "publicity or propaganda," Pub. L. No. 119-75, § 718, 140 Stat. at 495. At the outset, "the President is not an agency. So it is unclear whether *ultra vires* review is available at all." *Am. Foreign Serv. Ass'n v. Trump*, No. 25-5184, 2025 WL 1742853, at *2 (D.C. Cir. June 20, 2025); *see also id.* ("[A]n *ultra vires* action is a suit in equity, . . . and courts generally lack authority to enjoin the President." (citations omitted)); *Franklin*, 505 U.S. at 802–03 (plurality op.) (federal courts have "no jurisdiction of a bill to enjoin the President in the performance of his official duties"); *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) ("With regard to the President, courts do not have jurisdiction to enjoin him." (citation omitted)); *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1867).[6]

Even assuming *ultra vires* review is available, *see Dalton v. Specter*, 511 U.S. 462, 474 (1994), to prevail on an *ultra vires* claim, the plaintiff must establish that: 1) "review is not expressly precluded by statute;" 2) "there is no alternative procedure for review of the statutory claim;" and 3) "the challenged action is plainly in excess of [the executive's] delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory." *Glob. Health Council v. Trump*, 153 F.4th 1, 20 (D.C. Cir. 2025) (citation omitted), *denying reh'g en banc*, 2025 WL 2709437 (D.C. Cir. Aug. 28, 2025); *see also Nuclear Regul. Comm'n*, 605 U.S. at 681 (explaining that *ultra vires* review applies only when an executive "has taken action entirely 'in

---

[6] The same principles that foreclose injunctive relief also foreclose declaratory relief. *See Franklin*, 505 U.S. at 827 (Scalia, J., concurring in part and concurring in the judgment). And the Supreme Court has twice held that causes of action that are available against other government officials should not be extended to the President absent a clear statement by Congress. *See Nixon v. Fitzgerald*, 457 U.S. 731, 748 n.27 (1982); *Franklin*, 505 U.S. at 801.

excess of its delegated powers and contrary to a *specific prohibition*' in a statute" (citation omitted)).

A defendant "violates a clear and mandatory statutory command only when the error is so extreme that one may view it as jurisdictional or nearly so." *Glob. Health Council*, 153 F.4th at 20; *Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 764 (D.C. Cir. 2022) ("[*U*]*ltra vires* claims are confined to extreme error where the executive has stepped so plainly beyond the bounds of [its statutory authority], or acted so clearly in defiance of it, as to warrant the immediate intervention of an equity court[.]" (citation omitted)).

By contrast, "vague statutory provisions, such as one that requires an agency to use 'appropriate data' to calculate a payment amount, are not sufficiently clear and mandatory to warrant non-APA review." *Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*, 26 F.4th 960, 971 (D.C. Cir. 2022); *see also Fed. Express Corp.*, 39 F.4th at 764 ("Only error that is 'patently a misconstruction of the Act,' that 'disregard[s] a specific and unambiguous statutory directive,' or that 'violate[s] some specific command of a statute' will support relief." (citation omitted)). The "claim is essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds." *Nuclear Regul. Comm'n*, 605 U.S. at 681-82 (quoting *Nyant v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009)).

Here, Plaintiff asserts that the President directed salaried White House staff to develop and transfer the challenged ads to third parties for airing or to post the challenged ads to official social media pages. It argues that the ban on the use of appropriated funds "for publicity or propaganda purposes," extends to bar employees from devoting time to the challenged ads, even though those employees are paid fixed salaries, because those salaries are paid out of appropriated funds. Pl.'s Br. at 20–21 (citing *Neguse v. U.S. Immigr. & Customs Enf't*, 822 F. Supp. 3d 86, 105 (D.D.C. 2026) *appeal filed*, No. 26-5072 (D.C. Cir. Mar. 3, 2026) and *Common Cause II*). This theory

stacks a questionable theory on top of a questionable theory in a manner that cannot support *ultra vires* review.

