**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DEMOCRATIC NATIONAL COMMITTEE,<br><br>*Plaintiff*,<br><br>v.<br><br>DONALD J. TRUMP, *et al.*,<br><br>*Defendants*. | Civil Action No. 26 - 3506 (LLA) |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Democratic National Committee (the "DNC") brings this action against President Donald J. Trump, the White House Office, the Office of Management and Budget ("OMB"), and the U.S. Department of Homeland Security ("DHS") (collectively, "Defendants"). ECF Nos. 1, 29. The DNC alleges that OMB and DHS acted contrary to law and in excess of statutory authority, in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*, and that President Trump and the White House Office acted *ultra vires*, by using public funds to finance a national propaganda campaign to influence the November 2026 midterm elections in contravention of the Consolidated Appropriations Act, 2026, Pub. L. No. 119-75, § 718, 140 Stat. 173 (2026); the Purpose Statute, 31 U.S.C. § 1301(a); and the Anti-Deficiency Act, 31 U.S.C. §§ 1341(a), 1517. ECF No. 1 ¶¶ 184-200; ECF No. 29 ¶¶ 257-273. On October 28, 2026, less than a week before the November 3, 2026 midterm elections, the court issued a temporary restraining order ("TRO") staying OMB's apportionment of $20 million to develop and air certain challenged ads and prohibiting OMB and DHS from further developing and airing those ads. ECF No. 26, at 34-35. After the elections, the DNC filed an "amended" complaint, ECF

No. 29, and it moved for a preliminary injunction and a stay pursuant to Section 705 of the APA, 5 U.S.C. § 705, ECF No. 31. For the reasons explained below, the court construes the DNC's "amended" complaint as a supplemental complaint and denies the DNC's motion for a preliminary injunction and a stay.

## I. LEGAL BACKGROUND

The Appropriations Clause of the U.S. Constitution provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. "Textually, the command is unmistakable—'no money can be paid out of the Treasury unless it has been appropriated by an act of Congress.'" *Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 425 (2024) (quoting *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937)). "Decisions of the Supreme Court and [the D.C. Circuit] have strictly enforced the constitutional requirement, implemented by federal statutes, that uses of appropriated funds be authorized by Congress." *U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1342 (D.C. Cir. 2012) (Kavanaugh, J.).

Three such federal statutes are at issue here. First, "[a] core tenet of appropriations law is enshrined" in the Purpose Statute, *id.* at 1348, which provides that "[a]ppropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law," 31 U.S.C. § 1301(a). Next, the Anti-Deficiency Act prohibits any "officer or employee of the United States Government" from "mak[ing] or authoriz[ing] an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation." 31 U.S.C. § 1341(a)(1)(A). The Anti-Deficiency Act further prohibits any "officer or employee of the United States Government" from "involv[ing] [the] government in a contract or obligation for the payment of money before an appropriation is made unless authorized by law." *Id.*

§ 1341(a)(1)(B). Finally, the Consolidated Appropriations Act specifies that "[n]o part of any appropriation . . . shall be used directly or indirectly, including by private contractor, for publicity or propaganda purposes within the United States not heretofore authorized by Congress." § 718, 140 Stat. at 495.[1]

Once Congress appropriates funding, the Anti-Deficiency Act requires the President to apportion that funding. *See* 31 U.S.C. § 1513(b)(1). The President has delegated that authority to OMB. *See* Exec. Order No. 6,166 (June 10, 1933), as amended by Exec. Order No. 12,608, 52 Fed. Reg. 34617 (Sep. 9, 1987) ("The functions of making, waiving, and modifying apportionments of appropriations are transferred to [OMB]."). OMB, in turn, must apportion funds in accordance with Congress's instructions. *See Nat'l Endowment for Democracy v. United States*, 795 F. Supp. 3d 63, 66 (D.D.C. 2025) ("After Congress appropriates funding, [OMB] 'apportions' those funds by setting a schedule to determine when they will become available to the relevant executive agency[.]"); *Citizens for Resp. & Ethics in Wash. v. Off. of Mgmt. & Budget* ("*CREW*"), 791 F. Supp. 3d 29, 37 (D.D.C. 2025) ("The decisions about how to allocate funds are called 'apportionments,' and they are used to ensure that the Executive Branch does not spend more or less than Congress appropriated."), appeal docketed, No. 25-5267 (D.C. Cir. argued Oct. 13, 2026).

"An apportionment is legally binding." Off. of Mgmt. & Budget, Exec. Off. of the President, OMB Circular No. A-11, Preparation, Submission, and Execution of the Budget § 120.1 (2025). "[O]bligations and expenditures (disbursements) that exceed an apportionment are a

[1] Congress has prohibited the use of federal funds for "publicity or propaganda purposes" in annual appropriations bills since 1951. *See* Labor-Federal Security Appropriation Act, Pub. L. No. 82-134, § 702, 65 Stat. 209, 223 (1951) ("No part of any appropriation contained in this Act shall be used for publicity or propaganda purposes not heretofore authorized by the Congress.").

violation of, and are subject to reporting under, the Antideficiency Act," *id.*, which prohibits any "officer or employee of the United States Government" from "mak[ing] or authoriz[ing] an expenditure or obligation exceeding an apportionment," 31 U.S.C. § 1517(a)(1). Violations of that prohibition can result in administrative discipline, including removal from office, 31 U.S.C. § 1518, as well as criminal penalties of up to two years of imprisonment and a $5,000 fine, *id.* § 1519.