Turn first to the question of staff time. When Congress intends to restrict the use of appropriated funds to pay the salaries of federal employees who do certain things, it speaks clearly. For example, "[s]ince 1998, annual appropriations acts each year have contained a government-wide prohibition on the use of appropriated funds to pay the salary of any federal official who" "prevents another federal employee from communicating with Congress." *See* Principles of Federal Appropriations Law at 3-298 (citing Pub. L. No. 105-61, § 640, 111 Stat. 1272, 1318 (Oct. 10, 1997)).[7]

Other statutes directly and explicitly restrict the activities of federal employees paid with appropriated funds. The Hatch Act, for example, regulates certain government employees' participation in partisan political activities. Employees subject to the Act may not "engage in political activity" while "on duty [or] in any room or building occupied in the discharge of official duties by an individual employed . . . in the Government of the United States." 5 U.S.C. § 7324. And the Antideficiency Act, in addition to preventing the Government from incurring obligations in advance of an appropriation, 31 U.S.C. § 1341(a)(1)(B), specifically provides that officers and employees of the United States may not "accept voluntary services for [the] government or employ personal services exceeding that authorized by law," except in limited circumstances. *Id.* § 1342.

The "publicity or propaganda" ban contains no such clear implication for salaried employees. Indeed, the Hatch Act contains an exception that allows certain employees, including those "paid from an appropriation for the Executive Office of the President," 5 U.S.C. § 7324(b)(2)(B)(i), to engage in otherwise prohibited activity "if the costs associated with that political activity are not paid for by money derived from the Treasury of the United States,"

[7] The Government Accountability Office has applied this provision in narrow factual circumstances in the past, while recognizing that the provision "could raise constitutional separation of powers concerns." Principles of Federal Appropriations Law at 3-300.

5 U.S.C. §7324(b)(1). The exception supports Defendants' position that the mere use of staff time does not constitute an expenditure of appropriated funds.

If the ban extended as far as Plaintiff contends, then the Hatch Act would be superfluous, and courts would be charged with policing the inner workings of the Office of Political Affairs (OPA) and analyzing speeches crafted by White House speech writers for political or partisan bent. But the relevant publicity or propaganda language has been a regular feature of appropriations acts since 1951—and yet since then (and before), the President and his most senior advisors have long publicized their Administration's achievements. *See* Letter for Joseph S. Clark, United States Senate, B-144323 (Comp. Gen. Nov. 4, 1960), https://www.gao.gov/products/b-144323 ("Speeches by cabinet officers and other high Government officials, accompanied by press releases, have long been a standard practice."). Under Plaintiffs' view, these acts were always illegal. And yet the fact that nobody has ever suggested they are counsels against that conclusion. *Cf. Am. Legion v. Am. Humanist Ass'n*, 588 U.S. 29, 57 (2019) ("The passage of time gives rise to a strong presumption of constitutionality.").

Even if the use of staff time in connection with these ads did constitute an expenditure of appropriated funds, Plaintiff is wrong to suggest that a violation of the "publicity or propaganda" ban could be premised on such a de minimis expenditure. *See* Principles of Federal Appropriations Law at 3-295 (explaining that GAO declined to find a publicity or propaganda violation even though an agency spent appropriated funds to conduct a media analysis, which included purely partisan elements, where "there was minimal additional expense incurred by including the improper element").