## II. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A. Appropriation and Apportionment of DHS Funds

In July 2025, Congress enacted a budget reconciliation package known as the "One Big Beautiful Bill Act" ("OBBBA"). *See* Reconciliation Act, Pub. L. No. 119-21, 139 Stat. 72 (2025). As relevant here, Section 90004 of the OBBBA, titled "Border Security, Technology, and Screening," § 90004, 139 Stat. 359 (capitalization altered), appropriated $6,168,000,000 to Customs and Border Protection ("CBP"), an agency within DHS, for the following expenditures:

> (1) Procurement and integration of new nonintrusive inspection equipment and associated civil works, including artificial intelligence, machine learning, and other innovative technologies, as well as other mission support, to combat the entry or exit of illicit narcotics at ports of entry and along the southwest, northern, and maritime borders.
>
> (2) Air and Marine operations' upgrading and procurement of new platforms for rapid air and marine response capabilities.
>
> (3) Upgrades and procurement of border surveillance technologies along the southwest, northern, and maritime borders.
>
> (4) Necessary expenses, including the deployment of technology, relating to the biometric entry and exit system under section 7208 of the Intelligence Reform and Terrorism Prevention Act of 2004 (8 U.S.C. 1365b).
>
> (5) Screening persons entering or exiting the United States.

> (6) Initial screenings of unaccompanied alien children (as defined in section 462(g) of the Homeland Security Act of 2002 (6 U.S.C. 279(g))), consistent with the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (Public Law 110-457; 122 Stat. 5044).
>
> (7) Enhancing border security by combating drug trafficking, including fentanyl and its precursor chemicals, at the southwest, northern, and maritime borders.
>
> (8) Commemorating efforts and events related to border security.

§ 90004(a), 139 Stat. 359.[2]

The report of the House Budget Committee accompanying the OBBBA described the "commemorative events" category as "honoring meritorious contributions and achievements related to border security, including events recognizing victims of crimes." H.R. Rep. No. 119-106, at 792 (2025). The report specified that "[e]xamples of such events include Line-of-Duty death memorials, Department or agency anniversaries, and commendation ceremonies." *Id.* The report further explained that appropriated funding for that category "can be used for venue and setup, program materials, commemoratives (e.g., plaques, flags, awards); and personnel and services (e.g., honor guard, officiants, security)." *Id.*

In November 2025, OMB apportioned $500,000 to CBP for commemorative events pursuant to Section 90004 of the OBBBA. *See* ECF No. 3-4, at 58. Almost a year later, in September 2026, CBP submitted a request to OMB to "make an additional $20 million available for obligation" for the commemorative-events category. ECF No. 9-1 ¶¶ 3-4. The additional funding would come from funds obligated on a different line item for fiscal year 2027. *Id.*; *see* ECF No. 3-4, at 58. OMB approved the request the same day, ECF No. 9-1 ¶ 5, and increased the

---

[2] The $6,168,000,000 appropriation was designated "for fiscal year 2025" but "to remain available until September 30, 2029." § 90004(a), 139 Stat. 359.

CBP line item for commemorative events by $20 million, *see* ECF No. 3-4, at 60 (designating $20,500,000 for "OBBBA – Commerative [sic] Events").

DHS thereafter issued a $20 million purchase order to Lepugh, Inc. (doing business as "LMD Agency, Inc." or "LMD"), an advertising agency, for a "national media campaign." ECF No. 3-4, at 72-73 (capitalization omitted); *see* ECF No. 9-2 ¶ 3. DHS acknowledged that funding for that purchase order came from appropriations pursuant to Section 90004 of the OBBBA, designated for "[c]ommemorating efforts and events related to border security." ECF No. 9-2 ¶ 4 (alteration in original). The campaign entailed "placing national media buys"—that is, purchasing airtime to display advertisements—"with media outlets and programs on a national level using a combination of morning and evening cable news, 6-10am dayparts, 4-11pm dayparts, media programing through FOX, CNN, MSNOW, and NEWSMAX, Sunday shows including broadcasts with CBS, ABC, and NBC, and football commercial buys with CBS, ABC, ESPN, and other channels." *Id.* ¶ 5. The purchase order's "period of performance is September 20, 2026, through September 19, 2027, or until all deliverables and media placements have occurred." *Id.* ¶ 7; *see* ECF No. 3-4, at 71 (denoting the contract end date as "Sep 19, 2027").

**B. The First Wave of Advertisements**

The White House Office purportedly developed "at least 13 campaign-style ads" using public dollars (collectively, the "first wave" of ads), which were then shared with LMD for national distribution under the $20 million purchase order. ECF No. 1 ¶ 125. Of those ads, five aired on television: (1) "The Country He Loves" or "Love Me" ad, (2) the "Maduro" ad, (3) the "Final Battle" ad, (4) the "Mount Rushmore" ad, and (5) the "American Military Power" ad. *Id.* ¶¶ 59-123. Beginning in September 2026, these ads were broadcasted "across the country," including "in media markets where competitive congressional elections [were] being held." *Id.*

¶¶ 55, 57. The ads were also aired "across a range of television networks, including ABC, NBC, MS Now, CBS, CNN, Fox News, and Newsmax," and "targeted various television programming, including NFL and college football, news programs including 'Meet the Press' and 'Good Morning America,' and entertainment shows including 'Jimmy Kimmel Live!,' Saturday Night Live, and Dancing with the Stars." *Id.* ¶¶ 55-56.

***"The Country He Loves" or "Love Me" Ad.*** This ad began airing on television on September 23, 2026. *Id.* ¶ 59. The video features a montage of footage and photos of President Trump, accompanied by the song "Love Me" by JSMN, which repeats the lyrics "Love me, love me, love me, love me." *Id.* ¶¶ 60-64. The montage is overlaid with text stating that "America will never be a communist country" and includes a voiceover from President Trump declaring that "together we will defeat communism, socialism, and Marxism in America." *Id.* ¶ 61. The ad concludes with Dana White, president of the Ultimate Fighting Championship ("UFC"), describing President Trump as "the toughest, most resilient person [he has] ever met," followed by a disclosure stating that the ad was "Paid for by the U.S. Government." *Id.* ¶¶ 65, 67. A copy of the video without that disclosure was posted on the official White House YouTube channel on September 11. *Id.* ¶ 69.