Second, the terms "publicity" and "propaganda" are not so clear as to be subject to *ultra vires* review. The Consolidated Appropriations Act does not define "publicity" or "propaganda." *See* Principles of Federal Appropriations Law at 3-281 ("[T]here is no definition of either term."); *see also id.* at 3-282 ("[T]he prohibitions themselves provide little definitional guidance as to what

specific activities are publicity or propaganda"). Construing and applying those terms involves a "delicate balance between competing interests," *id.* at 3-281, including the Executive's "legitimate right to explain and defend its policies and respond to attacks on th[ose] polic[ies]." *Id.* at 3-294. While activity "completely devoid of any connection with official functions" is impermissible, *id.*, "[t]o restrict all materials that have some political content or express support of an Administration's policies would significantly curtail th[at] recognized and legitimate exercise of the Administration's authority to inform the public of its policies, to justify its policies and to rebut attacks on its policies." *Id.* at 3-296 (citation omitted); *see also id.* (acknowledging that it is "important for the public to understand the philosophical underpinnings of the policies advanced by elected officials and their staff in order for the public to evaluate and form opinions on those policies" (citation omitted)).

The Government Accountability Office's (GAO's) application of this standard is instructive. For example, GAO did not find a violation of the publicity or propaganda prohibition in an analogous matter which also involved use of White House staff time. That decision involved a mass mailing of editorials praising the President. The editorials were transmitted with a letter prepared by a member of the White House staff on State Department letterhead stationery. *See* Principles of Federal Appropriations Law at 3-285 (citing B-178528 (July 27, 1973)). Noting the extreme difficulty in distinguishing between disseminating information to explain or defend administration policies (permissible) and purely political or partisan activities (impermissible), the GAO found no violation of the publicity or propaganda law. *See id.* (citing B-194776 (June 4, 1979)); *see also id.* at 3-294 (explaining that the question whether any particular speech or release is "so completely devoid of any connection with official functions or so political in nature that it is not in furtherance of the purpose for which Government funds were appropriated" "is extremely difficult to determine in most cases as the lines separating the nonpolitical from the political cannot be precisely drawn"). For the same reasons, Plaintiff here is unlikely to show that the statute

provides a "clear and specific statutory mandate," *Fed. Express Corp.*, 39 F.4th at 766, that would justify *ultra vires* review.

Plaintiff also claims, with respect to the five ads that aired under the DHS Purchase Order, that the alleged violations of the Purpose Act and the Antideficiency Act are sufficient to support *ultra vires* review. To the extent the APA provides a vehicle to challenge the Purchase Order, *ultra vires* review is precluded. In any event, the Purpose Act provides that appropriations should be used for their intended purpose. *See* 31 U.S.C. § 1301(a) ("[A]ppropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law."). As with the prohibition on using funds for "publicity or propaganda," the Purpose Act's directive to use funds for which they are intended is likewise not sufficiently clear or specific to support *ultra vires* review. For its part, the Antideficiency Act directs that an officer or employee of the United States may not "involve [the] government in a contract or obligation for the payment of money before an appropriation is made unless authorized by law," *id.* § 1341(a)(1)(B). But not every violation of the Purpose Act automatically violates the Antideficiency Act. *See* Principles of Federal Appropriations Law at 3-12. The lack of clarity underscores the unavailability of *ultra vires* review. In all events, the Antideficiency Act is not privately enforceable. *See Thurston v. United States*, 696 F. Supp. 680, 683 (D.D.C. 1988); *Feldman v. Bowser*, 315 F. Supp. 3d 299, 305 (D.D.C. 2018).

Plaintiff's *ultra vires* claim is therefore unlikely to succeed.

**B. Plaintiff is Unlikely to Succeed on the Merits of the APA Claim**

**1. As to OMB, Plaintiff Has Not Challenged Final Agency Action**

Plaintiff contends that OMB's apportionment of the appropriated funds that DHS later obligated to a contract for the media buys constitutes a final agency action. Under the APA, aggrieved parties may only challenge "agency action" that is arbitrary, capricious, or otherwise not in accordance with law. *See* 5 U.S.C. § 706(2). The APA defines agency action as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or