***"Maduro" Ad.*** This ad began airing on television on September 24 in multiple versions ranging between thirty and sixty seconds long. *Id.* ¶¶ 74-75. The ad focuses on the United States' military operation to capture Venezuelan President Nicolás Maduro. *Id.* ¶ 74. The ad cuts between footage of President Maduro giving a speech to "come get him" with footage of Administration officials announcing the operation's success, including President Trump describing the military action as "one of the most stunning and effective" in American history. *Id.* ¶¶ 76-78. The end of the ad features Secretary of State Marco Rubio stating that "people need to understand that this is

not a President that just talks and does letters and press conferences," and warning against "play[ing] games while this President is in office." *Id.* ¶ 79. The ad concludes with a "Paid for by the U.S. Government" disclosure. *Id.* ¶ 80. A copy of the video without that disclosure was posted on the President Trump's Truth Social account on September 25. *See id.* ¶ 81.

***"Final Battle" Ad.*** This ad began airing on television over the weekend of September 26 and 27. *Id.* ¶ 86. The ad features black-and-white footage of President Trump walking down a hallway as his voiceover promises to "demolish the Deep State," "cast out the communists, Marxists, and fascists," "rout[] the fake news media," and "liberate America from these villains once and for all." *Id.* ¶¶ 88-89. The DNC alleges that the ad "is nearly identical to a political ad that President Trump used during his 2024 presidential election campaign," but for the ad's ending. *Id.* ¶ 92. Whereas the 2024 campaign ad concluded with graphics saying "Join President Trump's Fight for America" and displaying President Trump's 2024 campaign logo, the "Final Battle" ad ends with a "Paid for by the U.S. Government" disclosure. *Id.* ¶¶ 93-94.

***"Mount Rushmore" Ad.*** This ad began airing on television on September 27. *Id.* ¶ 100. The ad features remarks that President Trump delivered on July 3, 2026 at Mount Rushmore alongside footage of the event. *Id.* ¶¶ 102-104. In his remarks, President Trump describes the United States as "the most successful, most accomplished, most exceptional nation ever to exist in human history" and proclaims that "[t]his is only the beginning of the golden age of America." *Id.* ¶ 104. The ad concludes with a "Paid for by the U.S. Government" disclosure. *Id.* ¶ 105. A copy of the video without that disclosure was posted on the White House's official YouTube channel on September 9. *Id.* ¶ 106.

***"American Military Power" Ad.*** This ad began airing on television on September 30. *Id.* ¶ 111. The ad focuses on the United States' military operation in Iran. *Id.* ¶¶ 112-113. The ad

includes footage of military action interspersed with clips of President Trump, along with a voiceover from Secretary of Defense Pete Hegseth declaring that President Trump has "reminded the world, as he has time and time again, being an American means something unbreakable." *Id.* ¶¶ 114, 116. The ad concludes with a "Paid for by the U.S. Government" disclosure. ECF No. 29 ¶ 121. A copy of the video without that disclosure was posted on the White House's official YouTube channel on September 11. ECF No. 1 ¶ 119.

The ads that were shared on LMD but went unaired include (1) a "UFC 250" ad featuring a UFC fight held at the White House; (2) a "King of the Jungle" ad showing a lion hunting in the wild and disparaging President Trump's "perceived political enemies"; and (3) a "Resilience" ad highlighting various events in President Trump's life, including the announcement of his presidential candidacy in 2015 and the assassination attempt during the 2024 election campaign. *Id.* ¶¶ 124-135. The unaired ads also include a "God Made Trump" ad, which was originally "made by President Trump's supporters during the 2024 Presidential election" and "previously shown during the Republican Midterm Convention." *Id.* ¶ 129. Like the aired ads, each unaired ad concludes with a disclosure stating that it was "Paid for by the U.S. Government." *Id.* ¶ 130.

### C. Continued Public Funding of the First Wave of Advertisements

On October 5, 2026, President Trump announced on Truth Social that he would pay for the ads himself and "with the money [he] raised for MAGA[] Inc." because the "Radical Left [was] upset" that he was "paying for [the ads] with U.S.A. money." ECF No. 3-4, at 45; *see* ECF No. 1 ¶ 157. The DNC identifies MAGA Inc. as a super PAC closely affiliated with President Trump, that spent "hundreds of millions of dollars to support Republican candidates and oppose Democratic candidates in the November 2026 election[s]." ECF No. 1 ¶¶ 5, 49, 172, 182.

Despite President Trump's commitment, the ads continued to air with the "Paid for by the U.S. Government" disclosure. *Id.* ¶¶ 159-161. For example, on October 6, the "Final Battle" ad aired on a national broadcast of *Dancing with the Stars* on ABC and Disney+. *Id.* ¶ 160. That same day, OMB apportioned $1 million to the CBP line item for commemorative events for fiscal year 2027. ECF No. 9-1 ¶ 9. Then, on October 7, the "Final Battle" ad aired again during a broadcast of *Fox & Friends*. ECF No. 1 ¶ 161. All told, the first-wave ads continued to air on national television through October 12. *See* ECF No. 26, at 13; *see also* Notice, *Common Cause v. Dep't of Homeland Sec.*, No. 26-CV-8882 (S.D.N.Y. Oct. 12, 2026), ECF No. 43.

### D. The Second Wave of Advertisements

The White House Office purportedly developed a second set of "propaganda ads" that were posted on the White House's official YouTube channel from mid to late October 2026. ECF No. 29 ¶¶ 174-175. This second set of ads is comprised of six videos: (1) the "Every Democrat Voted Against No Tax on Tips" ad, (2) the "$5,000 to Americans" ad, (3) the "President Trump's Second Term: Stephen Miller" ad, (4) the "Man in the Arena" ad, (5) the "Cost of Socialism" ad, and (6) the "Retribution Through Success" ad (collectively, the "second wave" of ads). *Id.* ¶¶ 182-235. Of these six ads, MAGA Inc. paid for three to air on television. *Id.* ¶ 178.

***"Every Democrat Voted Against No Tax on Tips" Ad.*** This ad was uploaded to the White House's official YouTube channel on October 12. *Id.* ¶¶ 176, 182. The ad features photographs of Democratic lawmakers Congresswoman Alexandria Ocasio-Cortez, Senator Jon Ossoff, Senator Chuck Schumer, Congresswoman Nancy Pelosi, and Senator Elizabeth Warren, as a voiceover of President Trump states: "They voted against no tax on tips. They voted against no tax on overtime. They voted against no tax on Social Security." *Id.* ¶ 183. The ad concludes with a clip of Congressman Hakeem Jeffries saying, "Every single Democrat in Congress voted against

your tax cuts." *Id.* ¶ 185. The ad began airing on television on October 16 with a disclosure that it was paid for by MAGA Inc. *Id.* ¶ 188.