failure to act . . . .” *See id.* § 551(13). Each category is further defined. *See id.* § 551. And any agency action must be “final” to be subject to judicial review. *See id.* § 704. For an agency action to be final, it must be both (a) “the ‘consummation’ of the agency’s decision-making process,” and (b) a decision “by which ‘rights or obligations have been determined,’ or from which ‘legal consequences will flow.’” *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citations omitted); *Abbott Lab’ys v. Gardner*, 387 U.S. 136, 148 (1967). In other words, for the challenged action to be final, it must “inflict[] an actual, concrete injury,” *Darby v. Cisneros*, 509 U.S. 137, 144 (1993). By contrast, if an action affects the challenger’s rights only “on the contingency of future administrative action,” it is not final. *DRG Funding Corp. v. Sec’y of Hous. & Urb. Dev.*, 76 F.3d 1212, 1214 (D.C. Cir. 1996) (quoting *Rochester Tel. Corp. v. United States*, 307 U.S. 125, 130 (1939)); *see also Franklin*, 505 U.S. at 797 (to be final, the action must “directly affect the parties.”).

Here, OMB’s decision to approve the reapportionment of funds at CBP’s request made additional funds available to CBP for potential future obligation. *See* Woolf Decl. ¶¶ 4–6. Obligation is the act by which an agency commits to spend apportioned funds for a specified purpose. OMB’s approval of the reapportionment did not itself obligate any portion of the funds or determine how they ultimately would be spent. *Id.* ¶ 6.

Plaintiff’s theory of harm is contingent on what came next: DHS’s contracting with a vendor to air the ads. *See* Pl.’s Br. at 21 (“Each *publication* of an illegally-funded ad inflicts harm[.]” (emphasis added)). And even after OMB apportioned the funds, DHS had broad discretion to decide how to use the funds apportioned and could have used the funds for something else, consistent with its congressional directives. In other words, while apportionment may be necessary for the funding of the ads, it is not sufficient for them. Because OMB’s decision to reapportion the funds therefore affects Plaintiff only “on the contingency of [DHS’s] future administrative action,” and does not itself inflict any injury on Plaintiff, it is not final agency action. *DRG Funding Corp.*, 76 F.3d at 1214 (citation omitted).

Accordingly, while OMB's approval completed its consideration of CBP's particular reapportionment request, it did not determine whether, when, or how the additional funds would be obligated or expended. Those decisions required separate action by CBP. The fact that OMB completed one stage of the budgetary process does not mean that it consummated the distinct decision-making process concerning the advertising activity Plaintiff seeks to challenge. The relevant distinction is between OMB's authorization of budgetary resources and CBP's subsequent exercise of its procurement authority. The former established the availability of funds, and the latter determined whether and how those funds would be committed to particular services.

Subsequent developments in the lifecycle of appropriated funds further illustrate this distinction. Apportionments are effective only for the fiscal year to which they apply, and unobligated balances from multiyear appropriations must be apportioned again in subsequent fiscal years. Woolf Decl. ¶¶ 7–8. Thus, any particular apportionment or reapportionment does not irrevocably determine the ultimate disposition of the appropriated funds. Rather, the continued availability and use of those resources remains subject to applicable fiscal year limitations, subsequent apportionments, and independent agency decisions concerning obligation and expenditure.

Plaintiff therefore cannot establish final agency action with respect to OMB because any alleged injury resulting from the placement of the ads arises, if at all, from subsequent decisions of other agencies. Plaintiff is thus not likely to succeed on the merits of its APA claim as against OMB.

In concluding otherwise, this Court found that "an apportionment is a final decision from which legal consequences flow," ECF No. 26 at 21 (citing *Bennett*, 520 U.S. at 178), because "government officers and employees" who fail to abide by an apportionment's limits risk administrative and criminal consequences, *id.* But the relevant question is not whether the agency's action creates legal consequences for *someone*, it is whether the action creates legal consequences

for the *parties*. *See Franklin*, 505 U.S. at 797 ("The core question is whether the agency has completed its decisionmaking process, *and whether the result of that process is one that will directly affect the parties*." (emphasis added)). Here, OMB's apportionment created no consequences for Plaintiff because DHS could have chosen to obligate the funds for some other purpose, subject to statutory limits, even after the funds had been apportioned. Defendants respectfully disagree with the Court's contrary conclusions.