***"$5,000 to Americans" Ad.*** This ad was uploaded to the White House's official YouTube channel on October 12. *Id.* ¶¶ 176, 193. The ad features President Trump looking directly at the camera and saying, "I'm going to give all adult citizens in the United States $5,000." *Id.* ¶ 194. He promises: "If the Democrats win, you will have an economic depression. If the Republicans win, you will each have $5,000 in your pocket and economic success for our country like we have never ever seen before." *Id.* The ad began airing on television on October 29 with a disclosure that it was paid for by MAGA Inc. *Id.* ¶ 197.

***"President Trump's Second Term: Stephen Miller" Ad.*** This ad was uploaded to the White House's official YouTube channel on October 12. *Id.* ¶¶ 176, 202. The ad displays a montage of clips of President Trump's second term, including President Trump speaking at rallies and shaking hands with world leaders, while a voiceover from then-White House Deputy Chief of Staff for Policy Stephen Miller praises the President for solving problems "that plagued this nation for decades, generations, or even longer." *Id.* ¶¶ 203-204. The ad began airing on television on October 20 with a disclosure that it was paid for by MAGA Inc. *Id.* ¶ 206.[3]

---

[3] In its reply brief and at oral argument, the DNC identifies at least three additional ads that were uploaded to the White House's office YouTube channel after the November 2026 elections. *See* ECF No. 34, at 17-18; ECF No. 34-2 ¶ 20; *see also* ECF No. 35, at 13:4-13:13, 23:17-23:25. Among those new ads is a second "Stephen Miller" ad announcing Stephen Miller's appointment as White House Chief of Staff. *See* ECF No. 34, at 18; ECF No. 34-2 ¶ 20. This second "Stephen Miller" uses the same audio as the first "Stephen Miller" ad aired in October 2026 but features different visuals. ECF No. 34, at 18. The DNC acknowledges that these additional ads are beyond the scope of their complaint and request for a preliminary injunction. *See* ECF No. 35, at 13:4-13:13.

***"Man in the Arena" Ad.*** This ad was uploaded to the White House's official YouTube channel on October 12. *Id.* ¶¶ 176, 211. The ad also displays a montage of clips of President Trump's second term but features a voiceover reading a passage of President Theodore Roosevelt's 1910 "Citizenship in a Republic" speech that praises "the strong man" in the arena, whose face is marred by dust and sweat and blood." *Id.* ¶ 212.

***"Cost of Socialism" Ad.*** This ad was uploaded to the White House's official YouTube channel on October 25. *Id.* ¶ 219. The ad asserts that the Democratic Socialists of America's "proposed agenda" will lead to higher mortgage rates, fewer jobs, and greater public safety fears. *Id.* ¶ 220. The ad concludes by saying, "The decisions we make today will shape tomorrow, and the cost of getting it wrong could be irreversible," and displaying a White House logo that states "President Donald J. Trump." *Id.* ¶¶ 220, 222.

***"Retribution Through Success" Ad.*** This ad was uploaded to the White House's official YouTube channel on October 26. *Id.* ¶ 227. The ad again displays a montage of clips of President Trump's second term but also includes footage of President Trump's 2024 presidential campaign, overlaid by the chorus of "Somewhere I Belong" by Linkin Park. *Id.* ¶¶ 228, 230.

### E. This Litigation

The DNC is the national committee responsible for the day-to-day operations of the Democratic Party. ECF No. 1 ¶ 8; *see* 52 U.S.C. § 30101(14). The DNC's membership includes Democratic candidates running for office, as well as voters and volunteers for Democratic campaigns. *See* ECF No. 1 ¶ 4; ECF No. 3-5 ¶¶ 4-7, 13, 15, 18. In support of its mission "to elect[] Democratic candidates in federal, state, and local elections across the country," the DNC "solicits contributions and makes expenditures—both independently of and in coordination with

individual candidates—to support Democratic campaigns and committees." ECF No. 1 ¶ 8; ECF No. 29 ¶ 8.

The DNC filed suit against Defendants on October 7, 2026, challenging Defendants' unlawful use of appropriated funds to develop and air the first wave of ads. ECF No. 1. Two days later, on October 9, the DNC moved for a TRO, ECF No. 3, and the court ordered expedited briefing on the motion, Oct. 9, 2026 Minute Order. In its opposition brief filed on October 11, Defendants represented that the Administration would no longer use federal funds to air the challenged ads moving forward. ECF No. 9, at 1. Defendants included an October 10 declaration from Holly Mehringer, DHS's "Senior Official Performing the Duties of the Chief Financial Officer," attesting "to the best of [her] knowledge and belief" that DHS had "no plans to make any additional media buys under the [purchase order] or to renew the [o]rder." ECF No. 9-2 ¶¶ 1, 10. The motion was fully briefed on October 13, ECF Nos. 3-1, 9, 10, and the court heard oral argument on the motion on October 15, Oct. 15, 2026 Minute Entry. The DNC subsequently filed three status reports informing the court of the second wave of ads and requesting that any emergency relief extend to those ads. *See* ECF Nos. 14, 21, 25. The DNC also submitted a fourth status report regarding discovery updates from parallel proceedings in the U.S. District Court for the Southern District of New York indicating that "[White House Executive Office of the President ("EOP")] staff compiled" at least some of the first or second wave of ads. ECF No. 24, at 2.[4]

On October 28, the court issued a memorandum opinion and order granting the DNC's motion for a TRO. ECF No. 26. The court concluded that the DNC had established a substantial likelihood of success on the merits of its APA claim against OMB and DHS and declined to reach

---

[4] The White House Office and OMB are both components within the EOP. ECF No. 1 ¶¶ 10-11; *see Sculimbrene v. Reno*, 158 F. Supp. 2d 26, 29 (D.D.C. 2001).

the *ultra vires* claim against the White House Office. *See id.* at 15-16. Accordingly, the court tailored its relief by staying OMB's apportionment of $20 million to develop and air the first-wave ads and prohibiting OMB and DHS from further developing and airing the five first-wave ads that had already aired on television. *See id.* at 34. Defendants submitted a status report on October 30 confirming their compliance with the TRO. ECF No. 27.