**2. Plaintiff's APA Claim Against DHS Is Also Unlikely to Succeed**

Defendants respectfully resubmit their contention that the airing of the ads is not itself an agency action. The APA allows only for review of "agency action." 5 U.S.C. §§ 702, 704. The statute carefully defines "agency action" to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." *Id.* § 551(13). Each category is further defined.[8] *See also Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004) (*SUWA*) (explaining that "[a]ll of those categories involve circumscribed, discrete agency

---

[8] "[R]ule" "means the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency." 5 U.S.C. § 551(4).

"[O]rder" "means the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing." *Id.* § 551(6).

"[L]icense" "includes the whole or a part of an agency permit, certificate, approval, registration, charter, membership, statutory exemption or other form of permission." *Id.* § 551(8).

"[S]anction" "includes the whole or a part of an agency—(A) prohibition, requirement, limitation, or other condition affecting the freedom of a person; (B) withholding of relief; (C) imposition of penalty or fine; (D) destruction, taking, seizure, or withholding of property; (E) assessment of damages . . . ; (F) requirement, revocation, or suspension of a license; or (G) taking other compulsory or restrictive action." *Id.* § 551(10).

"[R]elief" "includes the whole or a part of an agency—(A) grant of money, assistance, license, authority, exemption, exception, privilege, or remedy; (B) recognition of a claim, right, immunity, privilege, exemption, or exception; or (C) taking of other action on the application or petition of, and beneficial to, a person." *Id.* § 551(11).

actions”). Crucially, the APA does not authorize “general judicial review of the [agency’s] day-to-day operations,” *Lujan v. Nat’l Wildlife Fed’n*, 497 U.S. 871, 899 (1990), or cover “all conduct such as, for example, constructing a building, operating a program, or performing a contract,” *Vill. of Bald Head Island v. U.S. Army Corps of Eng’rs*, 714 F.3d 186, 193 (4th Cir. 2013). The term “agency action” is “not so all-encompassing as to authorize us to exercise judicial review over everything done by an administrative agency.” *Indep. Equip. Dealers Ass’n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004) (Roberts, J.). “Airing” the ads fits into none of these categories, and therefore does not constitute an agency action that is reviewable under the APA. *See City of Phila. v. Sec’y U.S. Dep’t of Interior*, 179 F.4th 169, 183 (3d Cir. 2026) (holding that an agency’s decision to remove exhibits from a National Park site was not an “agency action” because it did not satisfy any of the definitions for “rule, order, license, sanction, [or] relief” (quoting 5 U.S.C. § 551(13))).

To the extent Plaintiff seeks to enjoin the contract that DHS entered into with the vendor, that effort fails as well. *See* Proposed Order at 3 (proposing that the Court stay the DHS contract obligating government funds to the vendor to air the challenged ads). Plaintiff does not have standing to stay the contract because it cannot show likely future injury stemming from the contract as of November 2, the date it amended its Complaint. *See supra* at pp. 12–13. DHS had previously averred that it would incur no obligations under that contract after October 11, *see* Mehringer Decl. ¶¶ 9, 10, and no obligations were in fact incurred after that date, *see generally* Suppl. Mehringer Decl. The vendor has completed the scope of work under the Purchase Order, and once the vendor is paid for services rendered, any residual funding left under the Purchase Order will be de-obligated. *See* Mehringer Decl. ¶¶ 9, 10. DHS has no plans to make any additional media buys under the Purchase Order, to renew the Purchase Order, or otherwise use DHS appropriated funds on any similar contracts for the creation or distribution of the challenged ads. *See* Mehringer Decl. ¶ 10. There is therefore nothing for the Court to enjoin.