The DNC then filed an "amended" complaint on November 2, adding new allegations about the second-wave ads, which were posted on the White House's official YouTube channel and aired on television by MAGA Inc. after the DNC had filed its original complaint on October 7. ECF No. 29.[5] That same day, the parties filed a joint status report in which the DNC confirmed its intent to seek a preliminary injunction. ECF No. 30. The next day, the court extended the TRO through November 25 for good cause pursuant to Federal Rule of Civil Procedure 65(b)(2) to allow the parties time to brief the DNC's motion for a preliminary injunction and for the court to consider the motion. Nov. 3, 2026 Minute Order. The DNC's motion for a preliminary injunction and a

---

[5] The parties dispute whether the court should construe the DNC's "amended" complaint, ECF No. 29, as truly amending the original complaint or merely supplementing it, *compare* ECF No. 33, at 12 (arguing that the DNC both "amended and supplemented its [c]omplaint"), *with* ECF No. 34, at 14-15 (asking the court to construe the amended complaint as a supplemental complaint); *see also* ECF No. 36, at 1-2. For purposes of this opinion, the court will exercise its discretion to treat the filing as a supplemental complaint, *nunc pro tunc*, because the filing only adds allegations of events that occurred after the original complaint was filed and Defendants offer no reason why doing so would create any undue delay or prejudice, *see* Fed. R. Civ. P. 15(d) (providing that a court "may . . . permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented"); *Hall v. Cent. Intel. Agency*, 437 F. 3d 94, 101 (D.C. Cir. 2006) (holding that motions for leave to file supplemental pleadings should be "freely granted" so long as doing so "will not cause undue delay or trial inconvenience, and will not prejudice the rights of any of the other parties to the action (quoting 6A Charles Alan Wright et al., Federal Practice and Procedure § 1504 (2d ed. 1990))); *see also Univ. of Colo. Health at Mem'l Hosp. v. Becerra*, No. 14-CV-1220, 2022 WL 2191690, at 36-37 & n.15 (D.D.C. June 17, 2022) (explaining that the district court may "treat[] [a] mislabeled amended complaint as a supplemental complaint, *nunc pro tunc*" (citation omitted)).

stay is now ripe, ECF Nos. 31-1, 33, 34, and the court heard oral argument on the motion on November 19, Nov. 19, 2026 Minute Entry.

### F. Parallel Litigation in the Southern District of New York

On the same day that the DNC filed this suit, Common Cause and other plaintiffs (collectively, the "Common Cause plaintiffs") filed suit in the Southern District of New York against DHS, DHS Secretary Markwayne Mullin, OMB, OMB Director Russell Vought, the EOP, and then-White House Chief of Staff Susie Wiles (collectively, the "defendants"). *See* Compl., *Common Cause*, No. 26-CV-8882 (S.D.N.Y. Oct. 7, 2026), ECF No. 1. Like the DNC, the Common Cause plaintiffs challenge the use of federal funds appropriated to DHS to pay for the ads, which they claim are propaganda. *See id.*

The next day, on the evening of October 8, the Common Cause plaintiffs filed a motion for a TRO and a stay under Section 705 of the APA. Mot., *Common Cause*, No. 26-CV-8882 (S.D.N.Y. Oct. 8, 2026), ECF No. 25. The next morning, on October 9, the district court held an initial conference on the motion and ordered expedited briefing. *See* Order, *Common Cause*, No. 26-CV-8882 (S.D.N.Y. Oct. 9, 2026), ECF No. 33. In support of their opposition to the TRO, the defendants included the same declaration from Ms. Mehringer attesting that DHS would not purchase any additional airtime beyond October 11. *See* Decl., *Common Cause*, No. 26-CV-8882 (S.D.N.Y. Oct. 10, 2026), ECF No. 38. On October 11, upon the conclusion of briefing, the district court entered a TRO effective as of 6:45 p.m. that day. Order, *Common Cause*, No. 26-CV-8882 (S.D.N.Y. Oct. 9, 2026), ECF No. 41.

After the TRO went into effect, the Common Cause plaintiffs notified the district court that some of the challenged ads had continued to air on national television on October 12. Notice, *Common Cause*, No. 26-CV-8882 (S.D.N.Y. Oct. 12, 2026), ECF No. 43. The district court

thereafter permitted the Common Cause plaintiffs to proceed with limited discovery in connection with their forthcoming preliminary injunction motion, set a briefing schedule on the motion, and extended the TRO through November 8. Order, *Common Cause*, No. 26-CV-8882 (S.D.N.Y. Oct. 14, 2026), ECF No. 53. On October 21, the Common Clause plaintiffs submitted a motion to compel, which included as exhibits the defendants' responses to discovery requests stating that "EOP staff compiled" some of the first and second wave of ads. Mot., *Common Cause*, No. 26-CV-8882 (S.D.N.Y. Oct. 21, 2026), ECF No. 75. Upon consent motions from the parties, the district court extended the TRO through November 20. Order, *Common Cause*, No. 26-CV-8882 (S.D.N.Y. Oct. 22, 2026), ECF No. 80.