Defendants also respectfully resubmit that even if the contract were to continue, this Court could not enjoin or set aside the contract because the vendor is not a party to this litigation. *See, e.g.*, *Nat. Res. Def. Council v. Kempthorne*, 539 F. Supp. 2d 1155, 1185 (E.D. Cal. 2008) ("It is well-settled that in an action to set aside a contract, all parties to the contract must be present."); *Kescoli v. Babbitt,* 101 F.3d 1304, 1310 (9th Cir. 1996) (where the plaintiff's action would affect agreements to which tribes were parties, tribes were necessary pursuant to Rule 19); *see also* Fed. R. Civ. P. 19 (providing that necessary parties claim an interest in the subject of the action such that disposing of the action in their absence may impair their ability to protect their interests). Here, the vendor "claims an interest relat[ed] to subject of the action"—the Purchase Order for the media buys—such that "disposing of the action in [its] absence may" "impair or impede [its] ability to protect [its] interest." Fed. R. Civ. P. 19(a)(1)(B). The vendor's interests would be affected, for example, if the government were precluded from paying its debts to the vendor pursuant to any court order. Therefore, if the Court were to contemplate the relief Plaintiff requests, the vendor would be a necessary party.

Accordingly, Plaintiff is not likely to succeed on the merits of its APA claim.

## IV. The Remaining Preliminary Injunction Factors Favor the Government

Plaintiff has not shown that "the balance of equities and consideration of the public interest" favor a preliminary injunction. *Winter*, 555 U.S. at 32. Where, as here, the Government is the defendant, these factors "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009). The Government has long ceased the conduct that was the basis for Plaintiff's TRO—the airing of the challenged ads with DHS-appropriated funds in the final weeks before the midterm elections. Now, the midterm elections are over. The next relevant election is two years away. And the novel theory Plaintiff currently advances regarding the use of White House staff time is not only legally insufficient to support *ultra vires* review, but would also work a significant intrusion into the functioning of a coordinate branch of Government. In addition, to the extent Plaintiff's requested

relief would preclude private parties from airing these ads with their own funds, that relief would raise grave First Amendment concerns. These factors favor the Government.

At bottom, Plaintiff's challenge seeks to enforce specific appropriations laws, but Congress has provided adequate alternative mechanisms to enforce those laws, *see, e.g.*, 31 U.S.C. § 1351 (Reports on violations of the Antideficiency Act). Plaintiff has not clearly shown that the public interest favors allowing it, as a private party, to vindicate the interests it asserts through this litigation. *See Thurston*, 696 F. Supp. at 683 (holding that "[n]o private right of action for declaratory, mandatory or injunctive relief exists under [the Antideficiency Act]" because the Act "explicitly sets forth procedures for reporting violations . . . and enforcing its provisions"); *Feldman*, 315 F. Supp. 3d at 305 (Jackson, K.B., J.) (same). Moreover, given the historic centrality of the political branches in decisions concerning the allocation of federal funds, *cf. Lincoln v. Vigil*, 508 U.S. 182, 192 (1993), and Congress's authority to oversee federal agencies, disputes in this area are better left to the political process than the courts.

## CONCLUSION

For the reasons above, the Court should deny Plaintiff's Motion for a Preliminary Injunction.

Dated: November 13, 2026

Respectfully submitted,

JONATHAN D. GUYNN
*Acting Assistant Attorney General*
*Civil Division*

JOSEPH E. BORSON
NOAH T. KATZEN
*Assistant Branch Directors*

*<u>/s/ Elisabeth Neylan</u>*
Elisabeth J. Neylan (N.Y. Bar Reg. Number 6125736)

William I. Friedman (N.Y. Bar Reg.
Number 4039509)
*Trial Attorneys*
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20530
Telephone: (202) 616-3519
Email: elisabeth.j.neylan@usdoj.gov

*Attorneys for the United States*