On October 23, the Common Cause plaintiffs filed a motion for an expanded TRO, asking the district court to further enjoin the second-wave ads. Mot., *Common Cause*, No. 26-CV-8882 (S.D.N.Y. Oct. 23, 2026), ECF No. 75. The defendants opposed the motion, arguing in part that the Common Cause plaintiffs could not obtain injunctive relief based on "new facts and claims that were not alleged in their Complaint" and "should be required to amend their Complaint." Opp'n, *Common Cause*, No. 26-CV-8882 (S.D.N.Y. Oct. 27, 2026), ECF No. 86, at 6. The Common Cause plaintiffs filed an amended complaint the next day. Am. Compl., *Common Cause*, No. 26-CV-8882 (S.D.N.Y. Oct. 28, 2026), ECF No. 90. On October 30, the district court granted the motion and entered an expanded TRO that prohibited the defendants from disseminating three of the six second-wave ads that, in the court's view, contained "purely partisan" content: (1) the "Every Democrat Voted Against No Tax on Tips" ad, (2) the "$5,000 to Americans" ad, and (3) the "Cost of Socialism" ad. ECF No. 31-2, at 36:14; *see* Order, *Common Cause*, No. 26-CV-8882

(S.D.N.Y. Oct. 30, 2026), ECF No. 101.[6] The expanded TRO ordered the defendants to remove the three ads from official government websites, including the White House's official YouTube channel, and was set to expire on November 13. Order, *Common Cause*, No. 26-CV-8882 (S.D.N.Y. Oct. 30, 2026), ECF No. 101, at 3.

On November 20, after the conclusion of briefing on the Common Cause plaintiffs' motion for a preliminary injunction and following a hearing on the motion, the district court denied the motion based on a lack of irreparable harm given that the November 2026 midterm elections had concluded. *See* ECF No. 36-1. Because the lack of irreparable harm provided a sufficient basis for denying preliminary relief, the district court declined to consider the other requirements for obtaining a preliminary injunction. *See id.* at 26.

## III. LEGAL STANDARDS

### A. Preliminary Injunction

A preliminary injunction is "an extraordinary remedy that should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (quoting *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004)). To receive a preliminary injunction, the plaintiff must show (1) "that [they] [are] likely to succeed on the merits," (2) "that [they] [are] likely to suffer irreparable harm in the absence of preliminary relief," (3) "that the balance of equities tips in [their] favor," and (4) "that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*,

---

[6] Although the Southern District of New York did not individually analyze the other three second-wave ads (the "President Trump's Second Term: Stephen Miller" ad, the "Man in the Arena" ad, and the "Retribution Through Success" ad), the court observed that the Common Clause plaintiffs' "broad and far reaching" proposed injunction created "difficult line drawing" problems. ECF No. 31-2, at 32:2-32:7.

555 U.S. 7, 20 (2008). Where, as here, the government is the opposing party, the third and fourth factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

### B. Stay Under Section 705 of the APA

The APA permits a court reviewing agency action to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings" if it is "necessary to prevent irreparable injury." 5 U.S.C. § 705. The standard for an administrative stay is substantially the same as the standard for a preliminary injunction. *See Nken*, 556 U.S. at 433-34. Because the public is "generally entitled to the prompt execution" of final agency orders, a stay "is not a matter of right, even if irreparable injury might otherwise result to the [plaintiff]." *Id.* at 427 (quoting *Virginian Ry. Co. v. United States*, 272 U.S. 658, 672 (1926)).

## IV. DISCUSSION

The court concludes that the DNC has not carried its burden of showing irreparable harm, which is sufficient to deny the DNC's motion for a preliminary injunction or a stay. *See Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 ("A movant's failure to show any irreparable harm is . . . grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief."); *see, e.g.*, *Havens v. U.S. Dep't of Educ.*, No. 26-CV-816, 2026 WL 3548605, at *9 (D.D.C. Nov. 18, 2026) ("[The movants] have not carried their burden of showing irreparable harm in the absence of a preliminary injunction . . . That is a sufficient basis to deny their motion."); *Centerline Logistics Corp. v. U.S. Dep't of Lab.*, No. 26-CV-2773, 2026 WL 2415797, at *9 (D.D.C. Aug. 18, 2026) ("[The] [movants]' inability to establish irreparable harm is sufficient to preclude the emergency-relief of a preliminary injunction."); *Sierra Club v.*

*Env't Prot. Agency*, 793 F. Supp. 3d 158, 166 (D.D.C. 2025) ("Because [the] [movants] have not clearly established irreparable harm, the Court will deny their motion without considering the other preliminary injunction factors."); *Corp. for Pub. Broad. v. Fed. Emergency Mgmt. Agency*, 792 F. Supp. 3d 67, 75 (D.D.C. 2025) ("The Court's analysis begins and ends with [the movant's] failure to meet the high bar for showing irreparable harm.").[7]

The D.C. Circuit has emphasized that "'the basis of injunctive relief in the federal courts has always been irreparable harm,'" meaning that "[a] movant's failure to show any irreparable harm is therefore grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (quoting *Sampson v. Murray*, 415 U.S. 61, 88 (1974)). In this way, the Circuit "has set a high standard for irreparable injury." *Id.* First, the injury "must be both certain and great," "actual and not theoretical," and "of such *imminence* that there is a 'clear and present' need for equitable relief." *Id.* (quoting *Wis. Gas Co. v. Fed. Energy Regul. Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam)). Second, the injury "must be beyond remediation," meaning that "[t]he possibility [of] adequate compensatory or other corrective relief . . . at a later date . . . weighs heavily against a claim of irreparable harm." *Id.* at 297-98 (quoting *Wis. Gas Co.*, 758 F.2d at 674). "Implicit in each of these principles is the further requirement that the movant substantiate the

[7] The parties dispute whether the court should assess the DNC's standing as of October 7, when the DNC originally filed suit, or November 2, when the DNC filed its "amended" complaint. *Compare* ECF No. 33, at 11-13, *with* ECF No. 34, at 12-15. Because the court is treating the DNC's November 2 filing as a supplemental complaint, *see supra* n.5, and because Defendants have not sought dismissal, *see* ECF No. 33, at 11 ("Defendants are not seeking dismissal at this time."); ECF No. 35, at 44:7-44:9 (same), the court relies on its previous standing analysis, *see* ECF No. 26, at 16-19, and denies the DNC's request for preliminary relief based on a lack of irreparable harm, *cf. Univ. of Cal. Student Ass'n v. Carter*, 766 F. Supp. 3d 114, 121 & n.3 (D.D.C. 2025) (leaving the issue of standing "for another day").

claim that irreparable injury is 'likely' to occur." *Wis. Gas Co.*, 758 F.2d at 674. Therefore, "[b]are allegations of what is likely to occur are of no value since the court must decide whether the harm will *in fact* occur." *Id.* In other words, "the movant must show that the alleged harm will directly result from the action which the movant seeks to enjoin." *Id.*

While the court previously found a likelihood of irreparable injury when it granted a TRO on October 28, that irreparable injury was tied to the November 3, 2026 midterm elections, which, at that point, were "less than one week away." ECF No. 26, at 31. At that time, the court found persuasive the DNC's arguments that OMB's and DHS's "use of public dollars to fund a nationwide media campaign" would "caus[e] Democratic campaign prospects to suffer." *Id.* at 27. And the court recognized that there could be "no do over and no redress" once "the November election[s] pass[ed]." *Id.* (quoting *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016)). But the November 2026 midterm elections have come and gone. In recognition of this fact, the DNC now anchors its irreparable injury of competitive harm to two December 2026 congressional runoff elections in Louisiana, additional elections that will take place in 2027, and special elections that "may be called at any time." ECF 31-1, at 38. The DNC further argues that an irreparable injury must exist because, "fundamentally, the 2028 presidential election cycle has begun." *Id.* At this juncture and on this record, the court is unpersuaded.

First, the DNC's most immediate deadline is the December 2026 runoff elections in Louisiana, but the DNC fails to make a "clear showing" that it will suffer any clear, great, and actual injury as to *those* elections absent preliminary relief. *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (quoting *Cobell*, 391 F.3d at 258). Fatal to the DNC's assertions of irreparable competitive harm, *see* ECF No. 31-1, at 37-38; ECF No. 34, at 16-19, is the lack of any connection between the Defendants' purportedly unlawful conduct and the Louisiana runoff elections, *see*

*MediNatura, Inc. v. Food & Drug Admin.*, 998 F.3d 931, 945 (D.C. Cir. 2021) (concluding that the movant failed to demonstrate irreparable harm that is "directly traceable" to the alleged unlawful conduct).

To begin, the DNC's competitive injury is belied by the allegations in their original and supplemental complaints, in which the DNC repeatedly asserts that the challenged ads were "attempt[s] to sway voters *in the weeks leading up to the November 2026 elections*." ECF No. 1 ¶¶ 70, 82, 96, 107, 120, 131 (emphasis added); ECF No. 29 ¶¶ 72, 84, 98, 109, 123, 134, 189, 198, 207, 215, 223, 232 (same). Now that the November 2026 midterm elections have passed—resulting in what the DNC has described as a "historic midterm cycle in which Democrats flipped the U.S. House, took back the U.S. Senate, elected governors, secured trifectas in state legislatures, and delivered victories up and down the ballot"—the DNC offers no reason to expect that the challenged ads will specifically harm its prospects in the Louisiana runoffs. *See Krepp v. Cao*, No. 25-CV-2371, 2026 WL 2209833, at *2 (D.D.C. July 31, 2026) (concluding that "changed circumstances, at minimum, cast doubt on the notion that [the plaintiff's] future experiences . . . will be a carbon-copy of her prior experiences").[8] Notably, although the DNC highlighted that President Trump had urged his supporters to "pretend that [he was] on the ballot" in the November 2026 midterm elections, ECF No. 31-1, at 2 (citing ECF No. 3-4 ¶ 24); *see* ECF No. 35, at 28:154-28:16 (arguing that "[President Trump] told his supporters to pretend he was on the ballot on November 3rd"), the DNC does not identify any similar statements made after those elections, *see* ECF No. 35, at 60:20-61:21, or any statements in connection with the runoff

[8] *Available at* https://perma.cc/V3A8-H9QF.

elections in Louisiana.[9] At bottom, the DNC's generalized representations that "President Trump's brazen use of federal funding continues to pose a severe risk to the DNC's campaign efforts," ECF No. 34-2 ¶ 21, fail to convince the court that any harm will be "both certain and great" as well as "actual and not theoretical," or that the "harm will *in fact* occur," *Wis. Gas Co.*, 758 F.2d at 674.[10]

Next, the DNC's irreparable harm arguments pegged to future elections in 2027 are even further afield. The mere invocation of some "partisan elections in 2027," ECF No. 31-1, at 38, does not satisfy the DNC's burden of "articulat[ing] a tangible injury that is either 'certain and great' or irreparable," *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297. Moreover, none of those forthcoming elections, which are a year away, are imminent. *See, e.g.*, *Reid v. Mayorkas*, 759 F. Supp. 3d 15, 27 (D.D.C. 2024) (finding that harm was "not particularly imminent" when it

---

[9] The court pauses here to address the current status of the challenged ads. None of the second-wave ads are being broadcast on television. As the DNC has represented, "MAGA[] Inc. ceased paying for airtime for the [second-wave] ads as of November 4th." ECF No. 35, at 16:18-16:19. Additionally, the three second-wave ads previously enjoined by the Southern District of New York remain unavailable on the White House's official YouTube channel, even though the TRO concerning those ads has expired. *See* Order, *Common Cause*, No. 26-CV-8882 (S.D.N.Y. Oct. 30, 2026), ECF No. 101, at 3. As to the first-wave ads, Defendants represent that "the Federal Government is no longer using appropriated funds to air the challenged ads." ECF No. 33, at 8. In sum, the first-wave ads and only some of the second-wave ads are now exclusively viewable online, and there is a fundamental difference between content intentionally injected "in[to] media markets where competitive congressional elections are being held," ECF No. 1 ¶¶ 55, 57, and content accessible only by affirmatively navigating to the White House's official YouTube channel.

[10] Indeed, some of the DNC's assertions undercut their irreparable harm arguments. The DNC suggests that even after the November 2026 elections, the White House Office has continued to unlawfully post videos online that "create a competitive advantage for Republicans," such as the second Stephen Miller ad posted on November 6. ECF No. 34, at 18; *see* ECF No. 34-2 ¶ 20 ("New propaganda videos have been developed and published after the November 2026 election, including publicity reels for Secretary of Defense Pete Hegseth and White House Chief of Staff Stephen Miller."). But the DNC expressly claims that it is *not* seeking relief as to those videos at this stage. *See* ECF No. 35, at 13:4-13:8.

"would occur seven months away); *District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 20 (D.D.C. 2020) (noting that "harm that is eight months away may not be sufficiently immediate"). And the DNC's gesture at additional hypothetical "[s]pecial elections" that "may be called at any time," ECF No. 31-1, at 38; *see* ECF No. 34-2 ¶ 21, "is far too speculative to warrant preliminary injunctive relief," *Chaplaincy of Full Gospel Churches*, 454 F.3d at 298.

In arguing otherwise, the DNC points to *League of United Latin American Citizens v. Executive Office of the President* ("*LULAC*"), 780 F. Supp. 3d 135 (D.D.C. 2025), appeal pending, No. 25-5476 (D.C. Cir.), which the DNC characterizes as persuasive authority because the district court there found irreparable harm "more than a year before the general election," ECF No. 31-1, at 37. In that case, various organizations challenged several provisions of an executive order that required documentary proof of citizenship on federal voter registration forms. *LULAC*, 780 F. Supp. 3d at 154. The court determined that the plaintiffs, including the DNC, established a strong likelihood of irreparable harm because the implementation of that executive order would undoubtedly disrupt the plaintiffs' ongoing voter registration and mobilization efforts. *See id.* at 201-02. To be sure, *LULAC* was decided in April 2025, well before the November 2026 elections. But the court found dispositive the "especially acute threat of near-term harm in Arizona because of the looming June [2025] deadline to register to vote in [a] special congressional election in that [s]tate." *Id.* at 201.[11] At the TRO stage of this litigation, the court found *LULAC* to be

---

[11] Moreover, the *LULAC* court relied on D.C. Circuit authority "expressly recogniz[ing] that a 'likely' threat of future enforcement of a documentary proof of citizenship rule suffices to show 'irreparable harm.'" *Id.* at 202 (citing *Newby*, 838 F.3d at 8-9). *Newby* itself involved "hard" voter registration deadlines that came "well before" the November elections. 838 F.3d at 7. And in *Newby*, the plaintiff organizations provided documented evidence that a proof-of-citizenship requirement "substantially limited" a plaintiff organization's ability to register voters. *Id.* at 8 ("A

(*continued on next page*)

persuasive authority because the DNC was similarly alleging acute competitive harm on the eve of the November 2026 midterm elections due to the first-wave ads being broadcast nationwide. *See* ECF No. 26, at 26-27. But, as explained, circumstances have changed. The DNC does not now make a "strong" showing of a disruption to *any* ongoing efforts. *LULAC*, 780 F. Supp. 3d at 201.

Finally, the DNC's argument that the "permanent" nature of electoral campaigns independently justifies preliminary relief, ECF No. 34, at 17, finds no purchase with this court. Such an argument, taken to its logical conclusion, would allow the DNC to seek preliminary relief in perpetuity because it could always point to the occurrence of *some* election *somewhere* in the country. Indeed, the DNC suggests that it would be reductive for the court to consider "particular election dates" because "American politics have long featured a 'permanent campaign.'" *Id.* But that directly contravenes the longstanding practice of benchmarking the timeline for irreparable harm, including in the very cases on which the DNC relies. *See, e.g.*, *Newby*, 838 F.3d at 7 ("The November 8 elections loom, and the registration cutoff for using the federal registration form comes well before that: 21 days before in Kansas; 30 days before in Georgia; and 15 days before in Alabama."); *LULAC*, 780 F. Supp. 3d at 201 ("This impending irreparable harm is particularly salient for the [plaintiffs] operating in Arizona, which has an upcoming federal voter registration deadline of June 16, 2025."). Thus, the mere existence of elections in a vacuum, untethered to any imminent harm, is not enough to warrant the "extraordinary" remedy of a preliminary injunction. *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (quoting *Cobell*, 391 F.3d at 258).

---

declaration of a former Kansas League president recounts that registration numbers in Kansas fell by more than 85% in three counties, nearly 70% in another, and two other counties suspended all registration efforts."). The DNC offers no such comparable evidence here.

In sum, because the DNC has failed to demonstrate irreparable harm stemming from the December 2026 runoff elections in Louisiana and prospective elections in 2027 and 2028, the DNC is not entitled to a preliminary injunction or a stay at this time. *See id.*[12]

## V. CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that Plaintiff's Amended Complaint, ECF No. 29, is construed as a Supplemental Complaint, *nunc pro tunc*. It is further **ORDERED** that Plaintiff's Motion for Preliminary Injunction and Stay, ECF No. 31, is **DENIED**. And it is further **ORDERED** that the parties shall file a joint status report on or before December 9, 2026, proposing next steps in this case.



LOREN L. ALIKHAN
United States District Judge

Date: November 25, 2026

[12] The court reiterates the D.C. Circuit's recognition that "Damocles's sword does not have to actually fall . . . before the court will issue an injunction." *Newby*, 838 F.3d at 9. Accordingly, this case would be in a different posture if the DNC sought relief based on an ad that disparaged a specific candidate or otherwise presented evidence that the challenged ads were intended to put a thumb on the scale of a particular election. Furthermore, nothing in this opinion should be construed to cast doubt on the DNC's likelihood of success on the merits. As the court explained in its opinion granting a TRO, the APA claim against the OMB and DHS is likely to succeed. *See* ECF No. 26, at 16. As to the *ultra vires* claim against the White House Office, the court is doubtful of Defendants' assertion that the use of EOP staff time cannot violate the appropriations statutes. *See Neguse v. U.S. Immigr. & Customs Enf't*, 822 F. Supp. 3d 86, 104-05 (D.D.C. 2026), appeal docketed, No. 26-5072 (D.C. Cir.). But the court need not resolve such issues now when the DNC has failed to show irreparable harm. *See, e.g.*, *Sierra Club*, 793 F. Supp. 3d at 166; *Corp. for Pub. Broad.*, 792 F. Supp. 3d at 75.